14 CV 9367

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACKROCK BALANCED CAPITAL PORTFOLIO (FI); BLACKROCK CORE ACTIVE BOND FUND B; BLACKROCK CORE ACTIVE LIBOR FUND B; BLACKROCK CORE BOND PORTFOLIO; BLACKROCK COREALPHA BOND FUND E; BLACKROCK COREALPHA BOND MASTER PORTFOLIO; BLACKROCK DYNAMIC HIGH INCOME – STRUCTURED CREDIT PORTFOLIO; BLACKROCK ENHANCED GOVERNMENT FUND, INC.; BLACKROCK FIXED INCOME GLOBALALPHA MASTER FUND LTD.; BLACKROCK INCOME TRUST, INC.; BLACKROCK LOW DURATION BOND PORTFOLIO; BLACKROCK MANAGED VOLATILITY V.I. FUND (FI); BLACKROCK MASTER TOTAL RETURN PORTFOLIO OF MASTER BOND LLC; BLACKROCK MULTI-ASSET INCOME – NON-AGENCY MBS PORTFOLIO; BLACKROCK MULTI-MANAGER ALTERNATIVE STRATEGIES FUND – LIBREMAX; BLACKROCK MULTI-SECTOR INCOME TRUST; BLACKROCK STRATEGIC INCOME OPPORTUNITIES PORTFOLIO; BLACKROCK TOTAL RETURN PORTFOLIO (INS – SERIES); BLACKROCK TOTAL RETURN V.I. PORTFOLIO (INS – VAR SER); BLACKROCK US MORTGAGE; AST PIMCO TOTAL RETURN BOND PORTFOLIO; FIXED INCOME SHARES (SERIES R); FIXED INCOME SHARES: SERIES C; FIXED INCOME SHARES: SERIES LD; FIXED INCOME SHARES: SERIES M; LVS I LLC; LVS II LLC; PACIFIC BAY CDO, LTD.; PACIFIC SHORES CDO, LTD.; PCM FUND, INC.; PIMCO ABSOLUTE RETURN | Case No. **VERIFIED DERIVATIVE COMPLAINT AND ALTERNATIVE CLASS ACTION AGAINST DEUTSCHE BANK NATIONAL TRUST COMPANY AND DEUTSCHE BANK TRUST COMPANY AMERICAS FOR BREACH OF CONTRACT; VIOLATION OF THE TRUST INDENTURE ACT OF 1939; BREACH OF FIDUCIARY DUTY; BREACH OF DUTY OF INDEPENDENCE; AND NEGLIGENCE** **JURY DEMAND** |



RECEIVED
NOV 24 2014
U.S.D.C. S.D. N.Y.
CASHIERS

RECEIVED
2014 NOV 24 P 11: 04
US DISTRICT COURT SDNY

STRATEGY 3D OFFSHORE FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY II MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III OVERLAY MASTER FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY IV IDF LLC; PIMCO ABSOLUTE RETURN STRATEGY IV MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY V MASTER FUND LDC; PIMCO BERMUDA TRUST II: PIMCO BERMUDA INCOME FUND (M); PIMCO BERMUDA TRUST IV: PIMCO BERMUDA GLOBAL BOND EX-JAPAN FUND; PIMCO BERMUDA TRUST: PIMCO EMERGING MARKETS BOND FUND (M); PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN GLOBAL AGGREGATE BOND SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN COREPLUS SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN COREPLUS STRATEGY SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN LOW DURATION SEGREGATED PORTFOLIO; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN UNCONSTRAINED BOND SEGREGATED PORTFOLIO; PIMCO CAYMAN TRUST: PIMCO CAYMAN GLOBAL ADVANTAGE BOND FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN TOTAL RETURN STRATEGY FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN U.S. BOND FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN U.S. INVESTMENT GRADE CORPORATE BOND FUND; PIMCO COMBINED ALPHA STRATEGIES MASTER FUND LDC;

PIMCO CORPORATE & INCOME OPPORTUNITY FUND; PIMCO CORPORATE & INCOME STRATEGY FUND; PIMCO DISTRESSED SENIOR CREDIT OPPORTUNITIES FUND II, L.P.; PIMCO DYNAMIC CREDIT INCOME FUND; PIMCO DYNAMIC INCOME FUND; PIMCO EQUITY SERIES: PIMCO BALANCED INCOME FUND; PIMCO ETF TRUST: PIMCO DIVERSIFIED INCOME ACTIVE EXCHANGE-TRADED FUND; PIMCO ETF TRUST: PIMCO LOW DURATION ACTIVE EXCHANGE-TRADED FUND; PIMCO ETF TRUST: PIMCO TOTAL RETURN ACTIVE EXCHANGE-TRADED FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME DURATION HEDGED FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EM FUNDAMENTAL INDEX® STOCKSPLUS® FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EMERGING LOCAL BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EMERGING MARKETS BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EURO BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, EURO INCOME BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL ADVANTAGE REAL RETURN FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL FUNDAMENTAL INDEX® STOCKSPLUS® FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL INVESTMENT GRADE CREDIT FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC,

HIGH YIELD BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, PIMCO CREDIT ABSOLUTE RETURN FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, PIMCO DIVIDEND AND INCOME BUILDER FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, STOCKSPLUS™ FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, STRATEGIC INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, TOTAL RETURN BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, UK LOW DURATION REAL RETURN FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, UNCONSTRAINED BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, US SHORT-TERM FUND; PIMCO FUNDS: PIMCO COMMODITIESPLUS® STRATEGY FUND; PIMCO FUNDS: PIMCO COMMODITY REAL RETURN STRATEGY FUND®; PIMCO FUNDS: PIMCO CREDIT ABSOLUTE RETURN FUND; PIMCO FUNDS: PIMCO DIVERSIFIED INCOME FUND; PIMCO FUNDS: PIMCO EM FUNDAMENTAL INDEXPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO EMERGING LOCAL BOND FUND; PIMCO FUNDS: PIMCO EMERGING MARKETS BOND FUND; PIMCO FUNDS: PIMCO EMERGING MARKETS CURRENCY FUND; PIMCO FUNDS: PIMCO EMG INTL LOW VOLATILITY RAFI®-PLUS AR FUND; PIMCO FUNDS: PIMCO FLOATING INCOME FUND; PIMCO FUNDS: PIMCO FOREIGN BOND FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: PIMCO FOREIGN BOND FUND (UNHEDGED); PIMCO FUNDS: PIMCO FUNDAMENTAL ADVANTAGE

ABSOLUTE RETURN STRATEGY FUND; PIMCO FUNDS: PIMCO GLOBAL ADVANTAGE® STRATEGY BOND FUND; PIMCO FUNDS: PIMCO GLOBAL BOND FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: PIMCO GLOBAL BOND FUND (UNHEDGED); PIMCO FUNDS: PIMCO HIGH YIELD FUND; PIMCO FUNDS: PIMCO INCOME FUND; PIMCO FUNDS: PIMCO INFLATION RESPONSE MULTI-ASSET FUND; PIMCO FUNDS: PIMCO INTERNATIONAL FUNDAMENTAL INDEXPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO INTERNATIONAL STOCKSPLUS® AR STRATEGY FUND (U.S. DOLLAR-HEDGED); PIMCO FUNDS: PIMCO INTERNATIONAL STOCKSPLUS® AR STRATEGY FUND (UNHEDGED); PIMCO FUNDS: PIMCO INTL LOW VOLATILITY RAFI®-PLUS AR FUND; PIMCO FUNDS: PIMCO INVESTMENT GRADE CORPORATE BOND FUND; PIMCO FUNDS: PIMCO LONG DURATION TOTAL RETURN FUND; PIMCO FUNDS: PIMCO LONG-TERM CREDIT FUND; PIMCO FUNDS: PIMCO LONG-TERM U.S. GOVERNMENT FUND; PIMCO FUNDS: PIMCO LOW DURATION FUND; PIMCO FUNDS: PIMCO LOW DURATION FUND II; PIMCO FUNDS: PIMCO LOW DURATION FUND III; PIMCO FUNDS: PIMCO LOW VOLATILITY RAFI®-PLUS AR FUND; PIMCO FUNDS: PIMCO MODERATE DURATION FUND; PIMCO FUNDS: PIMCO MORTGAGE OPPORTUNITIES FUND; PIMCO FUNDS: PIMCO MORTGAGE-BACKED SECURITIES FUND; PIMCO FUNDS: PIMCO REAL ESTATE REAL RETURN STRATEGY FUND; PIMCO FUNDS: PIMCO REAL RETURN ASSET FUND; PIMCO FUNDS: PIMCO REAL RETURN FUND;

PIMCO FUNDS: PIMCO SHORT-TERM FUND; PIMCO FUNDS: PIMCO SMALL CAP STOCKSPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO SMALL COMPANY FUNDAMENTAL INDEXPLUS® AR STRATEGY FUND; PIMCO FUNDS: PIMCO STOCKSPLUS® ABSOLUTE RETURN FUND; PIMCO FUNDS: PIMCO STOCKSPLUS® AR SHORT STRATEGY FUND; PIMCO FUNDS: PIMCO STOCKSPLUS® LONG DURATION FUND; PIMCO FUNDS: PIMCO TOTAL RETURN FUND; PIMCO FUNDS: PIMCO TOTAL RETURN FUND II; PIMCO FUNDS: PIMCO TOTAL RETURN FUND III; PIMCO FUNDS: PIMCO TOTAL RETURN FUND IV; PIMCO FUNDS: PIMCO UNCONSTRAINED BOND FUND; PIMCO FUNDS: PIMCO UNCONSTRAINED TAX MANAGED BOND FUND; PIMCO FUNDS: PIMCO WORLDWIDE FUNDAMENTAL ADVANTAGE AR STRATEGY FUND; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES ASSET-BACKED SECURITIES PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES DEVELOPING LOCAL MARKETS PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES EMERGING MARKETS PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES HIGH YIELD PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES INTERNATIONAL PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES MORTGAGE PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES SHORT-TERM PORTFOLIO; PIMCO FUNDS: PRIVATE ACCOUNT PORTFOLIO SERIES U.S.

GOVERNMENT SECTOR PORTFOLIO; PIMCO GLOBAL CREDIT OPPORTUNITY MASTER FUND LDC; PIMCO GLOBAL INCOME OPPORTUNITIES FUND; PIMCO GLOBAL STOCKSPLUS & INCOME FUND; PIMCO HIGH INCOME FUND; PIMCO INCOME OPPORTUNITY FUND; PIMCO INCOME STRATEGY FUND; PIMCO INCOME STRATEGY FUND II; PIMCO MULTI-SECTOR STRATEGY FUND LTD.; PIMCO OFFSHORE FUNDS - PIMCO ABSOLUTE RETURN STRATEGY IV EFUND; PIMCO OFFSHORE FUNDS: PIMCO OFFSHORE FUNDS - PIMCO ABSOLUTE RETURN STRATEGY V ALPHA FUND; PIMCO STRATEGIC INCOME FUND, INC.; PIMCO TACTICAL OPPORTUNITIES MASTER FUND LTD.; PIMCO VARIABLE INSURANCE TRUST: PIMCO COMMODITY REAL RETURN STRATEGY PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO EMERGING MARKETS BOND PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO FOREIGN BOND PORTFOLIO (U.S. DOLLAR HEDGED); PIMCO VARIABLE INSURANCE TRUST: PIMCO FOREIGN BOND PORTFOLIO (UNHEDGED); PIMCO VARIABLE INSURANCE TRUST: PIMCO GLOBAL ADVANTAGE STRATEGY BOND PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO GLOBAL BOND PORTFOLIO (UNHEDGED); PIMCO VARIABLE INSURANCE TRUST: PIMCO GLOBAL MULTI-ASSET MANAGED ALLOCATION PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO HIGH YIELD PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO LONG TERM U.S.

GOVERNMENT PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO LOW DURATION PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO REAL RETURN PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO TOTAL RETURN PORTFOLIO; PIMCO VARIABLE INSURANCE TRUST: PIMCO UNCONSTRAINED BOND PORTFOLIO; PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY; PRUDENTIAL TRUST COMPANY; THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; THE PRUDENTIAL INVESTMENT PORTFOLIOS 2; THE PRUDENTIAL INVESTMENT PORTFOLIOS 9; THE PRUDENTIAL INVESTMENT PORTFOLIOS INC.; THE PRUDENTIAL INVESTMENT PORTFOLIOS, INC. 17; THE PRUDENTIAL SERIES FUND; BROOKFIELD MORTGAGE OPPORTUNITY INCOME FUND INC.; BROOKFIELD SECURITIZED CREDIT QIF FUND; BROOKFIELD TOTAL RETURN FUND INC.; CRYSTAL RIVER CAPITAL INC.; MILLERTON ABS CDO LTD.; LIICA HOLDINGS, LLC; LIICA RE I, INC.; LIICA RE II, INC.; STONEBRIDGE LIFE INSURANCE COMPANY; TRANSAMERICA LIFE INSURANCE COMPANY; TRANSAMERICA PREMIER LIFE INSURANCE COMPANY; KORE ADVISORS LP; CHARLES SCHWAB & CO. INC.; SEALINK FUNDING LIMITED; DZ BANK AG; NATIONWIDE DEFINED BENEFIT MASTER TRUST; NATIONWIDE FINANCIAL SERVICES, INC.; NATIONWIDE LIFE INSURANCE COMPANY; NATIONWIDE MUTUAL FIRE INSURANCE COMPANY; and NATIONWIDE MUTUAL INSURANCE COMPANY, derivatively, on behalf of the

Trusts Identified in Exhibit 1,

                    Plaintiffs,

        -against-

DEUTSCHE BANK NATIONAL TRUST
COMPANY; and DEUTSCHE BANK
TRUST COMPANY AMERICAS,

                    Defendants,

        -and-

The Trusts Identified in Exhibit 1,

                    Nominal Defendants.

# TABLE OF CONTENTS

Page

I.   NATURE AND SUMMARY OF THE ACTION ............................................. 1

II.  PARTIES ....................................................................................... 10

     A.   Plaintiffs ............................................................................. 10

          1.   AEGON ......................................................................... 10

          2.   BlackRock Funds ............................................................ 11

          3.   Brookfield .................................................................... 13

          4.   Charles Schwab ............................................................. 13

          5.   DZ Bank ...................................................................... 14

          6.   Kore ........................................................................... 14

          7.   Nationwide .................................................................. 14

          8.   PIMCO ........................................................................ 15

          9.   Prudential ................................................................... 27

          10.  Sealink ....................................................................... 30

     B.   Defendants ........................................................................ 30

          1.   Deutsche Bank .............................................................. 30

          2.   The Nominal Defendant Trusts ........................................ 32

III. OVERVIEW OF THE TRUSTS .......................................................... 32

IV.  JURISDICTION AND VENUE .......................................................... 33

V.   COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ............. 34

VI.  DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS ..................... 35

VII. BACKGROUND - THE TRUSTEE'S ROLE AS GATEKEEPER IN THE SECURITIZATION PROCESS .......................................................... 37

VIII. DEUTSCHE BANK'S CONTRACTUAL OBLIGATIONS ........................ 41

     A.   The Mortgage Loan Purchase And Sale Agreement ................... 41

     B.   The Pooling And Servicing Agreements ................................. 43

|  | 1. | Deutsche Bank's Duties And Obligations Under The PSAs | 43 |
|  |  | a) | Duty To Provide Notice Of Breaches And To Enforce Putback Rights | 45 |
|  |  | b) | Duties Regarding The Servicers | 45 |
|  |  | c) | Duties Upon Knowledge Of An Event Of Default | 46 |
|  | 2. | The Servicers' Duties And Obligations Under The PSAs | 47 |
|  |  | a) | Duty To Provide Notice Of Breaches And To Enforce Putback Rights | 47 |
|  |  | b) | Duty To Perform Prudent And Customary Servicing Practices | 48 |
|  |  | c) | Duty To Perform Prudent Foreclosure Practices | 49 |
|  |  | d) | Duty To Perform Prudent Servicing Advances | 50 |

C. The Indentures And Sale Servicing Agreements ........................ 51

IX. THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE ORIGINATORS ........................ 54

A. High Default Rates Of The Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches ........................ 54

B. The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period ........................ 56

C. There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts ........................ 58

    1. IndyMac Bank ........................ 59

    2. New Century ........................ 61

    3. Argent ........................ 63

    4. American Home ........................ 65

    5. Impac Funding ........................ 67

    6. Option One ........................ 68

    7. Fremont ........................ 71

| | | 8. | Wells Fargo | 74 |

| | D. | The Systemic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period | 76 |

| | E. | There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts | 77 |

| | | 1. | Morgan Stanley | 77 |
| | | 2. | RBS | 80 |
| | | 3. | First Franklin | 83 |
| | | 4. | Barclays | 85 |
| | | 5. | Goldman Sachs | 88 |

X. DEUTSCHE BANK KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS | 90

A. The Trusts' Poor Performance | 91

B. Credit Rating Downgrades Of The Certificates Further Supports The Sellers' Breaches | 94

C. Deutsche Bank's Affiliates Were Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines | 95

D. Deutsche Bank Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers | 97

E. Deutsche Bank And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Seller Breaches | 99

F. Deutsche Bank Initiated Putback Litigation Against Many Of The Sellers | 103

XI. THE TRUSTS SUFFERED FROM PERVASIVE SERVICER VIOLATIONS | 107

A. The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations | 107

B. The Servicers Have Violated Their Prudent Servicing Obligations | 111

C. The Servicers Have Violated Their Foreclosure Obligations | 115

D. The Servicers Have Violated Their Modification Obligations | 119

E. The Servicers Have Abused Their Servicing Advances Obligations | 120

XII.   DEUTSCHE BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS ........................................ 124

     A.   Deutsche Bank Knew Of Pervasive And Systemic Breaches Of Representations And Warranties In The Trust Collateral................... 124

     B.   Deutsche Bank And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Servicer Breaches....................................................................................... 126

     C.   Deutsche Bank Issued Notices And Memoranda Confirming Its Knowledge Of Pervasive And Systemic Servicer Breaches.............. 126

     D.   Deutsche Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports................. 128

XIII.  DEUTSCHE BANK HAS FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES.................................................. 128

     A.   Failure To Enforce The Trusts' Repurchase Rights .......................... 128

     B.   Failure To Provide Notice To The Servicers Of Events Of Default.................. 129

     C.   Failure To Act Prudently After The Uncured Events Of Default...................... 129

     D.   Failure To Enforce The Trusts' Repurchase Rights .......................... 130

XIV.  DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS................ 131

XV.   DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST....................................................... 133

     A.   Deutsche Bank Was Economically Beholden To The Mortgage Loan Sellers ...................................................................................... 133

     B.   Deutsche Bank Originated And Sponsored Defective Loans............ 134

     C.   Deutsche Bank Refused To Discharge Its Duties In Order To Preserve Profits .......................................................................... 136

XVI.  CAUSATION ........................................................................................ 138

XVII.  DAMAGES............................................................................................ 139

XVIII. CAUSES OF ACTION ....................................................................... 139

FIRST CAUSE OF ACTION  BREACH OF CONTRACT (In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)................... 139

SECOND CAUSE OF ACTION  VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171 (In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank) ........................................... 147

THIRD CAUSE OF ACTION  NEGLIGENCE - BREACH OF PRE-DEFAULT
    DUTY OF INDEPENDENCE (In The Right Of The Trustee And On
    Behalf Of The Trusts Against Deutsche Bank) ............................................................. 150

FOURTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – DUTY
    OF CARE (In The Right Of The Trustee And On Behalf Of The Trusts
    Against Deutsche Bank) ................................................................................................. 152

FIFTH CAUSE OF ACTION  NEGLIGENCE – DUTY OF CARE (In The Right
    Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank) ...................... 154

SIXTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – BREACH
    OF POST-DEFAULT DUTY OF INDEPENDENCE (In The Right Of
    The Trustee And On Behalf Of The Trusts Against Deutsche Bank) ........................... 157

XIX.    CLASS ACTION ALLEGATIONS .............................................................................. 159

XX.     RELIEF REQUESTED ................................................................................................. 160

XXI.    JURY DEMAND ......................................................................................................... 161

Plaintiffs AEGON (as defined herein); BlackRock Funds (as defined herein); Brookfield (as defined herein); Charles Schwab & Co., Inc. ("Schwab"); Deutsche Zentral-Genossenschaftsbank AG, New York Branch, d/b/a DZ Bank AG, New York Branch ("DZ Bank"); Kore Advisors, LP ("Kore"); Nationwide (as defined herein); PIMCO (as defined herein); Prudential (as defined herein); and Sealink Funding Limited ("Sealink"); (collectively, "Plaintiffs") by and through their undersigned attorneys, hereby bring this derivative complaint (the "Complaint") in the right of the trustee and on behalf of and for the benefit of the residential mortgage-backed securities ("RMBS") Trusts identified in Exhibit 1 ("Trusts"), against Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") (collectively, "Deutsche Bank" or the "Trustee"), the Trustee for the Trusts to recover losses sustained by the Trusts as a result of Deutsche Bank's wrongful conduct. Alternatively, Plaintiffs bring this action on their own behalf and on behalf of a class of all current owners of certificates in the Trusts (the "Class") to recover for the losses directly suffered by Plaintiffs and the Class as a result of Deutsche Bank's wrongful conduct.

## I.    NATURE AND SUMMARY OF THE ACTION

1.      Defendant Deutsche Bank is the Trustee for more than one thousand RMBS trusts originally securitized by almost $1 trillion of residential mortgage loans.  Among them are the Trusts at issue in this action: 564 private-label RMBS Trusts securitized between 2004 and 2008 collateralized with loans worth over $562.8 billion at the time of securitization.  Deutsche Bank, as Trustee, is the sole gatekeeper for the protection of the Trusts and their beneficial certificateholders (the "Certificateholders"), and must at all times act in the best interests of the Trusts.  As alleged herein, Deutsche Bank failed to discharge its duties and obligations to protect the Trusts.  Instead, to protect its own business interests, Deutsche Bank ignored pervasive and systemic deficiencies in the underlying loan pools and the servicing of those loans and

unreasonably refused to take any action.   This derivative action seeks to recover billions of dollars in damages to the Trusts caused by Deutsche Bank's abdication of responsibility.[1]

2.      RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  The trust's assets consist entirely of the underlying loans, and the principal and interest payments on the loans are "passed through" to the certificateholders. Between 2004 and 2008, a handful of large investment banks – including Deutsche Bank – dominated the RMBS market and controlled the process from beginning to end.  These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors or beholden to them through warehouse lending or other financial arrangements.   Once the loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the certificateholders.  The sponsor also hand-picks the servicer, often an affiliate of the sponsor or originator, to collect payments on the loans.  Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsor's deals.

3.      To ensure the quality of the RMBS and the underlying loans, the Trust documents generally include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage

---

[1] This Complaint does not allege in any way that the Trustees were or are burdened by conflicts in connection with their negotiation, evaluation, or acceptance of any RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

securitization industry have no "skin" in the game once the RMBS are sold to certificateholders. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans, how much they can sell them to investors once packaged as securities, as well as various servicing-related income. Accordingly, volume became the focus, and the quality of the loans was disregarded.

4.     The fundamental role of a trustee in an RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus. Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests. Deutsche Bank, as Trustee, was the sole contractual party in the securitization process intended to be independent of the investment banks that sponsored the Trusts' securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both. Certificateholders must rely on the Trustee to protect the rights and interests of the trusts.

5.     Deutsche Bank knew that the pools of loans backing the Trusts were filled with defective mortgage loans. The abysmal performance of the Trust collateral – including spiraling defaults, delinquencies and foreclosures – is outlined on monthly remittance reports that Deutsche Bank, as Trustee, publishes and publicly files with the government. The monthly remittance reports detail how, by January 1, 2009, the Trusts had suffered collateral losses of nearly $27.8 billion. On average, one in every three loans in the Trusts was delinquent. Moreover, 199 Trusts had delinquency rates exceeding 40%, and 103 Trusts had delinquency rates of over 50%. By January 2011, the Trusts' total losses had more than doubled

to $62.5 billion, meaning that over 11% of the Trusts' entire loan pool had been written off.   By the start of 2010, nearly all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

6.     A steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors.  Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.   Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios ("LTVs"), owner occupancy status, and borrower credit scores – as well as the completeness of the loan files themselves.

7.     Not surprisingly, in the select actions that Deutsche Bank brought to protect financial crisis-era RMBS trusts (not at issue in this litigation), Deutsche Bank itself identified systemic and pervasive breaches of representations and warranties ("R&W").   In particular, Deutsche Bank sued the same originators and sponsors in the Trusts at issue here, alleging systemic and pervasive R&W breaches.  In those actions, Deutsche Bank knew of extraordinarily high R&W breach rates in some instances *exceeding 64 percent* – and concluded that the defective loans were "representative of the entire Mortgage Loan pool held by the Trust." Deutsche Bank's own admissions state that "loans were *routinely originated in breach of relevant underwriting guidelines*, and in disregard of clear defects in the loan applications . . . [which] has materially and adversely affected the value of the related mortgage loan or the

interest of the investors therein." Deutsche Bank also alleged and admitted that early defaults were, in particular, "***strongly indicative of defects in the loan origination process***."

8.      In another lawsuit, Deutsche Bank alleged that the underlying loans were **"replete with material breaches of the representations and warranties concerning the quality of the Loans and the borrowers' creditworthiness**." According to Deutsche Bank, a "preliminary investigation" uncovered at least 1,620 defective loans (or nearly 40% of the mortgage loan pool), and a forensic review found that **"nearly 93%" "materially breach[ed]"** the seller's representations and warranties. Deutsche Bank admits this shows **"a wholesale abandonment of underwriting guidelines and prudent underwriting practices"** and is **"so flagrant, that [the sponsor] must have discovered them long ago."**

9.      In yet another action, Deutsche Bank asserted that "in each deal [the sponsor] told the Trustee that they had carefully diligenced [sic] the loans, that the borrowers could repay, and then they also promised to buy back the loans if there were any breaches in the representations and warranties about the quality of the loans. ***It turns out that what they sold us was garbage***."

10.     Likewise, Deutsche Bank knew that the IndyMac-sponsored Trusts at issue here were filled with a high percentage of loans that breached representations and warranties. While Deutsche Bank took the easy path and filed proofs of claim in the IndyMac receivership proceedings, it took **<u>no</u>** action against solvent responsible parties, including originators and servicers.

11.     Deutsche Bank also knew of pervasive R&W breaches in the Trusts through government investigations into the same originators, sponsors and servicers as in the Trusts, and even cited to the same in enforcing contractual rights on behalf of trusts other than the Trusts here. For example, in litigation against Washington Mutual ("WaMu"), Deutsche Bank as trustee

alleged, "[b]ased on the Senate Subcommittee's findings, as well as the reports of other governmental agencies, the Trustee has reason to believe that many of the mortgage loans in the Trusts do not comply with the Representations and Warranties . . . which breaches had a material and adverse effect on the value of the loans or the interests of the Trusts therein."  Citing the Senate Subcommittee's finding that Washington Mutual "lacked effective internal controls, used shoddy lending practices, performed inadequate underwriting, failed to follow procedures, and committed critical errors," Deutsche Bank asserted that: "***WaMu's shoddy lending practices and its securitization of loans that were likely to go delinquent greatly increased the risks associated with those loans***."  Nevertheless, Deutsche Bank ignored these facts and unreasonably refused to take any action with respect to the Trusts at issue here, which included billions of dollars in defective loans originated by WaMu and other originators Deutsche Bank identified as "garbage" factories.

12.    Deutsche Bank was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral through "putback" initiatives led by many of the world's largest institutional mortgage investors.  These large-scale initiatives – several of which have yielded ***multi-billion dollar settlements*** – have targeted six of the leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves.

13.    For example, in December 2011, a group of major institutional investors asked Deutsche Bank, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying hundreds of JPMorgan sponsored trusts and deficient servicing of those loans. Together with similar instructions provided to four other trustees of the JPMorgan-sponsored trusts, the initiative covered more than ***$95 billion*** of RMBS issued from 2005 to 2007.  Less than two years later, Deutsche Bank and the other trustees were presented with a comprehensive

$4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts. On August 1, 2014 and October 2, 2014, Deutsche Bank and the other trustees involved in the putback initiative *accepted* JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned for *court approval* of the settlement. In January 2012, Deutsche Bank received similar written instructions from a group of major institutional investors in dozens of Trusts sponsored by Morgan Stanley or its affiliates (collectively, "Morgan Stanley"). Together with instructions provided to two other trustees of the Morgan Stanley-sponsored Trusts, the initiative covered more than *$25 billion* of RMBS issued from 2005 to 2007, including sixty-six Trusts at issue in this action. And in yet another investor-led initiative, Deutsche Bank, as trustee, gave its *approval* to an $8.7 billion settlement covering 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") from 2004 to 2008 with an original face amount of more than *$320 billion*.[2]

14. These and other certificateholder-led initiatives sought to "putback" large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($65.5 billion of loans sold to the Trusts), and Citibank ($67.9 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($78.1 billion of sponsored Trusts). In addition, these initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (servicer to $157.1 billion of loans sold to the Trusts).

---

[2] In January 2014, after a nine-week trial, New York Supreme Court Justice Barbara Kapnick largely approved an $8.5 billion settlement resolving mortgage repurchase claims for 530 RMBS trusts issued by Countrywide Financial Corporation and its affiliates ("Countrywide"). That initiative began in October 2010 and covers more than *$424 billion* of RMBS issued from 2004 to 2008.

15.     Finally, as a major player in the RMBS securitization market, and through its involvement in the historic putback initiatives above, Deutsche Bank learned of rampant, industrywide servicer violations by the same servicers for the Trusts.  Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state attorneys general and some of the Trusts' servicers.  Notably, without receiving certificateholder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

16.     For example, in October 2010, Deutsche Bank issued a notice to all holders of RMBS for which it served as trustee stating it was "aware" of ongoing government investigations into documentation deficiencies in foreclosure proceedings initiated by RMBS servicers and had communicated with the servicers; however, Deutsche Bank "reminded" investors that despite its knowledge of extensive servicer misconduct materially impacting the Trusts, Deutsche Bank would not take any affirmative action to enforce the Trusts' rights unless so directed by holders of a certain percentage of securities.  Likewise, in February 2011, in a letter to the court in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities* (Sup. Ct. N.J.), Deutsche Bank acknowledged that it served as the "legal representative" for the RMBS trusts, but declined to respond to inquiries regarding alleged improper foreclosure practices and procedures.  Deutsche Bank stated, "the Trustees would not be in the best position to address further inquiries by the Court concerning any possible 'irregularity in the handling of foreclosure proceedings.'"  To the contrary, the trustee is in the best position, but Deutsche Bank chose to ignore its duties for its own benefit.

17.    Deutsche Bank cannot credibly claim that its inaction is excusable because it had no obligation to independently undertake any investigation or initiate litigation to protect the interests of the Trusts and Certificateholders.  Indeed, Deutsche Bank has asserted in court filings that "***trustees routinely bring suits against originators of mortgage-backed securities to protect trust assets***."  Deutsche Bank further admitted that, as trustee, it has a "plain contractual right to assert claims to protect the Trust" – a right that is within the trustee's "independent contractual powers."

18.    Under the governing Pooling and Servicing Agreements ("PSAs"), upon Deutsche Bank's knowledge of an Event of Default by a servicer, Deutsche Bank is obligated to provide written notice of the default to the servicer.  Deutsche Bank, systematically failed, however, to provide notice to the servicers of their defaults because Deutsche Bank did not want to jeopardize its close business relationship with the servicers.  Moreover, Deutsche Bank's affiliates originated billions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties.  Many of the same entities that act as servicers for the Trusts also service these defective loans originated by Deutsche Bank's affiliates.  Thus, Deutsche Bank, acting in its own self-interest, refused to provide notice to the servicers of their defaults to evade liability for its own defective loans.

19.    Further, under the PSAs, within sixty to ninety days after the occurrence of an Event of Default, Deutsche Bank is obligated to transmit by mail to all Certificateholders notice of each Event of Default known to Deutsche Bank, unless the Event of Default has been cured or waived.  Although Events of Default occurred and were not – and have not been – cured or waived, Deutsche Bank has similarly failed to provide written notice to the Certificateholders of the Events of Default.  Deutsche Bank has covered up the Events of Default for several self-

interested reasons.  Among other things, as noted above, providing notice of the servicers' default could jeopardize close business relationships among Deutsche Bank's affiliates and the servicers and lead to potential liability for Deutsche Bank's affiliates in their capacity as an originator and sponsor to other RMBS trusts.  Moreover, as discussed in greater detail below, had Deutsche Bank provided notice of an Event of Default, it would have greatly increased Deutsche Bank's liabilities and duties, but Deutsche Bank's compensation under the PSA would have remained the same.

20.     Finally, after the Events of Default, Deutsche Bank failed to exercise its rights under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of its own affairs.  Deutsche Bank did nothing to protect the Trusts and Certificateholders, choosing instead to deliberately ignore the egregious Events of Default for its own benefit and to the detriment of the Trusts.

II.     **PARTIES**

A.     **Plaintiffs**

21.     Each of the plaintiffs identified below (collectively, the "Plaintiffs") is a Certificateholder in the Trusts as identified in Exhibit 1 attached hereto.  Each of the Plaintiffs was a Certificateholder of the respective Trusts at the time of the transactions of which it complains, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

22.     The Plaintiffs hold the economic and beneficial interest in their Certificates and are the true parties in interest.  No other party has an economic or beneficial interest in the Plaintiffs' Certificates in this matter.

1.     **AEGON**

23.     The following plaintiffs are collectively referred to as "AEGON."

24.     Plaintiff LIICA Holdings, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

25.     Plaintiff LIICA Re I, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

26.     Plaintiff LIICA Re II, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

27.     Plaintiff Stonebridge Life Insurance Company is a corporation organized under the laws of the State of Vermont with its principal place of business in Rutland, Vermont.

28.     Plaintiff Transamerica Life Insurance Company is a corporation organized under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa.

29.     Plaintiff Transamerica Premier Life Insurance Company is a corporation organized under the laws of Iowa with its principal place of business at 4333 Edgewood Road NE, Cedar Rapids, Iowa.

## 2.     **BlackRock Funds**

30.     The following plaintiffs are collectively referred to as the "BlackRock Funds."

31.     Plaintiff BlackRock Balanced Capital Portfolio (FI) is a registered investment company with its principal place of business in Wilmington, Delaware.

32.     Plaintiff BlackRock Core Active Bond Fund B is a collective trust fund with its principal place of business in San Francisco, California.

33.     Plaintiff BlackRock Core Active LIBOR Fund B is a collective trust fund with its principal place of business in San Francisco, California.

34.     Plaintiff BlackRock Core Bond Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

35.     Plaintiff BlackRock CoreAlpha Bond Fund E is a collective trust fund with its principal place of business in San Francisco, California.

36.     Plaintiff BlackRock CoreAlpha Bond Master Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

37.     Plaintiff BlackRock Dynamic High Income – Structured Credit Portfolio is a Cayman Island Private Fund.

38.     Plaintiff BlackRock Enhanced Government Fund, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

39.     Plaintiff BlackRock Fixed Income GlobalAlpha Master Fund Ltd. is a Cayman LLC with its principal place of business in San Francisco, California.

40.     Plaintiff BlackRock Income Trust, Inc. is a registered investment company with its principal place of business in Wilmington, Delaware.

41.     Plaintiff BlackRock Low Duration Bond Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

42.     Plaintiff BlackRock Managed Volatility V.I. Fund (FI) is a registered investment company with its principal place of business in Wilmington, Delaware.

43.     Plaintiff BlackRock Master Total Return Portfolio of Master Bond LLC is a limited liability company.

44.     Plaintiff BlackRock Multi-Asset Income – Non-Agency MBS Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

45.     Plaintiff BlackRock Multi-Manager Alternative Strategies Fund – Libremax is a Cayman Island Private Fund.

46.     Plaintiff BlackRock Multi-Sector Income Trust is a registered investment company with its principal place of business in Wilmington, Delaware.

47.     Plaintiff BlackRock Strategic Income Opportunities Portfolio is a registered investment company with its principal place of business in Wilmington, Delaware.

48.     Plaintiff BlackRock Total Return Portfolio (Ins – Series) is a registered investment company with its principal place of business in Wilmington, Delaware.

49.     Plaintiff BlackRock Total Return V.I. Portfolio (Ins – Var Ser) is a Cayman Island Private Fund.

50.     Plaintiff BlackRock US Mortgage is a registered investment company with its principal place of business in Wilmington, Delaware.

### 3.      **Brookfield**

51.     The following plaintiffs are collectively referred to as "Brookfield."

52.     Plaintiff Brookfield Mortgage Opportunity Income Fund Inc. is a corporation organized under the laws of the State of Maryland.

53.     Plaintiff Brookfield Securitized Credit QIF Fund is an Irish qualifying investor fund (and a sub-fund of Brookfield Investment Funds (QIF) plc, an Irish public limited company).

54.     Plaintiff Brookfield Total Return Fund Inc. is a corporation organized under the laws of the State of Maryland.

55.     Plaintiff Crystal River Capital Inc. is a corporation organized under the laws of the State of Maryland.

56.     Plaintiff Millerton ABS CDO Ltd. is a Cayman exempted company with limited liability.

### 4.      **Charles Schwab**

57.     Plaintiff Schwab is a California corporation and a wholly owned subsidiary of The Charles Schwab Corporation.

### 5.     **DZ Bank**

58.     Plaintiff DZ Bank is a commercial bank incorporated in Germany.  DZ Bank maintains an office at 609 Fifth Avenue, New York, New York.

### 6.     **Kore**

59.     Plaintiff Kore is a Delaware Limited Partnership with its principal place of business located at 1501 Corporate Drive, Suite 230, Boynton Beach, Florida.  Kore is the investment manager to Kore Fixed Income Fund Ltd., a private fund formed under the laws of the Cayman Islands and Sunrise Partners Limited Partnership, a private fund formed under the laws of Delaware (collectively, the "Private Funds").  Kore, through the Private Funds, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  Kore, through the Private Funds, has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 7.     **Nationwide**

60.     The following plaintiffs are collectively referred to as "Nationwide."

61.     Plaintiff Nationwide Defined Benefit Master Trust is a corporation organized under the laws of Ohio with its principal place of business in Columbus, Ohio.

62.     Plaintiff Nationwide Financial Services, Inc. is a corporation organized under the laws of Ohio with its principal place of business in Columbus, Ohio.

63.     Plaintiff Nationwide Life Insurance Company is a corporation organized under the laws of Ohio with its principal place of business in Columbus, Ohio.

64.     Plaintiff Nationwide Mutual Fire Insurance Company is a corporation organized under the laws of Ohio with its principal place of business in Columbus, Ohio.

65.     Plaintiff Nationwide Mutual Insurance Company is a corporation organized under the laws of Ohio with its principal place of business in Columbus, Ohio.

### 8.     PIMCO

66.     The following plaintiffs are collectively referred to as "PIMCO."

67.     Plaintiff AST PIMCO Total Return Bond Portfolio is a Cayman Islands business trust.

68.     Plaintiff Fixed Income SHares (Series R) is a Massachusetts business trust.

69.     Plaintiff Fixed Income SHares: Series C is a Massachusetts business trust.

70.     Plaintiff Fixed Income SHares: Series LD is a Massachusetts business trust.

71.     Plaintiff Fixed Income SHares: Series M is a Massachusetts business trust.

72.     Plaintiff LVS I LLC is a Delaware limited liability company.

73.     Plaintiff LVS II LLC is a Delaware limited liability company.

74.     Plaintiff Pacific Bay CDO, Ltd. is a Cayman Islands exempted company.

75.     Plaintiff Pacific Shores CDO, Ltd. is a Cayman Islands exempted company.

76.     Plaintiff PCM Fund, Inc. is a corporation existing under the laws of Maryland, with its principal place of business located at 1345 Avenue of the Americas, New York, New York.

77.     Plaintiff PIMCO Absolute Return Strategy 3D Offshore Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

78.     Plaintiff PIMCO Absolute Return Strategy II Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

79.     Plaintiff PIMCO Absolute Return Strategy III Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

80.     Plaintiff PIMCO Absolute Return Strategy III Overlay Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

81.     Plaintiff PIMCO Absolute Return Strategy IV IDF LLC is a limited liability company existing under the laws of Delaware.

82.     Plaintiff PIMCO Absolute Return Strategy IV Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

83.     Plaintiff PIMCO Absolute Return Strategy V Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

84.     Plaintiff PIMCO Bermuda Trust II: PIMCO Bermuda Income Fund (M) is a Bermuda business trust.

85.     Plaintiff PIMCO Bermuda Trust IV: PIMCO Bermuda Global Bond Ex-Japan Fund is a Cayman Islands business trust.

86.     Plaintiff PIMCO Bermuda Trust: PIMCO Emerging Markets Bond Fund (M) is a business trust existing under the laws of the Cayman Islands.

87.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Global Aggregate Bond Segregated Portfolio is a Cayman Islands exempted company.

88.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Segregated Portfolio is a Cayman Islands business trust.

89.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Strategy Segregated Portfolio is a Cayman Islands business trust.

90.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan Low Duration Segregated Portfolio is a Cayman Islands business trust.

91.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Unconstrained Bond Segregated Portfolio is a Cayman Islands exempted company.

92.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Advantage Bond Fund is a business trust existing under the laws of the Cayman Islands.

93.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Total Return Strategy Fund is a business trust existing under the laws of the Cayman Islands.

94.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman U.S. Bond Fund is a business trust existing under the laws of Cayman Islands.

95.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman U.S. Investment Grade Corporate Bond Fund is a business trust existing under the laws of the Cayman Islands.

96.     Plaintiff PIMCO Combined Alpha Strategies Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

97.     Plaintiff PIMCO Corporate & Income Opportunity Fund is a business trust existing under the laws of Massachusetts.

98.     Plaintiff PIMCO Corporate & Income Strategy Fund is a business trust existing under the laws of Massachusetts.

99.     Plaintiff PIMCO Distressed Senior Credit Opportunities Fund II, L.P. is a limited partnership existing under the laws of Delaware.

100.    Plaintiff PIMCO Dynamic Credit Income Fund is a business trust existing under the laws of Massachusetts.

101.    Plaintiff PIMCO Dynamic Income Fund is a business trust existing under the laws of Massachusetts.

102.    Plaintiff PIMCO Equity Series: PIMCO Balanced Income Fund is a business trust existing under the laws of Massachusetts.

103.    Plaintiff PIMCO ETF Trust: PIMCO Diversified Income Active Exchange-Traded Fund is a Cayman Islands business trust.

104.    Plaintiff PIMCO ETF Trust: PIMCO Low Duration Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

105.    Plaintiff PIMCO ETF Trust: PIMCO Total Return Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

106.    Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Duration Hedged Fund is a business trust organized under the laws of Ireland.

107.    Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Fund is a Cayman Islands business trust.

108.    Plaintiff PIMCO Funds: Global Investors Series plc, EM Fundamental Index® StocksPLUS® Fund is a corporation existing under the laws of Ireland.

109.    Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Local Bond Fund is a corporation existing under the laws of Ireland.

110.    Plaintiff PIMCO Funds: Global Investors Series plc, Emerging Markets Bond Fund is a corporation existing under the laws of Ireland.

111.    Plaintiff PIMCO Funds: Global Investors Series plc, Euro Bond Fund is a Cayman Islands business trust.

112.     Plaintiff PIMCO Funds: Global Investors Series plc, Euro Income Bond Fund is a corporation organized under the laws of Ireland.

113.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Advantage Real Return Fund is a Cayman Islands business trust.

114.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Bond Fund is a Cayman Islands business trust.

115.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Fundamental Index® StocksPLUS® Fund is a corporation existing under the laws of Ireland.

116.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund is a Cayman Islands business trust.

117.     Plaintiff PIMCO Funds: Global Investors Series plc, High Yield Bond Fund is a corporation existing under the laws of Ireland.

118.     Plaintiff PIMCO Funds: Global Investors Series plc, Income Fund is a corporation organized under the laws of Ireland.

119.     Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Credit Absolute Return Fund is a Cayman Islands business trust.

120.     Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Dividend and Income Builder Fund is a corporation existing under the laws of Ireland.

121.     Plaintiff PIMCO Funds: Global Investors Series plc, StocksPLUS™ Fund is a Cayman Islands business trust.

122.     Plaintiff PIMCO Funds: Global Investors Series plc, Strategic Income Fund is a Cayman Islands business trust.

123.     Plaintiff PIMCO Funds: Global Investors Series plc, Total Return Bond Fund is a corporation organized under the laws of Ireland.

124.     Plaintiff PIMCO Funds: Global Investors Series plc, UK Low Duration Real Return Fund is a corporation existing under the laws of Ireland.

125.     Plaintiff PIMCO Funds: Global Investors Series plc, Unconstrained Bond Fund is a corporation organized under the laws of Ireland.

126.     Plaintiff PIMCO Funds: Global Investors Series plc, US Short-Term Fund is a corporation existing under the laws of Ireland.

127.     Plaintiff PIMCO Funds: PIMCO CommoditiesPLUS® Strategy Fund is a business trust existing under the laws of Massachusetts.

128.     Plaintiff PIMCO Funds: PIMCO Commodity Real Return Strategy Fund® is a Cayman Islands business trust.

129.     Plaintiff PIMCO Funds: PIMCO Credit Absolute Return Fund is a business trust existing under the laws of Massachusetts.

130.     Plaintiff PIMCO Funds: PIMCO Diversified Income Fund is a business trust existing under the laws of Massachusetts.

131.     Plaintiff PIMCO Funds: PIMCO EM Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

132.     Plaintiff PIMCO Funds: PIMCO Emerging Local Bond Fund is a business trust existing under the laws of Massachusetts.

133.     Plaintiff PIMCO Funds: PIMCO Emerging Markets Bond Fund is a business trust existing under the laws of Massachusetts.

134.    Plaintiff PIMCO Funds: PIMCO Emerging Markets Currency Fund is a business trust existing under the laws of Massachusetts.

135.    Plaintiff PIMCO Funds: PIMCO EMG Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

136.    Plaintiff PIMCO Funds: PIMCO Floating Income Fund is a business trust existing under the laws of Massachusetts.

137.    Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

138.    Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

139.    Plaintiff PIMCO Funds: PIMCO Fundamental Advantage Absolute Return Strategy Fund is a business trust existing under the laws of Massachusetts.

140.    Plaintiff PIMCO Funds: PIMCO Global Advantage® Strategy Bond Fund is a business trust existing under the laws of Massachusetts.

141.    Plaintiff PIMCO Funds: PIMCO Global Bond Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

142.    Plaintiff PIMCO Funds: PIMCO Global Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

143.    Plaintiff PIMCO Funds: PIMCO High Yield Fund is a business trust existing under the laws of Massachusetts.

144.    Plaintiff PIMCO Funds: PIMCO Income Fund is a business trust existing under the laws of Massachusetts.

145.    Plaintiff PIMCO Funds: PIMCO Inflation Response Multi-Asset Fund is a business trust existing under the laws of Massachusetts.

146.    Plaintiff PIMCO Funds: PIMCO International Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

147.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

148.    Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

149.    Plaintiff PIMCO Funds: PIMCO Intl Low Volatility RAFI®-PLUS AR Fund is a business trust existing under the laws of Massachusetts.

150.    Plaintiff PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund is a business trust existing under the laws of Massachusetts.

151.    Plaintiff PIMCO Funds: PIMCO Long Duration Total Return Fund is a Massachusetts business trust.

152.    Plaintiff PIMCO Funds: PIMCO Long-Term Credit Fund is a Massachusetts business trust.

153.    Plaintiff PIMCO Funds: PIMCO Long-Term U.S. Government Fund is a Massachusetts business trust.

154.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund is a Massachusetts business trust.

155.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund II is a Massachusetts business trust.

156.    Plaintiff PIMCO Funds: PIMCO Low Duration Fund III is a Massachusetts business trust.

157.    Plaintiff PIMCO Funds: PIMCO Low Volatility RAFI®-PLUS AR Fund is a Massachusetts business trust.

158.    Plaintiff PIMCO Funds: PIMCO Moderate Duration Fund is a Massachusetts business trust.

159.    Plaintiff PIMCO Funds: PIMCO Mortgage Opportunities Fund is a Massachusetts business trust.

160.    Plaintiff PIMCO Funds: PIMCO Mortgage-Backed Securities Fund is a Massachusetts business trust.

161.    Plaintiff PIMCO Funds: PIMCO Real Estate Real Return Strategy Fund is a Massachusetts business trust.

162.    Plaintiff PIMCO Funds: PIMCO Real Return Asset Fund is a Massachusetts business trust.

163.    Plaintiff PIMCO Funds: PIMCO Real Return Fund is a Massachusetts business trust.

164.    Plaintiff PIMCO Funds: PIMCO Short-Term Fund is a Massachusetts business trust.

165.    Plaintiff PIMCO Funds: PIMCO Small Cap StocksPLUS AR Strategy Fund is a Massachusetts business trust.

166.    Plaintiff PIMCO Funds: PIMCO Small Company Fundamental IndexPLUS® AR Strategy Fund is a business trust existing under the laws of Massachusetts.

167.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Absolute Return Fund is a Massachusetts business trust.

168.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® AR Short Strategy Fund is a Massachusetts business trust.

169.    Plaintiff PIMCO Funds: PIMCO StocksPLUS® Long Duration Fund is a Massachusetts business trust.

170.    Plaintiff PIMCO Funds: PIMCO Total Return Fund is a Massachusetts business trust.

171.    Plaintiff PIMCO Funds: PIMCO Total Return Fund II is a Massachusetts business trust.

172.    Plaintiff PIMCO Funds: PIMCO Total Return Fund III is a Massachusetts business trust.

173.    Plaintiff PIMCO Funds: PIMCO Total Return Fund IV is a Massachusetts business trust.

174.    Plaintiff PIMCO Funds: PIMCO Unconstrained Bond Fund is a Massachusetts business trust.

175.    Plaintiff PIMCO Funds: PIMCO Unconstrained Tax Managed Bond Fund is a Massachusetts business trust.

176.    Plaintiff PIMCO Funds: PIMCO Worldwide Fundamental Advantage AR Strategy Fund is a Massachusetts business trust.

177.    Plaintiff PIMCO Funds: Private Account Portfolio Series Asset-Backed Securities Portfolio is a Massachusetts business trust.

178.    Plaintiff PIMCO Funds: Private Account Portfolio Series Developing Local Markets Portfolio is a Massachusetts business trust.

179.    Plaintiff PIMCO Funds: Private Account Portfolio Series Emerging Markets Portfolio is a Massachusetts business trust.

180.    Plaintiff PIMCO Funds: Private Account Portfolio Series High Yield Portfolio is a Massachusetts business trust.

181.    Plaintiff PIMCO Funds: Private Account Portfolio Series International Portfolio is a Massachusetts business trust.

182.    Plaintiff PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio is a Massachusetts business trust.

183.    Plaintiff PIMCO Funds: Private Account Portfolio Series Short-Term Portfolio is a Massachusetts business trust.

184.    Plaintiff PIMCO Funds: Private Account Portfolio Series U.S. Government Sector Portfolio is a Massachusetts business trust.

185.    Plaintiff PIMCO Global Credit Opportunity Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

186.    Plaintiff PIMCO Global Income Opportunities Fund is a trust existing under the laws of Canada.

187.    Plaintiff PIMCO Global StocksPLUS & Income Fund is a Massachusetts business trust.

188.    Plaintiff PIMCO High Income Fund is a Massachusetts business trust.

189.    Plaintiff PIMCO Income Opportunity Fund is a Massachusetts business trust.

190.    Plaintiff PIMCO Income Strategy Fund is a Massachusetts business trust.

191.    Plaintiff PIMCO Income Strategy Fund II is a Massachusetts business trust.

192.    Plaintiff PIMCO Multi-Sector Strategy Fund Ltd. is a Cayman Islands Exempted Company.

193.    Plaintiff PIMCO Offshore Funds - PIMCO Absolute Return Strategy IV eFund is a Cayman Islands business trust.

194.    Plaintiff PIMCO Offshore Funds: PIMCO Offshore Funds - PIMCO Absolute Return Strategy V Alpha Fund is a Cayman Islands business trust.

195.    Plaintiff PIMCO Strategic Income Fund, Inc. is a corporation existing under the laws of Maryland.

196.    Plaintiff PIMCO Tactical Opportunities Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

197.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Commodity Real Return Strategy Portfolio is a Cayman Islands Exempted Company.

198.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Emerging Markets Bond Portfolio is a Delaware business trust.

199.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Foreign Bond Portfolio (U.S. Dollar Hedged) is a Delaware business trust.

200.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Foreign Bond Portfolio (Unhedged) is a Delaware business trust.

201.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Advantage Strategy Bond Portfolio is a Delaware business trust.

202.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Bond Portfolio (Unhedged) is a Delaware business trust.

203.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Multi-Asset Managed Allocation Portfolio is a Delaware business trust.

204.    Plaintiff PIMCO Variable Insurance Trust: PIMCO High Yield Portfolio is a Delaware business trust.

205.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Long Term U.S. Government Portfolio is a Delaware business trust.

206.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Low Duration Portfolio is a Delaware business trust.

207.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Real Return Portfolio is a Delaware business trust.

208.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Total Return Portfolio is a Delaware business trust.

209.    Plaintiff PIMCO Variable Insurance Trust: PIMCO Unconstrained Bond Portfolio is a Delaware business trust.

### 9.    Prudential

210.    The following plaintiffs are collectively referred to as "Prudential."

211.    Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.   PRIAC is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.   PRIAC established and maintains the following open-end, commingled, insurance company separate accounts: Western Asset: Enhanced Cash, Wellington: Investment Grade Fixed Income, the Core Plus Bond Fund / REAMS Fund, Core Plus Bond

Pimco Fund, High Grade Bond Fund / GSAM Fund, North Carolina Fixed Income Fund - JP Morgan Chase and Union Carbide I (collectively, the "Separate Accounts").

212.    Plaintiff Prudential Trust Company ("PTC") is a corporation formed under the laws of Pennsylvania, with its principal place of business in Scranton, Pennsylvania. PTC is a wholly owned subsidiary of Prudential Investment Management, and ultimately Prudential Financial, Inc. PTC serves as Trustee for the Institutional Core Plus Bond Fund of the Prudential Company Master Commingled Investment Fund for Tax Exempt Trusts, the Institutional Core Bond Fund of the Prudential Trust Company Master Commingled Investment Fund for Tax Exempt Trusts, and the Prudential Merged Retirement Plan.

213.    Plaintiff The Prudential Insurance Company of America ("Prudential Insurance") is an insurance company formed under the laws of, and domiciled in, the State of New Jersey, with its principal place of business at 751 Broad Street, Newark, New Jersey. Prudential insurance is a wholly owned subsidiary of Prudential Holdings, LLC, which is a Delaware limited liability company. Prudential Holdings, LLC is a wholly owned subsidiary of Prudential Financial, Inc.

214.    Plaintiff Prudential Investment Portfolios 2 ("PIP 2"), formerly known as the Dryden Investment Fund, is a Delaware statutory trust with a principal place of business in Newark, New Jersey. PIP2 is an open-ended management investment company registered with the Securities and Exchange Commission. PIP 2 is comprised of two series funds, including the Prudential Core Short-Term Bond Fund.

215.    Plaintiff Prudential Investment Portfolios 9 ("PIP 9"), formerly known as the Dryden Large-Cap Core Equity, is a Delaware statutory trust with a principal place of business in Newark, New Jersey. PIP 9 is an open-ended management investment company registered with

the Securities and Exchange Commission. PIP 9 is comprised of three series funds, including the Prudential Absolute Return Bond Fund.

216. Plaintiff The Prudential Investment Portfolios Inc. is a Maryland Corporation with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey 07102. It is an open-end management investment company registered with the Securities and Exchange Commission ("SEC"). It consists of six series, including the Prudential Asset Allocation Fund.

217. Plaintiff The Prudential Investment Portfolios, Inc. 17 ("PIP 17"), formerly known as Prudential Total Return Bond Fund, Inc., is a Maryland Corporation with a principal place of business in Newark, New Jersey. It is an open-ended management investment company registered with the Securities and Exchange Commission. PIP 17 consists of two series funds, including the Prudential Total Return Bond Fund. PIP 17, through the Prudential Total Return Bond Fund, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.

218. Plaintiff The Prudential Series Fund ("PSF"), formerly known as Prudential Series Fund, Inc., is an unincorporated Delaware statutory trust with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey. PSF is an open-end management investment company registered with the Securities and Exchange Commission. PSF consists of eighteen series funds, including The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio. PSF, through The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio.

10. **Sealink**

219.    Plaintiff Sealink is a company incorporated under the laws of Ireland with the registered address of Sealink Funding Limited, Fourth Floor, 3 George's Dock, IFSC, Dublin 1, Ireland.

B. **Defendants**

1. **Deutsche Bank**

220.    Defendant Deutsche Bank Trust Company of the Americas ("DBTCA") is a New York banking corporation organized under New York law, and a licensed New York State-chartered insured depository institution regulated by the New York Department of Financial Services ("NYSDFS").  DBTCA engages in various banking activities and offers a variety of financial products and services, including corporate trust services.  DBTCA's principal place of business and principal pace of trust administration is located in New York, New York.  As Trustee for the Trusts, DBTCA receives a fee for the services rendered to each Trust by its employees.  The fee is based upon a set percentage of the value of each Trust, and is distributed to DBTCA pursuant to a schedule set forth in the PSA for each Trust.

221.    Defendant Deutsche Bank National Trust Company ("DBNTC") is a national banking association organized under the laws of the United States of America, to carry out the business of a limited purpose trust company.  DBNTC's main office is located in Los Angeles, California, and its principal place of trust administration is located in Santa Ana, California.  DBNTC is a nondepository trust company regulated by the Office of the Comptroller of the Currency ("OCC").  As of December 31, 2013, DBNTC had assets valued at over $188 billion, making it the eighth largest nondepository trust company in the United States.  As a nondepository trust company, DBNTC operates for profit, accepting and executing trusts, including the Trusts at issue in this action.  As Trustee for the Trusts, DBNTC receives a fee for

the services rendered to each Trust by its employees. The fee is based upon a set percentage of the value of each Trust, and is distributed to DBNTC pursuant to a schedule set forth in the PSA for each Trust.

222. DBTCA and DBNTC are indirect wholly owned subsidiaries of Deutsche Bank AG ("DBAG"), which maintains its corporate headquarters in Frankfurt, Germany. DBTCA is a wholly owned subsidiary of Deutsche Bank Trust Corporation ("DBTC"), which is a wholly owned subsidiary of DBAG. DBNTC is a wholly owned subsidiary of Deutsche Bank Holdings, Inc. ("DBHI"), which is a wholly owned subsidiary of DBTC. DBTCA and DBNTC are interconnected in a number of other ways beyond the fact that both are direct or indirect wholly owned subsidiaries of the same parent company. For example, DBTCA and DBNTC are listed as sharing office space at 60 Wall Street, New York, New York, 10005, and are listed with the same contact phone number at that address. DBTCA and DBNTC also share overlapping officers and personnel, and executives of DBTCA frequently sign regulatory filings and agreements on the behalf of DBNTC, and vice-versa.

223. Deutsche Bank, together with its affiliates, is involved in many aspects of the private-label RMBS market. As of April 2014, Deutsche Bank administered as Trustee more than $898 billion in original face value of non-agency RMBS issued between 2004 and 2008 (i.e., private-label RMBS not guaranteed by an agency of the United States government), with a total current balance of $177.9 billion, representing nearly 22% of all non-agency RMBS during that period based on current balances.

224. Additionally, Deutsche Bank through its affiliates, MortgageIT, Inc., Chapel Funding LLC, and DB Products ("DB Products"), originated tens of billions of dollars in loans leading up to the financial crisis. From 2004 through 2008, MortgageIT, Inc., Chapel Funding

LLC, and DB Structured Products, Inc. originated over $20 billion in mortgage loans sold to RMBS trusts, as set forth in the table below:

| Originator | Amount Originated |
|---|---|
| Chapel Funding LLC | $977,416,324 |
| DB Products | $4,582,761,345 |
| MortgageIT, Inc. | $14,609,498,744 |
| **Grand Total** | **$20,169,676,413** |

225. Deutsche Bank's affiliate DB Products was one of the largest RMBS sponsors. From 2004 to 2008, DB Products sponsored 128 RMBS offerings under the ACE, DBALT and DMSI shelves, which securitized over $100 billion in mortgage loans.

## 2. The Nominal Defendant Trusts

226. Each Trust is named herein as a nominal defendant. Each of the Trusts is a New York common law trust established under its respective PSA, or a Delaware statutory trust established under its respective Indenture and Sale Servicing Agreement ("SSA"). All of the Trusts are governed by the substantive laws of the state of New York, and are subject to the Trust Indenture Act of 1939 ("TIA") (15 U.S.C. § 77aaa, *et seq.*).[3]

## III. OVERVIEW OF THE TRUSTS

227. The Trusts in this action, identified in the attached Exhibit 1, are 514 New York common law trusts and 50 Delaware statutory trusts, resulting from non-agency residential mortgage-backed securitizations issued between 2004 and 2008, inclusive. The Trusts have a

---

[3] The Trusts' Governing Agreements set forth Deutsche Bank's duties as trustee. Over 90% of the Trusts are governed by an agreement styled as a PSA and certain related agreements that the PSA references and incorporates. The remaining Trusts are governed by a document styled as an Indenture and certain related agreements that the Indenture references and incorporates, including the Sales and Servicing Agreement. All of the Governing Agreements are substantially similar, and impose the same duties on Deutsche Bank as Trustee to the Trusts and Certificateholders. Accordingly, this Second Amended Complaint primarily refers to the PSAs when discussing the Trustee's contractual obligations.

total original principal balance of over $562.8 billion, and a current principal balance of approximately $107.8 billion as of November 1, 2014. To date, the Trusts have suffered total realized collateral losses of $89.4 billion. Moreover, as a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will incur substantial losses.

228. The Trusts have a high concentration of loans originated by the following eight lenders: IndyMac Bank, FSB ("IndyMac"), New Century Financial Corporation ("New Century"), Argent, Option One Mortgage Corporation ("Option One"), American Home Mortgage Corp. ("American Home"), Impac Funding Corp. ("Impac"), Fremont Investment & Loan ("Fremont"), and Wells Fargo. These lenders collectively originated over $333.7 billion in loans, representing approximately 59% of the total original face value of the mortgage loans in the Trusts. Notably, over $6.2 billion in mortgage loans were originated by Deutsche Bank's affiliate MortgageIt, Inc.

229. A significant portion of the Trusts were sponsored by five entities. Specifically, over $184.4 billion in loans were sold to the Trusts by Morgan Stanley, RBS Greenwich, First Franklin, Barclays and Goldman Sachs, representing approximately 32% of the total original face value of the mortgage loans in the Trusts.

230. An overwhelming majority of the Trusts' loans are serviced by three entities. Specifically, $283.1 billion in loans are serviced by Wells Fargo , IndyMac and Countrywide (n/k/a Bank of America), representing approximately 35% of the total original face value of the mortgage loans in the Trusts.

## IV.    **JURISDICTION AND VENUE**

231. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(d).

232. Venue is proper in this District under 28 U.S.C. §1391(b).

## V. COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

233. Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused. For nearly all of the Trusts, the no action clause in the PSA identifies Deutsche Bank, as Trustee, as the sole notice party. If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that Deutsche Bank initiate proceedings against itself and to indemnify Deutsche Bank for its own liability to the Trusts, an "absurd" requirement that the parties did not intend. *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

234. For most of the remaining Trusts identifies Wells Fargo, in its capacity as Trust Administrator, Securities Administrator or Master Servicer, as a notice party. For these trusts, it would be similarly absurd for Plaintiffs to demand that Wells Fargo bring the instant suit against Deutsche Bank because Wells Fargo also suffers from disabling conflicts, and compliance with such a demand would require Wells Fargo to admit to its wrongdoing. In connection with these Trusts, Wells Fargo, in its capacity as Master Servicer or primary servicer, defaulted and continues to default on its obligations to the Trusts and has harmed trust beneficiaries by failing to observe and perform covenants and agreements set forth in the PSAs, including by unreasonably refusing to provide notice of seller breaches of representations and warranties, requiring the sellers to perform their repurchase obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Consequently, it would be absurd to demand that Wells Fargo bring claims against Deutsche Bank in connection with these Trusts because doing so would require Wells Fargo to allege and prove its own misconduct and liability to the Trusts and may invoke Wells Fargo's indemnity obligations to the Trustee. Likewise, it would be absurd

and contravene the parties' intentions to require Plaintiffs to indemnify Wells Fargo against the costs, expenses, and liabilities incurred in a suit against Deutsche Bank. Moreover, Wells Fargo receives a direct financial benefit from not suing Deutsche Bank, because any suit by Wells Fargo against Deutsche Bank would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees. The suit would also interfere with Wells Fargo's business relationships with Deutsche Bank, including billions of dollars in servicing fees annually from Deutsche Bank. For example, Wells Fargo serves as Master Servicer to over seven RMBS trusts issued between 2004 and 2008 with an original face value of over $30.4 billion for which Deutsche Bank serves as trustee.

## VI.     DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

235.     Plaintiffs bring the claims set forth below derivatively in the right of the Trustee and on behalf of the Trusts. Plaintiffs have the right to bring this suit derivatively under New York law. All of Plaintiffs' claims relate to Deutsche Bank's breach of common duties owed to the Trusts and Certificateholders through its mismanagement of the Trusts and its failure and unreasonable refusal to act in the best interests of the Trusts, including enforcing the Trusts' rights against those who have harmed the Trusts. This is common to all holders of interests in the Trusts, not just Plaintiffs, because all Certificateholders are paid from the cash flows generated by the same pool or pools of mortgages in the Trusts. Accordingly, Plaintiffs' claims concern a purported injury to the Trusts as a whole. *See Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95 Civ. 9426, 1996 WL 601705, at *2-4 (S.D.N.Y. Oct. 18, 1996).

236.     The terms of the PSAs are consistent with asserting the claims derivatively, as they specifically provide as follows:

no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided *and for the common benefit of all Certificateholders*.

PSA § 12.07 (emphasis added).

237.     This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

238.     Plaintiffs are Certificateholders and have been beneficial owners of RMBS in each of the Trusts during all or a large portion of Deutsche Bank's wrongful course of conduct alleged herein.  Moreover, under New York General Obligations Law §13-107, the transfer of ownership in the certificates vested in the Plaintiffs the claims or demands alleged herein.

239.     Plaintiffs will adequately and fairly represent the interests of the Trusts and their investors in enforcing and prosecuting the rights that form the subject matter of this action.  At all relevant times, Plaintiffs have acted equitably and in good faith, without any ulterior motive, and in the belief that the Trusts and Certificateholders are entitled to the relief sought on their behalf.

240.     As set forth below, Plaintiffs have not made a demand on Deutsche Bank or Wells Fargo to institute this action because such demand would be futile.

241.     Any demand on Deutsche Bank to institute this action would be futile because the wrongful acts alleged herein were committed by Deutsche Bank and Deutsche Bank would not agree to sue itself, particularly since it faces claims for losses by the Trusts in excess of $27 billion.  In addition, since Deutsche Bank itself committed the wrongdoing complained of herein, and is accused of negligent and misconduct, it therefore is not disinterested and lacks independence to exercise business judgment.  Moreover, Deutsche Bank has benefitted from, and

continues to benefit from, its wrongdoing as alleged herein, (i.e., its failure to act in the best interest of the Trusts and Certificateholders), as Deutsche Bank has maintained and preserved its business relationships with the Sellers and Servicers and thereby continues to derive financial benefits from serving as Trustee to Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

242.     Any demand on Wells Fargo to institute this action on behalf of the remaining Trusts in which it is identified as a notice party under the PSAs' no action clause also would be futile because, as alleged above, Wells Fargo committed wrongdoing in its capacity as Master Servicer or servicer, and any suit brought by Wells Fargo on behalf of the Trusts would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees and could implicate certain indemnity obligations owed to Deutsche Bank.  Wells Fargo also has benefitted from, and continues to benefit from, its wrongdoing as alleged herein as it continues to derive financial benefits from serving as Master Servicer or servicer to the Trusts and many other RMBS trusts for which Deutsche Bank acts as Trustee.  Accordingly, Wells Fargo is not disinterested and lacks independence to exercise business judgment.

## VII.     BACKGROUND - THE TRUSTEE'S ROLE
### AS GATEKEEPER IN THE SECURITIZATION PROCESS

243.     RMBS provide investors with an interest in the income generated by one or more designated pools of residential mortgages.  The securities themselves represent an interest in an issuing trust that holds the designated mortgage pools.  The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

244.     The Trust Indenture Act of 1939 requires that a trustee be appointed for all bond issues over $10 million so that the rights of investors are not compromised.  In an RMBS

transaction, the "issuer" appoints the trustee, which is the only independent party to the PSAs. Accordingly, the trustee serves the critical role of an independent party with access to all relevant information, including the mortgage loan files. Investors reasonably understand that the trustee is under an affirmative duty to take action to protect the interests of the trusts and their beneficiaries, the certificateholders. As part of the RMBS transaction, the trustee is assigned "all right, title and interest" in the underlying mortgage loans. The PSAs require the trustee, or its agent, to take physical possession of the mortgage loans, ensure that each mortgage loan was properly conveyed and certify that the documentation for each loan was accurate and complete.

245. The trustee is contractually responsible for the transactions of the issuing trust. The trustee is responsible for administering the trust for the benefit of investors, including guaranteeing that the transactions are administered in accordance with the related documentation, following compliance and performance-related matters and handling cash and information processing for the investors. The trustee must work closely with the issuer and servicer to protect the welfare of the trust. In contrast to the roles of issuer or servicer, which can be combined, the trustee's sole purpose is to represent the investor and, therefore, the trustee must be an independent entity without any conflicts of interest. The PSAs contractually obligate the trustee to oversee and manage the servicer, including granting the trustee the power to replace the servicer for its failure to act in accordance with the servicer's contractual obligations.

246. Although the structure and underlying collateral of the mortgages may vary from trust to trust, RMBS trusts all function similarly: the cash flow from interest and principal payments on the underlying loan is passed through to the trust and distributed to certificateholders in the order laid out in the securitization agreements, commonly referred to as the "cashflow waterfall." The duties and responsibilities of the trustee are identical in all RMBS

transactions – namely to represent the trusts and their investors as an independent third party. Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion. Yet, only a handful of major financial institutions served as trustees and contractually agreed to perform the vitally important gatekeeping functions to protect certificateholders. Among this handful of major RMBS trustees, Deutsche Bank held the largest market share during this period.



Source: *Bloomberg*

247. The process of securitizing mortgages into RMBS involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors. First, a sponsor creates a loan pool from mortgages it originated or purchased from other financial institutions. The sponsor has the right to require the seller to repurchase or replace loans that do not meet represented quality standards after purchasing a mortgage pool.

248.     Second, the sponsor transfers the loans to a "depositor," which segments the cash flows and risks in the loan pool among different levels of investment or "tranches."  Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches.  In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

249.     Third, the depositor transfers the mortgage pool to the issuing trust so that it can be used as collateral for RMBS that will be issued and sold to investors.  The depositor then passes the RMBS to the underwriters for sale to investors in exchange for payment.

250.     The servicer is appointed by the sponsor and is a party to the PSAs.  The servicer, often an affiliate of the sponsor or of an originator of a substantial portion of the loans in the trust, collects payments from the underlying borrowers.  After collection, the servicer sends the funds to the trustee, which then makes payments to the certificateholders.  Mortgage defaults reduce the available principal and interest payments to be paid to the trust and passed through to investors.  Mortgage delinquencies similarly reduce the available principal and interest to be paid to the trust and distributed to investors.

251.     Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer may have to take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the trust and its beneficial owners – the certificateholders.  Foreclosures result in higher losses to the trust (and therefore to the RMBS investors) if the value of the collateral is lower than anticipated.  For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan

servicing and oversight, are essential to the quality of the RMBS and the timely receipt of principal and interest payments to the trust for distribution to the certificateholders.

## VIII. DEUTSCHE BANK'S CONTRACTUAL OBLIGATIONS

252.     The Trusts and Certificateholders' rights and Deutsche Bank's contractual duties, as Trustee for the Trusts at issue in this action are set forth in the relevant securitization agreements, including the Mortgage Loan Purchase and Sale Agreements ("MLPAs") (or similar documents) and the Governing Agreements.

253.     Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and display degrees of variation, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements

### A.     The Mortgage Loan Purchase And Sale Agreement

254.     The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor.  The MLPA governs the terms of the sale of the mortgage loans acquired for securitization.  In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

255.     The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has

a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

256. Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders therein, the seller is obligated to cure the breach in all material respects. The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

257. If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust. For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

258. The repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

259. Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders in the loans. The seller's cure, substitute and repurchase obligations do not require any showing that the seller's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party prove reliance on servicing and origination documents.

260. Upon the sale of the mortgage loans to the Trust, the rights under MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were assigned to Deutsche Bank, as Trustee for the benefit of the Trust and all the Certificateholders, in accordance with the PSAs.

**B.**     **The Pooling And Servicing Agreements**

261. The PSAs are contracts between, among others, the depositor, the servicer, and Deutsche Bank, as Trustee, which govern the Trusts that issued certificates. Plaintiffs, as investors in the Trusts, are third party beneficiaries of the PSAs.

262. The PSAs for each of the Trusts are substantially similar and memorialize (i) the transfer and conveyance of the mortgage loans from the depositor to the Trust; (ii) the Trusts' issuance of beneficial certificates of interests in the Trusts to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates.

**1.**     **Deutsche Bank's Duties And Obligations Under The PSAs**

263. The PSAs set forth Deutsche Bank's contractual duties and obligations, which are substantially similar for each Trust governed by a PSA. Further, upon information and belief, Deutsche Bank employed the same general set of policies and procedures to oversee and manage the Trusts regardless of the individual variations contained within the PSAs.

264. Most importantly, each of the PSAs requires that Deutsche Bank acquire and protect the trust corpus for the benefit of Certificateholders.[4]

265. The PSAs also require Deutsche Bank to oversee and enforce the sellers' and the servicers' obligations. In performing these contractual obligations, Deutsche Bank is required to act in the best interests of and for the protection of the Trusts and their Certificateholders. Certificateholders, unlike the trustee, have no direct contact with the sellers and servicers and have no ability to influence or examine the servicers' decisions. Moreover, under the PSAs, Certificateholders do not have the right to directly enforce the responsible party's representations and warranties or the servicers' duties, absent satisfaction of the collective action provisions. Thus, Certificateholders must rely on Deutsche Bank to protect their interests.

266. The PSAs require the depositor to deliver to and deposit with, or cause to be delivered to and deposited with, Deutsche Bank, the mortgage files, which must at all times be identified in the records of Deutsche Bank as being held by or on behalf of the Trust. Furthermore, the PSAs require Deutsche Bank to acknowledge receipt of the mortgage files on behalf of the Trust and to acknowledge that all mortgage pool assets, mortgage files and related documents and property held by it at any time are held by it as trustee of the Trust.

267. Once the mortgage files are in Deutsche Bank's possession, the PSAs require Deutsche Bank to ensure that the underlying mortgage loans were properly conveyed to the Trusts, and that the Trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each of the mortgage loans. Deutsche Bank is required to review each mortgage file within a certain time period after the "Closing Date" and deliver to the depositor a certification that all documents required have been executed and received.

---

[4] This duty typically is expressed in Section 2.2 of the PSAs.

268.     If Deutsche Bank identifies any defect in a mortgage loan file for an underlying mortgage loan contained in a Trust, Deutsche Bank must promptly notify either the servicer or depositor, and that party shall promptly notify the applicable seller of the defect and take appropriate steps on behalf of the Trust to enforce such seller's obligation to correct or cure the defect or repurchase or substitute such mortgage loan.

### a)     Duty To Provide Notice Of Breaches And To Enforce Putback Rights

269.     Under the PSAs, Deutsche Bank is entrusted to ensure that mortgage loans in the Trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain quality as represented by the sellers in the MLPAs.  The Trusts were assigned all of the rights under the MLPAs pertaining to the mortgage loans, including the right to put back loans that breached the sellers' representations and warranties.

270.     To protect the Trusts and all Certificateholders, the PSAs require Deutsche Bank to give prompt written notice to all parties to the PSA upon its discovery of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[5]

### b)     Duties Regarding The Servicers

271.     Under the PSAs, Deutsche Bank, as Trustee, has certain duties with respect to enforcing the obligations of the servicers, whose authority and responsibilities are delegated by Deutsche Bank.  In particular, the PSAs set forth Deutsche Bank's obligations upon occurrence

---

[5] With modest variation among the PSAs, this duty typically is expressed in Sections 2.3 and 2.8 of the PSAs.

of an "Event of Default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time period. The PSAs identify several types of failures by the servicer that may give rise to an Event of Default. Such failures include, breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for no more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee requiring the same to be remedied, or knowledge of such failure by a "Servicing Officer" of the servicer, whichever is earlier.[6]

272.     The remedies for uncured servicer Events of Default include termination of the servicer and reimbursement for trust assets lost as a result of the servicers' violations. As detailed herein, Deutsche Bank did not perform its duties to monitor the servicers and did not initiate any action against the servicers for the benefit of the Trusts and Certificateholders.

### c)     Duties Upon Knowledge Of An Event Of Default

273.     The PSAs impose additional obligations upon Deutsche Bank once a responsible officer of Deutsche Bank has knowledge of the occurrence of an Event of Default. *First*, Deutsche Bank must give written notice to the relevant servicer of the occurrence of such an event within the specified time period after Deutsche Bank obtains knowledge of the occurrence. *Second*, within sixty to ninety days after the occurrence of any Event of Default, Deutsche Bank is required to provide written notice to all Certificateholders of the Event of Default, unless the Event of Default has been cured or waived. *Third*, and most importantly, the PSAs require Deutsche Bank to exercise the rights and powers vested in it by the PSA using the same degree

---

[6] These duties are typically expressed in Section 7 of the PSAs.

of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.[7]

274.    Deutsche Bank's failure to give notice to the servicers of an Event of Default does not prevent the triggering of an Event of Default should Deutsche Bank's failure result from its own negligence or willful misconduct.

### 2.    The Servicers' Duties And Obligations Under The PSAs

275.    The PSAs also establish the servicers' duties and obligations to the Trusts and all Certificateholders.  In essence, the servicers' contractual role is to manage the mortgage loans for the benefit of the Trust and its Certificateholders.[8]

#### a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights

276.    The PSAs require the servicers to notify all parties to the PSAs if the servicers discover a breach of any of the seller's representations and warranties that adversely and materially affects the value of the mortgage loan or the interests of the Trusts.  The PSAs generally require the servicers, on behalf of the Trusts, to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans or mortgage loan files.

277.    The servicers are greatly disincentivized to enforce these contractual duties related to the sellers' repurchase obligations.  The servicer is selected by the sponsor, and therefore risks losing future business and becoming adverse to the seller if it vigilantly enforces the seller's repurchase obligations.  Additionally, the servicers often are affiliates of the sellers

---

[7] This duty is typically expressed in Section 8.1 of the PSAs.

[8] The servicer duties described below are generally found in Section 3 of the PSAs.

because in connection with the sale of a loan pool, the seller typically retains the loan servicing rights for its own servicing division. In addition, due to the fact that the servicers' affiliates, in their capacity as sellers, likewise sold loans in breach of specific representations and warranties to other RMBS Trusts and face similar repurchase liability, the servicers were disincentivized from enforcing these contractual duties.

278.     Consequently, it is crucial that the trustee monitor the servicer to ensure that the servicer is enforcing the Trusts' repurchase rights against the sellers so that the Trusts hold mortgage loans of the same credit quality and characteristics as bargained for. Moreover, where the servicers fail to enforce the Trusts' repurchase rights, the trustee must step in and exercise the Trusts' rights.

<b>b)     Duty To Perform Prudent And<br>Customary Servicing Practices</b>

279.     The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Trusts and the Certificateholders (i) in the same manner in which they service and administer similar mortgage loans for their own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicers to receive compensation or other fees for its services under the PSA, the obligation of the servicers to make servicing advances under the PSA, and the servicers' ownership, servicing or management for others of any other mortgage loans.

280.     In truth, the servicers' financial interests in managing the Trusts' loans often diverge from those of the Trusts. Servicers typically pay upfront for mortgage servicing rights. To make a profit, servicers must recoup their outlay based on their net servicing income (i.e.,

gross servicing income minus servicing costs). The amount of servicers' compensation in the form of servicing fees, float, and retained interests varies based on factors beyond the servicers' control, particularly mortgage prepayment speeds, which are largely a function of interest rates. Accordingly, a servicer's ability to maximize its net servicing income depends in large part on its ability to levy ancillary fees and to control servicing costs. For this reason, servicers are incentivized to aggressively pursue ancillary fees and to pursue loss mitigation strategies that minimize costs, even if they are inconsistent with – or contrary to – the interests of the Trusts and the Certificateholders.

281. Accordingly, it is essential that the Trustee takes action where it learns of imprudent servicing activities to ensure that servicers: (i) maintain accurate and adequate loan and collateral files so as not to prejudice the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral; and (ii) avoid incur unnecessary servicing fees to maintain mortgaged property.

### c) Duty To Perform Prudent Foreclosure Practices

282. The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

283. In truth, the servicers' financial interests in managing loans often diverge from those of the Trusts. For example, to minimize the costs of foreclosures, servicers from 2007

through 2010 pervasively cut corners in the discharge of their servicing duties at the expense of the accuracy, reliability and currency of loan documents and information.

284.     Thus, it is essential that Trustee takes action where it learns of imprudent foreclosure practices subsequent to borrower defaults to ensure the servicers function in a way that maximizes value for the Trusts and the Certificateholders.

### d)     Duty To Perform Prudent Servicing Advances

285.     The PSAs provide that the servicers may recover servicing advances.  Servicers are required to advance monthly principal and interest ("P&I") and taxes and insurance payments on delinquent loans.  Servicers also advance legal fees, maintenance, and preservation costs on properties that have already been foreclosed and become wholly owned by the Trust (or "REO"), rather than sold to a third party.  Servicers are able to recover these advances from the net proceeds of the property when sold.

286.     Under the PSAs, the servicer's advancing obligations are subject to a deemed non-recoverability standard where the servicer has the right to curtail additional advances based on a reasonable analysis that the servicer could not otherwise recover its advances based on projected, probable net liquidation proceeds.  Thus, if a servicer believes that the P&I advances will exceed the net proceeds of a foreclosure on the mortgaged property, the servicer generally has the right to cease making the P&I advances and to look to the rest of the Trust's loan pool for recovery of any excess paid.  This means that servicers' P&I advances are functionally the most senior claim on the Trusts and the servicers get paid **first** before any certificateholder.  As explained by Ocwen Financial Corporation ("Ocwen"), a major subprime servicer: "Most of our advances have the highest reimbursement priority (i.e., they are on 'top of the waterfall') so that we are entitled to repayment [from loan proceeds] before any interest or principal is paid on the

bonds."[9]  In the majority of cases, the servicer may recover advances in excess of loan proceeds from pool-level proceeds.  Additionally, under the PSAs, the servicers are only entitled to recoup customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations.

287.    In practice, servicers are incentivized to abuse their advancing obligations by incurring unnecessary or inflated expenses related to delinquent loans because those advances are the senior-most claims on the Trusts and will almost always be recoverable.

288.    Thus, it is critical that trustees monitor the servicers and, in particular, servicing advances to ensure servicers do not manipulate the recoverable and "reasonable and necessary" designations to their own advantage and to the Trusts' detriment.

### C.    The Indentures And Sale Servicing Agreements

289.    The minority of the trusts have a different structure—they issued notes pursuant to an indenture (collectively, the "Indentures") on which Deutsche Bank serves as indenture trustee. A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these transactions. As evinced below, although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and Deutsche Bank's duties and obligations are similar under the two structures.

290.    The Indentures are contracts between, among others, the Trust, as issuer, and Deutsche Bank, as Trustee.  In this agreement, the issuer (i.e., the Trust) pledges the mortgage loan assets of the Trust to Deutsche Bank, the Indenture Trustee.  Deutsche Bank accepts the

---

[9]  Ocwen, Annual Report (Form 10-K) at 40 (Mar. 13, 2008), *available at* http://www.sec.gov/Archives/edgar/data/873860/000101905608000419/ocn_10k07.htm.

pledge of the mortgage loans and holds the assets of the Trust in trust for the Noteholders. The Trust, in turn, issues the notes to investors.

291. The Indentures set forth duties on the part of the Trust as issuer. Such duties, which must be punctually performed and observed, include taking all action necessary or advisable to cause the Trust or the Indenture Trustee to: (i) enforce any of the rights to the mortgage loans; and (ii) preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders/Certificateholders in such Trust Estate against the claims of all persons and parties.

292. The Indentures set forth Deutsche Bank's contractual duties and obligations, which are substantially similar if not identical to Deutsche Bank's contractual duties and obligations in the PSAs. For example, as pledgee of the mortgage loans, Deutsche Bank, as Indenture Trustee, has the benefit of the representations and warranties made by the sellers in the MLPAs. If a responsible officer of Deutsche Bank has actual knowledge of any breach of representation or warranty made by the Seller in the MLPA, Deutsche Bank shall promptly notify the Seller of the breach and the Sellers' obligation to cure such defect or repurchase or substitute for the related mortgage loan.

293. Like the PSAs, the Indentures impose similar obligations on the trustee following an "Event of Default." However, pursuant to the Indenture, only the conduct of the issuer, the Trust, can constitute an Event of Default. An Event of Default occurs under the Indenture, when, among other things, a default occurs in the observance or performance of any covenant or agreement of the Trust made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by Deutsche Bank or to the Trust and Deutsche Bank by a requisite number of Noteholders. The Indentures define a "default" as "[a]ny

occurrence which is or with notice or the lapse of time or both would become an Event of Default."

294.    Once Deutsche Bank has actual knowledge of an Event of Default, Deutsche Bank must enforce the rights of the Noteholders, whether for the specific performance of any covenant, agreement or right under the Indenture, or to enforce any other proper remedy or legal or equitable right vested by law.  In carrying out these post-Event of Default duties, Deutsche Bank must exercise its rights and obligations under the Indenture using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs.

295.    The SSAs are contracts between, among others, the depositor, the trust (typically a Delaware statutory trust), as issuer, Deutsche Bank, as Indenture Trustee, and the master servicer.  The SSAs contain substantially similar if not identical provisions to the PSAs.  Like the PSAs, the SSAs call for the depositor's conveyance of mortgage loans to the Trust in which the notes participate and establish the rights and obligations of the master servicer for the notes.

296.    Like the PSAs, the SSAs for each of the Trusts are substantially similar and provide for nearly identical obligations on the part of master servicers with respect to servicing the mortgage loans, including covenants (i) to provide notice of seller breaches; (ii) to administer the mortgage loans consistently with industry practice; (iii) to use reasonable efforts to collect all payments owed on the mortgage loans, including with respect to foreclosure, and to follow the same collection procedures it follows for servicing mortgage loans in its own portfolio; and (iv) to make proper servicing advances.

297.    The SSAs also define "Master Servicer Events of Default," which include a failure to observe or perform material covenants and agreements set forth in the SSA to be

performed by the master servicer, that materially affects the rights of the Noteholders, and such failure continues unremedied for a specified period after written notice was given. If a Servicer Event of Default occurs under the SSA which a responsible officer of Deutsche Bank, as Indenture Trustee, has received written notice or has actual knowledge of, Deutsche Bank must immediately terminate the Master Servicer and either substitute in as master servicer or find a successor. Deutsche Bank must also give prompt written notice to all Noteholders of Servicer Events of Default.

## IX. THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE ORIGINATORS

298. Each of the Trusts' loan pools contained a high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' rights in those mortgage loans. Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and combined loan-to-value ("CLTV") ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated, among other things, by the high default rates of the mortgage loans, the plummeting credit ratings of the RMBS and certificates, the results of investors' forensic reviews and re-underwriting of loans within the Trusts in other litigation, and evidence highlighting the originators' abandonment of underwriting standards.

### A. High Default Rates Of The Mortgage Loans And Plummeting Credit Ratings Are Indicative Of Massive Seller Breaches

299. The extremely high default rates of the mortgage loans within the Trusts and the decline in the credit ratings of the RMBS to below investment grade are strong evidence of the

originators' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts.

300. The Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics originators represented and warranted. For example, as of November 1, 2014, over 15% of the relevant mortgage loans among all 564 Trusts have been written off for a loss. Within certain RMBS sponsor labels, such as IndyMac Trusts, over 14% of the relevant mortgage loans had been written off for a loss. Moreover, as of January 1, 2009, an astounding 45% or more of the relevant mortgage loans were delinquent in 145 individual Trusts.

301. Not only have the mortgage loans experienced extraordinary rates of delinquency and default, but the ratings of the RMBS supported by them have significantly deteriorated. Because of the high delinquency, foreclosure, and default rates of the underlying mortgage loans, more than 80% of all certificates within the Trusts have been downgraded.

302. The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools ultimately backing the certificates. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies. The significant rating downgrades experienced by the RMBS are also strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

## B. The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period

303. During the height of the mortgage and securitization boom in the United States market between 2004 and 2008, originators of residential mortgage loans sold and securitized loans in RMBS in violation of their stated underwriting guidelines and in breach of the representations and warranties provided to the purchasers of the loan pools.

304. Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis. Using WaMu as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[10]

305. The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[11] The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately – as has been the case in past speculative booms and busts – we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

---

[10] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

[11] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

> [I]t was the collapse of the housing bubble − fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages − that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

306.   During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ." *Id*.

307.   Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts. For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and Washington Mutual prior to January 1, 2009, including 95 of the Trusts. As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

308.    On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including 32 of the Trusts. The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

309.    On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, BoA, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009, including 170 of the Trusts. The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

C.    **There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts**

310.    Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures. The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in

which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

311.　A summary of testimonial and documentary evidence as to each of the major originators of the mortgage loans to the Trusts is set forth below.

312.　During the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans industry wide placed volume over quality, and systemically originated loans to be sold and securitized in RMBS in violation of their stated underwriting guidelines and of their representations and warranties to the purchasers of the loan pools.　By 2011, through severe losses in the credit performance of the residential mortgage collateral, increasing delinquencies, wholesale ratings downgrades of RMBS certificates, and extensive public disclosures regarding originator underwriting abuses, the fact that RMBS Trusts issued between 2004 and 2008 were filled with defective loans was apparent to all participants in the U.S. mortgage and securitization industry.

313.　The Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures.　The originators' systemic, pervasive breach of their representations and warranties is confirmed through the poor performance of the underlying loans, the dramatic increases in collateral losses to the Trusts, federal and state government investigations, published government reports, well publicized news reports, public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

## 1.　**IndyMac Bank**

314.　IndyMac Bank originated approximately $82 billion of residential mortgage loans sold to the Trusts.　IndyMac's systemic and pervasive origination of loans that breached

representations and warranties concerning adherence to stated underwriting guidelines was well documented through federal investigations and reports, investor litigation, insurer lawsuits, and news media sources. For example, the OCC's "Worst Ten in the Worst Ten" list included IndyMac as the eleventh worst mortgage originator based on 2005 through 2007 loan originations as of March 29, 2009.

315. Litigation brought by federal agencies exposed IndyMac's loan origination failures. On October 4, 2012, the National Credit Union Administration ("NCUA") sued Credit Suisse and IndyMac in connection with the packaging and sale of $715 million in RMBS and alleged IndyMac systematically abandoned the stated underwriting guidelines in the offering documents, making the mortgage-backed securities significantly riskier than indicated. *See Nat'l Credit Union Admin. Bd. v. Credit Suisse (USA) LLC, et al.*, No. 12-cv-02648 (D. Kan. Oct. 4, 2012).

316. On July 6, 2011, the FDIC filed the action *Federal Deposit Insurance Corp. v. Michael Perry*, No. 11-cv-05561 (C.D. Cal. July 6, 2011) against the lender's former Chairman and Chief Executive on claims that he overloaded the Pasadena thrift with risky and fraudulent home loans before it collapsed in July 2008. In *Securities and Exchange Commission v. S. Blair Abernathy*, No. 11-cv-01308 (C.D. Cal. Feb. 11, 2011) the SEC alleged that despite receiving monthly internal reports revealing that 12 to 18 percent of IndyMac's loans contained misrepresentations regarding important loan and borrower characteristics, no such disclosure was made in the offering documents. These types of actions were widely followed by news media. *See, e.g.*, *The FDIC Claims An IndyMac Victory*, Bloomberg Businessweek (Dec. 10, 2012); *Former IndyMac CEO Michael Perry to Pay $1 Million in Settlement*, L.A. Times (Dec. 15, 2012).

317.     *MBIA Insurance Corp. v. IndyMac Bank, F.S.B., et al.*, No. 09-cv-01011 (D.D.C. May 29, 2009) involved IndyMac securitized mortgage loans from 2006 and 2007 wherein the plaintiff bond insurer MBIA sought to be indemnified for the losses it incurred when borrowers defaulted and investors made claims under their insurance policies because IndyMac's deceptions led MBIA into issuing the policies.

318.     Similarly, a class action lawsuit brought by two pension fund investors on May 14, 2009, alleged that IndyMac failed to meet its own underwriting guidelines on certain securitized mortgage loans and failed to disclose the risks of mortgage-backed securities. *See In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-04583 (S.D.N.Y. May 14, 2009).

### 2.     New Century

319.     New Century originated approximately $65.5 billion in mortgage collateral included in the Trusts.  As of March 29, 2009, New Century was ranked as the worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on originations from 2005 to 2007.   Multiple highly publicized government investigations and lawsuits exposed New Century's improper loan origination practices and pervasive noncompliance with its underwriting guidelines.

320.     New Century's systemic origination of defective loans during the same time period as the New Century loans were originated and sold to the Trusts were detailed in the FCIC Report and The United States Senate Permanent Subcommittee on Investigations April 13, 2011 report entitled "Wall Street and the Financial Crisis, Anatomy of a Financial Crisis" (the "Senate Report").  The Senate Report found that "[s]ubprime lenders like New Century were known for issuing poor quality subprime loans."  Senate Report at 21.  The Senate Report identified a number of [New Century's] harmful mortgage practices, "including 'increasing loan originations, without due regard to the risks associated with that business strategy'; risk layering in which it

issued high risk loans to high risk borrowers, including originating in excess of 40% of its loans on a stated income basis; allowing multiple exceptions to underwriting standards; and utilizing poor risk management practices that relied on the company's selling or securitizing its high risk mortgages rather than retaining them." *Id*. at 236.

321. The FCIC Report concluded that "New Century—once the nation's second-largest subprime lender — ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157. For instance, "[i]n a June 2004 presentation, the Quality Assurance staff reported they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. In 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated." *Id*.

322. Such massive underwriting failures led to high default rates and eventually New Century's collapse. According to the Bankruptcy Court Examiner for New Century, Michael J. Missal, "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. . . . Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels."

323. The New Century Bankruptcy Report also found that in June 2005, the Internal Audit Department audited the company's loan origination process at its Sacramento wholesale fulfillment center and found that 45% of the loans had improper Real Estate Settlement Procedures Act ("RESPA") disclosures, 32% of the loans did not have approval stipulations fully

satisfied, 39% of the loans had noted exceptions with income calculations and/or verification of income, and 23% had appraisal exception problems. *Id*. at 152.

324. New Century's poor underwriting practices and defective loans have also been the subject of well publicized lawsuits brought on behalf of government agencies. In December 2009, the SEC charged three former New Century executives, including the CEO, "with fraudulent accounting that misled investors about the company's finances." Senate Report at 236. The SEC alleged that the New Century executives were "downplaying the riskiness of the company's loans and concealing their high delinquency rates." The complaint stated that, although New Century had represented itself as a prudent subprime lender, it "soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." *Id*.

325. Loan file reviews confirm New Century's pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it originated. For example, in *FHFA v. HSBC, et al.*, the FHFA reviewed a sample of loan files in the HASC 2005-I1 and HASC 2006-NC1 securitizations. New Century, originated all of the loans in these two trusts. The FHFA found that 17.53% of the loans in HASC 2005-I1 and 18.12% of the loans in HASC 2006-NC1 had LTV ratios over 100%. *FHFA v. HSBC N. Am. Holdings Inc., et al.*, No. 11-cv-06189 (S.D.N.Y. June 28, 2012) Amended Compl. ¶113.

### 3. **Argent**

326. Argent originated approximately $67.9 billion loans included in the Trusts at issue here.[12] As detailed below, between 2004 to 2008, Argent systemically originated loans in

---

[12] In September of 2007, Citibank acquired Argent, including its wholesale mortgage origination division and the servicing rights to collect on more than $45 billion in home loans. Argent merged into CitiMortgage shortly thereafter.

violation of its underwriting guidelines and in breach of the representations and warranties it provided to the purchasers of its loans. By 2011, this became apparent to all players in the RMBS industry, including Deutsche Bank.

327. Argent's systemic and pervasive origination of loans that breached representations and warranties concerning adherence to stated underwriting guidelines was well documented through government investigations and published reports, investor litigation, insurer actions, and nationally published news articles. For example, the OCC's "Worst Ten in the Worst Ten" list included Argent as the **eighth worst mortgage originator** based on 2005-2007 loan originations as of March 29, 2009. During his April 7, 2010 testimony before the FCIC, Richard Bowen, the former Business Chief Underwriter at Citibank, testified that he advised against the acquisition of Argent because "we sampled loans that were originated by Argent, and we found large numbers that did not – that were not underwritten according to the representations that were there." *Subprime Lending and Securitization and Government Sponsored Entities: Hearing Before the Financial Crisis Inquiry Commission,* (Apr. 7, 2010), Hearing Transcript at 239.

328. Litigation by government sponsored entities also shed light on Argent's loan origination problems. In September of 2011, the FHFA sued Citigroup seeking $3.6 billion concerning misrepresentations of the quality of the underlying collateral for certain mortgage-backed securities purchased by Fannie Mae and Freddie Mac. *See FHFA v. Citigroup, Inc., et al*., No. 11-cv-06196 (S.D.N.Y. Sept. 2, 2011). The lawsuit accused Citigroup of misleading the government-sponsored housing finance companies about the risks embedded in ten mortgage-backed securities, including significantly overstating borrowers' abilities to repay the loans. Argent was one of the largest sources of loans at issue in this action.

329.    Private investors, such as Ellington Management Group LLC, sued to recover losses stemming from loans originated by Argent and misrepresentations about the debt's risks. *See Ellington Mgmt. Grp. LLC, et al., v. Ameriquest Mortg. Co., et al.*, 09-cv-00416 (S.D.N.Y. Jan. 14, 2009).

330.    Reports from national and local news media also revealed systemic and pervasive origination of loans that breached representations and warranties.  For example, on October 20, 2009, *Bloomberg* reported that about 60% of mortgages originated by Argent were connected to homes in default, according to MDA DataQuick.  *See Countrywide Mortgages Lead California in Defaults*, Bloomberg (Oct. 20, 2009).

331.    Also, the *Miami Herald* reported that a Vice President at Argent "spent three years during the height of the housing boom tutoring Florida mortgage brokers in the art of fraud" and "taught them how to doctor credit reports, coached them to inflate income on loan applications, and helped them invent phantom jobs for borrowers."  *Home Loan Racket Flourished in Florida*, Miami Herald (Jan. 29, 2009).  According to the news report, out of 129 loan applications obtained by the *Miami Herald* from a local broker that were funded by Argent, "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  *Id*.

### 4.    <u>American Home</u>

332.    American Home originated approximately $36.8 billion in mortgage collateral included in the Trusts.   American Home's lending practices landed it in the 2009 "Worst Ten in the Worst Ten" Report,  appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-

Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

333.    In April 2009, the SEC filed fraud charges against the former top executives of American Home's parent company, American Home Investment Corp., for their role in misleading investors regarding American Home's systematic disregard of sound underwriting standards and risky lending practices that led to the lender's bankruptcy in August of 2007. According to Robert Khuzami, Director of the SEC's Division of Enforcement, "'[t]hese senior [American Home] executives did not just occupy a front row seat to the mortgage meltdown - *they were part of the show.*'"  American Home's former CEO paid $2.5 million to settle the SEC's fraud charges.

334.    In May 2009, an economics reporter for *The New York Times* published a news report recounting his experience in obtaining a loan from American Home. The reporter, Edmund Andrews, revealed how American Home actively concealed and omitted negative information on his loan application in order to qualify him for a loan. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.  One of its specialties was serving people just like me: borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.
>
>                                          . . .
>
> [The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."  What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic withholdings in my paycheck?  No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.  "I am here to enable dreams," he explained to me long afterward.  [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence.

> "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage--not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. Times, May 17, 2009, at MM46. Not surprisingly, shortly after obtaining the AHM loan – a loan the reporter could not afford – the reporter defaulted.

335.     On January 14, 2010, American Home settled a class action lawsuit brought by investors for $37.25 million for misrepresenting itself as a conservative lender. *See In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y.). In the Amended Class Action Complaint, investors in American Home common/preferred stock alleged that the company was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. Based on statements from more than 33 confidential witnesses, including former American Home employees, and internal company documents, investors alleged that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud, and that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans. *See* Am. Class Action Compl. ¶¶120-21.

### 5.     <u>Impac Funding</u>

336.     Impac originated approximately $28.3 billion in mortgage collateral included in the Trusts. During the height of the mortgage and securitization boom, Impac systemically originated loans in breach of the representations and warranties it provided to the purchasers of its loans.

337.     On September 24, 2009, the FDIC, as successor in interest to IndyMac Bank, filed a lawsuit against Impac Funding in the Central District of California alleging breach of contract due to Impac's failure to repurchase $4.5 million in loans sold to IndyMac Bank.  The complaint alleged that Impac's fraudulent mortgage lending practices resulted in the breach of numerous representations and warranties, triggering a duty by Impac to repurchase the loans.  The parties agreed to a settlement in June 2010.

338.     In *FHFA v. JP Morgan,* No. 11-6188 (S.D.N.Y. filed June 13, 2012), the FHFA reviewed 535 loan files from the group of loans backing a securitization in which Impac originated 13.56% of the loans.  The FHFA's review revealed that 98% of the loans (523 out of 535) were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.  Of the 523 loans that did not comply with the underwriting guidelines, none had sufficient compensating factors to warrant an exception.  *Id.* ¶¶359, 367.  Moreover, of the 535 loans reviewed, 89 loans (or 25.2 percent) revealed an incorrect calculation of the borrower's debts which, when corrected, caused the debt-to-income ratio to exceed the applicable underwriting guidelines for the product type.  *Id.* ¶386.

339.     Impac's faulty loan origination practices were also the subject of a suit by a class of its shareholders in *Pittleman v. Impac. Mortg. Holdings, Inc.*, which contained detailed accounts of former employees regarding Impac's disregard of its underwriting guidelines.  *Pittleman v. Impac. Mortg. Holdings, Inc., No.* 07-970 (CD. Cal. filed Oct. 27, 2008). *See* Third Am. Compl.

### 6.     Option One

340.    Option One, a wholly owned subsidiary of H&R Block, Inc. ("H&R Block"), originated approximately $123.3 billion in mortgage collateral included in the Trusts.  Option One was ranked as the sixth worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on originations from 2005 to 2007.  Government actions, investor litigation, and putback actions made public Option One's pervasive noncompliance with its own underwriting standards.

341.    On August 9, 2011, H&R Block, Option One's parent company, agreed to settle a suit initiated by the Massachusetts State Attorney General for $125 million.  *See* Massachusetts Attorney General Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions* (Aug. 9, 2011).  In announcing the August 9, 2011 settlement, Massachusetts's Attorney General stated that Option One engaged in "***ultra-risky practices***," a "***blatant disregard*** for prudent underwriting standards," and "made loans that it knew were likely to fail."  At bottom, in making loans – including loans that were sold into the Trusts – Option One "did not take into account anything [such as a borrower's ability to repay] but the fees that were to be generated."

342.    Investors in significant RMBS lawsuits against underwriting banks have made similar allegations regarding Option One's abusive origination and securitization practices, and systemic abandonment of underwriting guidelines, which resulted in large percentages of defective Option One loans being securitized and sold in private-label RMBS trusts.  *See, e.g., The Prudential Ins. Co. of Am. v. Bank of Am., et al.*, No. 13-cv-01586 (D. N.J. Mar. 14, 2013) (alleging Option One systematically abandoned its underwriting guidelines); *Royal Park Invs. SA/NV v. The Royal Bank of Scotland*, Index No. 653541/2013 (N.Y. Sup. Ct. Oct. 11, 2013) (alleging that "Option One had completely abandoned its stated underwriting guidelines and was

simply seeking to originate as many loans as possible, without any regard for the borrowers' actual repayment ability or the true value and adequacy of the mortgaged properties to serve as collateral").

343.    The results of loan file reviews conducted by investors have further confirmed Option One's pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it originated.  In *Phoenix Light SF Ltd. v. J.P. Morgan Securities LLC*, Option One originated all the mortgage loans in OOMLT 2007-3, OOMLT 2007-4, OOMLT 2007-5, SVHE 2007-OPT4, and ABFC 2006-OPT2.  *Phoenix Light SF Limited, et al. v. J.P. Morgan Sec. LLC, et al.*, Index No. 651755/2012 (N.Y. Sup. Ct. Oct. 5, 2012) Amended Compl. ¶322.  The plaintiff's forensic review found that: (i) for OOMLT 2007-3, 29.50% of the loans had LTVs over 100% and owner occupancy was overstated by 8.83%.  *Id*. at ¶¶778, 792; (ii) for OOMLT 2007-4, 30.51% of the loans had LTVs over 100% and owner occupancy was overstated by 7.17%.  *Id*. at ¶¶777, 791; (iii) for OOMLT 2007-5, 28.90% of the loans had LTVs over 100% and owner occupancy was overstated by 10.06%.  *Id*. at ¶¶777, 791; (iv) for SVHE 2007-OPT4, 21.51% of the loans had LTVs over 100% and owner occupancy was overstated by 5.87%.  *Id*. at ¶¶777, 791; and (v) for ABFC 2006-OPT2, 24.59% of the loans had LTVs over 100% and owner occupancy was overstated by 7.64%.  *Id*. at ¶¶778, 792.

344.    In *Nomura Asset Acceptance Corp. v. Nomura Credit & Capital*, a putback action brought by HSBC as trustee, the plaintiff's "[i]nvestigation into origination files for the Mortgage Loans and publicly available data concerning the Mortgage Loans [] revealed a significant number of breaches of the Mortgage Representations.  As discussed in more detail below, over 91.8% (519 individual loans with an aggregate principal balance of over $41 million) of the Mortgage Loan Files (defined below) reviewed contain[ed] information

discovered to be false or inaccurate or which, even if true, constitute[d] a breach of the Mortgage Representations." *Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2005-S4, by HSBC Bank USA, Nat'l Ass'n, in its capacity as Trustee v. Nomura Credit & Capital, Inc.*, Index No. 653541/2011 (N.Y. Sup. Ct. Aug. 24, 2012) First Amended Compl. ¶4. Option One originated approximately 10% of the loans in this trust. *Id.* at ¶69.

### 7. <u>Fremont</u>

345. Fremont originated over $16 billion in loans included in the Trusts at issue here. As detailed below, Fremont systemically originated loans in violation of its underwriting guidelines and in breach of the representations and warranties. By 2009-2011, this became readily apparent to all players in the RMBS industry, including Deutsche Bank. Fremont's systemic and pervasive origination of defective loans was well documented through government investigations, investor litigation, and national news reports. For example, the OCC's "Worst Ten in the Worst Ten" list included Fremont as ***the sixth worst mortgage originator*** based on 2005-2007 loan originations as of March 29, 2009.

346. Beginning in 2009, Fremont's origination practices have been the subject of numerous governmental investigations and reports. For example, the FCIC Report discusses how the credit rating agency Moody's Investors Service ("Moody's") created an independent surveillance team in 2004 in order to monitor previously rated deals. The Moody's surveillance team began to see a rise in early payment defaults in mortgages originated by Fremont in 2006 and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer remarked that Moody's had never had to put on watch deals rated in the same calendar year. In 2007, in an unprecedented move, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional thirty-two securities on watch. Moody's noted that about 60% of the securities

affected contained mortgages from one of four originators, one of which was Fremont. FCIC Report at 221-222.

347. According to the FCIC Report, when securitizers kicked loans out of securitization pools, some originators simply put those loans into new pools. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times. FCIC Report at 168.

348. The Senate Report also paints Fremont in a negative light, noting that Fremont was a lender "well known within the industry for issuing poor quality loans." Senate Report at 11. In March of 2007, Fremont, once the nation's fifth-largest subprime mortgage lender, stopped originating subprime loans after receiving a cease and desist order from the FDIC. *Id.* at 45, 237; FCIC Report at 233. The cease and desist letter "exposed the existence of unsafe and unsound subprime lending practices" by Fremont when it determined that Fremont had been operating with "a large volume of poor quality loans" and maintained "unsatisfactory lending practices." Senate Report at 45, 238. Finally, in June of 2008, shortly after the FDIC filed a second public enforcement action against the bank, Fremont declared bankruptcy. *Id.* at 238.

349. In June of 2009, the Attorney General of Massachusetts reached a $10 million settlement with Fremont in order to redress, among other things, Fremont's predatory lending practices. *Attorney General Martha Coakley Reaches $10 Million Settlement with Subprime Lender Fremont Investment and Loan*, Attorney General of Massachusetts Press Release (June 9, 2009). According to the Attorney General Office's complaint, Fremont was selling risky loan products that it knew were designed to fail, such as 100% financing loans and "no

documentation" loans.  *See Massachusetts v. Fremont Inv. & Loan and Fremont Gen. Corp.*, No. 07-4373 (Sup. Ct. Mass. Oct. 4, 2007).

350.    In an amended complaint filed by the FHFA on December 21, 2011, *FHFA v. UBS Americas, Inc. et al.*, No. 11-cv-05201 (S.D.N.Y. Dec. 21, 2011), the FHFA alleged: A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this."  The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams.  He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.  Amended Compl. ¶333; *see also NCUA v. UBS Sec., LLC*, No. 13-cv-6731 (S.D.N.Y. Sept. 23, 2013) Compl. ¶176.  On July 25, 2013, the FHFA announced that it had reached an agreement to settle the case for $885 million.  *FHFA Announces Settlement with UBS*, Federal Housing Finance Agency Press Release (July 25, 2013).

351.    Investor litigation also exposed to Defendant Deutsche Bank Fremont's improper origination practices.  In *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741 (Sup. Ct. Mass. July 9, 2010), plaintiffs based much of their case on sixty-three confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.  Fremont, according to the lawsuit, regularly approved loans with unrealistic and unreasonable stated incomes − such as

pizza delivery workers making $6,000 a month. *Id.* Compl. ¶175; *see also NCUA v. UBS Sec., LLC*, No. 13-cv-6731, Compl. ¶175.

### 8. <u>Wells Fargo</u>

352. Wells Fargo originated approximately $6.8 billion of residential mortgage loans sold to the Trusts. Wells Fargo's origination practices have been the subject of numerous governmental investigations and reports and private RMBS lawsuits. For example, the FCIC Report issued in January 2011 revealed, for the first time, findings in a confidential 2005 "peer group" study conducted by examiners from the Federal Reserve and other agencies of mortgage practices at six companies, including Wells Fargo. Notably, the study observed "a very rapid increase in the volume of [] irresponsible loans, very risky loans" by Wells Fargo and these five other lenders, and that a "large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated." FCIC Report at 172. The FCIC Report further revealed for the first time that Freddie Mac "put back" $1.2 billion in ineligible mortgage loans to Wells Fargo during 2009 and 2010, while Fannie Mae put back $2.3 billion ineligible mortgage loans to Wells Fargo from 2007 through 2010. *Id.* at 225.

353. Wells Fargo's systemic violations of representations and warranties regarding the credit quality of the loans it originated have been the subject of several highly publicized RMBS lawsuits. For instance, in *In re Wells Fargo Mortgage-Backed Certificates Litigation,* No. 09-CV-01376 (N.D. Cal. Mar. 27, 2009), the court found that the private investor plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. Apr. 22, 2010). In 2011, Wells Fargo agreed to pay $125 million to settle the litigation. The FDIC made similar allegations in *FDIC v. Chase Mortgage Finance Corp., et al.*, No. 12-cv-6166 (S.D.N.Y.

Aug. 10, 2012), contending that Wells Fargo and other originators overstated the values of properties such that virtually every representation about the LTV ratios of the loans was untrue or misleading.

354. The results of loan file reviews conducted by investors have further confirmed Wells Fargo's abandonment of their underwriting standards and pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it originated. For example, in *FHFA v. Citigroup Inc., et al*., the FHFA reviewed 1,851 loan files in the CMLTI 2006-WF1 and CMLTI 2006-WF2 securitizations. Wells Fargo originated all of the loans in these two trusts. The FHFA found that a stunning 79% of the reviewed mortgage loans in these securitizations were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents. *FHFA v. Citigroup Inc., et al*., No. 11-cv-6196 (S.D.N.Y. June 28, 2012) Amended Compl. ¶136.

355. In addition, there is ample public evidence of Wells Fargo's failure to originate loans in compliance with federal and state law. For example, on July 20, 2011, the Federal Reserve announced that it had levied a record $85 million fine against Wells Fargo for pushing borrowers with good credit into expensive subprime mortgages and falsifying loan applications. Similarly, in late 2012, the U.S. Attorney for the Southern District of New York claimed that Wells Fargo engaged in a "longstanding and reckless trifecta of deficient training, deficient underwriting and deficient disclosure, all while relying on the convenient backstop of government insurance." *Manhattan U.S. Attorney Files Mortgage Fraud Lawsuits Against Wells Fargo Bank, N.A. Seeking Hundreds of Millions of Dollars in Damages for Fraudulently Certified Loans*, U.S. Attorney's Office Southern District of New York (Oct. 9, 2012).

356.     Further, on January 5, 2012, it was widely publicized that a group of institutional investors provided notice to U.S. Bank and HSBC, as trustees, of breach of seller representations and warranties in loan pools securing approximately $19 billion of RMBS issued by various affiliates of Wells Fargo in forty-eight trusts from the WFALT, WFMBS and WMLT shelves, as well as deficient servicing of those loans ("January 5, 2012 Notice"). In the January 5, 2012 Notice, the investor group issued instructions to U.S. Bank and HSBC to open an investigation into the problems of ineligible mortgages in RMBS pools and deficient servicing of those loans.

**D.     The Systemic Disregard Of Prudent Securitization
Standards Was Pervasive During The Relevant Period**

357.     It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts failed to conduct adequate due diligence of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

358.     As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities.  These problems appear to have been significant.

FCIC Report at 187.

359.     As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors

pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books. Consequently, by 2011, it was equally apparent to all players in the United States mortgage and securitization industry that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

### E. There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Sponsors Of The Trusts

360. As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices. The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically, failures by the same sponsors whose mortgage loans were deposited into the Trusts. A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth below.

### 1. Morgan Stanley

361. Morgan Stanley, through its affiliates Morgan Stanley Mortgage Capital, Inc. and Saxon Capital, Inc., sponsored more than **$78.2 billion** in mortgage loans securitized in the 70 Trusts under the MSAC, MSHEL, MSIX, and MSM shelves. By January 1, 2009, it was evident that the credit quality of the underlying loan collateral for the Morgan Stanley-label Trusts did not match Morgan Stanley's and the originators' representations and warranties. At this time, over 35% of all the loans with the Morgan Stanley-label Trusts were delinquent. Notably, twenty-three Morgan Stanley-label Trusts had delinquency rates in excess over 50%, including

MSHEL 2005-4 in which a staggering 76.9% of the loans within the loan pool were delinquent. Moreover, the Morgan Stanley-label Trusts had incurred realized losses of over $4.7 billion. By January 2011, collateral losses had ballooned to over $9.5 billion, representing an increase of over 100%. As of November 1, 2014, the Morgan Stanley-label Trusts have incurred realized losses of over $13.4 billion, meaning that over 16% of Trusts' loan pools have been written off.

362.    According to the FCIC, Morgan Stanley devoted minimal resources to due diligence on the loans it securitized. For instance, the head of due diligence was based not in New York but rather in Boca Raton, Florida, and he had, at any one time, only two to five individuals reporting to him directly − and they were actually employees of a personnel consultant, Equinox. FCIC Report at 168.

363.    Government investigations and lawsuits involving Morgan Stanley-sponsored offerings exposed the consequences of its poor due diligence. In *FHFA v. Morgan Stanley*, a forensic review conducted by the FHFA of 210 loans from the MSM 2007-2AX securitization, substantially similar to the Morgan Stanley-label Trusts at issue here. The study revealed that approximately 93% of the reviewed loans had not been underwritten in accordance with the applicable underwriting guidelines. *FHFA v. Morgan Stanley et al.*, No. 11-cv-6739 (S.D.N.Y. June 13, 2012) Amended Compl. ¶112.[13]

---

[13] The FHFA's forensic analyses of offerings by other major RMBS sponsors also demonstrated widespread abandonment of underwriting guidelines. For example, in *FHFA v. HSBC*, No. 11-cv-06189 (S.D.N.Y.), the FHFA conducted a forensic analysis of seventeen RMBS offerings sponsored by HSBC between 2005 and 2007, including at least ten of the Trusts at issue here (FFML 2006-FF11, HASC 2005-I1, HASC 2005-NC1, HASC 2006-HE1, HASC 2006-HE2, HASC 2006-NC1, HASC 2006-OPT2, HASC 2006-OPT3, HASC 2006-OPT4, and HASC 2007-OPT1). With respect to HASC 2006-HE1, and HASC 2007-OPT1, for example, the FHFA's forensic analysis found that over 30% and 23% of underlying loan pools had a LTV ratio greater than 100% (compared to the represented 0%), and the amount of non-owner occupied properties had been understated by more than 11% and 8%, respectively. Amended

364. During an 18-month period ending June 31, 2007, a third-party due diligence firm, Clayton Holdings, Inc. ("Clayton"), rejected 16% of the loans it reviewed for Morgan Stanley. This information was provided to Morgan Stanley, but it overruled Clayton's findings and "waived in" approximately 56% of those loans. (*See* Clayton All Trending Report at 8, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis sacramento#documents.)

365. In Morgan Stanley's 2006 and 2007 New Century-originated loan pools, the large majority of the loans reviewed by Clayton were identified by Clayton as having some type of exception. Most loans had multiple exceptions. *In re Morgan Stanley & Co. Inc*., Civil Action No. 10-2538 (Suffolk Cnty. Sup. Ct. June 24, 2010) Assurance of Discontinuance at ¶26. However, in instances where Clayton found material exceptions to the guidelines, Clayton found that only approximately 9% of the loans had sufficient compensating factors to offset such exceptions; meaning, 91% of the loans failed to have compensating factors. *Id.* at ¶27.

366. During 2006 and 2007, Morgan Stanley waived exceptions on and purchased a large number of the loans found by Clayton to violate guidelines without sufficient compensating factors. In the last three quarters of 2006, Morgan Stanley waived more than half of all material exceptions found by Clayton (there can be more than one material exception on one "exception"

---

Compl. ¶¶107, 113. *See also Deutsche Zentral – Genossenshaftsbank AG v. HSBC*, No. 12-cv-4025 (S.D.N.Y. Sept. 17, 2012) (HASC 2006-OPT1, *inter alia*); *FHFA v. Barclays Bank PLC, et al.*, No. 11-cv-06190 (S.D.N.Y. Sept. 2, 2011) (ARSI 2006-W2, *inter alia*); *Nat'l Credit Union Admin. Bd. v. Barclays Cap. Inc.*, No. 12-cv-2631 (D. Kan. Sept. 25, 2012) (same). *See also, e.g.*, *Mass. Mutual Life Insur. Co. v. HSBC Bank*, No. 11-cv-30141 (D. Mass. May 20, 2011) (FFML 2006-FF11, *inter alia*); *The Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 2:12-cv-06590 (D. N.J. Oct. 26, 2012) (same); *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, Index No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011) (same).

loan), and purchased a substantial number of New Century loans found by Clayton to violate guidelines without sufficient compensating factors. *Id.* at ¶28.

367.    Morgan Stanley agreed to pay $102 million to settle the claims asserted by the Massachusetts Attorney General and also agreed to drastic changes in its underwriting practices. *Id.* at ¶¶45-52; FCIC Report at 226.

368.    Private lawsuits involving Morgan Stanley-sponsored offerings provide further confirmation of the pervasive and systemic deficiencies in the mortgage loan pools underlying Morgan Stanley-sponsored trusts. In *Prudential v. Morgan Stanley,* No. L308012 (N.J. Super. L. Apr. 25, 2012), for example, institutional investors asserted claims against Morgan Stanley (and its affiliates) for common law fraud and violations of state securities law for knowingly securitizing poor quality loans in forty-one RMBS offerings between 2004 and 2007, including over twenty of the Trusts. The plaintiffs' loan level review "indicated that 13.9% of the loans underlying its Certificates had a LTV in excess of 100%," in contrast to the 0% that Morgan Stanley represented in the offering materials. Compl. ¶114. "Moreover, the Offering Materials represented that only 7.7% of the loans had a LTV of between 90 and 100%. Thus, [plaintiffs'] analysis revealed that in reality approximately 30% of the loans had a LTV of greater than 90%." *Id.*

## 2.    **RBS**

369.    The Royal Bank of Scotland Group PLC ("RBS"), through its affiliates RBS Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.) and Soundview, sponsored approximately **$58.6 billion** in mortgage loans securitized in 56 of the Trusts under the HVMLT, RBSGC, and SVHE shelves. It was clear by January 1, 2009, RBS had dumped large percentages of toxic loans within the RBS-label Trusts. By this time, these securitizations were averaging delinquency rates of over 35%. As a result of these severe delinquencies, the

RBS-label Trusts' losses began to mount. For example, between 2009 and 2011 collateral losses among the RBS-label Trusts more than doubled from approximately $3 billion to over $7 billion. As of November 1, 2014, the RBS-label Trusts had suffered realized losses of $11 billion, representing 19% of the original face value of these securitizations.

370. RBS's poor mortgage securitization practices have been the subject of government and investor lawsuits. In *FHFA v. Royal Bank of Scotland Group PLC, et al.*, No. 11-cv-01383 (Dist. Conn. Feb. 1, 2012), the FHFA performed a forensic analysis of sixty-eight RBS-sponsored securitizations and/or RBS-underwritten securitizations and found that "at least 3.12 percent of the mortgage loans for each Securitization had a LTV ratio over 100 percent, and for most Securitizations this figure was much larger." Amended Compl. ¶113. The FHFA also found that "the Prospectus Supplement for each Securitization was grossly inaccurate, understating the percentage of non-owner occupied properties by at least six percent, and for many Securitizations by ten percent or more." Amended Compl. ¶107.

371. In *NCUA v. Royal Bank of Scotland Group*, No. 11-cv-2340 (D. Kan. Aug. 24, 2012), the NCUA asserted claims against RBS (and others) for federal and state securities law violations in connection with twenty-five RMBS offerings, including at least ten of the Trusts (HVMLT 2006-6, ARSI 2006-W3, FHLT 2006-3, SAST 2006-3, HVMLT 2006-SB1, SVHE 2006-WF2, NHEL 2007-1, HVMLT 2006-14, INDX 2006-AR6, and SVHE 2005-OPT4). The NCUA's commissioned a forensic review that demonstrated significant deficiencies in the loan pools there at issue. For example, with respect to HVMLT 2006-SB1 and SVHE 2006-WF2, the NCUA's analysis found that the weighted average CLTV ratio was 19.49% and 18.65% higher than represented, and that the amount of owner occupied properties was overstated by 14.9% and 14.7%, respectively. Amended Compl. at ¶¶263, 274.

372.    Similarly, in *CMFG v. RBS Securities*, No. 12-cv-00037 (W.D. Wis. March 16, 2012), investors sued RBS to rescind their purchases of certain RBS-sponsored RMBS – including the RBSGC 2007-A Trust at issue here.  A forensic review performed by the investors of approximately 40% of all the loans in the pools found that the loans suffered from pervasive material breaches of representations and warranties.  For example, the LTV and CLTV ratios were "dramatically understated" by as much as 12% on average.  Contrary to RBS's assurances that not a single loan in the pools had a LTV or CLTV ratio above 100%, more than one-quarter of the tested mortgage loans had LTV or CLTV ratios above 100% − meaning the outstanding loans on the mortgaged properties exceeded the value of the properties at the time of loan origination.  Finally, RBS dramatically overstated the percentage of the mortgages in the underlying loan pools that were owner-occupied.  On average, owner-occupancy rates were overstated by more than 12%.

373.    In *Massachusetts Mutual Life Insurance Co. v. RBS Financial Products, Inc.*, 11-cv-30044 (D. Mass. Feb. 24, 2011), investors asserting state Blue Sky law claims against RBS as sponsor for certain RMBS trusts, including the RBSGC 2007-A Trust at issue here, also performed an extensive forensic analysis and found pervasive breaches of representations and warranties.  As to the RBSCG 2007-A Trust, "43% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 32% of the loans tested had LTVs that were 10 or more percentage points more than was represented."  Complaint, ¶144.

374.    In February 2014, RBS agreed to pay $275 million to employee health and pension funds to resolve a consolidated class action alleging that RBS misled investors with respect to the quality of the loans in fourteen RBS-sponsored securitizations.  *N.J. Carpenters*

*Vacation Fund, et al. v. Royal Bank of Scotland Grp. PLC, et al.*, No. 08-cv-05093 (S.D.N.Y. June 3, 2008).

### 3. First Franklin

375. First Franklin, a subsidiary of Merrill Lynch (which was purchased by Bank of America), was major sponsor and loan seller to the Trusts. First Franklin sponsored over $18.3 billion in loans for fourteen Trusts and originated approximately $3.1 billion in loans included in the Trusts at issue here. During the height of the mortgage and securitization boom, First Franklin systemically originated and securitized loans in breach of the representations and warranties it provided to the purchasers of its loans. The performance of First Franklin-label Trusts reflects these abusive practices, as by January 1, 2009 an astounding 57% of all loans within these Trusts were delinquent, and the Trusts had incurred losses of over $1.7 million. By January 2011, these Trusts had suffered losses of $2.8 billion. The abject performance of the First Franklin-label Trusts has persisted. As of November 1, 2014, the Trusts have suffered collateral losses of over $3.8 billion, meaning that nearly 22% of the original face value of the loans has been written off.

376. First Franklin's abandonment of its underwriting standards and poor origination and securitization practices are well documented through government investigations and reports, investor litigation, insurer actions, and news reports. For example, the OCC's "Worst Ten in the Worst Ten" list included First Franklin as the *fifth-worst originator* based on 2005-2007 loan originations as of March 29, 2009. Moreover, the Senate Report identified First Franklin as one of five mortgage originators to which Goldman Sachs directed the most repurchase requests for breaches of representations and warranties concerning underwriting loan quality. *See* Senate Report at 487, n.2051.

377.    In September 2011, the FHFA sued Merrill Lynch and its subsidiary First Franklin, among others, for $24.8 billion, for misrepresenting the quality of mortgage-backed securities sold to Fannie Mae and Freddie Mac.  *See FHFA v. Merrill Lynch & Co., et al*., No. 11-cv-06202 (S.D.N.Y. Sept. 2, 2011).  This action, along with similar actions initiated by the FHFA, was covered by the national media.  *See, e.g., FHFA Sues 17 Banks Over Massive Mortgage Losses At Fannie and Freddie*, Forbes (Sept. 2, 2011).

378.    Well publicized private investor class action and individual lawsuits and settlements also exposed the securitization and origination problems at First Franklin during this time period.  For example, the Public Employees' Retirement System of Mississippi led a class action against First Franklin, alleging that investors were misled about the underwriting quality of the underlying collateral supporting mortgage-backed investments.  *See Pub. Emps' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, No. 08-cv-10841 (S.D.N.Y. Dec. 12, 2008).  The $315 million settlement of this class action was publicized in 2011.

379.    AIG sued First Franklin, among others, for $10 billion in August 2011, alleging that First Franklin and others falsely asserted that the mortgages underlying mortgage-backed securities were issued according to objective underwriting guidelines, when in fact, the defendants encouraged borrowers to falsify loan applications, pressured property appraisers to inflate home values, and ignored obvious red flags in the underwriting process.  *See AIG, Inc., et al., v. Bank of Am. Corp., et al.,* No. 11-cv-06212 (S.D.N.Y. Sept. 6, 2011).

380.    In April 2012, bond insurer Ambac Assurance Corp. ("Ambac") sued Bank of America, accusing the company's First Franklin and Merrill Lynch units of misrepresentations concerning mortgage-backed securities.  *See Ambac Assurance Corp., et al. v. First Franklin Fin. Corp., et al.*, Index No. 651217/2012 (N.Y. Sup. Ct. Apr. 16, 2012).  Ambac reviewed 1,750

loans in the securitization and found that representations and warranties were breached **in 94% of the loans**. *See id.* Ambac further alleged that First Franklin originated most of the loans, and that the misrepresentations included underwriting practices and the due diligence done on the pooled loans, and at the loan level, such as borrowers' incomes and employment. The national media reported on these types of bond-insurer actions. *See, e.g., Ambac Sues Bank of America Over Mortgage-Based Securities*, Bloomberg (Apr. 16, 2012); *Ambac Backed $856M In Bad MBS Due To Merrill's Tricks: Suit*, Law360 (Apr. 16, 2012).

381. Forensic reviews of First Franklin-label Trusts at issue demonstrate the breaches of representations and warranties made by First Franklin to the Trusts in connection with their sale of materially defective loans. For example, in *Prudential v. Bank of America*, No. 13-cv-01586 (D.N.J.), plaintiff found striking breach rates in First Franklin-label trusts that are substantially similar to the Trusts at issue here. Within FFML 2004-FF1, 5,037 of 6,096 loans, or 82.63%, contained at least one material defect. Similarly, plaintiff found that 3,420 of the 4,930 loans reviewed from FFML 2005-FF6 (69.38%) contained at least one material defect and 2,202 of the 3,220 loans reviewed from FFML 2005-FFH1 contained at least one material defect.

### 4. **Barclays**

382. Barclays sponsored more than $8.5 billion in mortgage loans securitized in nine of the Trusts. The Barclays-label Trusts have been marked by poor performance. By January 1, 2009, the Barclays-label Trusts were averaging delinquency rates of over 47.7%, with 3 trusts experiencing delinquency rates in excess of 44%. As a result of these severe delinquencies, the Barclays-label Trusts began to incur alarming losses. For example, between 2009 and 2011 collateral losses among the Barclays-label Trusts nearly doubled from approximately $834 million to $1.6 billion. As of November 1, 2014, these trusts have suffered collateral losses of approximately $2.3 billion, meaning that nearly 27% of the entire loan pool has been written off.

383.    Barclays' faulty due diligence and securitization practices were addressed by the government reports.  For example, during the FCIC investigation, Clayton provided evidence that Barclays securitized a significant number of loans that did not comply with the stated underwriting guidelines.  Clayton reviewed 6,275 loans for Barclays. It found that 1,711 (27%) did not comply with the stated underwriting guidelines and did not have compensating factors. Barclays waived the defects for 471 of the 1,711 (27.5%).  Moreover, even though the reports from Clayton gave notice to Barclays that on average 27% of the sampled loans did not comply with underwriting guidelines or possess compensating factors, Barclays failed to conduct any additional review of the loans not yet sampled.  In other words, even though it knew that the un-sampled set would contain approximately the same proportion of bad loans (as such is the purpose of sampling), Barclays ignored this obvious defect, and instead, placed all of the un-sampled loans into the securitizations as well.

384.    Barclays' securitization practices have also been the target of regulatory investigations and enforcement actions. For example, on December 22, 2011, the Financial Industry Regulatory Authority (FINRA) fined Barclay's $3 million for Barclay's alleged misrepresentations regarding residential mortgage-backed securities.  FINRA stated that Barclay's provided inadequate supervision and incorrect delinquency data in issuing RMBS, leaving investors without critical information for valuing the securities. According to FINRA, Barclay's had inaccurate data on its website from 2007 to 2010 regarding three RMBS it underwrote and sold.

385.    Barclays' securitization practices have also been the subject of several significant RMBS cases brought by investors.  For example, on December 29, 2011, German bank HSH Nordbank AG ("HSH") sued Barclays in connection with approximately $123 million of RMBS

that HSH purchased that were issued under the SABR shelf. HSH alleged that Barclays misrepresented the quality of the mortgages underlying the securities, particularly with respect to lien status, LTV ratios and the percentage of properties occupied by the owners. HSH performed a forensic analysis of loans within these Barclays-sponsored securitizations and found that between 38.4% and 60.4% of the sampled loans were never assigned to the Trusts. HSH similarly found that owner occupancy was overstated between 14.3% and 19.2%. HSH further found that the weighted average CLTV was overstated between 7.1% and 19.6%.

386.    Other investor loan file reviews of Barclays-sponsored securitizations also confirm Barclays' pervasive and systemic sale of defective loans to the Trusts. For example, in *Federal Home Loan Bank v. Ally Financial Inc., et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011), plaintiff reviewed loans from Barclays-label trust BCAP 2006-AA1. The plaintiff's review revealed that 14.4% of the sampled loan group's loans had an LTV ratio exceeding 100%, contrary to Barclays' representation that no loan's LTV exceeded 100%. The plaintiff found that Barclays had understated the number of loans with an LTV ratio higher than 80% by 70.1% and an LTV ratio higher than 90% by 37.1%.

387.    Similarly, in *Sealink Funding v. Barclays Bank Plc, et al.*, No. 12-cv-7966 (S.D.N.Y. Oct. 25, 2012), plaintiff conducted loan level analysis and investigation of the mortgage loans within SABR 2006-HE1, a trust substantially similar to the Trusts at issue here, and found that the loans were dramatically inconsistent with the originators' and Barclays' representations and warranties. Plaintiff found that the actual percentage of loans within this securitization with a CLTV over 100% was 62.2%, contrary to Barclays' representation that no loan had a CLTV ratio exceeding 100%. Plaintiff also found that Barclays had overstated owner

occupancy by 24.7%, and that 42.4% of the mortgage loans had been assigned to a party other than the Trust.

### 5.   **Goldman Sachs**

388.   Goldman Sachs, through its affiliate Goldman Sachs Mortgage Company, sponsored more than **$40.7 billion** in mortgage loans securitized in fifty-two of the Trusts under the GSAA, GSAMP, GSR, GSRPM and NCAMT shelves.   By January 1, 2009, it was evident that the credit quality of the underlying loan collateral for the Goldman Sachs-label Trusts did not match Goldman Sachs' and the originators' representations and warranties.   At this time, 33% of all the loans in the Goldman Sachs-label Trusts were delinquent.   Ten Goldman Sachs-label Trusts had delinquency rates in excess of 50%.   Moreover, the Goldman Sachs-label Trusts had suffered over $2.8 billion in losses.   By January 2011, collateral losses had swollen to $5.5 billion.   As of November 1, 2014, the Goldman Sachs-label Trusts had suffered over $8.2 billion in collateral losses, meaning that over 20% of the face value of these Trusts have been written off.

389.   The FCIC Report and the Senate Report are replete with findings that Goldman Sachs routinely securitized defective loan pools and performed little or no due diligence of the loans underlying the Trusts.   For example, according to an internal Clayton trending report, an average of 22.9% of these loans did not comply with the stated underwriting guidelines and did not have compensating factors that would merit approval; yet Goldman Sachs waived in between 30%-40% of these defective loans.   While Clayton reviewed only a sample of the Goldman Sachs-securitized loan pools, the FCIC concluded based on its own sample that "one could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans."

390.    Goldman Sachs' abandonment of its represented mortgage-securitization guidelines has also been the subject of several state and federal government investigations.  For example, in December 2007, Massachusetts Attorney General Martha Coakley commenced an investigation into the role of Goldman Sachs and other banks in: (i) facilitating the origination of illegal or otherwise improper mortgages; (ii) failing to ascertain whether mortgage loans purchased from originators complied with stated underwriting guidelines; (iii) failing to prevent problem mortgage loans from being put into securitization collateral groups; (iv) failing to correct inaccurate information in securitization trustee reports concerning repurchases of bad loans; and (v) failing to disclose to investors the problems with mortgage loans placed into securitization collateral groups.  In May 2009, Goldman Sachs entered into a settlement with Massachusetts to resolve the investigation, agreeing to pay approximately $50 million in relief to homeowners and an additional $10 million to the State.  In announcing the settlement, the Massachusetts Attorney General stated that Goldman Sachs did not take "sufficient steps to avoid placing problem loans in securitization pools."

391.    In addition, Goldman Sachs' securitization practices have been investigated by the SEC.  In July 2010, the SEC announced that Goldman Sachs had agreed to pay a then-record $550 million to settle SEC charges that Goldman Sachs misled investors in a subprime mortgage product just as the United States housing market was starting to collapse.  In agreeing to the SEC's largest-ever penalty paid by a Wall Street firm, Goldman Sachs also acknowledged that its marketing materials for the subprime product contained incomplete information.

392.    Over the past five years, Goldman Sachs has also been a defendant in at least twelve significant RMBS investor lawsuits.  Forensic investigations and loan level reviews conducted by investors in these actions further confirm the pervasive breaches of representations

and warranties in Goldman Sachs-label RMBS. For example, in September 2010, the Federal Home Loan Bank of Seattle ("FHLB-Seattle") filed a securities fraud action against Goldman Sachs concerning four Goldman Sachs-sponsored RMBS offerings. In FHLB-Seattle's analysis of the quality of the loans included in these offerings, it found that Goldman Sachs made untrue or misleading statements regarding LTV ratios, owner occupancy, or underwriting guidelines for between *50% and 60%* of the loans. Similarly, in June 2012, the FHFA filed a securities fraud action against Goldman Sachs concerning forty RMBS offerings in which Fannie Mae and Freddie Mac had invested, thirty-six of which were Goldman Sachs-sponsored. The FHFA's review of at least 1,000 randomly selected mortgage loans found that *99.6%* of the reviewed loans from GSAMP 2006-FM3 breached representations in the transaction documents or did not comply with underwriting guidelines.

393. Forensic investigations and loan level reviews conducted by bond insurers have reached the same conclusions regarding the poor loan quality of Goldman Sachs' sponsored offerings. For example, in August 2011, CIFG Assurance North America ("CIFG"), monoline insurer, filed a fraud and breach of contract action against Goldman Sachs in connection with an insurance policy CIFG wrote for one Goldman Sachs-sponsored RMBS offering, GSAA 2007-S1. CIFG's review of 491 randomly selected loans found that 393 or approximately 80% of the loans "did not comply with one or more of [Goldman Sachs'] representations and warranties . . . or . . . underwriting guidelines."

## X.  DEUTSCHE BANK KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

394. There is ample evidence that beginning in 2009 and continuing through the present, Deutsche Bank "discovered" that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors'

representations and warranties regarding the loans credit quality. Preliminarily, as discussed above, since 2009 and continuing to the present, there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices. In addition to the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the relevant originators and sponsors, as explained below there is a plethora of additional evidence of Deutsche Bank's and its responsible officers' knowledge that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

A.  **The Trusts' Poor Performance**

395.  Under the PSAs, the servicers provide monthly Servicer Reports to Deutsche Bank. Deutsche Bank then aggregates the information in the Servicer Reports to generate final monthly Remittance Reports to Certificateholders. The monthly Servicer Reports and Trustee Remittance Reports contain specific information regarding the performance of the mortgage loans and the value of the underlying mortgaged property, including summaries regarding the servicers' collection efforts, the amount of loans that are delinquent or subject to bankruptcy, the amounts recovered through foreclosure ("REO") and the Trust's realized collateral losses.

396.  The mortgage loans in the Trusts suffered, and continue to suffer, from staggering and unexpected losses and poor performance (*e.g.,* high rate of delinquent and defaulted mortgage loans in the Trusts). Deutsche Bank was provided loss and performance information on at least a monthly basis.

397.  For example, by January 1, 2009, over 34% of the relevant mortgage collateral across all of the Trusts was delinquent. Within certain RMBS sponsor labels, such as the Argent-label Trusts, an average of 41% of the relevant mortgage collateral was delinquent, and

delinquencies in trusts sponsored by Morgan Stanley averaged a similarly staggering 35%. Moreover, 25% or more of the relevant mortgage loans were delinquent in more than two out of every three Trusts. Astonishingly, 106 trusts had over 50% of their collateral in delinquency, with the MLMI 2005-AR1 reaching approximately 85%.

398. As of July 1, 2014, the Trusts on average reported realized losses, including losses from delinquent loans in bankruptcies, foreclosures, and real estate owned or "REOs" (collectively "Delinquencies"), of approximately $158 million. The average Delinquencies rate for the Trusts is reflected in the chart below:



399. These high losses and delinquency rates, known to Deutsche Bank through the monthly Service Reports and Trustee Remittance Reports, indicated, along with the facts detailed above, that the underlying mortgage loans in the Trusts systemically breached what the sellers represented and warranted.

400. In addition, the Servicer Reports and Trustee Remittance Reports provided information regarding loan modifications granted by the servicers to borrowers who failed to

timely make principal and interest payments on their loans. In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default. Loan modifications often include changes to the loan's interest rate, term, or outstanding principal. As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons. First, escalating loan modifications correlate to misstated borrower income and creditworthiness. Second, the servicers' decisions to modify rather than foreclose on loans indicate that the underlying collateral is not adequate security to satisfy the outstanding balance because the original LTV or CLTV ratio was not as represented and/or the appraised property value was misstated. As indicated below, loan modifications in the Trusts dramatically increased beginning in 2009 and are continuing to the present, providing Deutsche Bank further information regarding the systemic breaches of representations and warranties in the Trusts:



**Cumulative Loan Modifications in Deutsche Bank Trusts**

Source: Bloomberg

401. Deutsche Bank knew (or should have known) that the Trusts' exceptionally poor performance was due to the industrywide abandonment of sound underwriting and securitization practices and not due to any external market condition. As detailed above, numerous complaints have been filed by investors, monoline insurers and other market participants alleging fraud and other causes of action arising from the defective loans issued by the same originators and securitized by the same sponsors as the Trusts. Deutsche Bank, as Trustee, and the servicers were responsible for responding to requests for loan files and other documentation necessary for the prosecution of those actions, including litigants' forensic review of loan files. In this manner, Deutsche Bank was aware of and informed about allegations of blatant, flagrant breaches of representations and warranties.

## B. Credit Rating Downgrades Of The Certificates Further Supports The Sellers' Breaches

402. At the time of securitization, all of the Trusts' senior tranches were rated "investment grade." Bond rating firms, such as Standard & Poor's, use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating. "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade. An investment grade rating signifies that the bond has a relatively low risk of default and are judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them. Credit ratings for bonds below investment grade designations (i.e., "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

403. However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and Deutsche Bank began reporting severe collateral losses in the performance of the mortgage loans in the Trusts, the Trusts' certificates' credit

ratings were drastically downgraded. By December 31, 2009, two-thirds of the senior tranches in the Trusts had been downgraded at least once. Across all Trusts, over 80% of all certificates had been downgraded by at least one ratings agency. Further, over 50% of the senior certificates had been downgraded to junk bond status.

### C. Deutsche Bank's Affiliates Were Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines

404. Deutsche Bank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by Deutsche Bank's affiliate, DB Products and parent company Deutsche Bank AG's involvement in significant RMBS litigation in its capacity as securitization underwriter.

405. For example, on September 2, 2011, the FHFA, as conservator for Fannie Mae and Freddie Mac, filed lawsuits against seventeen of the largest financial institutions involved in the packaging, marketing and sale of RMBS that Fannie Mae and Freddie Mac purchased during the period from 2005 to 2007, including Deutsche Bank affiliates.[14] Fifteen of the FHFA's actions were concentrated before Southern District of New York Judge Denise L. Cote for coordinated pretrial proceedings, thereby allowing Deutsche Bank affiliates access to the pleadings and discovery in each of these cases.

406. Each of the FHFA's complaints alleged that the defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards,

---

[14] Complaints were filed against the following lead defendants, in alphabetical order: Ally Financial Inc. f/k/a GMAC, LLC; Bank of America Corporation; Barclays Bank PLC; Citigroup, Inc.; Countrywide Financial Corporation; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon; General Electric Company; Goldman Sachs & Co.; HSBC North America Holdings, Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co. / First Franklin Financial Corp.; Morgan Stanley; Nomura Holding America Inc.; The Royal Bank of Scotland Group PLC; and Société Générale.

including representations that significantly overstated the borrowers' capacity to repay their mortgage loans and the percentage of loans secured by owner occupied properties. The FHFA further alleged that defendants materially understated the loan-to-value ratios of the underlying loans.

407. To support its allegations of defendants' misrepresentations regarding the credit quality and characteristics of the underlying loan collateral, the FHFA's complaints highlighted the severe delinquencies, immense collateral losses and staggering credit downgrades suffered by both the securitizations at issue in its cases and all RMBS in general of this vintage. Significantly, the FHFA's actions involved at least 100 of the Trusts at issue in this action, representing over 15% of the Trusts in this action. In fact, five of these securitizations – INDX 2005-AR9, INDX 2006-AR9, RAST 2005-A15, NHEL 2007-1 and NCHET 2006-2 – were the subject of *FHFA v. Deutsche Bank AG, et al.*, No. 11-cv-06192-DLC (S.D.N.Y.).

408. In addition, the FHFA provided highly detailed summaries of the evidence and testimony obtained through federal and state investigations, enforcement actions and reports revealing both industrywide abuses by the mortgage loan originators and sponsors during this period, and widespread breaches of representations and warranties by specific originators and sponsors in connection with RMBS trusts. These financial institutions included many of the largest mortgage loan sellers to the Trusts, such as Morgan Stanley, RBS, Goldman Sachs, New Century, Credit Suisse, First Franklin, Countrywide, IndyMac, Merrill Lynch, and New Century.

409. Moreover, FHFA cited the results of its own forensic review of loan level data for a sampling of hundreds of thousands of mortgage loans and re-underwriting of thousands of loan files from these securitizations, including almost 100 of the Trusts. The data review revealed systemic and pervasive misrepresentations regarding owner occupancy and LTV ratios in each of

the securitizations, including the Trusts at issue and other securitizations involving the same sponsors to the Trusts, same RMBS labels, same RMBS shelves, same vintage, same loan product type, or the same originators.

410.    Significantly, on December 20, 2013, FHFA announced a $1.9 billion settlement with Deutsche Bank AG to settle the claims at issue in *FHFA v. Deutsche Bank AG, et al.*, No. 11-cv-06192-DLC.

411.    Given the FHFA's detailed allegations and Deutsche Bank's parent company and securitization arm's active participation in the FHFA actions as named defendants, Deutsche Bank and its responsible officers had actual knowledge that the Trusts' loan pools contained high percentages of loans that materially and adversely affected the Trusts and certificateholders' interests in those loans.

412.    As described in further detail below, in addition to the FHFA actions, Deutsche Bank's affiliates have been named in several other actions alleging that originators and sponsors industrywide during the relevant period, including major originators of loans sold to the Trusts, systematically abandoned their stated underwriting guidelines.    The evidence and testimony perpetuated in these actions provide further support for Deutsche Bank's knowledge of the presence of defective loans in the Trusts.

### D.    Deutsche Bank Received Written Notice Of Pervasive And Systemic Seller Breaches From Financial Guaranty Insurers

413.    Deutsche Bank also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation involving these same originators and sponsors in its capacity as trustee and, through its affiliates, sponsor.

414. Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts. Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning quality and origination practices for the mortgage loans. The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

415. Monoline insurers have initiated numerous lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which Deutsche Bank serves as trustee or a Deutsche Bank affiliate served as sponsor. Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike certificateholders) were often able to obtain access to loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties in securitizations with the same sellers to the Trusts.

416. Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, Deutsche Bank was notified by both the responsible mortgage loan sellers and the parties to the PSAs (including Wells Fargo as Master Servicer) of these sellers' systemic and pervasive breaches of representations and warranties.

417. The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made Deutsche Bank and its responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry affecting RMBS issued between 2004 and 2008, as well as of

the identities of the offending originators and sponsors that misrepresented the credit quality and characteristics of the mortgage loans collateralizing these trusts.

418. For example, in *CIFG Assurance N. Am., Inc. v. GreenPoint Mortgage Funding, Inc.*, No. 653449/2012 (N.Y. Sup. Ct. Oct. 1, 2012), the monoline insurer CIFG sued GreenPoint Mortgage Funding, Inc. alleging that its review of loan files originated by the GreenPoint revealed breaches in 82% of the loans reviewed. Notably, Deutsche Bank acted as the trustee for the trust at issue in the litigation.

419. In *Assured Guaranty Corp. v. DB Structured Products, Inc.*, et al, No. 651824/2010 (N.Y. Sup. Ct. Oct. 25, 2010), the monoline insurer Assured sued DBSP, an affiliate of Defendant, alleging that its review of loan files securitized by the defendant revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that the defendant represented would be followed.

420. Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits reflected these mortgage loan sellers' systemic and pervasive violation of underwriting and securitization guidelines, U.S. Bank discovered that these same defective underwriting and securitization practices applied equally to all of the other Trusts containing loans originated and securitized by these same originators and sponsors.

**E. Deutsche Bank And Its Responsible Officers
Received Written Notice From Certificateholders
Of Pervasive And Systemic Seller Breaches**

421. Deutsche Bank, in its capacity as Trustee to many Trusts at issue herein, as well as RMBS trusts that are not the subject of this action but which are secured by loans originated and sponsored by the very same entities that originated and sponsored the loans underlying the Trusts at issue herein, has repeatedly received notice from Certificateholders of pervasive and systemic

violations of representations and warranties by the loan sellers. Based on the sheer volume of the defective mortgage loans identified, together with the systemic and pervasive faulty origination and securitization practices complained of in the Certificateholders' breach notices, Deutsche Bank and its responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

422. For example, on December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts sponsored by JPMorgan or its affiliates issued written instructions to Deutsche Bank, Wells Fargo, The Bank of New York Mellon ("BNYM"), HSBC, and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative"). The notices covered more than $95 billion of RMBS issued by JPMorgan from 2005 to 2007. Less than two years later, Deutsche Bank and the other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts. On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative, including Deutsche Bank, accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.

423. The JPMorgan Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($65.5 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley and GreenPoint (collectively, $78.7 billion of sponsored Trusts). In addition, the JPMorgan Putback Initiative identified and seeks recovery of

losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $157.2 billion of loans sold to the Trusts) and Countrywide (original servicer to $37 billion of loans sold to the Trusts).

424.    On January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to Deutsche Bank, U.S. Bank, and Wells Fargo, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Morgan Stanley Putback Initiative"). The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007, including at least sixty-six of the Trusts at issue herein.

425.    The Morgan Stanley Putback Initiative identified and seeks to compel the repurchase of large quantities of loans (1) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($65.4 billion of loans sold to the Trusts) and American Home Mortgage ($36.8 billion of loans sold to the Trusts); and (2) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Morgan Stanley ($78.1 billion of sponsored Trusts) and Saxon Asset ("Saxon") ($9.8 billion of sponsored Trusts). In addition, the Morgan Stanley Putback Initiative identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $157 billion of loans sold to the Trusts) and Saxon (original servicer to $15.1 billion of loans sold to the Trusts).

426.    On May 14, 2012, a group of major institutional mortgage investors in several hundred RMBS trusts sponsored by ResCap or its affiliates reached agreement with ResCap and

its affiliated debtors to resolve claims for breaches of representations and warranties concerning large numbers of loans in the pools securing those trusts (the "ResCap Putback Initiative"). The settlement covered more than $320 billion of RMBS largely issued between 2004 and 2008, including 195 trusts for which Deutsche Bank serves as trustee. The trustees for these trusts, which were aware of the repurchase and servicing claims through, among other things, the bankruptcy proceedings, are Deutsche Bank, U.S. Bank, Wells Fargo, and BNYM.

427. The ResCap Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($65.5 billion of loans sold to the Trusts) and Accredited ($13.3 billion of loans sold to the Trusts).

428. On or about May 22, 2013, Melissa Rossiter, a Vice President of Deutsche Bank National Trust Company, received a letter regarding Morgan Stanley ABS Capital I Inc. Trust 2007-NC1 ("MSAC 2007-NC1") from counsel representing Freddie Mac. In this letter, Freddie Mac identified 100 loans within the MSAC 2007-NC1 in breach of representations and warranties. Freddie Mac formally notified Deutsche Bank National Trust Company that "in light of the pervasive breaches . . . it is apparent that similar breaches of representations and warranties affect the entire pool of mortgage loans securitized in MSAC 2007-NC1 Trust.

429. On or about June 7, 2013, Kellie Rodriguez, a Vice President of Deutsche Bank National Trust Company and Alice Tatusian of Deutsche Bank National Trust Company, received a second letter dated June 10, 2013, regarding MSAC 2007-NC1 from certain certificateholders in that trust. In this letter, Freddie Mac identified 1,736 loans within the MSAC 2007-NC1 in breach of representations and warranties. The certificateholders informed Deutsche Bank that

"further investigation, including re-underwriting of the loan files themselves, will reveal substantial additional evidence of breaches throughout the Trust's mortgage pool."

430.     Despite Deutsche Bank's actual notice of widespread loan defaults and breaches by the same originators, sponsors, and servicers that originated, sponsored, and serviced the loans underlying the Trusts at issue here, as the examples above illustrate, Deutsche Bank failed to act in accordance with its obligations under the Governing Agreements and TIA to enforce the originators' and sponsors' obligations to cure, substitute or repurchase defective mortgage loans and the servicers' obligations to follow proper servicing practices.

F.     **Deutsche Bank Initiated Putback
Litigation Against Many Of The Sellers**

431.     Deutsche Bank has participated in at least eighteen actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors, sellers and servicers as the Trusts at issue in this action.[15]   Based on its involvement in those putback actions, which alleged pervasive, systemic breaches of representations and warranties, Deutsche Bank was aware of similarly pervasive, systemic breaches of representations and warranties in the Trusts.

432.     In each of the above-referenced putback actions, loan level reviews identified breach rates *exceeding 50%* in every offering, including those sponsored by the same sponsors as the Trusts and involving loans originated and sold by the same originators and sponsors as the Trusts.

433.     On August 26, 2009, Deutsche Bank, which was the trustee for ninety-nine trusts in which WaMu sold, sponsored and serviced loans, filed a federal lawsuit against the FDIC (as the receiver for WaMu) and others on behalf of the WaMu-DB Trusts and the investors in the

---

[15] Trusts at issue in the limited putback claims pursued by Deutsche Bank are not included in this action, except for those trusts where putback claims were untimely.

WaMu-DB Trusts seeking to enforce the trusts' and certificateholders' rights. *See Deutsche Bank Nat'l Trust Co. v. FDIC, as receiver for Wash. Mut. Bank, et. al.*, No. 09-cv-01656 (D.D.C. Sept. 8, 2010) (the "WaMu Putback Litigation"). Deutsche Bank commenced its action because the FDIC failed to respond to its proof of claim filed the preceding year. Deutsche Bank's complaint in the WaMu Putback Litigation details WaMu's systemically deficient origination practices and pervasive sale of mortgage loans that failed to comply with representations and warranties between 2004 and 2008.

434. Notably, Deutsche Bank's complaint extensively cites the Senate Subcommittee findings, including that "WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities." Amended Compl. ¶69. Deutsche Bank alleges that "[b]ased upon: (a) the pervasiveness of such practices by WaMu, as found by the Senate Subcommittee; and (b) the high proportion of WaMu's securitized mortgage loans that were sold to, or deposited in, the Trusts during the relevant time period, the Trustee has reason to believe that such practices affected mortgage loans sold to, or deposited in, the Trusts by WaMu and that, accordingly, many of the mortgage loans in the Trusts do not comply with the Representations and Warranties." *Id*. at ¶74.

435. In *Deutsche Bank National Trust Co. v. Barclays, et al.*, Index No. 651338/2013 (N.Y. Sup. Ct. Sept. 17, 2013), Deutsche Bank conducted "an exhaustive forensic review of a sample of loan origination documents" which revealed that the mortgage loans sold by Barclays and its affiliates to the trust failed to meet the standards set forth in Barclays' representations and warranties. In fact, ***more than 64% of the mortgage loans examined were determined to be in breach of those representations and warranties***. Compl. ¶3. The review of 2,221 mortgage loans revealed 539 loans with actual LTV ratios that exceeded 95%, and 365 loans with actual

cumulative LTV ratios that exceeded 100%, all of which were far greater than the ratios reported. *Id*. at ¶56. This action pertains to the SABR 2007-BR1 offering, and New Century and Ameriquest (two of the originators of loans supporting the Trusts at issue here) were the two principal originators of the 5,028 mortgage loans in this trust. *Id*. at ¶25.

436. Moreover, a loan level review of loans originated by New Century and included in the HASC 2007-NC1 offering uncovered breaches in at least 2,725 loans – almost 60% of the loans in the trust. According to Deutsche Bank, this suggested a "high breach rate across the Trust's entire Mortgage Loan pool." *Deutsche Bank Nat'l Trust Co. v. HSBC Bank USA*, Index No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013) Compl. ¶62.

437. In a similar putback action against Decision One, Deutsche Bank alleged that two separate breach notices identified no fewer than 2,558 distinct breaches of Decision One's representations and warranties that materially and adversely affect the value of 1,443 defective loans, which meant that ***over half of the loans conveyed into the trust were in material breach***. *See Deutsche Bank Nat'l Trust Co. v. Decision One*, No. 2013-L-005823 (Ill. Cir. Ct. May 31, 2013), Compl. ¶53.

438. Deutsche Bank also made similar allegations in other actions. For example, against EquiFirst Corp., Deutsche Bank alleged that many breaching loans went into default within eighteen months of the closing of the securitization. "The fact that such Mortgage Loans went into default so early in the life of the Trust – bearing in mind that the loans were (almost exclusively) 30-year loans – is strongly indicative of defects in the loan origination process or error or fraud on the part of the borrowers or others involved in that process." *Deutsche Bank Nat'l Trust Co. v. EquiFirst Corp.*, Index No. 651957/2013, (N.Y. Sup. Ct. Nov. 18, 2013) Compl. ¶84.

439.     Similarly, shortly before the filing of this Second Amended Complaint, Deutsche Bank brought a putback action against Morgan Stanley on a single RMBS securitization, Morgan Stanley Structured Trust I 2007-1, which Deutsche Bank asserts was filled ***almost entirely*** with defective loans.  *Deutsche Bank Nat'l Trust Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 14-cv-3020 (S.D.N.Y. Apr. 28, 2014).   In its complaint, Deutsche Bank asserts that "[t]he pool of Loans Morgan Stanley Capital sold to the Trust is replete with material breaches of the representations and warranties concerning the quality of the Loans and the borrowers' creditworthiness" – so much so, that even a "preliminary investigation" uncovered at least 1,620 defective loans – or nearly 40% of the pool.  Worse yet, a forensic review of loans by a re-underwriting firm found that ***"nearly 93%"*** of the loans examined ***"materially breached the [seller's] representations and warranties,"*** which demonstrates ***"a wholesale abandonment of underwriting guidelines and prudent underwriting practices."***  In particular, Deutsche Bank's forensic analysis found "income misrepresentations were so blatant that Morgan Stanley Capital must have known (or at least should have known) about them at the time the Loans were originated."

440.     Additional breaches of representations and warranties asserted in Deutsche Bank's complaint against Mortgage Stanley included misrepresented debt-to-income ratios, owner occupancy status, and loans "tainted by collusion between buyers, sellers, brokers, and other parties."  According to Deutsche Bank, "the remainder of the Loans, if reviewed, would exhibit a similar defect rate."  Indeed, as Deutsche Bank alleges, "[t]he foregoing breaches and many others throughout the Loans are so pervasive, and their nature is so flagrant, that Morgan Stanley Capital must have discovered them long ago."

441.     In short, the high rates of defaults cited by Deutsche Bank in support of putback actions relating to other RMBS trusts demonstrates that Deutsche Bank was well aware of the pervasive, systemic breaches of representations and warranties of the loans at issue here as well.

## XI.     THE TRUSTS SUFFERED FROM<br>PERVASIVE SERVICER VIOLATIONS

442.     In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, popular, regulatory and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private-label RMBS.

443.     Much like other private-label RMBS trusts of the same vintage, each of the Trusts suffers from ongoing Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and duties imposed on them by the PSAs.  The servicers' breach of their covenants is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic, pervasive deviation from usual, customary and lawful servicing practices in their administration of mortgages and, more specifically, illegal and illicit servicing activities by the same servicers that service the loans held by the Trusts.

### A.     The Servicers Failed To Give Notice Of Seller<br>Breaches Of Representations And Warranties<br>And Enforce The Sellers' Repurchase Obligations

444.     As with the Trustee, the PSAs require the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon the servicer's discovery of the

breach. Moreover, the servicers are required under the PSAs to enforce the sellers' obligation to repurchase, substitute, or cure defective loans.

445. In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division. These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices, and therefore had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools. These servicers failed to notify parties to the PSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

446. Additionally, for the benefit of the Trusts, and pursuant to the PSAs, the sponsors acquired primary mortgage guaranty insurance ("PMI") policies for loans that had a LTV ratio in excess 80% which served as a "credit enhancement" in order to offer additional security to Certificateholders in the Trusts and to induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers. In the aftermath of the financial crisis, servicers have tendered claims to mortgage insurers under the PMI policies on the Trusts' behalf on defaulted loans. The mortgage insurers have denied coverage, canceled or rescinded the mortgage insurance policies, or invoked policy exclusions for a high percentage of claims as a result of misrepresentations regarding the insured mortgage loans, including on the basis that the originator engaged in predatory lending or systemic fraud in the underwriting of the mortgage loans. After these mortgage insurance claim denials, the servicers failed to observe or perform in a material respect their covenants and/or agreements

under in the PSAs by failing to notify parties to the PSAs that the mortgage loan sellers violated representations and warranties at the time they sold loans to the Trusts..  Moreover, the servicers failed to tender the defective, defaulted loans to the sellers for repurchase.  Instead, the servicers charged the over-collateralized accounts for losses, causing damage to the Trusts and their Certificateholders.

447.    Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts.  Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  Thus, in the process of performing loan modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages.  Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

448.    As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches of representations and warranties within the Trusts' loan pools.  Nevertheless, the servicers have not notified the other parties to the PSAs of these seller breaches.

449.    Further, the servicers have been specifically notified by monoline insurers of pervasive breaches by the sellers.  For instance, Countrywide Home Loans Servicing (k/n/a BAC Home Loan Servicing) is one of the leading servicers of the Trusts, administrating more than **$37**

**billion** in mortgage loans securitized in the Trusts. Countrywide Home Loans Servicing LP has been notified in litigation by MBIA, Ambac, FGIC, Assured Guaranty, and other mortgage and monoline insurers of pervasive, systemic breaches of representations and warranties by Countrywide entities in their capacity as originators.

450.     Likewise, in *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC, et al.*, Index No. 603751/09 (N.Y. Sup. Ct. Dec. 14, 2009), MBIA sued Select Portfolio Servicing, Inc., which services over $10 billion in mortgage loans held by the Trusts. In addition to alleging that Select Portfolio Servicing, Inc. had engaged in improper servicing activities, MBIA reported that 79% of randomly selected loans and 87% of adversely selected loans breached representations and warranties in a Credit Suisse securitization.

451.     Similarly, in *MBIA Insurance Corporation v. Morgan Stanley, et al.*, Index No. 29951/10 (N.Y. Sup. Ct. Feb. 2, 2011), MBIA sued Saxon Mortgage Service Inc., which services over $6 billion in mortgage loans held by the Trusts. MBIA reported that 93% of randomly selected loans and 98% of adversely selected loans breached representations and warranties in a Morgan Stanley securitization.

452.     Notwithstanding the servicers' discovery of material breaches of representations and warranties, the servicers have not notified the other parties to the PSAs (including Deutsche Bank) of these breaches. Moreover, although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the sellers' obligation to repurchase, substitute, or cure these defective loans as required under the PSAs.

453.     The servicers' systemic, pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations has materially affected the rights of the Trusts and all Certificateholders under the PSAs by depriving

the Trusts of mortgage loans of adequate credit quality as initially represented, or alternatively funds representing the "Repurchase Price" as defined by the PSAs, with respect to each defective mortgage loan.

**B. The Servicers Have Violated**
   **Their Prudent Servicing Obligations**

454.    The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicers' right to receive compensation or other fees for their services under the PSAs, their obligation to make servicing advances under the PSAs, and their ownership, servicing, or management for others of any other mortgage loans.

455.    Nationally publicized government enforcement actions and settlements reached with the servicers demonstrate that the servicers have systemically and pervasively violated these prudent servicing obligations. For example, in June 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP (f/d/b/a Countrywide Home Loans Servicing, LP), a wholly owned subsidiary of Bank of America, National Association (collectively, "Countrywide/BAC") for their "unlawful acts and practices in servicing mortgage loans." *Federal Trade Comm'n v. Countrywide Home Loans, Inc., et al.*, No. 10-cv-4193 (C.D. Cal. June 7, 2010). In March 2008, before being acquired by Bank of America Corporation, Countrywide was ranked as the top mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4

trillion. In September 2009, after its acquisition of Countrywide, Bank of America was ranked as the nation's top mortgage servicer with a servicing portfolio of over $2.1 trillion. Countrywide/BAC are servicers for many of the Trusts. The FTC emphasized that many of the loans improperly serviced by Countrywide/BAC are the same "risky, high-cost loans that had been originated or funded by Defendants' parent company, Countrywide Financial Corporation . . . , and its subsidiaries . . . ."

456. According to the FTC, when borrowers fell behind on their payments, Countrywide/BAC imposed a number of default-related services (such as property inspections and foreclosure trustee services) "by funneling the work through a panoply of Countrywide subsidiaries." In its mortgage servicing operation, Countrywide/BAC follows a so-called "vertical integration strategy" to generate default-related fee income. Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen for default services. These subsidiaries exist solely to generate revenues for Countrywide/BAC and do not operate at arms'-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added substantial mark-ups to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were contrary to both prudent servicing standards and the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

457. Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through Chapter 13 bankruptcy. According to the FTC, Countrywide/BAC made various representations to those

borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy cases when fees and escrow shortages and deficiencies accrued on their loan. After the bankruptcy cases closed and borrowers no longer had the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

458. By way of further example, in February 2012, forty-nine State attorneys general and the federal government announced a historic $25 billion joint state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of single-family residential mortgages: (i) Residential Capital, LLC, Ally Financial, Inc. ("Ally Financial"), and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A.

459. In their corresponding complaint filed in March 2012, the state attorneys general and the federal government alleged that these servicers had engaged in unfair, deceptive, and unlawful servicing processes, including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

(v) providing borrowers false or misleading information in response to borrower complaints; and (vi) failing to maintain appropriate staffing, training, and quality-control systems.

460.    Similarly, in December 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in forty-nine states, and the District of Columbia filed a proposed court order requiring the country's largest non-bank mortgage loan servicer, Ocwen, and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in first lien principal reduction to underwater borrowers in order to compensate for years of systemic misconduct at every stage of the mortgage servicing process.    The consent order also covered two companies previously purchased by Ocwen, Litton Loan Servicing LP ("Litton") and Homeward Residential Holdings LLC (previously known as American Home Mortgage Servicing, Inc. or "AHMSI").    According to the CFPB and attorneys general's complaint, Ocwen violated state consumer law in a number of ways, including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging borrowers unauthorized fees for default-related services; (iii) imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home insurance coverage; and (iv) providing false or misleading information in response to consumer complaints.

461.    High-profile class actions against the servicers have further revealed violations of prudent servicing practices.    For example, in June 2012, nationwide class actions were brought on behalf of millions of homeowners against JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., Bank of America, N.A., Citibank, N.A., and HSBC Bank, Inc., alleging that mortgage borrowers were overcharged for force-placed insurance.    The borrowers specifically alleged that these servicers imposed force-placed insurance policies that were far more expensive than market rates and received hundreds of millions of dollars in clandestine commissions from the

insurance companies writing the policies. The servicers' practice of imposing expensive force-placed insurance increased the borrowers' monthly payments by a large amount. As a result, homeowners who were already behind in payments or were facing financial difficulties went into foreclosure. The plaintiff borrowers have also entered into several well publicized settlements with these servicers, including settlements of $300 million with JPMorgan Chase, $110 million with Citibank, $32 million with HSBC, and $19.3 million with Wells Fargo.[16]

462.    Notably, the Ally/GMAC, Bank of America, Citi, JPMorgan Chase, Wells Fargo, Ocwen and HSBC entities subject to the above-mentioned settlements collectively service and administrate over $213 billion in mortgage loans held by the Trusts. Plaintiffs are informed and believe that these servicers and each of the other servicers to the Trusts have engaged in the same violations of their prudent servicing obligations in servicing and administrating the mortgage loans for the Trusts.

463.    The servicers' systemic, pervasive failure to observe their prudent servicing obligations has materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

C.    **The Servicers Have Violated Their Foreclosure Obligations**

464.    The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no

---

[16] *Alfred Herrick, et al. v. JPMorgan Chase Bank, N.A., et al.*, 13-21107 (S.D. Fla.); *Hall v. Bank of Am., N.A.*, 12-22700 (S.D. Fla.); *Lopez v. HSBC Bank USA, N.A. et al.*, 13-21104 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, 13-60721 (S.D. Fla.); and *Casey, et al., v. Citibank N.A.*, 12-00820 (N.D.N.Y.).

satisfactory arrangements can be made for collection of delinquent payments. Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

465. Highly publicized government enforcement actions and settlements reached with the servicers similarly have revealed the servicers have breached their foreclosure obligations. For example, in the fourth quarter of 2010, the Federal Reserve System, the OCC, the FDIC, and the Office of Thrift Supervision ("OTS") (collectively, the "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers which represented more than two-thirds of the servicing market. These servicers included Ally Bank/GMAC, Aurora Bank, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo, many of which are servicers to the Trusts. In April 2011, the Agencies issued a joint report entitled "Interagency Review of Foreclosure Policies and Practices," summarizing the findings of their reviews and providing an overview of the potential impact associated with instances of foreclosure-processing weaknesses that occurred industrywide. Notably, the Agencies' reviews found "critical weaknesses in each of the servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the Agencies initiated formal enforcement actions against each of the fourteen servicers subject to the review to address those weaknesses and risks. The enforcement actions detailed the weaknesses at each servicer and required each servicer, among other things, to conduct a more complete review of

certain aspects of foreclosure actions that occurred between January 1, 2009, and December 31, 2010.

466.    Similarly, as noted above, in March 2012, following an extensive investigation of Wells Fargo, Bank of America, Citigroup, Countrywide, J.P. Morgan Chase, Ally Financial, Inc., and GMAC Mortgage, LLC – some of the same servicers that service billions of dollars of loans in the Trusts – the Justice Department, the Department of Housing and Urban Development ("HUD") and forty-nine state attorneys general filed a complaint against these servicers and announced the $25 billion National Mortgage Settlement of the claims set forth in the complaint. In the complaint, the attorneys general and federal government alleged that these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, charging improper fees, preparing, executing, notarizing or presenting false and misleading documents and engaging in robosigning.

467.    Likewise, as noted above, in December 2013, following an extensive investigation of Ocwen and certain of its acquired entities, the CFPB, authorities in forty-nine states, and the District of Columbia filed a complaint against Ocwen and announced a $2 billion settlement of the claims stated in the complaint. The CFPB's and attorneys general's complaint alleged that Ocwen engaged in the same wrongful conduct related to foreclosures described in the complaint against the servicers leading to the National Mortgage Settlement.

468.    In addition, private litigation has exposed the servicers' wrongful foreclosure practices. For example, in a California class action that has survived a motion to dismiss, plaintiffs alleged that Aurora Loan Services, Inc. foreclosed on homes without any notice that loan modifications were denied and without allowing borrowers access to any cure method

despite promises in an agreement to do so. *Mauder, et al. v. Aurora Loan Servs., LLC*, No. 10-cv-03383 (N.D. Cal. Aug. 2, 2010) Class Action Compl. ¶2.

469.    Servicers have also frequently wrongfully foreclosed on properties owned by military servicemembers who were protected under the Servicemembers Civil Relief Act ("SCRA").   Based on a federal government complaint accusing Countrywide Home Loans Servicing LP (the fourth largest servicer of loans in the Trust) of violating the SCRA on approximately 160 properties, Countrywide agreed to pay $20 million to the victims.  *United States v. BAC Home Loans Servicing, LP F/K/A Countrywide Home Loans Servicing, LP And Any Successors In Interest*, No. 11-cv-04534 (C.D. Cal. May 31, 2011) Consent Order ¶18.

470.    The servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them.  Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.



Sources: RealtyTrac, Moody's Analytics

471.    The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on

mortgages that would have been liquidated but for the servicers' breach of their duties. For example, in the complaint that led to the National Mortgage Settlement discussed above, the federal government and forty-nine states accused Citigroup, Wells Fargo, Bank of America, J.P. Morgan Chase, Countrywide, and Ally Financial (many of which were servicers of loans in the Trusts) of unfair and deceptive practices in the discharge of their loan servicing activities for, among other things, "*charging excessive or improper fees for default-related services.*" *United States, et al. v. Bank of Am., et al.*, No. 12-cv-0361 (D.D.C. Mar. 12, 2012) Compl. ¶51.

472. The servicers' systemic, pervasive violations of their foreclosure obligations have materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents. The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations. The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

### D. The Servicers Have Violated Their Modification Obligations

473. The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances. When modifications are required to remedy predatory-lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.

474. The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violation, as well as the expenses reasonably

incurred in enforcement of the sellers' obligation to cure predatory mortgages. For instance, in October 2008, attorneys general in eleven states announced a landmark, $8.68 billion settlement of predatory-lending claims against Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending. The settlement enabled eligible subprime and pay-option mortgage borrowers whose loans were serviced by Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for some borrowers, reduction of their principal balances.

475. The servicers have also breached the PSAs by agreeing to modify loans held in the Trusts to settle claims by various attorneys general related to the servicers' wrongful servicing and foreclosure practices. For example, in meeting their payment obligations with respect to the National Mortgage Settlement, the settling servicers received credit for writing down principal of, and providing forbearance for, mortgage loans held by the Trusts.

476. The servicers' violations of their loan modification obligations have materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and Certificateholders by using Trust collateral to settle claims that were not, and could never be, made against the Trusts.

### E. The Servicers Have Abused Their Servicing Advances Obligations

477. The PSAs provide that the servicers are to advance principal and interest on a loan only if they determine that the advance payment is recoverable. The PSAs further provide that the servicers may only recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the servicers' performance of their servicing obligations. The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts. In particular, the servicers have manipulated the "recoverable"

designation to their advantage.  During low interest rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on the loans, which exceed the relatively low cost of financing the advances on these delinquent loans.  When interest rates have increased, however, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable.  The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

478.    The servicers' manipulation of the "recoverable" designation was illustrated in the May 2013 remittance reports for many of the Trusts.  Following the Federal Reserve Board's May 11, 2013 announcement of its plan for tapering its bond-buying program, interest rates quickly shot up.  In a transparent response to the increase in the cost of financing their advances, the servicers switched the designation from recoverable to unrecoverable for an unprecedented amount of delinquent mortgage loans within the Trusts.  Specifically, the servicers wrote down an amazing $1.2 billion in May 2013 alone, representing a 66% increase over the prior reporting period.  The servicers' massive write-downs are particularly suspicious, given that the mortgaged property values had been steadily rising for the past twelve months.



**Reported Collateral Write Downs in Detsuche Bank Trusts**

Source: Bloomberg

479. The Trusts and their Certificateholders are harmed by the servicers' manipulation of the "recoverable" designation because the Trusts incur more interest rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the PSAs.

480. The servicers' abuse of their advancing obligations is further illustrated by their increasing use of "unrecognized forbearances." The servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the principal amounts of the mortgage loans. The forbearances allow the servicers to lower their advanced principal payments on the loans. Nevertheless, the servicers do not formally write-down the loan balances or make any recognition on the Trusts' accounts. Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the servicers to earn full servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the

Trusts' loan pools, although the mortgage loans are accruing interest at a lower principal amount and without the servicers having to make any advances.

481. According to a Credit Suisse study, unrecognized forbearances in the Trusts totaled over $1.0 billion as of April 2013.[17] At least 386 Trusts had some amount of unrecognized forbearance, and at least 23 of the Trusts had unrecognized forbearance amounts exceeding 3% of the Trust's current collateral balance:

**Top 10 Deutsche Bank Trusts By Share Of Current Balance Forbearance**

Data as of April 2013 distributions. 1st lien only

| Offering | Original Face Amount | Then Current Balance | Estimated Unrecognized Forbearance | Unrecognized Forbearance as % of Current Balance |
|---|---|---|---|---|
| AHMA 2006-2 | $1,200,506,100 | $366,178,529 | $33,121,646 | 9.05% |
| AHMA 2007-1 | $1,505,808,822 | $620,105,834 | $48,868,355 | 7.88% |
| AHMA 2007-5 | $776,597,903 | $361,494,580 | $26,958,490 | 7.46% |
| AHMA 2007-2 | $1,723,705,150 | $685,359,750 | $49,444,152 | 7.21% |
| ALBT 2007-OA1 | $319,128,991 | $95,237,892 | $6,747,166 | 7.08% |
| AHM 2007-1 | $3,727,138,479 | $811,064,174 | $54,226,230 | 6.69% |
| AHMA 2006-5 | $1,520,374,100 | $566,018,996 | $37,053,289 | 6.55% |
| AHMA 2006-6 | $1,256,055,315 | $516,266,430 | $31,287,317 | 6.06% |
| HVMLT 2007-5 | $1,114,933,578 | $614,038,400 | $36,017,942 | 5.87% |
| HASC 2006-OPT4 | $947,175,000 | $225,418,534 | $12,676,979 | 5.62% |

Source: Credit Suisse, Loan Performance

482. The servicers' pervasive use of unrecognized forbearances harms the Trusts and their Certificateholders since the Trusts pay higher servicing fees to the servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

483. Despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their charges to a level 100% or more above the market price – to provide

---

[17] Credit Suisse estimated that, as of April 2013, unrecognized forbearances on non-agency RMBS deals issued after 2000 (first lien only) totaled around $8.3 billion.

services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement their servicing income.

## XII. DEUTSCHE BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

484.    There is ample evidence that, since 2009 and continuing to the present, Deutsche Bank and its responsible officers have known of the above-described widespread, severe failures on the part of the servicers to perform in material respects their obligations under the PSAs. Preliminarily, as discussed above, since 2009 and continuing to the present, there has been a steady stream of public disclosures regarding the servicers' violations.  Apart from the highly publicized government investigations, reports and enforcement actions, as well as high-profile litigation involving the servicers, as explained below, there is a host of additional evidence demonstrating Deutsche Bank's and its responsible officers' knowledge that the servicers have materially breached their contractual obligations.  This evidence includes, among other things, a notice issued by Deutsche Bank to all Certificateholders of RMBS for which Deutsche Bank serves as trustee, and a memorandum issued to all servicers of mortgage loans securitizing RMBS for which Deutsche Bank serves as trustee, that admit Deutsche Bank's awareness of extensive servicer misconduct adversely impacting the Trusts.

### A.    Deutsche Bank Knew Of Pervasive And Systemic Breaches Of Representations And Warranties In The Trust Collateral

485.    As set forth herein, beginning as early as 2009 and continuing to the present, pervasive and systemic breaches of representations and warranties within the mortgage loans included in the Trusts became apparent to Deutsche Bank and its responsible officers.

486.    In violation of its duties and loyalties to the Trusts, its contractual obligations as Trustee, and its obligations under the Governing Agreements and the TIA, Deutsche Bank took no action to protect the Trusts.  Instead, for its own self-interests, Deutsche Bank acted against

the interests of the Trusts, actively avoided direct knowledge of particular breaches and frustrated any communications with Certificateholders.

487.    For example, as noted above, on August 26, 2009, Deutsche Bank, as trustee for ninety-nine trusts in which WaMu sold, sponsored and serviced loans, filed a federal lawsuit against the FDIC (as the receiver for WaMu) and others on behalf of the WaMu-DB Trusts and the investors in the WaMu-DB Trusts seeking to enforce the trusts' and certificateholders' rights (the "Deutsche Bank Litigation").  Deutsche Bank commenced its action because the FDIC failed to respond to its proof of claim filed the preceding year.  In addition to highlighting WaMu's systemically deficient origination practices and pervasive sale of mortgage loans that failed to comply with representations and warranties between 2004 and 2008, Deutsche Bank's complaint in the Deutsche Bank Litigation detailed WaMu's serving abuses.  *See Deutsche Bank Nat'l Trust Co. v. FDIC, as Receiver for Wash. Mut. Bank, et. al.*, No. 1:09-cv-01656 (D.D.C. Aug. 26, 2009).

488.    On January 31, 2012, an investor group issued instructions to Deutsche Bank, U.S. Bank, and Well Fargo, as trustees, to open investigations of ineligible mortgages in pools securing over $25 billion of RMBS issued by various affiliates of Morgan Stanley and deficient servicing of those loans.

489.    On September 19, 2012, the same investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to Deutsche Bank and other RMBS trustees, as well as Wells Fargo, the servicer or master servicer, identifying breaches by Wells Fargo of specific servicing covenants in PSAs for ninety-five trusts from the Morgan Stanley-label IXIS, MSAC, and MSM and SAST shelves and 149 trusts from the Wells Fargo-label WFALT, WFMBS and WMLT shelves.  The September 19, 2012 Notice alleged that each of these servicing failures had

materially affected the rights of the certificateholders and constituted ongoing Events of Default in the servicer's performance under the relevant PSAs. The January 5, 2012 Notice, coupled with the September 19, 2012 Notice, put Deutsche Bank on notice of systemic deficient servicing practices by Wells Fargo, which is one of the largest originators, sponsors and servicers of loans in the Trusts.

**B.** **Deutsche Bank And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Servicer Breaches**

490.    In its capacity as trustee to other RMBS trusts that are not the subject of this action, Deutsche Bank and its responsible officers also repeatedly received written notice from Certificateholders of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts. Based on the systemic, pervasive practices complained of in the Certificateholders' breach notices, Deutsche Bank and its responsible officers knew that the servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

**C.** **Deutsche Bank Issued Notices And Memoranda Confirming Its Knowledge Of Pervasive And Systemic Servicer Breaches**

491.    Deutsche Bank has also confirmed its knowledge of pervasive and systemic servicer breaches in written correspondence to the Certificateholders and servicers of the mortgage loans included in the Trusts. For example, as noted above, in October 2010, Deutsche Bank issued a notice to all holders of RMBS for which it served as trustee stating it was "aware" of ongoing government investigations into documentation deficiencies in foreclosure proceedings initiated by RMBS servicers. As stated in the notice, it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure

practices, procedures and/or documentation." According to Deutsche Bank, these defects included "the execution and filing by certain Servicers and/or their agents of potentially defective documents, possibly containing alleged untrue assertions of fact, in connection with certain foreclosure proceedings," such as misuse of powers of attorney furnished by Deutsche Bank that allow the servicers to sign documents and institute foreclosure proceedings and other legal actions in the name of the Trustee on behalf of the Trusts. Deutsche Bank's notice informed Certificateholders that it had "communicated" with the loan servicers, but "reminded" investors that it otherwise would not take "any remedial actions" to enforce the Trusts' rights unless so directed by holders with a requisite percentage in principal amount of securities, "subject to conditions stated in the governing documents."

492. Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee. In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to Certificateholders. The memorandum referred to the expansive scope of the reported servicer deficiencies, which implicated "foreclosure proceedings relating to mortgage loans owned by the Trusts." The memorandum confirmed that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [PSAs] and applicable law." Deutsche Bank's memorandum warned the servicers that it would require them to "indemnify and hold harmless Deutsche Bank, individually and in its capacity as Trustee, the Trusts and the investors from all liability, loss, cost and expense of any kind" arising from "any servicing activities in breach or

violation of the Governing Documents and/or applicable law," but did not undertake affirmative action to recover actual losses incurred by the Trusts as a result of the servicers' pervasive and systemic breaches.

### D. Deutsche Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports

493.    Deutsche Bank and its responsible officers also knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports Deutsche Bank itself published.  These reports detailed the Trusts' increasing loan modifications, staggering losses, and write-downs due to the poor credit quality of the loans, but did not reflect the servicers' actions to enforce the sellers' repurchase obligations.  The reports similarly reflected the servicers' abuse of servicing advances.

## XIII. DEUTSCHE BANK HAS FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES

494.    Despite Deutsche Bank's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, and servicer violations, Deutsche Bank failed to perform its duties as Trustee to protect the Trusts and Certificateholders.

### A. Failure To Enforce The Trusts' Repurchase Rights

495.    As set forth above, beginning in 2009 and continuing to the present, Deutsche Bank and its responsible officers discovered deficiencies in mortgage loan files, breaches of the sellers' representations and warranties regarding the mortgage loans' credit quality and characteristics, and the harm that these seller violations caused to the Trusts and their Certificateholders.

496.    Deutsche Bank breached its contractual and its statutory duties under the TIA and was negligent by failing to (i) provide notice to the servicers and the responsible sellers upon its

discovery of these breaches, and (ii) take any action to enforce the sellers' obligation to repurchase the defective mortgage loans.

### B. Failure To Provide Notice To The Servicers Of Events Of Default

497.     As set forth above, beginning in 2009 and continuing to the present, Deutsche Bank and its responsible officers knew of failures by the servicers to perform in material respects its covenants in the PSAs, including the servicers' (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery of the breaches and to enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of loan modification obligations; and (v) improper servicing advances.  These breaches by the servicers constituted "Events of Default" as defined by the PSAs.

498.     Deutsche Bank breached its contractual obligations and its statutory duties under the TIA and was negligent by failing to provide notice to the servicers of these Events of Default or terminating the servicers.

### C. Failure To Act Prudently After The Uncured Events Of Default

499.     As set forth above, the Events of Default occurred, remained uncured for the requisite period of time and are continuing.  Consequently, under the PSAs, Deutsche Bank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise of those rights and powers, as a prudent person would exercise or use under the circumstances in the conduct of the person's own affairs.

500.     A prudent person would have taken action to protect the Trusts and their Certificateholders from the known seller breaches of representations and warranties by

exercising all of the trustee's rights under the PSAs to enforce the sellers' repurchase obligations, including timely investigating to determine all of the materially breaching mortgage loans and suing the sellers for specific performance to compel their repurchase of those loans. Deutsche Bank breached its contractual, statutory and fiduciary duties and was negligent by failing to act prudently and not taking these actions.

501. A prudent person would have also taken action to protect the Trusts and their Certificateholders from the known servicer violations by exercising all of the trustee's rights under the PSAs to enforce the servicers' prudent servicing obligations, including ensuring that all Events of Default were cured, terminating the servicers, substituting itself as the substitute servicer, or replacing the servicers, and enforcing the servicers obligations to reimburse the Trusts for losses caused as a result of their breaches through suit if necessary. Deutsche Bank breached its contractual, statutory, and fiduciary duties and was negligent by failing to act prudently and not taking these actions.

## D. Failure To Enforce The Trusts' Repurchase Rights

502. As set forth above, beginning in 2009 and continuing to the present, Deutsche Bank and its responsible officers discovered deficiencies in mortgage loan files, breaches of the sellers' representations and warranties regarding the credit quality and characteristics of the mortgage loans, and the harm that these seller violations caused to the Trusts and their Certificateholders.

503. Deutsche Bank had no good faith reason for failing to provide notice of these Events of Default to the Certificateholders. Consequently, Deutsche Bank breached its contractual, statutory and fiduciary duties and was negligent by failing to provide Certificateholders with notice of these Events of Default.

## XIV.  DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS

504.    Deutsche Bank failed to protect the Trusts after Trust Sponsors or Originators filed for bankruptcy or otherwise became insolvent.  In these instances, Deutsche Bank only acted to assert the Trusts' rights when it was in Deutsche Bank's interests and only to the limited extent consistent with Deutsche Bank's interests.  In particular, Deutsche Bank failed to adequately and comprehensively pursue relief against numerous solvent third parties that were also contractually liable under the PSAs for servicing violations or representation and warranty violations.  Finally, Deutsche Bank failed to provide notice of seller defaults, Events of Defaults, and otherwise notify Certificateholders of information known only to Deutsche Bank that was necessary for Certificateholders to take action to protect their rights and avoid or mitigate losses.

505.    Deutsche Bank has failed to adequately protect the Trusts against pervasive violations in the servicing of loans collateralizing Trusts sponsored by failed entities.  Loans collateralizing these Trusts were serviced (and continue to be serviced) by third parties unaffiliated with the bankrupt or insolvent sponsors.  As discussed herein, servicers have independent duties and obligations under the PSAs, and their liability for breach of those duties and obligations is untethered to solvency of the sponsor.

506.    For example, Wells Fargo was a major servicer of loans securitizing insolvent sponsors American Home Mortgage and Fremont, servicing over $35.5 billion of loans collateralizing American Home Mortgage and Fremont-sponsored RMBS in this action.  There is ample evidence that Wells Fargo engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including trusts sponsored by American Home Mortgage and Fremont.  Among other things, Wells Fargo was one of the fourteen federally regulated mortgage servicers against whom the Federal Reserve, the OCC, the FDIC,

and the OTS initiated formal enforcement actions against, which resulted in a Consent Order against Wells Fargo based on comprehensive interagency findings of serious abuses and "critical weaknesses" in its servicing and foreclosure processes. Despite Deutsche Bank's knowledge of such systemic and pervasive servicing abuses by solvent third party servicers, including Wells Fargo, Deutsche Bank failed to adequately protect the rights of American Home Mortgage and Fremont-sponsored Trusts against solvent servicers.

507. In addition, Deutsche Bank also has not pursued representation and warranty claims against solvent originators for thousands of breaching mortgage loans backing Trusts sponsored by failed entities. Examples of such solvent third party sellers of loans to bankrupt or insolvent sponsors include Citibank, Argent, and ABN Amro, which collectively sold over $30 billion of loans securitizing Trusts sponsored by Ameriquest at issue in this action.

508. Further, as noted above, in 2008, Lehman, a major sponsor for the Trusts filed for bankruptcy. In connection with Lehman's bankruptcy, Deutsche Bank, U.S. Bank, Wilmington Trust Company, Wilmington Trust, National Association, and Law Debenture Trust Company of New York, in their capacity as trustee, separate trustee or indenture trustee (collectively, the "Lehman Bankruptcy RMBS Trustees"), filed proofs of claims, asserting that Lehman was liable to 405 trusts for breaches of representations and warranties for all one million of the mortgage loans underlying these Trusts. In pursuing these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a sample of nearly 5,000 loans in 255 of the 405 RMBS trusts that suffered a loss. The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans. Deutsche Bank was the trustee for trusts subject to this review. Deutsche Bank has not, however, pursued solvent originators to enforce representation and warranty claims as to the thousands of

breaching mortgage loans in those Trusts. Examples of such solvent third party loan sellers include Provident Bank and Finance America, which sold hundreds of millions of dollars of loans securitizing Lehman-sponsored Trusts at issue in this action.

509. Deutsche Bank also failed to discharge its contractual and statutory obligations concerning Trusts sponsored by failed entities by neglecting to provide written notice to Certificateholders of defaults in the form of rampant breaches of representations and warranties by the sellers and servicer violations (including continuing Events of Default), including with respect to deficient loans sold by solvent responsible parties. Proper notice would have enabled Certificateholders to, among other things, determine whether to take independent or collective action to protect their interests against such breaches of representations and warranties, including against solvent responsible parties and others engaged in abusive securitization practices.

## XV. DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

510. Deutsche Bank failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and the Certificateholders because acting to diligently protect the interests of the Trusts would have conflicted with its own interests.

### A. Deutsche Bank Was Economically Beholden To The Mortgage Loan Sellers

511. Trustees are selected by the sponsor, which is often an affiliate of the servicer. While Deutsche Bank was charged with representing the interests of the Trusts and all Certificateholders, it was economically beholden to the sponsors. Indeed, Deutsche Bank had close, repeat business relationships with most if not all of the sponsors. For example, Deutsche Bank received over 30% of its private-label residential mortgage securitization trusteeship appointments from just three banks (IndyMac, WaMu, and GMAC) based on the cumulative original face value of the offerings. And, the vast percentage of these banks' servicing business

was conducted by their respective affiliates: IndyMac (96.17%), Long Beach/WaMu (98.18%) and GMAC (99.04%). Accordingly, Deutsche Bank was incentivized to not require servicers to take necessary action because these servicers were affiliated with the sponsors that provided valuable trustee appointments. In short, Deutsche Bank failed to protect the Trusts because it did not want to risk losing significant business from these sponsors.

**B.    Deutsche Bank Originated
        And Sponsored Defective Loans**

512.    Deutsche Bank AG, through its affiliates as originators and sponsors for trusts, sold and securitized hundreds of millions of dollars of loans that breached applicable representations and warranties. Specifically, Deutsche Bank AG, through its affiliates (*e.g.,* DB Products), sponsored thirty-five RMBS offerings under the ACE, DBALT, DMSI and MHL labels that were collateralized by a total of over $106 billion in certificates issued from trusts ("DB-Sponsored Trusts"). Indeed, many of the same entities that acted as sellers through their affiliate companies acted in the capacity as servicer or trustee for the DB-Sponsored Trusts, including Deutsche Bank. In fact, Deutsche Bank served as Trustee for nine out of eleven of the deals from the MHL shelf, despite – as explained below – having intimate knowledge of the originators' (i.e., MortgageIt, Inc.) improper lending practices and the poor performance of the loans its affiliates originated.

513.    Many of the underlying residential mortgage loans for DB-Sponsored Trusts were originated by Deutsche Bank and its affiliates. For example, Deutsche Bank, AG, through its affiliates MortgageIt, Inc., DB Home Lending LLC, and Chapel Funding Corp., combined to originate over $16.2 billion in loans used to collateralize DB-Sponsored Trusts. In addition, Deutsche Bank acquired loans for its securitizations from some of the most notorious mortgage originators at the time, including Freemont, Countrywide, New Century, Option One,

GreenPoint, and WMC. As a mortgage loan seller, both as an originator and sponsor, Deutsche Bank made representations and warranties to the DB-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

514. Moreover, Deutsche Bank's close relationships with the subprime lenders that originated the loans backing the RMBS gave it unique insight into the quality of those loans. These relationships included Deutsche Bank's role as one of the largest warehouse lenders to numerous subprime lenders, extending lines of credit totaling billions of dollars to several of the originators whose loans backed the DB-Sponsored Trusts, including New Century, Countrywide, American Home, Option One and Ameriquest. As a result of its close relationships with loan originators – as an affiliate, multibillion dollar warehouse lender, and multibillion dollar securitization partner – Deutsche Bank had detailed knowledge about these originators' improper origination practices, failure to abide their underwriting guidelines, and the poor quality of the loans they originated and securitized.

515. As of 2007, Deutsche Bank had warehouse lending commitments to subprime lenders totaling at least a billion dollars. Before providing such funding, Deutsche Bank became intimately familiar with the lending practices of these originators through extensive due diligence on their business operations. As explained by one industry publication, warehouse lenders such as Deutsche Bank have "detailed knowledge of the lender's operations" with "day-to-day pipeline exposure to what the mortgage lender [is] doing."[18]

516. Widespread public evidence demonstrates pervasive violations of seller representations and warranties in the DB-Sponsored Trusts. For example, in *Massachusetts*

---

[18] Kevin Connor, *Wall Street and the Making of the Subprime Disaster* (November 2007) at 11. *Bayerishche Landesbank v. Deutsche Bank AG*, Index No. 651264/2012 (N.Y. Sup. Ct.) Compl. ¶102.

*Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities*, No. 2:08-cv-03178 (E.D.N.Y. May 24, 2010), investors reviewed a sample of loans from two Deutsche Bank-label Trusts at issue here, DBALT 2006-AB4 and DBALT 2006-AR5, and found that Deutsche Bank understated the LTV ratio in 44% and 51% of the sampled loans for each trust.

517.    Moreover, in the FHFA's analysis of the quality of the loans included in Deutsche Bank sponsored offerings, it consistently found that 20% or more of the loans in these offerings had LTV ratios of over 100% and that non-owner occupied properties had been repeatedly understated by 10% or more.  *See FHFA v. Deutsche Bank, AG, et al.*, No. 1:11-cv-06192 (S.D.N.Y. Sept. 2, 2011).  As further support for its allegations of Deutsche Bank's systematic misreporting of owner occupancy and LTV statistics, FHFA's complaint highlighted government and private investigations into the originators' underwriting practices, revealing widespread abandonment of the originators' reported underwriting guidelines during the relevant period, the collapse of the Certificates' credit ratings, and the surge in delinquencies and defaults in the mortgages in the Deutsche Bank securitizations.

518.    Accordingly, because Deutsche Bank itself faced enormous repurchase liability for its own originated or sponsored loans sold in breach of representations and warranties, Deutsche Bank was disincentivized to take any action against the sellers and servicers for the Trusts, or even alert the Certificateholders to the sellers' and servicers' misconduct.

### C.    Deutsche Bank Refused To Discharge Its Duties In Order To Preserve Profits

519.    Deutsche Bank was also conflicted because discharging its critical pre- and post-default duties owed to the Trusts and the Certificateholders would have necessarily diminished its profits.  Specifically, such conduct would have directly impaired Deutsche Bank's profits by increasing costs and expenses while revenue remained unchanged.  Indeed, rather than act

pursuant to its proscribed contractual, statutory, and common law duties, Deutsche Bank failed and unreasonably refused to enforce the sellers' repurchase obligations and servicers' prudent servicing requirements in order to avoid the associated transactional costs of exercising the Trusts' rights against these entities – or provoke the servicers to shine the light on Deutsche Bank's own wrongful conduct.

520.    For example, prior to a "default" under the TIA or an "Event of Default" under the PSAs, Deutsche Bank had minimal ministerial duties to perform.[19] Following a default under the TIA or Event of Default under the PSAs, however, Deutsche Bank's obligations expand such that it must act as a prudent person.  This requirement carries with it significant and more costly responsibilities, including seeking direction from the certificateholders regarding the appropriate actions it should take on behalf of the trusts.  However, fulfilling these greater duties increases costs while Deutsche Bank's compensation under the PSAs – a fixed fee rate based on the unpaid principal balance of the Trust (typically less than one basis point) – would remain unchanged.

521.    Additionally, the occurrence of an Event of Default could lead to the termination of the master servicer, which would have profound financial implications on Deutsche Bank.  If the master servicer were terminated, Deutsche Bank would have to retain a successor master servicer or substitute itself in as the master servicer.  The compensation that Deutsche Bank or the successor master servicer could obtain would be heavily restricted.  For example, typical – and more lucrative – servicing income, such as float, excess spread, and ancillary fees are prohibited for a successor master servicer under the PSAs.  Nevertheless, Deutsche Bank or the

---

[19] New York common law still imposed certain non-waivable duties on Deutsche Bank both before and after a "default" under the TIA or an "Event of Default" under the PSAs.

successor master servicer would be required to hold regulatory capital against the servicing rights.

522. Further, the occurrence of a default under the TIA or an Event of Default under the PSAs requires Deutsche Bank to provide notice of these defaults to the certificateholders. In addition to alerting certificateholders as to seller and servicer violations, the default notice would expose Deutsche Bank's negligence in carrying out its ministerial duties, including its failure to receive, process, maintain and hold all or part of the mortgage loan files as required under the PSAs. Consequently, Deutsche Bank's providing notice to the certificateholders of defaults could lead to potential liability or its removal as trustee of the Trusts.

523. Accordingly, the increased duties, costs, and liability risk associated with enforcing the Trusts' rights against the above-described seller and servicer violations would make Deutsche Bank's trusteeships less profitable and possibly unprofitable. For these reasons, Deutsche Bank failed and unreasonably refused to enforce the Trusts' rights against the sellers and servicers.

## XVI. CAUSATION

524. Deutsche Bank's failure and unreasonable refusal to enforce the Trusts' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to waste away. The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the principal and interest payments owed to the Trusts. Moreover, servicer violations have exacerbated the Trusts' losses. Had Deutsche Bank performed its duties as Trustee, in particular had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached the representations and warranties, it

would have prevented the Trusts from incurring substantial losses and Trust assets from wasting away. Had Deutsche Bank enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Certificateholders.

## XVII. **DAMAGES**

525. The Trusts have incurred substantial damages attributable to Deutsche Bank's breaches of its contractual, statutory, fiduciary, and common law duties. In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency. As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations. Damages incurred by the Trusts and caused by the Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XVIII. **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)**

526. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

527. The PSAs are valid contracts that memorialize the issuance of certificates of beneficial interests in the Trusts, and establish Deutsche Bank's contractual duties and obligations, in its capacity as Trustee, to the Trusts and all their respective Certificateholders. Each of the relevant contractual provisions is substantively similar if not identical in all of the PSAs, and imposes substantially the same if not identical duties and obligations on Deutsche Bank in its capacity as Trustee.

528.    The Trusts and each of the Plaintiffs have performed all of the conditions, covenants, and promises required in accordance with each of the PSAs.

529.    Under each PSA, Deutsche Bank owed a duty to the Trusts and all Certificateholders (i) to give prompt written notice to all parties to the PSA of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affect the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon Deutsche Bank's discovery of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

530.    As set forth above, Deutsche Bank materially breached each PSA by (i) failing to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon Deutsche Bank's discovery of the breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure the defective mortgage loans.

531.    In addition, the PSAs required Deutsche Bank, upon an "Event of Default" to (i) provide written notice to all Certificateholders of the Event of Default within sixty days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and powers vested in Deutsche Bank by the PSA using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

532.    The PSAs define an "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice

of the failure has been given to the servicer by the trustee requiring the failure to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

533. Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

534. The servicers have failed and refused to do the following, each of which has materially impaired the rights of the Trusts and all Certificateholders:

(a) Breaches of Representations and Warranties. As with the Trustee, the PSAs required the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon the servicer's discovery of the breach. The servicers have failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Trusts:

(i) although servicers often modify mortgage loans, and in the process of doing so have discovered that specific loans breached applicable representations and warranties, the servicers have not notified the other parties of these breaches;

(ii) although there has been widespread public evidence of pervasive breaches of applicable representations and warranties, and although the servicers have been specifically notified by insurers and Certificateholders of these pervasive breaches, the servicers

have not notified the other parties to the PSAs (including Deutsche Bank) of these breaches; and

(iii)     although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

(b)     <u>Violation of Prudent Servicing Obligations.</u>  The PSAs require the servicer to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicer's right to receive compensation or other fees for its services under the PSA, the servicer's obligation to make servicing advances under the PSA, and the servicer's ownership, servicing or management for others of any other mortgage loans.  In violation of their prudent servicing obligations under the PSAs, the servicers have:

(i)     failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(ii)     failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(iii)    failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(iv)    imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(v)     incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(vi)    prejudiced the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral.

(c)    <u>Violation of Foreclosure Obligations</u>.  The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, each of the PSAs contemplates that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.  Despite these covenants, the servicers have:

(i)     continued to keep defaulted mortgage loans on their books, rather than foreclose or liquidate the loans, in order to wrongfully

maximize their servicing fees, at the expense of the Trusts' and Certificateholders' best interests, including the right to recover from pool or financial guaranty insurance policies;

(ii)     failed to maintain records in an accurate, appropriate, and adequate manner, which has impeded the process of foreclosure and liquidation of defaulted mortgages and caused wholly avoidable delays that have injured the Trusts and Certificateholders;

(iii)    continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

(iv)     failed to place the interests of the Trusts and Certificateholders before their own interests.

(d)    <u>Violation of Modification Obligations</u>.    The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.   When modifications are required to remedy predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.   The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys' general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably

incurred in enforcing the sellers' obligation to cure predatory mortgages. The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders. The servicers have therefore failed:

(i)     to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

(ii)    to deliver to the trustees a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

(e)     Improper Servicing Advances.  The PSAs provide that the servicers may recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including but not limited to the cost of the preservation, restoration, and protection of a mortgaged property. Despite the requirement that servicing advances be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a

fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

535.    Deutsche Bank and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, Deutsche Bank failed to deliver written notices to the servicers of the defaults or terminate the servicers.  Similarly, Deutsche Bank failed to provide Certificateholders with notice of these Events of Default.  By failing to take these actions, Deutsche Bank materially breached the PSAs.

536.    These Events of Default occurred, remained uncured for the requisite period of time, and are continuing.  Consequently, under the PSAs, Deutsche Bank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the trustee's rights to recover for these Events of Default, and would have done so promptly.  By failing to take this action, Deutsche Bank materially breached the PSAs.

537.    Deutsche Bank's material breaches of the PSAs have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away.  For example, had Deutsche Bank protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  Deutsche

Bank's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses. Similarly, had Deutsche Bank enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses. Deutsche Bank's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

538. Deutsche Bank's material breaches of the PSAs have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)**

539. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

540. Congress enacted the TIA, 15 U.S.C. § 77aaa, *et seq*., to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

541. Each of the PSAs is an "indenture," and Deutsche Bank is an "indenture trustee," within the meaning of the TIA. 15 U.S.C. §§ 77ccc(7), (10). As noted above, each of the PSAs is substantially similar and imposes substantially the same duties on Deutsche Bank in its capacity as Trustee. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs and the related Trusts. 15 U.S.C. § 77ddd(a)(1). Deutsche Bank has violated multiple provisions of the TIA.

542.     First, the TIA requires that, before default, the indenture trustee be liable for any duties specifically set out in the indenture.  15 U.S.C. § 77000(a)(1).  As set forth above, Deutsche Bank has failed to comply, in good faith, with numerous duties specifically assigned to it by each of the PSAs, including the duties:

(a)     to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' representations and warranties, upon Deutsche Bank's discovery of the breaches;

(b)     to enforce the sellers' obligations to repurchase, substitute, or cure defective mortgage loans; and

(c)     to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.

543.     By failing to comply with these specific duties, Deutsche Bank violated the TIA.

544.     In addition, the TIA requires Deutsche Bank to inform Certificateholders of defaults within ninety days after their occurrence.  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase or substitute defective or nonconforming loans in the Trusts; and (ii) the failure on the part of the servicers to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and servicing and administering the mortgage loans in accordance with applicable law and

customary and usual standards of practice of mortgage lenders and loan servicers. Given the great importance of those defaults to the Certificateholders' interests, Deutsche Bank had no good faith reason for failing to provide notice of those defaults. Accordingly, by failing to provide this notice, Deutsche Bank violated the TIA.

545.    Second, in case of default, the TIA requires Deutsche Bank to exercise its rights and powers under the PSA as a prudent person would, under those circumstances, in the conduct of the persons' own affairs. 15 U.S.C. § 77000(c). Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts, any prudent person under those circumstances would have exercised all of the trustee's rights to, among other things, enforce the sponsors' and originators' obligation to repurchase, substitute, or cure defective mortgage loans, and a prudent person would have exercised those rights promptly. Indeed, with the number of delinquent and defaulting mortgages in the Trusts increasing, as a result, *inter alia*, of these defects, the Trusts could only have been protected from the resulting losses through the trustee's prompt exercise of those rights, which were designed precisely to limit the number of delinquent and defaulting mortgages in the Trusts. By failing to exercise those rights in such circumstances, Deutsche Bank violated the TIA.

546.    Deutsche Bank's violations of the TIA have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away. For example, had Deutsche Bank protected the rights of the Trusts by enforcing the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, as it was contractually obligated to do under the PSAs, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price"

of the defective mortgage loans. Deutsche Bank's inaction with respect to the originators and sponsors has allowed the Trusts to be filled with defective mortgage loans of poor credit quality and significant documentation deficiencies that have increased the severity of the Trusts' losses. Similarly, had Deutsche Bank enforced the servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses. Deutsche Bank's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

547. Deutsche Bank's violations of the TIA have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

<u>**THIRD CAUSE OF ACTION**</u>

**NEGLIGENCE - BREACH OF PRE-DEFAULT DUTY OF INDEPENDENCE**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)**

548. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

549. Under New York law, Deutsche Bank, as Trustee, had extra-contractual, pre-default duties to the Trusts and all Certificateholders. These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest. Trustees like Deutsche Bank must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights. This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

550.    Under each of the PSAs, Deutsche Bank holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

551.    Under each of the PSAs, Deutsche Bank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Deutsche Bank held for the benefit of the Trusts and the Certificateholders.

552.    As alleged in detail above, Deutsche Bank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

553.    As alleged herein, however, Deutsche Bank was economically beholden to the sellers.  In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, Deutsche Bank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

554.    Because Deutsche Bank was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its representations and warranties, Deutsche Bank has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

555.    Deutsche Bank's negligent breach of its pre-default duty of independence has directly and proximately caused damages to the Trusts.  For example, had Deutsche Bank not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual

standards of practice of prudent mortgage servicers with respect to the mortgage loans in the Trusts. Deutsche Bank's inaction has relieved the sellers of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

556. Deutsche Bank's negligent breaches of its pre-default duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY – DUTY OF CARE**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)**

557. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

558. Under New York law, after the occurrence of an Event of Default, Deutsche Bank's duties expanded to include a fiduciary duty owed to the Trusts and all Certificateholders. This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Certificateholders following an Event of Default. Following the Events of Default described above, Deutsche Bank breached its fiduciary duties to the Trusts and all Certificateholders in several respects.

559. First, Deutsche Bank, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements. At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing

Agreements. Deutsche Bank, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators. Moreover, Deutsche Bank failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

560. Deutsche Bank's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of Deutsche Bank's fiduciary duty to the Trusts and to all Certificateholders.

561. Second, Deutsche Bank, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Deutsche Bank, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing

violations. Moreover, Deutsche Bank failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. Deutsche Bank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of Deutsche Bank's fiduciary duty to the Trusts and to all Certificateholders.

562. Deutsche Bank's breach of its fiduciary duty has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for Deutsche Bank's breach of its fiduciary duty.

563. Deutsche Bank's breaches of its fiduciary duty have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

### FIFTH CAUSE OF ACTION

### NEGLIGENCE – DUTY OF CARE
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)**

564. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

565. Under New York law, after the occurrence of an Event of Default, Deutsche Bank owed duties to the Trusts and all Certificateholders, which included the obligation to bring all available claims for the benefit of the Trusts and the Certificateholders. Following the Events of

Default described above, Deutsche Bank breached its duties to the Trusts and to all Certificateholders in several respects.

566.    First, Deutsche Bank, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.  Deutsche Bank, however, negligently failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.  Moreover, Deutsche Bank negligently failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

567.    Deutsche Bank's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, and failure to provide notice to the Certificateholders of the breaches or of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted negligence.

568.    Second, Deutsche Bank, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the

mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Deutsche Bank, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations. Moreover, Deutsche Bank negligently failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. Deutsche Bank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of its duty to the Trusts and all Certificateholders.

569. Deutsche Bank's negligence has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the originators and sponsors but for Deutsche Bank's negligence.

570. Deutsche Bank's negligence has injured all Certificateholders, including Plaintiffs, in that it has diminished the value of the certificates held by the Certificateholders and has prevented the Certificateholders from protecting the rights of the Trusts.

## SIXTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY –
### BREACH OF POST-DEFAULT DUTY OF INDEPENDENCE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against Deutsche Bank)

571.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

572.    Under New York law, Deutsche Bank, as Trustee, had extra-contractual, post-default duties to the Trusts and all Certificateholders.  These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest.  Trustees like Deutsche Bank must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

573.    Under each of the PSAs, Deutsche Bank holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

574.    Under each of the PSAs, Deutsche Bank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Deutsche Bank held for the benefit of the Trusts and the Certificateholders.

575.    As alleged in detail above, after Events of Default, Deutsche Bank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

576.	As alleged herein, however, Deutsche Bank was economically beholden to the sellers.  In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, Deutsche Bank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

577.	Because Deutsche Bank was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its specific representations and warranties, Deutsche Bank has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

578.	Deutsche Bank's breach of its post-default fiduciary duty of independence has directly and proximately caused damages to the Trusts.  For example, had Deutsche Bank not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans. Deutsche Bank's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

579.	Deutsche Bank's breaches of its post-default fiduciary duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## XIX.     CLASS ACTION ALLEGATIONS

580.     Alternatively, in the event the Court does not permit this action to proceed as a derivative action, Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of certificates in the Trusts (the "Class") that have suffered damages as a result of Deutsche Bank's misconduct alleged herein.  Excluded from the Class are Defendant Deutsche Bank, the Sellers and the Servicers, and, for each of them, their respective officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

581.     The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.  Record beneficial owners and other members of the Class may be identified from records maintained by Deutsche Bank or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

582.     Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all own certificates in the Trusts and held them at or after the time of Deutsche Bank's misconduct; (ii) all the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) Deutsche Bank's alleged misconduct was substantially the same with respect to all class members; (iv) and all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by Deutsche Bank's statutory, contractual, and common law breaches and violations that are alleged of herein.

583. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and asset-backed securities litigation.

584. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Deutsche Bank breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether Deutsche Bank violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of Deutsche Bank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

585. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. There will be no difficulty in the management of this action as a class action.

## XX.   RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)   Determining that this action is a proper derivative action maintainable under law and that demand is excused;

(b)   Awarding to the Trusts money damages against Deutsche Bank for all losses suffered as a result of Deutsche Bank's breaches of contractual, statutory, common law and fiduciary duties, and negligence;

(c)     Requiring Deutsche Bank to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its trustee obligations under the PSAs and applicable laws, and to protect the Trusts and the Certificateholders from a repeat of the damaging events described herein;

(d)     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

(e)     In the event the Court determines that this action is not a proper derivative action, determining that this action is a class action pursuant to Rule 23; and

(f)     Granting any other and further relief that the Court deems just and proper.

## XXI.  JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 24, 2014

| BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP | BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP |
|---|---|

JEROEN VAN KWAWEGEN

BLAIR A. NICHOLAS

JEROEN VAN KWAWEGEN (JV 1010)
JAI CHANDRASEKHAR (JC 3789)
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:   (212) 554-1444

BLAIR A. NICHOLAS
TIMOTHY A. DELANGE
BENJAMIN GALDSTON
BRETT M. MIDDLETON
DAVID R. KAPLAN
LUCAS E. GILMORE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:   (858) 793-0323

*Counsel for Plaintiffs*