**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACKROCK CORE BOND PORTFOLIO;  BLACKROCK FIXED INCOME GLOBALALPHA MASTER FUND LTD.;  BLACKROCK LOW DURATION BOND PORTFOLIO;  BLACKROCK MASTER TOTAL RETURN PORTFOLIO OF MASTER BOND LLC;  BLACKROCK STRATEGIC INCOME OPPORTUNITIES PORTFOLIO;  BLACKROCK TOTAL RETURN PORTFOLIO (INS - SERIES);  FIXED INCOME SHARES (SERIES R);  FIXED INCOME SHARES: SERIES M;  LVS I LLC; LVS II LLC;  PIMCO ABSOLUTE RETURN STRATEGY 3D OFFSHORE FUND LTD.;  PIMCO ABSOLUTE RETURN STRATEGY III MASTER FUND LDC;  PIMCO ABSOLUTE RETURN STRATEGY IV IDF LLC;  PIMCO ABSOLUTE RETURN STRATEGY IV MASTER FUND LDC;  PIMCO ABSOLUTE RETURN STRATEGY V MASTER FUND LDC;  PIMCO BERMUDA TRUST II: PIMCO BERMUDA INCOME FUND (M);  PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN COREPLUS SEGREGATED PORTFOLIO;  PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN LOW DURATION SEGREGATED PORTFOLIO;  PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN UNCONSTRAINED BOND SEGREGATED PORTFOLIO;  PIMCO CAYMAN TRUST: PIMCO CAYMAN U.S. BOND FUND;  PIMCO COMBINED ALPHA STRATEGIES MASTER FUND LDC;  PIMCO DYNAMIC CREDIT INCOME FUND;  PIMCO DYNAMIC INCOME FUND;  PIMCO ETF TRUST: PIMCO DIVERSIFIED INCOME ACTIVE | Case No. 14-cv-9367-RMB-SN<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**<u>JURY DEMAND</u>** |

EXCHANGE-TRADED FUND;  PIMCO
ETF TRUST: PIMCO TOTAL RETURN
ACTIVE EXCHANGE-TRADED FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, DIVERSIFIED INCOME
DURATION HEDGED FUND;  PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, DIVERSIFIED INCOME FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, EMERGING LOCAL
BOND FUND;  PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
EURO BOND FUND;  PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
GLOBAL BOND FUND;  PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, GLOBAL INVESTMENT GRADE
CREDIT FUND;  PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
HIGH YIELD BOND FUND;  PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, INCOME FUND;  PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
PIMCO CREDIT ABSOLUTE RETURN
FUND;  PIMCO FUNDS: GLOBAL
INVESTORS SERIES PLC, STRATEGIC
INCOME FUND;  PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
TOTAL RETURN BOND FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, UNCONSTRAINED
BOND FUND;  PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC, US
FUNDAMENTAL INDEX®
STOCKSPLUS® FUND;  PIMCO
FUNDS: PIMCO
COMMODITIESPLUS® STRATEGY
FUND;  PIMCO FUNDS: PIMCO
COMMODITY REAL RETURN
STRATEGY FUND®;  PIMCO FUNDS:
PIMCO CREDIT ABSOLUTE RETURN
FUND;  PIMCO FUNDS: PIMCO
DIVERSIFIED INCOME FUND;  PIMCO
FUNDS: PIMCO EMERGING
MARKETS CURRENCY FUND;
PIMCO FUNDS: PIMCO FLOATING

INCOME FUND;  PIMCO FUNDS:
PIMCO FOREIGN BOND FUND (U.S.
DOLLAR-HEDGED);  PIMCO FUNDS:
PIMCO FOREIGN BOND FUND
(UNHEDGED);  PIMCO FUNDS:
PIMCO FUNDAMENTAL
ADVANTAGE ABSOLUTE RETURN
STRATEGY FUND;  PIMCO FUNDS:
PIMCO GLOBAL ADVANTAGE®
STRATEGY BOND FUND;  PIMCO
FUNDS: PIMCO GLOBAL BOND
FUND (U.S. DOLLAR-HEDGED);
PIMCO FUNDS: PIMCO INCOME
FUND;  PIMCO FUNDS: PIMCO
INFLATION RESPONSE MULTI-
ASSET FUND;  PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (U.S. DOLLAR-
HEDGED);  PIMCO FUNDS: PIMCO
INVESTMENT GRADE CORPORATE
BOND FUND;  PIMCO FUNDS: PIMCO
LONG DURATION TOTAL RETURN
FUND;  PIMCO FUNDS: PIMCO LONG-
TERM CREDIT FUND;  PIMCO
FUNDS: PIMCO LOW DURATION
FUND;  PIMCO FUNDS: PIMCO LOW
DURATION FUND II;  PIMCO FUNDS:
PIMCO LOW VOLATILITY RAFI®-
PLUS AR FUND;  PIMCO FUNDS:
PIMCO MODERATE DURATION
FUND;  PIMCO FUNDS: PIMCO
MORTGAGE OPPORTUNITIES FUND;
PIMCO FUNDS: PIMCO REAL ESTATE
REAL RETURN STRATEGY FUND;
PIMCO FUNDS: PIMCO REAL
RETURN FUND;  PIMCO FUNDS:
PIMCO SHORT-TERM FUND;  PIMCO
FUNDS: PIMCO STOCKSPLUS® AR
SHORT STRATEGY FUND;  PIMCO
FUNDS: PIMCO TOTAL RETURN
FUND;  PIMCO FUNDS: PIMCO
UNCONSTRAINED BOND FUND;
PIMCO FUNDS: PIMCO WORLDWIDE
FUNDAMENTAL ADVANTAGE AR
STRATEGY FUND;  PIMCO FUNDS:
PRIVATE ACCOUNT PORTFOLIO

SERIES ASSET-BACKED SECURITIES
PORTFOLIO;  PIMCO FUNDS:
PRIVATE ACCOUNT PORTFOLIO
SERIES MORTGAGE PORTFOLIO;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES SHORT-TERM
PORTFOLIO;  PIMCO FUNDS:
PRIVATE ACCOUNT PORTFOLIO
SERIES U.S. GOVERNMENT SECTOR
PORTFOLIO;  PIMCO GLOBAL
CREDIT OPPORTUNITY MASTER
FUND LDC;  PIMCO INCOME
OPPORTUNITY FUND;  PIMCO
OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY IV
EFUND;  PIMCO OFFSHORE FUNDS:
PIMCO OFFSHORE FUNDS - PIMCO
ABSOLUTE RETURN STRATEGY V
ALPHA FUND;  PIMCO TACTICAL
OPPORTUNITIES MASTER FUND
LTD.;  PIMCO VARIABLE
INSURANCE TRUST: PIMCO
EMERGING MARKETS BOND
PORTFOLIO;  PIMCO VARIABLE
INSURANCE TRUST: PIMCO
FOREIGN BOND PORTFOLIO (U.S.
DOLLAR HEDGED);  PIMCO
VARIABLE INSURANCE TRUST:
PIMCO FOREIGN BOND PORTFOLIO
(UNHEDGED);  PIMCO VARIABLE
INSURANCE TRUST: PIMCO GLOBAL
ADVANTAGE STRATEGY BOND
PORTFOLIO;  PIMCO VARIABLE
INSURANCE TRUST: PIMCO LONG
TERM U.S. GOVERNMENT
PORTFOLIO;  PIMCO VARIABLE
INSURANCE TRUST: PIMCO REAL
RETURN PORTFOLIO;  PIMCO
VARIABLE INSURANCE TRUST:
PIMCO TOTAL RETURN PORTFOLIO;
PRUDENTIAL RETIREMENT
INSURANCE AND ANNUITY
COMPANY;  PRUDENTIAL TRUST
COMPANY;  THE PRUDENTIAL
INSURANCE COMPANY OF
AMERICA;  THE PRUDENTIAL

INVESTMENT PORTFOLIOS 2;  THE
PRUDENTIAL INVESTMENT
PORTFOLIOS 9;  THE PRUDENTIAL
INVESTMENT PORTFOLIOS, INC. 17;
THE PRUDENTIAL SERIES FUND;
FIREBIRD RE CORP.;
TRANSAMERICA LIFE INSURANCE
COMPANY;  TRANSAMERICA
PREMIER LIFE INSURANCE
COMPANY;  KORE ADVISORS LP;
SEALINK FUNDING LIMITED; and DZ
BANK AG,

                Plaintiffs,

      -against-

DEUTSCHE BANK NATIONAL TRUST
COMPANY and DEUTSCHE BANK
TRUST COMPANY AMERICAS,

                Defendants.

This Amended Class Action Complaint ("Amended Complaint") is submitted to the Court in unredacted form pursuant to the parties' Stipulation and Agreed Protective Order entered on October 5, 2015 [ECF. No. 105] (the "Protective Order") because it includes "Discovery Materials" designated by Defendants as "Confidential" or "Highly Confidential" as those terms are defined under the Protective Order.  In accordance with the Protective Order, Plaintiffs are concurrently filing a version of the Amended Complaint in the public record, which redacts such purportedly protected information.  Plaintiffs reserve all rights to challenge Defendants' confidentiality designations, including on the grounds that the Discovery Materials do not qualify for protection or do not qualify for the level of protection asserted.

TABLE OF CONTENTS

Page

I.     SUMMARY OF THE ACTION ................................................................................. 1

II.    PARTIES ............................................................................................................... 12

III.   JURISDICTION AND VENUE ............................................................................. 15

IV.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ............................ 15

V.     OVERVIEW OF THE TRUSTS ........................................................................... 15

VI.    BACKGROUND ................................................................................................... 17

       A.    The Critical Enforcement Function Of The Indenture Trustee ............................ 17

       B.    Securitization Process ................................................................................ 19

VII.   THE GOVERNING AGREEMENTS .................................................................... 20

       A.    The Mortgage Loan Purchase And Sale Agreement ............................................ 21

       B.    The Trust Agreement ................................................................................. 23

       C.    The Sale And Servicing Agreement ............................................................... 23

       D.    The Indenture ............................................................................................ 23

VIII.  DEUTSCHE BANK'S DUTIES UNDER THE GOVERNING
       AGREEMENTS ..................................................................................................... 23

       A.    Duty To Hold Trust Assets For The Benefit Of Noteholders .............................. 24

       B.    Duties To Provide Notice Of Breaches And To Enforce Seller
             Repurchase Obligations .............................................................................. 24

       C.    Duties Regarding The Servicers ................................................................... 24

       D.    Duties Upon An Indenture Event Of Default ...................................................... 26

IX.    THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF
       REPRESENTATIONS AND WARRANTIES ....................................................... 27

       A.    The Trusts' Mortgage Loans Have Experienced High Delinquency,
             Modification, And Loss Severity Rates .............................................................. 28

       B.    The Notes Have Experienced Massive Credit Downgrades ................................... 29

       C.    The Systemic Disregard Of Underwriting Standards Was Pervasive
             During The Relevant Period ........................................................................ 30

D.    The Originators' Rampant Underwriting Failures ................................. 32

E.    The Systemic Disregard Of Prudent Securitization Standards Was
      Pervasive During The Relevant Period ................................................ 32

F.    The Sponsors' Widespread Breach Of Representations And
      Warranties ........................................................................................... 35

G.    Litigation Confirms The Sellers' Rampant Breaches Of
      Representations And Warranties .......................................................... 35

X.    DEUTSCHE BANK KNEW THAT THE TRUSTS WERE FILLED
      WITH DEFECTIVE LOANS ........................................................................ 36

A.    Unresolved Exception Reports ............................................................ 36

B.    Deutsche Bank And Its Responsible Officers Received Written
      Notice From Parties And Investors Of Pervasive And Systemic
      Seller Breaches ................................................................................... 37

C.    Deutsche Bank Monitored The Performance Of The Trusts ................ 39

D.    Deutsche Bank Received Written Notice Of Pervasive And
      Systemic Seller Breaches From Financial Guaranty Insurers ............. 40

E.    Deutsche Bank Initiated Putback Litigation Against Many Of The
      Sellers 42

F.    Deutsche Bank's Affiliates Were Named In RMBS Litigation
      Involving Common Loan Sellers' Systemic Abandonment Of
      Underwriting Guidelines ..................................................................... 43

G.    Reports, Investigations And Litigation Involving The Sellers ............. 45

XI.   THE TRUSTS SUFFER FROM PERVASIVE SERVICER VIOLATIONS .................... 46

A.    The Servicers Failed To Give Notice Of Seller Breaches Of
      Representations And Warranties .......................................................... 46

B.    The Servicers Have Violated Their Prudent Servicing Obligations ..... 48

C.    The Servicers Have Violated Their Foreclosure Obligations .............. 49

D.    The Servicers Have Violated Their Modification Obligations ............. 50

E.    The Servicers Have Abused Their Servicing Advances Obligations ... 51

F.    Certain Trusts Have Experienced Triggering Events .......................... 52

G.    Certain Servicers Went Insolvent ....................................................... 52

XII.  DEUTSCHE BANK HAS KNOWN OF SERVICER VIOLATIONS
      PLAGUING THE TRUSTS ........................................................................... 52

A.  Deutsche Bank And Its Responsible Officers Received Written Notice From Holders Of Pervasive And Systemic Servicer Breaches .......................................................................... 52

B.  Deutsche Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports ................................... 54

C.  Deutsche Bank Issued Notices And Memoranda Confirming Its Knowledge Of Pervasive And Systemic Servicer Breaches ................................. 55

XIII.   NUMEROUS INDENTURE EVENTS OF DEFAULT HAVE OCCURRED ...................................................................................... 56

XIV.   DEUTSCHE BANK' KNOWLEDGE OF INDENTURE EVENTS OF DEFAULT ................................................................................ 57

XV.   DEUTSCHE BANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES .......................................................... 57

A.  Failure To Enforce The Trusts' Repurchase Rights Against Responsible Sellers ...................................................................... 58

B.  Failure To Provide Notice To The Servicers Of Servicer Events Of Default 58

C.  Failure To Act Prudently Subsequent To Indenture Events Of Default 58

D.  Failure To Provide Notice To Noteholders Of The Uncured Indenture Events Of Default ................................................ 59

XVI.   DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS ................................ 60

XVII.   DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST .................................................... 62

A.  Deutsche Bank Faced Substantial Liability For Defective Loans In The Trusts That Deutsche Bank Itself Originated Or Sponsored ........................ 62

B.  Deutsche Bank Face Enormous Liability For Defective Loans It Originated And Sponsored In Other Trusts .......................................... 63

C.  Deutsche Bank Was Economically Beholden To The Mortgage Loan Sellers ............................................................................ 65

XVIII. CAUSATION .......................................................................... 65

XIX.   DAMAGES ............................................................................. 66

XX.   CAUSES OF ACTION ................................................................. 66

XXI.   CLASS ACTION ALLEGATIONS .................................................... 75

XXII.  RELIEF REQUESTED..................................................................................................... 77

XXIII. JURY DEMAND ............................................................................................................ 78

Plaintiffs (as defined herein) bring this action on behalf of themselves and all other current owners of notes issued by the trusts listed in Exhibit 1 (the "Trusts") against Defendants Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") (collectively, "Deutsche Bank," "Trustee," or the "Indenture Trustee"), the Indenture Trustee for the Trusts, to recover damages caused by Deutsche Bank's wrongful conduct.

## I.     SUMMARY OF THE ACTION

1.     This action arises from Deutsche Bank's failure to discharge its essential duties as trustee of 62 RMBS indenture trusts.  Deutsche Bank, as Indenture Trustee, has certain contractual, statutory and common law duties to act on behalf of the Trusts and their beneficial noteholders (the "Noteholders" or "Holders"), and must at all times act in the best interests of the Trusts. Specifically, Deutsche Bank is obligated to: (i) enforce the Trusts' repurchase rights for loans that it knows do not comply with seller representation and warranties; (ii) remedy known servicing violations; (iii) act prudently subsequent to Events of Default; and (iv) promptly provide notice to all noteholders of all uncured Events of Default.  In the face of overwhelming evidence of pervasive seller, servicer and issuer breaches plaguing the Trusts, including internal communications confirming defectively originated loans, rampant servicing failures, and Servicing and Indenture Events of Default occurring within the Trusts, Deutsche Bank failed to perform these critical tasks.  Instead, to protect its own business interests, and to avoid liability for its own origination and securitization of defective loans for other RMBS trusts, Deutsche Bank ignored pervasive and systemic underwriting deficiencies in the underlying loan pools and the servicing of those loans and unreasonably refused to take any action.

2.     Plaintiffs are investors that acquired RMBS notes with a purchase value in excess of $2.6 billion issued by the Trusts.  As Noteholders, Plaintiffs are beneficiaries of the Trusts.

3.      Defendant Deutsche Bank serves as trustee for more than one thousand RMBS trusts originally securitized by almost $1 trillion of residential mortgage loans.  Among them are the Trusts at issue in this action: 62 Delaware statutory trusts created between 2004 and 2008 that issued notes secured by loans worth approximately $90.3 billion at the time of securitization.  This class action seeks to recover the significant monetary damages caused by Deutsche Bank's abdication of its duties and responsibilities as Indenture Trustee.[1]

4.      The Trusts, like other RMBS trusts, were created to facilitate the securitization and sale of residential mortgage loans to investors.  The Trusts' assets consist entirely of the underlying loans.  The Trusts issue classes of notes that are sold to investors that represent obligations of the Trusts, which are secured by the underlying loans.  Payments of principal and interest ("P&I") on the notes paid to investors are made from the amounts collected from the Trusts' loan pools.  Thus, the value of the mortgage loan pools and the certificates issued by the Trusts are directly linked to the quality of the mortgage loans.

5.      Between 2004 and 2008, a handful of large investment banks dominated the RMBS market and controlled the process from beginning to end.  These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors, or beholden to them through warehouse lending or other financial arrangements.  Once the loans are originated, acquired and selected for securitization, the seller, through an affiliate called the depositor, creates a trust where the loans are deposited for the benefit of the Noteholders.  The

---

[1] This Amended Class Action Complaint ("Complaint") does not allege in any way that Deutsche Bank or any other residential mortgage-backed securities ("RMBS") trustee was or is burdened by conflicts in connection with its negotiation, evaluation, or acceptance of any investor-driven RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

sponsor also hand-picks the servicer, often an affiliate of the seller or originator, to collect payments on the loans.  Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsors' deals.

6.     To ensure the quality of the RMBS and the underlying loans, the trust documents include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage securitization industry have no "skin" in the game once the RMBS are sold to investors.  Instead, their profits are principally derived from the spread between the cost to originate or purchase loans and, how much they can sell them to investors once packaged as securities, as well as various servicing-related income.  Accordingly, volume became the focus, and the quality of the loans was disregarded.

7.     The fundamental role of an indenture trustee is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus and to enforce the noteholders' rights.  Noteholders do not have unfettered access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and therefore must rely on the trustee to protect their interests.  Deutsche Bank, as Indenture Trustee, was the sole contractual party in the Trusts' securitization process intended to be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders,

or both.  Noteholders must rely on the Indenture Trustee to protect their rights.  The Governing Agreements (as defined herein) therefore require the Indenture Trustee, among others, to enforce the sellers' obligation to cure, substitute, or repurchase such mortgage loans for the benefit of the Noteholders.

8.      In turn, as Indenture Trustee for the Trusts, Deutsche Bank owes Plaintiffs and the Class certain contractual and common law duties, as well as duties under the Trust Indenture Act of 1939 ("TIA").  In particular, Deutsche Bank is required to provide notice of breaches of representations and warranties by the Originators and Sponsors concerning key attributes of the mortgage loans underlying the Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending.  Deutsche Bank has a duty to enforce the obligation of the responsible parties (typically the Sponsors, and their affiliates that served as the depositors (the "Depositors") or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation.  Deutsche Bank is also required to address defaults by the Servicers who were required to engage in prudent servicing and loss mitigation practices.  Deutsche Bank is further required to act prudently subsequent to Events of Default, and to provide notice of all Events of Default to Noteholders.

9.      Deutsche Bank failed to discharge these critical duties.  Specifically, Deutsche Bank knew that the pools of loans backing the Trusts were filled with defective mortgage loans in breach of seller representations and warranties, including those representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios.  Indeed, Deutsche Bank's own internal exception reports confirm that it identified great numbers of loan files within the Trusts that were incomplete or improperly documented, but these

deficiencies were not corrected or disclosed to Noteholders. Deutsche Bank's records also confirm that it repeatedly received written notices of seller breaches of representations and warranties identifying underwriting deficiencies for loans in the Trusts, as well as loans in other RMBS Trusts originated or securitized by common Sellers that would necessarily implicate pervasive Seller breaches within the Trusts. Nevertheless, Deutsche Bank regularly disregarded its contractual and statutory duties to enforce the rights of the Trusts as against the responsible parties.

10.     In addition, Deutsche Bank knew that the pools of loans backing the Trusts were filled with defective mortgage loans by virtue of the abysmal performance of the Trusts' collateral. The mounting delinquencies and collateral losses within the Trusts' loan pools and credit downgrades were outlined on monthly remittance reports that Deutsche Bank, as Indenture Trustee, publishes and disseminates to investors, the credit agencies and the government. The monthly remittance reports detail how, by January 1, 2009, the Trusts had suffered collateral losses exceeding $2.5 billion. On average, nearly one in every four loans in the Trusts was delinquent. Moreover, twenty-seven Trusts had delinquency rates exceeding 30%, and four Trusts had delinquency rates of over 50%. By January 2011, the Trusts' total losses had more than **doubled** to $6.7 billion. By the start of 2010, virtually all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

11.     Indeed, for many of the Trusts, the historical delinquencies and collateral losses within the Trusts' loan pools has been so severe that it has caused "Triggering Events" under the Trusts' Governing Agreements, causing Deutsche Bank to change the distribution of Trust proceeds, evaluate the performance of the Trusts' servicers, and make increased disclosures to the credit rating agencies. Deutsche Bank's internal records confirm that it knew of such Triggering Events in the ACCR 2004-1, ACCR 2005-1, ACCR 2005-2, ACCR 2005-4, ACCR 2006-1,

NCHET 2006-1, NCHET 2006-2, SAST 2006-3 Trusts.  These Triggering Events constituted Events of Default under the Governing Agreements for these Trusts and contractually obligated Deutsche Bank to act prudently on behalf of the Trusts and Noteholders, including taking action against responsible parties.

12.     Further, a steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors.  Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.  Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including LTV ratios, owner occupancy status, and borrower credit scores – as well as obvious deficiencies in the completeness of the loan files themselves. Deutsche Bank and its responsible officers knew of these proceedings and the allegations and evidence developed therein, either through Deutsche Bank's active participation or it's monitoring of these proceedings given Deutsche Bank's significant role in the RMBS market.

13.     Not surprisingly, in the select actions that Deutsche Bank brought to protect financial crisis-era RMBS trusts (not at issue in this litigation), Deutsche Bank itself identified systemic and pervasive breaches of representations and warranties ("R&W").  In particular, Deutsche Bank sued the same originators and sponsors in the Trusts at issue here, alleging systemic and pervasive R&W breaches.  In those actions, Deutsche Bank knew of extraordinarily high R&W breach rates in some instances ***exceeding 64%*** – and concluded that the defective loans were

"representative of the entire Mortgage Loan pool held by the Trust."  In fact, Deutsche Bank admitted that "loans were *routinely originated in breach of relevant underwriting guidelines*, and in disregard of clear defects in the loan applications . . . [which] has materially and adversely affected the value of the related mortgage loan or the interest of the investors therein."  Deutsche Bank also alleged and admitted that early defaults were, in particular, "*indicative of adverse selection on the part of originators*."

14.     In another lawsuit, Deutsche Bank alleged that the underlying loans were *"replete with material breaches of the representations and warranties concerning the quality of the Loans and the borrowers' creditworthiness*."  According to Deutsche Bank, a "preliminary investigation" uncovered at least 1,620 defective loans (or nearly 40% of the mortgage loan pool), and a forensic review found that *"nearly 93%" "materially breach[ed]"* the seller's representations and warranties.  Deutsche Bank admits this shows *"a wholesale abandonment of underwriting guidelines and prudent underwriting practices"* and is *"so flagrant, that [the sponsor] must have discovered them long ago."*

15.     Elsewhere, in a suit involving New Century-originated loans, Deutsche Bank alleged that a forensic review revealed "at least 1,081 loans with actual LTV and CLTV ratios that exceeded the ratios reported on the Mortgage Loan Schedule, and thus violated the applicable underwriting guidelines."  Deutsche Bank further alleged that "review of the Mortgage Loans' performance history also revealed 1,201 Mortgage Loans with payment defaults within the first eighteen months following origination."

16.     Deutsche Bank was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral though "putback" initiatives led by many of the world's largest institutional mortgage investors.  These large-scale initiatives – several of which have yielded

*multi-billion dollar settlements* – have targeted six of the leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves.

17.     For example, in December 2011, a group of major institutional investors asked Deutsche Bank, as trustee, to investigate large numbers of ineligible mortgages in loan pools underlying hundreds of JPMorgan-sponsored trusts and deficient servicing of those loans. Together with similar instructions provided to four other trustees of the JPMorgan-sponsored trusts, the initiative covered more than *$95 billion* of RMBS issued from 2005 to 2007.  Less than two years later, Deutsche Bank and the other trustees were presented with a comprehensive $4.5 billion settlement offer covering 330 JPMorgan-sponsored trusts.  On August 1, 2014 and October 2, 2014, Deutsche Bank and the other trustees involved in the putback initiative *accepted* JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned for *court approval* of the settlement.  In January 2012, Deutsche Bank received similar written instructions from a group of major institutional investors in dozens of trusts sponsored by Morgan Stanley or its affiliates (collectively, "Morgan Stanley").   Together with instructions provided to two other trustees of the Morgan Stanley-sponsored trusts, the initiative covered more than *$25 billion* of RMBS issued from 2005 to 2007.  And in yet another investor-led initiative, Deutsche Bank, as trustee, gave its *approval* to an $8.7 billion settlement covering 570 RMBS trusts sponsored by Residential Capital and its affiliates ("ResCap") from 2004 to 2008 with an original face amount of more than *$320 billion*.[2]

---

[2] In January 2014, after a nine-week trial, New York Supreme Court Justice Barbara Kapnick largely approved an $8.5 billion settlement resolving mortgage repurchase claims for 530 RMBS trusts issued by Countrywide Financial Corporation and its affiliates ("Countrywide").   That initiative began in October 2010 and covers more than *$424 billion* of RMBS issued from 2004 to 2008.  On March 5, 2015, the First Judicial Department of the New York Appellate Division issued

18.     These and other certificateholder-led initiatives sought to "putback" large quantities of loans (i) originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($21.1 billion of loans sold to the Trusts), and American Home ($19.4 billion of loans sold to the Trusts); and (ii) securitized by the same investment banks and financial institutions that sponsored the Trusts, including Impac Funding ($16.7 billion of sponsored Trusts).  In addition, these initiatives identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (servicer to $30.6 billion of loans sold to the Trusts).

19.     Apart from Seller representations and warranty breaches, Deutsche Bank has known that the Trusts were plagued with systemic servicer violations resulting in Servicing Events of Default under the Governing Agreements.  Internal communications reflect Deutsche Bank's responsible officers' actual knowledge of servicing failures, Triggering Events, and servicer bankruptcies and insolvencies sufficient to trigger Servicer Events of Default under the Governing Agreements.

20.     In addition, as a major player in the RMBS securitization market, and through its involvement in the historic putback initiatives above, Deutsche Bank learned of rampant, industrywide servicer violations by the same servicers for the Trusts.  Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state attorneys general and some of the Trusts' servicers.  Notably, without

---

an opinion affirming the trial court's decision approving the trustee's decision to enter into the settlement and modifying the order to include all loan modifications.

receiving certificateholder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

21.    For example, in October 2010, Deutsche Bank issued a notice to all holders of RMBS for which it served as trustee stating it was "aware" of ongoing government investigations into documentation deficiencies in foreclosure proceedings initiated by RMBS servicers and had communicated with the servicers; however, despite its knowledge of extensive servicer misconduct materially impacting the Trusts, Deutsche Bank refused to take any affirmative action to enforce the Trusts' rights unless so directed by holders of a certain percentage of securities and indemnified.  Likewise, in February 2011, in a letter to the court in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities* (Sup. Ct. N.J.), Deutsche Bank acknowledged that it served as the "legal representative" for the RMBS trusts, but declined to respond to inquiries regarding alleged improper foreclosure practices and procedures.  Deutsche Bank stated, "the Trustees would not be in the best position to address further inquiries by the Court concerning any possible 'irregularity in the handling of foreclosure proceedings.'"  To the contrary, the trustee is in the best position as the sole independent party with authority to enforce these obligations, but for its own self-interests Deutsche Bank ignored its duties.

22.    Deutsche Bank has asserted in court filings that "***trustees routinely bring suits against originators of mortgage-backed securities to protect trust assets***."  Deutsche Bank further admitted that, as trustee, it has a "plain contractual right to assert claims to protect the Trust" – a right that is within the trustee's "independent contractual powers."

23.    Further, Deutsche Bank has known of numerous defaults by the Issuers (*i.e.*, the Delaware Statutory Trusts).  In particular, in light of these rampant and uncured seller and servicer breaches, Deutsche Bank knew that the Issuers were breaching their obligations under the

-10-

Indentures to require (i) the Sellers to abide by their representations and warranties with respect to the mortgage loans and to cure, substitute, or repurchase nonconforming mortgage loans; and (ii) the Servicers to comply with their prudent servicing violations and remedy servicing breaches. Additionally, Deutsche Bank knew of the Issuers' failures to provide written notice to Deutsche Bank of these seller and servicer defaults.

24.     When Deutsche Bank learned of seller, servicer and issuer violations, Deutsche Bank had the duty to notify Noteholders of them, among other things.  Deutsche Bank, however, acted in its own self-interest and refused to take action against responsible parties and provide notice to Noteholders of defaults to avoid scrutiny of its own origination and securitization business, evade liability for its own defective loans, and preserve its business relations with other major RMBS industry participants.  Indeed, Deutsche Bank systematically failed to provide notice of the defaults or take other appropriate action because doing so would have exposed Deutsche Bank to substantial liability for its own misconduct as a major RMBS seller.  Deutsche Bank's affiliates originated and sponsored ***billions of dollars*** in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties.  Many of the same entities that act as sellers or servicers for the Trusts also service or administrate the defective Deutsche Bank loans.  Thus, Deutsche Bank was economically beholden to those sellers and servicers because it faced enormous repurchase liability for the sale and securitization of its own loans if it took action against them.  Consequently, Deutsche Bank did not take action against the sellers and servicers who violated their obligations to the Trusts because it feared retaliation from those same entities with respect to other loans for which Deutsche Bank faced similar liability.

25.     Indeed, Deutsche Bank's disabling conflicts of interest are patently manifest in that its affiliate, MortgageIT, is one of the largest originators and spoonsors for loans the Trusts at issue

in this action.  Specifically, Deutsche Bank faced substantial repurchase liability in connection with the *seven* Trusts with an original face amount of more than $5 billion that MortgageIT sponsored, and the more than $4 billion in mortgage loans originated by MortgageIT that serve as collateral for the Trusts.  Were Deutsche Bank to take action and enforce the Trusts' rights with respect to those defective loans that MortgageIT originated or sponsored, it would expose Deutsche Bank's own misconduct and require Deutsche Bank to compensate the Trusts.

26.     Finally, once there were Events of Default, Deutsche Bank had the duty to exercise its rights and obligations under the Governing Agreements using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs. Deutsche Bank blatantly failed to do so.  Deutsche Bank did nothing to protect the Noteholders, choosing instead to deliberately ignore the Events of Default for its own benefit and to the detriment of the Trusts and Noteholders.  The Trusts and in turn Noteholders have experienced substantial losses which would not have occurred but for Deutsche Bank's failure to perform its responsibilities under the Governing Agreements, the TIA, 15 U.S.C. § 77ooo, and common law. By failing to perform its duties, Deutsche Bank has caused the Trusts and Noteholders to suffer billions of dollars in losses.

## II.    PARTIES

27.     Each of the plaintiffs identified in Exhibit 2 attached hereto (collectively, the "Plaintiffs") is a Noteholder in the Trusts as identified in Exhibit 1 attached hereto.  Each of the Plaintiffs have or are in the process of receiving authorization to sue from the registered holder, Cede & Co. for those Trusts identified as containing so-called Negating Clauses that limit the parties who may enforce the Governing Agreement.  The Plaintiffs hold the economic and beneficial interest in their Notes and are the true parties in interest.  No other party has an economic or beneficial interest in the Plaintiffs' Notes in this matter.

28.     Defendant DBTCA is a New York banking corporation organized under New York law, and a licensed New York State-chartered insured depository institution regulated by the New York State Department of Financial Services ("NYSDFS").  DBTCA engages in various banking activities and offers a variety of financial products and services, including corporate trust services. DBTCA's principal place of business and principal place of trust administration is located in New York, New York.  As Indenture Trustee for the Trusts, DBTCA receives a fee for the services rendered to each Trust by its employees.  The fee is based upon a set percentage of the value of each Trust, and is distributed to DBTCA pursuant to a schedule set forth in the PSA for each Trust.

29.     Defendant DBNTC is a national banking association organized under the laws of the United States of America, to carry out the business of a limited purpose trust company. DBNTC's main office is located in Los Angeles, California, and its principal place of trust administration is located in Santa Ana, California.  DBNTC is a nondepository trust company regulated by the Office of the Comptroller of the Currency ("OCC").  As of December 31, 2013, DBNTC had assets valued at over $188 billion, making it the eighth largest nondepository trust company in the United States.  As a nondepository trust company, DBNTC operates for profit, accepting and executing trusts, including the Trusts at issue in this action.  As Trustee for the Trusts, DBNTC receives a fee for the services rendered to each Trust by its employees.  The fee is based upon a set percentage of the value of each Trust, and is distributed to DBNTC pursuant to a schedule set forth in the Governing Agreements for each Trust.

30.     DBTCA and DBNTC are indirect wholly owned subsidiaries of Deutsche Bank AG ("DBAG"), which maintains its corporate headquarters in Frankfurt, Germany.  DBTCA is a wholly owned subsidiary of Deutsche Bank Trust Corporation ("DBTC"), which is a wholly owned subsidiary of DBAG.  DBNTC is a wholly owned subsidiary of Deutsche Bank Holdings,

-13-

Inc. ("DBHI"), which is a wholly owned subsidiary of DBTC.  DBTCA and DBNTC are interconnected in a number of other ways beyond the fact that both are direct or indirect wholly owned subsidiaries of the same parent company.  For example, DBTCA and DBNTC are listed as sharing office space at 60 Wall Street, New York, New York, 10005, and are listed with the same contact phone number at that address.  DBTCA and DBNTC also share overlapping officers and personnel, and executives of DBTCA frequently sign regulatory filings and agreements on the behalf of DBNTC, and vice-versa.

31.    Deutsche Bank, together with its affiliates, is involved in many aspects of the private-label RMBS market.  As of January 2016, Deutsche Bank administered as Trustee more than $896 billion in original face value of non-agency RMBS issued between 2004 and 2008 (i.e., private-label RMBS not guaranteed by an agency of the United States government), with a total current balance of $169.2 billion, representing nearly 22% of all non-agency RMBS during that period based on current balances.

32.    Additionally, Deutsche Bank through its affiliates, MortgageIT, Inc. ("MortgageIT"), Chapel Funding LLC ("Chapel"), and DB Structured Products, Inc. ("DB Products"), originated tens of billions of dollars in loans leading up to the financial crisis.  From 2004 through 2008, MortgageIT, DB Products and Chapel originated more than $20 billion in mortgage loans sold to RMBS trusts, as set forth in the table below:

| Originator | Amount Originated |
|---|---|
| MortgageIT | $14,609,498,744 |
| DB Products | $4,582,761,345 |
| Chapel | $977,416,324 |
| **Grand Total** | **$20,169,676,413** |

-14-

33.     Deutsche Bank's affiliate DB Products was one of the largest RMBS sponsors. From 2004 to 2008, DB Products sponsored 128 RMBS offerings under the ACE, DBALT and DMSI shelves, which securitized over $100 billion in mortgage loans.

## III.    JURISDICTION AND VENUE

34.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims.

35.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## IV.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

36.     Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused.  For all of the Trusts, the no action clause in the Indenture identifies Deutsche Bank, as Indenture Trustee, as the sole notice party.  If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that Deutsche Bank initiate proceedings against itself and to indemnify Deutsche Bank for its own liability to the Trusts, an "absurd" requirement that the parties did not intend.  *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992).

## V.    OVERVIEW OF THE TRUSTS

37.     The Trusts in this action, identified in the attached Exhibit 1, are 62 Delaware statutory trusts, resulting from non-agency RMBS issued between 2004 and 2008, inclusive.  The Trusts have a total original principal balance of approximately $90.3 billion, and a current principal balance of approximately $13.1 billion as of January 31, 2016.  *See* Exhibit 3.  To date, the Trusts have suffered total realized collateral losses of over $9.8 billion.  *Id*. at 3.  As a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will continue to incur substantial losses.

-15-

38.     Sixteen lenders were disclosed to have originated loans sold to the Trusts. However, seven of these banks – including Deutsche Bank's own affiliate MortgageIT – collectively contributed over 95% of the loans ($89 billion):



39.     The Trusts were sponsored by fourteen separate entities, including Deutsche Bank's own affiliate MortgageIT (7 Trusts with a total original face amount of $5 billion):

| | Trustee & Sponsor | No. of Trusts | Original Face Amount | Current Amount | Collateral Loss | Loss Severity |
|---|---|---|---|---|---|---|
| 1 | American Home Mortgage | 8 | $19,370,402,485 | $3,741,864,551 | ($2,553,939,967) | 13.2% |
| 2 | New Century | 10 | $21,217,870,000 | $2,209,091,215 | ($2,129,382,810) | 10.0% |
| 3 | Accredited Mortgage | 9 | $8,772,874,000 | $1,711,730,731 | ($1,173,042,715) | 13.4% |
| 4 | Impac | 11 | $16,650,293,000 | $1,649,007,006 | ($767,373,352) | 4.6% |
| 5 | Saxon Asset | 6 | $6,178,545,000 | $938,042,271 | ($691,734,244) | 11.2% |
| 6 | Deutsche Bank | 7 | $5,067,127,624 | $870,662,634 | ($484,427,988) | 9.6% |
| 7 | Aames Mortgage | 4 | $4,680,297,000 | $577,525,509 | ($538,591,499) | 11.5% |
| 8 | Terwin | 1 | $980,000,000 | $325,773,979 | ($588,533,056) | 60.1% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | Global Mortgage | 1 | $3,863,864,690 | $267,546,414 | ($15,555,850) | 0.4% |
| 10 | Aegis | 1 | $528,062,000 | $258,284,515 | ($190,938,079) | 36.2% |
| 11 | FBR | 1 | $783,273,000 | $199,178,428 | ($170,425,034) | 21.8% |
| 12 | Goldman Sachs | 1 | $511,373,000 | $145,851,343 | ($83,811,274) | 16.4% |
| 13 | IndyMac | 1 | $650,071,000 | $108,190,718 | ($358,180,817) | 55.1% |
| 14 | Encore Credit | 1 | $1,034,450,000 | $100,172,327 | ($109,674,941) | 10.6% |
| | Grand Total | 62 | $90,288,502,799 | $13,102,921,640 | ($9,855,611,626) | 10.9% |

40.     Eleven entities served as Master Servicers to the Trusts.  However, Wells Fargo is by far the largest Servicer, aministering 21 Trusts with an original face amount of approximately $31 billion.  A host of entities act as sub-servicers, including Ocwen Financial Corporation ("Ocwen").

| | Master Servicer | No. of Trusts | Original Face Amount | Current Amount | Collateral Loss | Loss Severity |
|---|---|---|---|---|---|---|
| 1 | Wells Fargo Bank | 21 | $30,587,927,793 | $5,777,046,384 | ($3,866,256,875) | 12.6% |
| 2 | New Century Mortgage Corp. | 9 | $20,050,171,000 | $1,911,440,686 | ($1,834,454,269) | 9.1% |
| 3 | Accredited Home Lenders | 9 | $8,772,874,000 | $1,711,730,731 | ($1,173,042,715) | 13.4% |
| 4 | IMPAC Funding Corp. | 11 | $16,650,293,000 | $1,649,007,006 | ($767,373,352) | 4.6% |
| 5 | Saxon | 6 | $6,178,545,000 | $938,042,271 | ($691,734,244) | 11.2% |
| 6 | LaSalle Bank NA | 1 | $980,000,000 | $325,773,979 | ($588,533,056) | 60.1% |
| 7 | Carrington Mortgage Services, LLC | 1 | $1,167,699,000 | $297,650,529 | ($294,928,541) | 25.3% |
| 8 | Bank of America, National Association | 1 | $3,863,864,690 | $267,546,414 | ($15,555,850) | 0.4% |
| 9 | Indymac Bank FSB | 1 | $650,071,000 | $108,190,718 | ($358,180,817) | 55.1% |
| 10 | Citi | 1 | $1,034,450,000 | $100,172,327 | ($109,674,941) | 10.6% |
| 11 | U.S. Bank | 1 | $352,607,316 | $16,320,594 | ($155,876,966) | 44.2% |
| | Grand Total | 62 | $90,288,502,799 | $13,102,921,640 | ($9,855,611,626) | 10.9% |

## VI.     BACKGROUND

### A.     The Critical Enforcement Function Of The Indenture Trustee

41.     RMBS notes are debt instruments issued to investors by an issuing trust that holds one or more mortgage subpools.  The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

42.     A RMBS indenture trustee has certain contractual and common law obligations to the trust and its noteholders.  By comparison, unlike the indenture trustee, noteholders have no right to act independently on behalf of the Trust.  Moreover, it is extremely difficult for noteholders to act as a cohesive group where individual bondholder investments are relatively small, minimizing the economic incentive to take action or cooperate.  This is exacerbated by the fact that the identities of the trust's noteholders are confidential and constantly change, as notes are actively traded.

43.     For each RMBS note issue, an indenture trustee is appointed to act as a type of agent on behalf of the noteholders collectively to ensure the "efficient centralized enforcement" of the sellers' and servicers' obligations.  The governing agreements and the law mandate that an indenture trustee administer the trust as a representative of noteholders to help enforce their rights.

44.     The essential duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the trusts and their investors as an independent third party. Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion.  Yet, only a handful of major American financial institutions served as RMBS trustees and contractually agreed to perform the vitally important enforcement functions to protect RMBS investors.  Among this handful of major RMBS trustees, Deutsche Bank held the largest market share during this period.



**B.      Securitization Process**

45.      The process of securitizing mortgages involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors.  First, a sponsor creates a loan pool from mortgages it originated or purchased from other financial institutions.

46.      Second, the sponsor transfers the loans to a "depositor," typically a bankruptcy-remote entity setup by the sponsor, which segments the cash flows and risks in the loan pool among different levels of investment or "tranches."  Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches.  In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

47.      Third, the depositor conveys the mortgage pool to the trust in exchange for the transfer of the RMBS to the depositor.

48.     Finally, the depositor sells the RMBS to an underwriter, and provides the revenue from the sale to the seller.  The underwriter markets and sells the RMBS to investors.

49.     After the transaction closes, the servicer collects payments from the underlying borrowers.  After collection, the servicer sends the funds to the trust, which then makes payments to the noteholders.  Mortgage delinquencies and defaults reduce the available P&I payments to be paid to the trust and passed through to investors.

50.     Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer should take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the noteholders.  Foreclosures result in higher losses to the trust (and therefore to the noteholders) if the value of the collateral is lower than anticipated.  For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of P&I payments to the trust for distribution to the noteholders.

## VII.   THE GOVERNING AGREEMENTS

51.     Noteholders' rights and Deutsche Bank's contractual duties, as Indenture Trustee for the Trusts at issue in this action, are set forth in the relevant securitization agreements, which include Mortgage Loan Purchase and Sale Agreements ("MLPAs"), the Trust Agreement, the Sale and Servicing Agreement ("SSA"), and the Indentures (or similar agreements) (collectively, the "Governing Agreements").

52.     Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the

-20-

Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements.

**A.**    **The Mortgage Loan Purchase And Sale Agreement**

53.    The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor.  The MLPA governs the terms of the sale of the mortgage loans acquired for securitization.  In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

54.    The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator.  To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

55.    Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the RMBS investors therein, the seller is obligated to cure the breach in all material respects.  The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

56.     If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust.  For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

57.     The MLPA's repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties.  Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

58.     Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Noteholders in the loans.  The seller's cure, substitute and repurchase obligations do not require any showing that the related mortgage loan has experienced a realized loss, that the seller's breach of representations and warranties caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party relied on servicing and origination documents at any point in time.

59.     Upon the sale of the mortgage loans to the Trust, the rights under the MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were assigned to Deutsche Bank, as Indenture Trustee for the benefit of the Noteholders, in accordance with the Indentures.

### B. **The Trust Agreement**

60.     The Trust Agreement is a contract between the Depositor, an entity known as the Owner Trustee, and other entities, which creates a Delaware statutory trust known as the "Issuer," which issues the notes.

### C. **The Sale And Servicing Agreement**

61.     The SSA (sometimes called a Transfer and Servicing Agreement) is a contract between the Depositor, the Master Servicer, the Issuer, the Sponsor and Deutsche Bank, as the Indenture Trustee, among others, pursuant to which: (i) the Depositor conveys its right, title, and interest in the mortgage loans to the Issuer; (ii) the Issuer conveys to the Depositor certificates of the Issuer; and (iii) the Master Servicer agrees to supervise, monitor, and oversee the obligations of the servicer to service the loans.

### D. **The Indenture**

62.     The Indenture is a contract between the Issuer and Deutsche Bank, as the Indenture Trustee, among others, pursuant to which the Issuer issues notes, which it conveys to the Depositor, again in exchange for the certificate described above.  Subsequently, the notes are sold to investors. As part of the same agreement, the Issuer pledges its rights relating to the certificates to the Indenture Trustee to secure its P&I payment obligations on the notes.  Deutsche Bank, as the Indenture Trustee, holds this pledge on behalf of investors who purchase the notes.

## VIII. **DEUTSCHE BANK'S DUTIES UNDER THE GOVERNING AGREEMENTS**

63.     The Governing Agreements, and in particular the SSAs and Indentures, set forth Deutsche Bank's contractual duties and obligations to the Noteholders, which are substantially similar for each Trust.  Further, upon information and belief, Deutsche Bank employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the Governing Agreements.

### A. Duty To Hold Trust Assets For The Benefit Of Noteholders

64. The Governing Agreements require that Deutsche Bank hold the Trust assets for the use and benefit of all present and future Noteholders.[3]

### B. Duties To Provide Notice Of Breaches And To Enforce Seller Repurchase Obligations

65. The Governing Agreements require Deutsche Bank to give prompt written notice to all parties upon its discovery of a breach of a representation or warranty made by a seller that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[4]

### C. Duties Regarding The Servicers

66. Under the Governing Agreements, Deutsche Bank, as Indenture Trustee, has certain duties with respect to enforcing the obligations of the servicers. In particular, where Deutsche Bank learns of a servicer's failure to observe or perform in any material respect any other covenants or agreements under the SSAs, Deutsche Bank must promptly provide written notice to the servicer.[5]

67. The SSAs also set forth the Indenture Trustee's obligations upon occurrence of a Servicer "Event of Default," which is defined as a specified failure of the servicer to perform its

---

[3] *See* Exhibit 5, Chart 1.

[4] *See* Exhibit 5, Chart 2. Some of the Trusts' Governing Agreements are silent as to which entity is responsible for enforcing the sellers' compliance with their repurchase obligations, prior to an Event of Default. SAST SSA § 2.3. Regardless, Deutsche Bank's failure to provide notice of seller breaches it discovered or otherwise taking action against the responsible seller violated its contractual obligations. *Id.* In addition, Plaintiffs allege the occurrence of Events of Default, upon which Deutsche Bank has a duty to act as a prudent person and must exercise its right to enforce seller repurchase obligations. SAST Indenture 6.01(a).

[5] *See* Exhibit 5, Chart 3.

servicing duties and cure this failure within a specified time period.[6]  The SSAs identify several types of failures by the servicers that may give rise to a Servicer Event of Default, including the servicer's failure to observe or perform in any material respect any covenants or agreements in the SSA, the servicer's bankruptcy or insolvency, and for certain of the Indenture Trusts, Trigger Events tied to a Cumulative Loss Trigger Event or a Delinquency Trigger Event.

68.     If a Servicer Event of Default occurs under the SSA which a responsible officer of Deutsche Bank, as Indenture Trustee, has received written notice or has actual knowledge of, Deutsche Bank must give prompt written notice to all Noteholders of the Servicer Event of Default.[7]

69.     The remedies for uncured Servicer Events of Default include termination of the servicer and recoupment of Trust assets lost as a result of the servicers' violations.[8]  As detailed herein, Deutsche Bank did not perform its duties to enforce the obligations of the servicers, did not provide written notice of Servicer Events of Defaults to Noteholders and did not initiate any action against the servicers for the benefit of Noteholders.

---

[6] *See* Exhibit 5, Chart 4.

[7] *See* Exhibit 5, Chart 6.  Some of the Trusts' Indentures do not specifically set forth this provision. However, this variance is insignificant given that all the Trusts' Indentures incorporate the Indenture Trustee's duties under the TIA, whether or not they are physically contained in the Indenture, including the Indenture Trustee's duty to give notice to Noteholders upon knowledge of a default.  *See* Exhibit 5, Chart 7; 15 U.S.C. § 77ooo(b).

[8] *See* Exhibit 5, Chart 8.

### D.    <u>Duties Upon An Indenture Event Of Default</u>

70.     The Indenture requires the Issuer to enforce any rights with respect to the Trust and preserve and defend title to the Trust and the rights of the Indenture Trustee and the Noteholders in such Trust against the claims of all persons and parties.[9]

71.     The Indentures define a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."[10] An Event of Default occurs under the Indenture, when, among other things, the Issuer fails to observe or perform any covenants or agreements made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by Deutsche Bank, as Indenture Trustee.[11]

72.     Upon learning of the occurrence of a default, the Indenture requires the Issuer to provide written notice to Deutsche Bank of the status of the default and what action the Issuer is taking or proposes to take with respect thereto. The Indenture also requires the Issuer to provide Deutsche Bank with prompt written notice of each Event of Default under the Indenture.[12]

73.     If an Event of Default under the Indenture has occurred and is continuing, Deutsche Bank must exercise the rights and powers vested in it by the Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.[13] Such rights and powers under the Indenture expressly include Deutsche Bank's ability to enforce the rights of the Trusts and Noteholders as against all

---

[9] *See* Exhibit 5, Chart 9.

[10] *See* Exhibit 5, Chart 10.

[11] *See* Exhibit 5, Chart 11.

[12] *See* Exhibit 5, Chart 12.

[13] *See* Exhibit 5, Chart 13.

parties responsible for harming the Trusts, including by instituting litigation against responsible sellers and servicers.[14]

74.     Under the Indenture, Deutsche Bank must also promptly mail to each Noteholder notice of the Event of Default unless such Event of Default shall have been waived or cured, or in certain circumstances, if in good faith it determines that withholding the notice is in the best interests of Noteholders.[15]

## IX.    THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES

75.     Each of the Trusts' loan pools contains a high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Noteholders' interests in those mortgage loans.  Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and CLTV ratios were systemically and pervasively false.  These breaches are demonstrated by: (1) the high default rates of the mortgage loans; (2) the collateral losses suffered by the Trusts; (3) the plummeting credit ratings of the RMBS; (4) evidence highlighting the Sellers' (i) routine abandonment of their underwriting guidelines, (ii) widespread fabrication of borrower and loan information, (iii) massive breaches of their representations and warranties, and (iv) engagement in predatory and abusive lending; and (5) the results of forensic reviews and re-underwriting of loans within the Trusts in other litigation.

---

[14] *See* Exhibit 5, Chart 14.

[15] *See* Exhibit 5, Chart 15.

A. **The Trusts' Mortgage Loans Have Experienced**
   **High Delinquency, Modification, And Loss Severity Rates**

76.     The extremely high delinquency, modification and collateral loss rates of the mortgage loans within the Trusts are strong evidence of the Sellers' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts.  As reflected by Exhibits 3 and 4, the Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics the Sellers represented and warranted.  As reflected by Exhibit 4, as of January 1, 2009, approximately 28.3% of the relevant mortgage loans across the Trusts were seriously delinquent.  Within certain RMBS-sponsor labels, such as the Aames-label Trusts, approximately 49.7% of the relevant mortgage loans were delinquent.  Moreover, an astounding 40% or more of the relevant mortgage loans were delinquent in at least thirteen of the Trusts.  Further, nineteen of the Trusts have delinquency rates of above 25% for the mortgage loans remaining in the Trusts.

77.     As reflected by Exhibit 8, loan modifications in the Trusts also dramatically increased beginning in early 2009, providing further evidence of systemic seller breaches of representations and warranties in the Trusts.  In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default.  Loan modifications often include changes to the loan's interest rate, term, and/or outstanding principal.  As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons.  First, escalating loan modifications correlate to misstated borrower income and creditworthiness.  Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance, because the original LTV ratio (or CLTV ratio) was not

as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

78.     As a result of the severe delinquencies, modifications, borrower defaults and foreclosures, the Trusts incurred tremendous collateral losses.  By January 1, 2009, collateral losses in the Trusts had already reached over $2.5 billion.  By January 1, 2011, realized losses increased to $6.7 billion.

**B.**     **The Notes Have Experienced Massive Credit Downgrades**

79.     The significant rating downgrades experienced by the notes issued by the Trusts are also strong evidence that the underlying loans were improperly underwritten, and that they do not have the credit risk characteristics the sellers represented and warranted.

80.     Credit ratings are opinions about credit risk published by a rating agency.  In issuing its credit ratings for RMBS, the rating agencies consider the quality of the underlying loan collateral and creditworthiness of the borrower to determine relative likelihood that the RMBS may default.  At the time of securitization, all of the Trusts' senior tranches were rated "investment grade."  Bond rating firms, such as Standard & Poor's, use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating.  "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade.  An investment grade rating signifies that the bond has a relatively low risk of default and is judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them.  Credit ratings for bonds below investment grade designations (*i.e.*, "BB," "B," "CCC," etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

81.     However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and Deutsche Bank began reporting severe collateral losses

in the Trusts, the Trusts' notes' credit ratings were drastically downgraded. Currently, approximately 98.3% of the senior tranches in the Trusts have been downgraded at least once. Across all Trusts, over 98% of all notes had been downgraded by at least one credit rating agency. Finally, over 85.3% - nearly all - of the senior notes had been downgraded to junk bond status, a startling number.

### C.   The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period

82.    During the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold loans securitized in RMBS that violated their stated underwriting guidelines and breached the representations and warranties made to the purchasers of the loan pools.

83.    Government investigations and reports and newspaper reports have uncovered the extent of the loan originators' pervasive abandonment of underwriting standards. For example, the Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis. Using Washington Mutual ("WaMu") as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[16]

---

[16] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

84.     Similarly, in January 2011, the Financial Crisis Inquiry Commission ("FCIC") issued its final report that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[17]  The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics."  "Unfortunately − as has been the case in past speculative booms and busts − we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis."  *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble − fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages − that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

85.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  As explained by a former fraud specialist at the notoriously corrupt lender New Century, "'[t]he definition of a good loan changed from 'one that pays' to 'one that could be sold.'""  *Id*. at 105.  The FCIC Report found that consequently "the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ." *Id*.

---

[17] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

### D.    The Originators' Rampant Underwriting Failures

86.    Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures.  The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through numerous federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

87.    Indeed, the mortgage loans underlying the Trusts were originated by some of the worst lenders during the relevant time period, including New Century, American Home, Impac Funding, Accredited, Saxon, Aames, ***and even Deutsche Bank itself***.  Through public and private investigations and litigation, each of these RMBS lenders have been shown to have systemically abandoned their own underwriting guidelines during the relevant time period, churning out billions of dollars in loans with LTVs, owner occupancy status, title condition and other qualities and characteristics that were materially different than as represented and saddling RMBS trusts, including those at issue here, with significantly impaired collateral.  A summary of testimonial and documentary evidence as to each of these major originators of the mortgage loans to the Trusts is set forth in Exhibit 10.

### E.    The Systemic Disregard Of Prudent Securitization
###     Standards Was Pervasive During The Relevant Period

88.    It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the

same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

89.     As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

90.     As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books.  Consequently, by 2011, it was apparent to all players in the United States mortgage and securitization industry, including Deutsche Bank, that the mortgage loans deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

91.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging,

-33-

marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009, including twenty-seven of the Trusts at issue in this action.  *See* Exhibit 11.  As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

92.     On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including eight of the Trusts at issue in this action. *See* Exhibit 11.  The settlement includes an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

93.     On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009, including thirty-four of the Trusts at issue in this action. *See* Exhibit 11.  The settlement includes an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

94.     On February 11, 2016, the Justice Department, together with federal and state regulators, announced a $3.2 billion settlement with Morgan Stanley to resolve federal and state

civil claims related to Morgan Stanley's marketing, sale and issuance of RMBS, including eleven of the Trusts at issue in this action. *See* Exhibit 11. As part of the agreement, Morgan Stanley acknowledged in writing that it failed to disclose critical information to prospective investors about the quality of the mortgage loans underlying its RMBS and about its due diligence practices, which caused investors to suffered billions of dollars in losses.

### F. The Sponsors' Widespread Breach Of Representations And Warranties

95.     As with other RMBS trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices. The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts.

96.     In fact, it is now well-known that in connection with the securitization of loans for RMBS trusts including those at issue here, the Trusts' major sponsors, American Home, New Century, Accredited, Impac Funding, Saxon, **and even Deutsche Bank itself**, systemically disregarded their own and third-party due diligence reports reflecting the defective nature of the underlying mortgage loans, and as a result materially breached representations and warranties contained in the Governing Agreements. A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth in Exhibit 9.

### G. Litigation Confirms The Sellers' Rampant Breaches Of Representations And Warranties

97.     As reflected by Exhibit 12, at least sixteen of the Trusts have been the subject of significant RMBS litigation which involved or was made known to Deutsche Bank: *Federal*

*Housing Finance Agency v. Goldman Sachs & Co. et al.*, No. 11-cv-6198 (S.D.N.Y. June 13, 2012)

and *Phoenix SF Limited v. Morgan Stanley*, No. 0652986-2013 (N.Y. Sup. Ct. Aug. 26, 2013).   In

each of these actions, investors provided detailed allegations concerning the sellers' systemic

abandonment of underwriting standards that resulted in these Trusts and Noteholders suffering

substantial losses.   In several of those actions, the plaintiffs' allegations were substantiated through

forensic reviews of loan files for specific loans within the Trusts, which revealed rampant breaches

of the sellers' representations and warranties concerning the loans' LTV ratios, owner occupancy,

and other material qualities and characteristics.

## X.   DEUTSCHE BANK KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

98.     There is ample evidence that beginning in 2009 and by 2011, Deutsche Bank knew

that each of the Trusts' loan pools contained high percentages of mortgage loans that materially

breached the sellers' representations and warranties regarding their characteristics and credit

quality.

### A.     Unresolved Exception Reports

99.     Under the Governing Agreements, Deutsche Bank was required to identify loan

files that contained missing or incomplete documentation in the "Document Exception Report."

Deutshce Bank was also required to certify in the "Final Certification of the Trustee" that it had

taken physical possession of the mortgage loan files, had reviewed all of the loan files for the

mortgage loans in the Trusts and those files – other than those listed on the "Document Exception

Report" – contained complete and accurate documentation and had been properly endorsed and

assigned over to Deutsche Bank as Indenture Trustee for the Trusts.

100.     Deutsche Bank knew of numerous incomplete or improperly documented loan files

within the Trusts, which are reflected in Deutsche Bank's own internal exception reports.

Plaintiffs are informed and believe that Deutsche Bank did not correct or address these deficiencies.

### B. Deutsche Bank And Its Responsible Officers Received Written Notice From Parties And Investors Of Pervasive And Systemic Seller Breaches

101.    Deutsche Bank's internal records have confirmed that Deutsche Bank repeatedly received written notice from parties to the Governing Agreements of breaches of representations and warranties by the Sellers for specific loans within the Trusts, including by Saxon, Aames, New Century, and FBR.  Based on this information, Deutsche Bank and its responsible officers knew that these loans, as well as other loans within the Trusts' loan pools sold by these same parties, were defective.

102.    In addition, Deutsche Bank, in its capacity as trustee to other RMBS trusts that are not the subject of this action but which are secured by loans originated and securitized by the very same entities that originated and securitized the loans underlying the Trusts at issue herein, repeatedly received written notice from investors complaining of systemic and pervasive breaches by these same sellers.  For example, on January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to Deutsche Bank, U.S. Bank, and Wells Fargo, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans (the "Morgan Stanley Putback Initiative").  The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007.  The Morgan Stanley Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($21.1 billion of loans sold to the Trusts) and American Home Mortgage

($19.4 billion of loans sold to the Trusts); and (2) securitized by an investment bank that sponsored six of the Trusts, Saxon Asset ("Saxon") ($6.2 billion of sponsored Trusts).

103.    Similarly, on December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts sponsored by JPMorgan or its affiliates issued written instructions to Deutsche Bank, Wells Fargo, The Bank of New York Mellon ("BNYM"), HSBC, and U.S. Bank, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative"). The notices covered more than $295 billion of RMBS issued by JPMorgan from 2005 to 2007. Less than two years later, Deutsche Bank and the other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts.  On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative, including Deutsche Bank, accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.

104.    The JPMorgan Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($21.1 billion of loans sold to the Trusts), GreenPoint ($352.6 million of loans sold to the Trusts), American Home ($19.3 billion of loans sold to the Trusts), and Impac Funding ($16.6 billion of loans sold to the Trusts).

105.    On May 14, 2012, a group of major institutional mortgage investors in several hundred RMBS trusts sponsored by ResCap or its affiliates reached agreement with ResCap and its affiliated debtors to resolve claims for breaches of representations and warranties concerning large numbers of loans in the pools securing those trusts (the "ResCap Putback Initiative").  The settlement covered more than $553.5 billion of RMBS largely issued between 2004 and 2008,

including 172 trusts for which Deutsche Bank serves as trustee.  The trustees for these trusts, which were aware of the repurchase and servicing claims through, among other things, the bankruptcy proceedings, are Deutsche Bank, U.S. Bank, Wells Fargo, and BNYM.

106.     The ResCap Putback Initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including New Century ($21.1 billion of loans sold to the Trusts), American Home Mortgage Corp. ($19.3 billion of loans sold to the trust) and Accredited ($14.2 billion of loans sold to the Trusts).

107.     Despite Deutsche Bank's actual notice of widespread loan defaults and breaches by the same originators, sponsors, and servicers that originated, sponsored, and serviced the loans underlying the Trusts at issue here, as the examples above illustrate, Deutsche Bank failed to act in accordance with its obligations under the Governing Agreements and the TIA to enforce the originators' and sponsors' obligations to cure, substitute or repurchase defective mortgage loans and the servicers' obligations to follow proper servicing practices.

### C.     Deutsche Bank Monitored The Performance Of The Trusts

108.     Deutsche Bank and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance.  As noted above, it was evident by January 2009 from the extremely high mortgage loan delinquency, modification, default, foreclosure and loss severity rates within the Trusts' loan pools that the mortgage loans sold to the Trusts were not as the Sellers had represented and warranted.

109.     Deutsche Bank was aware of these events, as they monitored the Trusts' performance.  For example, Deutsche Bank was provided with regular reports regarding the

performance of the mortgage loans in each of the Trusts by the servicers and other of its agents. In addition, Deutsche Bank published monthly reports on the performance of the mortgage loans in each of the Trusts, which included delinquent loans, loans that had gone into foreclosure, and loans that incurred realized losses upon the sale of their collateral.  Moreover, Deutsche Bank was acutely aware of the credit ratings for the Trusts because as part of the rating agencies' ongoing surveillance and monitoring of the Trusts, Deutsche Bank fielded inquiries and provided detailed data to the rating agencies so that they could make informed decisions on their grading of the securities.

110.    Indeed, for many of the Trusts, the historical delinquencies and collateral losses within the Trusts' loan pools has been so severe that it has caused "Triggering Events" under the Trusts' Governing Agreements, causing Deutsche Bank to change the distribution of Trust proceeds, evaluate the performance of the Trusts' servicers, and make increased disclosures to the credit rating agencies.  Deutsche Bank's internal records confirm that it knew of such Triggering Events in the ACCR 2004-1, ACCR 2005-1, ACCR 2005-2, ACCR 2005-4, ACCR 2006-1, NCHET 2006-1, NCHET 2006-2, SAST 2006-3 Trusts.  These Triggering Events constituted Events of Default under the Governing Agreements for these Trusts and contractually obligated Deutsche Bank to act prudently on behalf of the Trusts and Noteholders, including taking action against responsible parties.

       **D.**    **Deutsche Bank Received Written Notice**
               **Of Pervasive And Systemic Seller**
               **Breaches From Financial Guaranty Insurers**

111.    Deutsche Bank also discovered that the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties through its involvement in financial guaranty insurer litigation

involving these same originators and sponsors in its capacity as trustee and, through its affiliates, sponsor.

112.   Financial guaranty insurers provide financial guaranty insurance for RMBS issued from many of the Trusts.  Under the Governing Agreements for these insured RMBS, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning quality and origination practices for the mortgage loans.  The Governing Agreements for the insured RMBS also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the Governing Agreement (including the Trustee), in order to compel the responsible mortgage loan seller to repurchase loans that breach representations and warranties.

113.   Monoline insurers have initiated numerous lawsuits against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which Deutsche Bank serves as trustee or a Deutsche Bank affiliate served as sponsor. Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike noteholders) were often able to obtain access to loan files or conduct a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties in securitizations with the same sellers to the Trusts.

114.   Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, Deutsche Bank was notified by both the responsible mortgage loan sellers and the parties to the Governing Agreements of these sellers' systemic and pervasive breaches of representations and warranties.

115.   The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made Deutsche Bank and its responsible

officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry affecting RMBS issued between 2004 and 2008, as well as of the identities of the offending originators and sponsors that misrepresented the credit quality and characteristics of the mortgage loans collateralizing these trusts.

116.    For example, in *CIFG Assurance North America, Inc. v. GreenPoint Mortgage Funding, Inc*., No. 653449/2012 (N.Y. Sup. Ct. Oct. 1, 2012), the monoline insurer CIFG sued GreenPoint Mortgage Funding, Inc. alleging that its review of loan files originated by GreenPoint revealed breaches in 82% of the loans reviewed.  Notably, Deutsche Bank acted as the trustee for the trust at issue in the litigation.

117.    In *Assured Guaranty Corporation v. DB Structured Products, Inc., et al*, No. 651824/2010 (N.Y. Sup. Ct. Oct. 25, 2010), the monoline insurer Assured sued DB Products, an affiliate of Defendant, alleging that its review of loan files securitized by the defendant revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that the defendant represented would be followed.

118.    Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits reflected these mortgage loan sellers' systemic and pervasive violation of underwriting and securitization guidelines, Deutsche Bank discovered that these same defective underwriting and securitization practices applied equally to all of the other Trusts containing loans originated and securitized by these same originators and sponsors.

E.    **Deutsche Bank Initiated Putback
       Litigation Against Many Of The Sellers**

119.    As reflected by Exhibit 13, Deutsche Bank has participated in at least three actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors and

servicers as the Trusts at issue in this action.[18]  In each of the putback actions, loan level reviews were conducted which identified pervasive breach rates **exceeding 64%** in every offering, including those sponsored by the same sponsors as the Trusts and involving loans originated and sold by the same originators and sponsors as the Trusts.  Based on its involvement in these putback actions, which alleged pervasive and systemic breaches of representations and warranties, Deutsche Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Trusts.

### F.   Deutsche Bank's Affiliates Were Named In RMBS Litigation Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines

120.    Deutsche Bank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by the involvement of Deutsche Bank's affiliate, DB Products, and parent company, DBAG, in significant RMBS litigation in their capacity as securitization underwriter.

121.    For example, on September 2, 2011, the FHFA, as conservator for Fannie Mae and Freddie Mac, filed lawsuits against seventeen of the largest financial institutions involved in the packaging, marketing and sale of RMBS that Fannie Mae and Freddie Mac purchased during the period from 2005 to 2007, including Deutsche Bank affiliates.[19]  Fifteen of the FHFA's actions

---

[18] Trusts at issue in the limited putback claims pursued by Deutsche Bank are not included in this action, except for those trusts where putback claims have been adjudged or are subject to dismissal as untimely-filed by Deutsche Bank.

[19] Complaints were filed against the following lead defendants, in alphabetical order: Ally Financial Inc. f/k/a GMAC, LLC; Bank of America Corporation; Barclays Bank PLC; Citigroup, Inc.; Countrywide Financial Corporation; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon; General Electric Company; Goldman Sachs & Co.; HSBC North America Holdings, Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co. / First Franklin Financial Corp.; Morgan

were concentrated before Southern District of New York Judge Denise L. Cote for coordinated pretrial proceedings, thereby allowing Deutsche Bank affiliates access to the pleadings and discovery in each of these cases.

122.   Each of the FHFA's complaints alleged that the defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans and the percentage of loans secured by owner occupied properties.  The FHFA further alleged that defendants materially understated the LTV ratios of the underlying loans.

123.   To support its allegations of defendants' misrepresentations regarding the credit quality and characteristics of the underlying loan collateral, the FHFA's complaints highlighted the severe delinquencies, immense collateral losses and staggering credit downgrades suffered by both the securitizations at issue in its cases and all RMBS in general of this vintage.  Significantly, the FHFA's actions involved at least six of the Trusts at issue in this action, representing nearly 10% of the Trusts in this action.

124.   In addition, the FHFA provided highly detailed summaries of the evidence and testimony obtained through federal and state investigations, enforcement actions and reports revealing both industrywide abuses by the mortgage loan originators and sponsors during this period, and widespread breaches of representations and warranties by specific originators and sponsors in connection with RMBS trusts.  These financial institutions included many of the largest mortgage loan sellers to the Trusts, such as Impac Funding Corp., Accredited Home Lenders, Inc., Saxon Mortgage, and Aames Capital Corp.

---

Stanley; Nomura Holding America Inc.; The Royal Bank of Scotland Group PLC; and Société Générale.

125.     Moreover, FHFA cited the results of its own forensic review of loan level data for a sampling of hundreds of thousands of mortgage loans and re-underwriting of thousands of loan files from these securitizations, including six of the Trusts.  The data review revealed systemic and pervasive misrepresentations regarding owner occupancy and LTV ratios in each of the securitizations, including the Trusts at issue and other securitizations involving the same sponsors to the Trusts, same RMBS labels, same RMBS shelves, same vintage, same loan product type, or the same originators.

126.     Significantly, on December 20, 2013, FHFA announced a $1.9 billion settlement with DBAG to settle the claims at issue in *FHFA v. Deutsche Bank AG, et al.*, No. 11-cv-06192-DLC (S.D.N.Y.).

127.     Given the FHFA's detailed allegations and Deutsche Bank's parent company and securitization arm's active participation in the FHFA actions as named defendants, Deutsche Bank and its responsible officers had actual knowledge that the Trusts' loan pools contained high percentages of loans that materially and adversely affected the Trusts and Noteholders' interests in those loans.

128.     As described in further detail below, in addition to the FHFA actions, Deutsche Bank's affiliates have been named in several other actions alleging that originators and sponsors industrywide during the relevant period, including major originators of loans sold to the Trusts, systematically abandoned their stated underwriting guidelines. The evidence and testimony perpetuated in these actions provide further support for Deutsche Bank's knowledge of the presence of defective loans in the Trusts.

**G.     Reports, Investigations And Litigation Involving The Sellers**

129.     As discussed above, since 2009 there has been a steady stream of public disclosures regarding the Originators' systemic underwriting abuses and the Sponsors' faulty securitization

practices.  As a result of the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the Originators, Sponsors and the Trusts themselves, Deutsche Bank and its responsible officers knew that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties. *See* Exhibits 9, 10.

## XI.     THE TRUSTS SUFFER FROM PERVASIVE SERVICER VIOLATIONS

130.    In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, public, regulatory and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private-label RMBS.

131.    Much like other private-label RMBS trusts of the same vintage, each of the Trusts suffer from ongoing Servicer Events of Default caused by the Servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the Governing Agreements.  The Servicers' breach of their covenants is confirmed through federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation from usual, customary and lawful servicing practices in their administration of mortgages and, more specifically, illegal and illicit servicing activities by the same Servicers who service the loans held by the Trusts.

### A.     The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties

132.    As with the Trustee, the Indentures require the Servicers to give prompt written notice to all parties to the SSAs of a breach of a representation or warranty made by a Seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan

or the interests of the Noteholders in any such mortgage loan, upon the Servicer's discovery of such breach.

133.    In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division.  These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices and, therefore, had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools.  These servicers failed to notify parties to the SSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

134.    Further, as noted above, the Servicers have regularly modified mortgage loans held by the Trusts.  Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties as the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  In fact, borrowers often conceded in their loan modification requests that they had inflated their income and/or lied about their employment status, and were unable to make their mortgage payments.  Thus, in the process of performing loan modifications, the Servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages.  Nevertheless, the servicers systemically failed to notify the other parties to the SSAs of these breaches.

135.    As also set forth above, there has been widespread public evidence of the Originators' abandonment of underwriting guidelines and the Sponsors' faulty securitization practices that made the Servicers aware of material Seller breaches representations and warranties within the Trusts' loan pools.  Nevertheless, the Servicers have not notified the other parties to the SSAs of these Seller breaches or enforced the Sellers' repurchase obligations.

136.    Further, the Servicers have been specifically notified by monoline insurers of pervasive breaches by the Sellers.  Notwithstanding the Servicers' "discovery" of material breaches of representations and warranties, the Servicers have not notified the other parties to the SSAs of these breaches.

137.    The Servicers' systemic and pervasive failure to give notice of the Sellers' material breaches of representations and warranties and to enforce the Sellers' repurchase obligations have materially affected the rights of the Trusts and all Noteholders in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the Governing Agreements, with respect to each defective mortgage loan.

### B.    The Servicers Have Violated Their Prudent Servicing Obligations

138.    The SSAs require that the Servicers service and administer the mortgage loans for and on behalf of the Noteholders (i) in the same manner in which they service and administer similar mortgage loans for their own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the Servicer to receive compensation or other fees for its services under the SSA, the obligation of the Servicer to make servicing advances under the SSA, and the Servicer's ownership, servicing or management for others of any other mortgage loans.

139.    As demonstrated by Exhibit 14, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the Servicers have systemically and pervasively violated these prudent servicing obligations.

140.    The Servicers' systemic and pervasive failure to observe their prudent servicing obligations have materially affected the rights of the Trusts and all Noteholders in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

### C.    The Servicers Have Violated Their Foreclosure Obligations

141.    The SSAs require the Servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, each of the SSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

142.    As demonstrated by Exhibit 14, highly publicized government enforcement actions, private litigation and settlements involving the servicers demonstrate that the Servicers have systemically and pervasively violated these foreclosure obligations.

143.    As reflected by Exhibit 14, studies show that the Servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them.  Indeed, in several states, the average number of days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.  The Servicers' delay in foreclosing has allowed the Servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the Servicers' breach of their duties.

144.    The Servicers' systemic and pervasive violation of their foreclosure obligations have materially affected the rights of the Trusts and all Noteholders in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents.  The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations.  The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

**D.    The Servicers Have Violated Their Modification Obligations**

145.    The SSAs provide that the Servicers agree to a modification of any mortgage loan only in certain specified circumstances.  When modifications are required to remedy predatory lending or foreclosures violations, the SSAs require that the Seller or the Servicer – and not the Trusts or the Noteholders – bear the costs to cure such breach.

146.    The Servicers have breached the SSAs by agreeing to modify loans held in the Trusts for the purpose of settling predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage seller (their parent companies) bear the costs of curing the violation, as well as the expenses reasonably incurred in enforcement of the seller's obligation to cure predatory mortgages.  The Servicers have also breached the SSAs by agreeing to modify loans held in the Trusts for the purpose of settling claims related to their wrongful servicing and foreclosure practices made by various attorneys general.

147.    The Servicers' violation of their modification obligations have materially affected the rights of the Trusts and all Noteholders in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and Noteholders by using Trust collateral to settle claims that are not, and could never be, made against the Trusts.

-50-

**E.**    **The Servicers Have Abused Their Servicing Advances Obligations**

148.    The SSAs provide that the Servicers are to advance P&I on a loan only if they determine that the advance payment is recoverable.  The SSAs further provide that the Servicers may only recover servicing advances that are customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the Servicers of their servicing obligations.

149.    The Servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts.  In particular, the Servicers have manipulated the recoverable designation to their advantage.  During low interest rate environments, the Servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the Servicers could continue to earn their servicing fees on these loans, which exceed the relatively low cost of financing the advances on these delinquent loans.  However, when interest rates have increased, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable.  The switch in designation enables the Servicers to recoup all prior advances as a senior claim of the Trusts.

150.    The Trusts and their Noteholders are harmed by the Servicers' manipulation of the recoverable designation because the Trusts incur more interest rate risk exposure than expected since the Servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the SSAs.

151.    Finally, despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the Servicers instead utilized affiliated vendors – who marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement its servicing income.  These improper servicing advancing have exacerbated the Trusts' losses.

F.      **Certain Trusts Have Experienced Triggering Events**

152.    Due to the abject performance of the underlying loan collateral, certain of the Trusts have experienced Triggering Events tied to collateral delinquency and loss performance that altered these Trusts' base cash flow allocation in order to protect senior tranches and caused an Event of Default to occur within these Trusts.

G.      **Certain Servicers Went Insolvent**

153.    Finally, certain of the Trusts have experienced Events of Default as a result of the insolvency or bankruptcy of certain of the Servicers, including American Home Mortgage.

## XII.  DEUTSCHE BANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

154.    Beginning in early 2009 and continuing to the present, Deutsche Bank and its responsible officers have known of the above described widespread and severe failures on the part of the Servicers to observe or perform in material respects their obligations under the SSAs.

### A.  Deutsche Bank And Its Responsible Officers Received Written Notice From Holders Of Pervasive And Systemic Servicer Breaches

155.    As confirmed by Deutsche Bank's internal documents, in its capacity as trustee to other RMBS trusts that are not the subject of this action but are serviced by common Servicers, Deutsche Bank and its responsible officers repeatedly received written notice from Holders of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts.  Based on the systemic and pervasive practices complained of in the Noteholders' breach notices, Deutsche Bank and its responsible officers knew that servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

156.    For example, according to internal documents, Deutsche Bank was informed by a major RMBS investor of imprudent servicing practices and foreclosure deficiencies by Bank of America, a major servicer for the Trusts.

157.    Deutsche Bank's internal records also confirm that on January 23, 2015, it received a letter from a group of major RMBS investors in 115 RMBS trusts serviced by Ocwen, informing it of ongoing Events of Default caused by Ocwen's failure to observe and peform, in material respects, the covenants and agreements imposed on it by the Governing Agreements.  The notice followed a lengthy investigation, assisted by servicing and economic experts, and presented Deutsche Bank with overwhelming evidence of Ocwen's deficient servicing practices, including with respect to unnecessary and excessive charges to the trusts, violations of its modification obligations, advancement abuses, failed loss mitigation procedures, conflicts of interest, inadequate recordkeeping practices and failures to comply with applicable law.

158.    In addition, on January 31, 2012, an investor group issued instructions to Wells Fargo, Deutsche Bank, and U.S. Bank, as trustees, to open investigations of ineligible mortgages in loan pools securing over $25 billion of RMBS issued by various affiliates of Morgan Stanley and deficient servicing of those loans.  On September 19, 2012, the same investor group sent a Notice of Non-Performance ("September 19, 2012 Notice") to Deutsche Bank and other entities, identifying breaches by servicers Wells Fargo and Saxon of specific servicing covenants in the Governing Agreements for ninety-five trusts from the Morgan Stanley-label IXIS, MSAC, and MSM and SAST shelves, including six of the Trusts.  The September 19, 2012 Notice alleged that these servicing failures had materially impaired the rights of the holders and constituted ongoing Events of Default in the servicer's performance under the relevant Governing Agreements.

Significantly, Wells Fargo and Saxon service a total of $36 billion in loans originally held by the Trusts.

**B.  Deutsche Bank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports**

159.   Deutsche Bank and its responsible officers knew of the Servicers' improper servicing practices through the Servicers' servicing reports and the monthly remittance reports Deutsche Bank published.  These reports apprised Deutsche Bank of the Servicers' breach of duty to provide notice of breaches of Seller representations and warranties and failure to enforce the Sellers' repurchase obligations by detailing the Trusts' early loan payment defaults, increasing loan modifications, staggering losses, and write-downs due to the poor credit quality of the loans, but did not reflect the Servicers' actions to enforce the Sellers' repurchase obligations.

160.   The reports apprised Deutsche Bank of the Servicers' breach of their duty to perform prudent and customary servicing practices with respect individual loans within the Trusts by reflecting the Servicers' excessive fees and failure to pursue appropriate loss mitigation strategies.  The reports also informed Deutsche Bank of the Servicers' breach of their duty to perform prudent foreclosure by detailing the Servicers' excessive delay in foreclosing on properties securing the Trusts' loans and incurring unnecessary legal and administrative expenses due to inaccurate loan documentation.  The reports further informed Deutsche Bank of the Servicers' breach of their duties with respect to modifying loans, including using Trust funds to pay the Servicers' required borrower relief obligations under regulatory settlements, through implementation of modifications on Trust-owned mortgages that shifted the costs of the settlement to the Trusts and enriched the Servicers unjustly.  Finally, the servicing reports disclosed the Servicers' abuse of their advancing obligations by reflecting the unnecessary and inflated expenses related to delinquent loans.

-54-

### C. Deutsche Bank Issued Notices And Memoranda Confirming Its Knowledge Of Pervasive And Systemic Servicer Breaches

161.    Deutsche Bank has also confirmed its knowledge of pervasive and systemic servicer breaches in written correspondence investors, servicers, and others.  For example, as noted above, in October 2010, Deutsche Bank issued a notice to all holders and servicers of RMBS for which Deutsche Bank served as trustee acknowledging that it was "aware" of ongoing government investigations into documentation deficiencies in foreclosure proceedings initiated by RMBS servicers, including servicers to the Trusts at issue in this Action.  As stated in the notice, it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  According to Deutsche Bank, these defects included "the execution and filing by certain Servicers and/or their agents of potentially defective documents, possibly containing alleged untrue assertions of fact, in connection with certain foreclosure proceedings," such as misuse of powers of attorney furnished by Deutsche Bank that allow the servicers to sign documents and institute foreclosure proceedings and other legal actions in the name of the Trustee on behalf of the Trusts.  Deutsche Bank's notice stated that it had "communicated" with the loan servicers but would not take "any remedial actions" to enforce the Trusts' rights unless so directed by holders with a requisite percentage in principal amount of securities, "subject to conditions stated in the governing documents."

162.    Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to

investors.  The memorandum referred to the expansive scope of the reported servicer deficiencies, which implicated "foreclosure proceedings relating to mortgage loans owned by the Trusts."  The memorandum confirmed that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [Indentures] and applicable law."  Deutsche Bank's memorandum warned the servicers that it would require them to "indemnify and hold harmless Deutsche Bank, individually and in its capacity as Trustee, the Trusts and the investors from all liability, loss, cost and expense of any kind" arising from "any servicing activities in breach or violation of the Governing Documents and/or applicable law," but did not undertake affirmative action to recover actual losses incurred by the Trusts as a result of the servicers' pervasive and systemic breaches.

## XIII.  <u>NUMEROUS INDENTURE EVENTS OF DEFAULT HAVE OCCURRED</u>

163.    The Issuers have systemically failed to perform material covenants and agreements under the Indentures, including by failing to: (i) "enforce the rights to the mortgage loans"; (ii) "preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties"; and (iii) failing to provide written notice to Deutsche Bank of all defaults and Events of Default.

164.    Based on the abject performance of the Trusts and widespread public evidence of the Originators' abandonment of underwriting guidelines, the Sponsors' faulty securitization practices, and the Servicers' failures to perform material covenants and agreements under the SSAs, the Issuers have known of material seller breaches representations and warranties within the Trusts' loan pools.  The Issuers have breached their obligations under the Indenture to (i) require the Sellers to cure, substitute, or repurchase nonconforming mortgage loans; (ii) demand that the Servicers cure their servicing violations; and (iii) provide written notice to Deutsche Bank of all defaults and Events of Defaults.

**XIV.   DEUTSCHE BANK' KNOWLEDGE OF INDENTURE EVENTS OF DEFAULT**

165.   Beginning in early 2009 and continuing to the present, Deutsche Bank and its responsible officers have known of the above described Indenture Events of Default.  Each month, Deutsche Bank, as Indenture Trustee, prepared cash distribution summaries that detailed the growing rate of mortgage loan delinquencies, modifications, defaults, foreclosures, servicing advances and fees, and realized credit losses in each of the Trusts.  These summaries were also required to identify any mortgage loan that had been repurchased by a responsible seller, or received a credit from the responsible servicer.  However, because no mortgage loans were repurchased by sellers for having been underwritten in violation of the represented underwriting standards, or received credits by the servicer for improper servicing violations, Deutsche Bank knew that there were enormous unresolved problems with the credit quality, servicing and administration of the mortgage loans in the Trusts, that defective mortgage loans were not being repurchased by the Sellers, that the Trusts were not being reimbursed for losses attributable to servicing violations, and that the Issuers were not acting to enforce the Trusts' rights as against responsible sellers and servicers.  Deutsche Bank also knew that the Issuers were failing to carry out their obligations to provide notice of all known defaults.

**XV.   DEUTSCHE BANK FAILED TO DISCHARGE ITS
       CRITICAL PRE- AND POST-DEFAULT DUTIES**

166.   Despite Deutsche Bank's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the Originators, Sellers, Depositors, and Sponsors, servicer violations, and Issuer breaches, Deutsche Bank failed to perform its duties as Trustee to protect the Trusts and Noteholders.

A. **Failure To Enforce The Trusts'**
   **Repurchase Rights Against Responsible Sellers**

167.    As set forth above, beginning in 2009 and by 2011, Deutsche Bank and its responsible officers discovered the Trusts contained loans that materially breached the Sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Noteholders' interests in those mortgage loans.  Deutsche Bank breached its contractual and statutory duties under the TIA and was negligent by failing to (i) provide notice to the parties to the Governing Agreements and/or the responsible Sellers upon its discovery of these breaches, and (ii) take any action to enforce the Sellers' repurchase of the defective mortgage loans.

B. **Failure To Provide Notice To The Servicers Of Servicer Events Of Default**

168.    As set forth above, beginning in 2009 and continuing to the present, Deutsche Bank and its responsible officers knew of failures on the part of the Servicers to observe or perform in material respects their covenants or agreements in the SSAs, including the Servicers' (i) failure to give notice to the other parties of Seller breaches of representations and warranties upon discovery thereof and enforce the Sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of modification obligations; and (v) improper servicing advances.  Deutsche Bank knew that these breaches were material and that they could give rise to "Events of Default" as defined by the SSAs.

169.    Deutsche Bank breached its contractual and statutory duties under the TIA by failing to provide notice to the Servicers of these defaults and Events of Default, and terminating the Servicers.

C. **Failure To Act Prudently Subsequent To Indenture Events Of Default**

170.    As set forth above, beginning in 2009 and continuing to the present, Deutsche Bank and its responsible officers have known of uncured and continuing Indenture Events of Default as

a result of the Issuers' numerous breaches under the Indentures.  Consequently, under the Indentures, Deutsche Bank had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

171.   A prudent person would have taken action to protect the Trusts and their Noteholders from the known Seller breaches of representations and warranties by exercising all of its rights under the Governing Agreements to enforce the Sellers' repurchase obligations, including timely conducting an investigation to determine all of the materially breaching mortgage loans and bringing suit against the Sellers for specific performance to compel their repurchase of those loans. Deutsche Bank breached its contractual, statutory and fiduciary duties by failing to act prudently and take these actions.

172.   A prudent person would have also taken action to protect the Trusts and their Noteholders from the known Servicer violations by exercising all of its rights under the Governing Agreements to enforce the Servicers' prudent servicing obligations, including ensuring that all Servicer Events of Default were cured, terminating the servicers, substituting itself as the substitute servicer or replacing the Servicers, and enforcing the Servicers' obligations to reimburse the Trusts for losses caused as a result of their breaches through suit, if necessary.  Deutsche Bank breached its contractual, statutory and fiduciary duties by failing to act prudently and taking these actions.

**D.   Failure To Provide Notice To Noteholders Of The Uncured Indenture Events Of Default**

173.   As set forth above, known Indenture Events of Default occurred, remained uncured for the requisite period of time and are continuing.   Consequently, under the Governing

Agreements, Deutsche Bank also had and continues to have the obligation to provide all Noteholders with notice of these Indenture Events of Default.

174.   Deutsche Bank had no good faith reason for failing to provide notice of these Indenture Events of Default to the Noteholders.   Accordingly, Deutsche Bank breached its contractual, statutory and fiduciary duties by failing to provide all Noteholders with notice of these Indenture Events of Default.

## XVI.   DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS

175.   Deutsche Bank failed to protect the Trusts after Trust Sponsors or Originators filed for bankruptcy or otherwise became insolvent.   In these instances, Deutsche Bank only acted to assert the Trusts' rights when it was in Deutsche Bank's interests and only to the limited extent consistent with Deutsche Bank's interests.   In particular, Deutsche Bank failed to adequately and comprehensively pursue relief against numerous solvent third parties that were also contractually liable under the Governing Agreements for servicing violations or representation and warranty violations.   Finally, Deutsche Bank failed to provide notice of Seller defaults, Events of Default, and otherwise notify Noteholders of information known only to Deutsche Bank that was necessary for Noteholders to take action to protect their rights and avoid or mitigate losses.

176.   Deutsche Bank has failed to adequately protect the Trusts against pervasive violations in the servicing of loans collateralizing Trusts sponsored by failed entities.   Loans collateralizing these Trusts were serviced (and continue to be serviced) by third parties unaffiliated with the bankrupt or insolvent sponsors.   As discussed herein, servicers have independent duties and obligations under the SSAs, and their liability for breach of those duties and obligations is untethered to solvency of the sponsor.

177.    For example, Wells Fargo was a major Servicer of loans securitizing insolvent Trust sponsor American Home Mortgage, servicing over $19.3 billion of loans collateralizing American Home Mortgage-sponsored RMBS in this action.   There is ample evidence that Wells Fargo engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including trusts sponsored by American Home Mortgage.   Among other things, Wells Fargo was one of the fourteen federally regulated mortgage servicers against whom the Federal Reserve, the OCC, the FDIC, and the OTS initiated formal enforcement actions, which resulted in a Consent Order against Wells Fargo based on comprehensive interagency findings of serious abuses and "critical weaknesses" in its servicing and foreclosure processes.   Despite Deutsche Bank's knowledge of such systemic and pervasive servicing abuses by solvent third party Servicers, including Wells Fargo, Deutsche Bank failed to adequately protect the rights of American Home Mortgage-sponsored Trusts against solvent servicers.

178.    In addition, Deutsche Bank also has not pursued representation and warranty claims against solvent Originators for breaching mortgage loans backing Trusts sponsored by failed entities.

179.    Deutsche Bank also failed to discharge its contractual and statutory obligations concerning Trusts sponsored by failed entities by neglecting to provide written notice to Noteholders of defaults in the form of rampant breaches of representations and warranties by the Sellers and Servicer violations (including continuing Events of Default), including with respect to deficient loans sold by solvent responsible parties.   Proper notice would have enabled Noteholders to, among other things, determine whether to take independent or collective action to protect their interests against such breaches of representations and warranties, including against solvent responsible parties and others engaged in abusive securitization practices.

## XVII.  DEUTSCHE BANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

180.    Deutsche Bank failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Noteholders because acting to diligently protect the interests of the Trusts and Noteholders would have conflicted with its own interests.  As set forth below, Deutsche Bank was involved with the Servicers' misconduct, helped facilitate it, or looked the other way so that the Servicers would return the favor when the roles were reversed with respect to the billions of dollars in repurchase liability that Deutsche Bank faced for defective loans that it originated or securitized.

### A.    Deutsche Bank Faced Substantial Liability For Defective Loans In The Trusts That Deutsche Bank Itself Originated Or Sponsored

181.    One of the Trusts' largest sponsors was MortgageIT, having sponsored over $5 billion in mortgage loans sold to seven of the Trusts at issue.  Simlarly, MortgageIT was one of the largest originators for the Trusts, having originated more than $4 billion of loans that serve as collateral for the Trusts.

182.    On June 11, 2006, Deutsche Bank's affiliate, DB Products, acquired MortgageIT for $429 million.  As a result of the merger, and pursuant to the express terms of the merger agreement, Deutsche Bank acquired all of the pre-merger assets and liabilities of MortgageIT.  On January 3, 2007, the acquisition was completed.

183.    MortgageIT's abusive origination and securitization practices have been the subject of several public and private information actions.  For example, the United States Attorney's Office ("USAO") has alleged that upper management at MortgageIT and Deutsche Bank knowingly permitted egregious underwriting violations through MortgageIT's participation in the Federal Housing Administration ("FHA") Direct Endorsement Lender program ("DEL Program").  As

outlined in the USAO complaint, MortgageIT, as a matter of course, failed to verify borrower income, employment history, credit history, cash investment in the mortgaged property, and other due diligence requirements while underwriting mortgage loans, and failed to review all early payment defaults, in direct contradiction to the required certifications it provided to the government.

184.   Such reckless practices have had severe consequences on the performance of MortgageIT-originated loans and MortgageIT-sponsored trusts.   For example, the MortgageIT Trusts at issue here have suffered collateral losses of approximately $485 million.

185.   Deutsche Bank and its responsible officers knew of MortgageIT's abusive practices and breaches of representations and warranties.   Nevertheless, in conflict with the interests of the Noteholders, Deutsche Bank failed to take action against MortgageIT because Deutsche Bank itself would have been ultimately responsible for repurchasing the defective loans.

**B.** **Deutsche Bank Face Enormous Liability For Defective Loans It Originated And Sponsored In Other Trusts**

186.   DBAG, through its affiliates as originators and sponsors for trusts, sold and securitized hundreds of millions of dollars of loans to other RMBS trusts that breached applicable representations and warranties.   Specifically, DBAG, through its affiliates (*e.g.,* DB Products), sponsored thirty-five RMBS offerings under the ACE, DBALT, DMSI and MHL labels that were collateralized by a total of over $106 billion in loans ("DB-Sponsored Trusts").   Many of the same entities that acted as sellers or servicers to the Trusts or through their affiliate companies acted in the capacity as servicer or trustee for the DB-Sponsored Trusts, including Wells Fargo.

187.   Many of the underlying residential mortgage loans for DB-Sponsored Trusts were originated by Deutsche Bank and its affiliates.   For example, DBAG, through its affiliates MortgageIT, DB Home Lending LLC, and Chapel, combined to originate over $16.2 billion in

loans used to collateralize DB-Sponsored Trusts.  In addition, Deutsche Bank acquired loans for its securitizations from some of the most notorious mortgage originators at the time, including Fremont, Countrywide, New Century, Option One, GreenPoint, and WMC.  As a mortgage loan seller, both as an originator and sponsor, Deutsche Bank made representations and warranties to the DB-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

188.    Widespread public evidence demonstrates pervasive violations of seller representations and warranties in the DB-Sponsored Trusts.  For example, in *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities*, No. 2:08-cv-03178 (E.D.N.Y. May 24, 2010), investors reviewed a sample of loans from two Deutsche Bank-label Trusts, DBALT 2006-AB4 and DBALT 2006-AR5, and found that Deutsche Bank understated the LTV ratio in 44% and 51%, respectively, of the sampled loans for each trust.

189.    Moreover, in the FHFA's analysis of the quality of the loans included in Deutsche Bank sponsored offerings, it consistently found that 20% or more of the loans in these offerings had LTV ratios of over 100% and that non-owner occupied properties had been repeatedly understated by 10% or more.  *See FHFA v. Deutsche Bank, AG, et al.*, No. 1:11-cv-06192 (S.D.N.Y. Sept. 2, 2011).  As further support for its allegations of Deutsche Bank's systematic misreporting of owner occupancy and LTV statistics, the FHFA's complaint highlighted government and private investigations into the originators' underwriting practices, revealing widespread abandonment of the originators' reported underwriting guidelines during the relevant period, the collapse of the Certificates' credit ratings, and the surge in delinquencies and defaults in the mortgages in the Deutsche Bank securitizations.

190.    Accordingly, because Deutsche Bank itself faced enormous repurchase liability for its own originated or sponsored loans sold in breach of representations and warranties, Deutsche

Bank was disincentivized to take any action against the sellers and servicers for the Trusts, or even alert the Noteholders to the sellers' and servicers' misconduct.

### C. Deutsche Bank Was Economically Beholden To The Mortgage Loan Sellers

191.    Trustees are selected by the sponsor, which is often an affiliate of the servicer. While Deutsche Bank was charged with representing the interests of the Trusts and all Noteholders, it was economically beholden to the Sponsors.  Indeed, Deutsche Bank had close, repeat business relationships with most if not all of the Sponsors.  Accordingly, Deutsche Bank was incentivized to not require Servicers to take necessary action because these Servicers were affiliated with the Sponsors that provided valuable trustee appointments.  In short, Deutsche Bank failed to protect the Trusts because it did not want to risk losing significant business from these Sponsors.

## XVIII. CAUSATION

192.    Deutsche Bank's failure and unreasonable refusal to enforce the Trusts' and Noteholders' rights against the Sellers and Servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to dissipate.  The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the P&I payments owed to the Trusts.  Moreover, servicer violations have exacerbated the Trusts' losses.  Had Deutsche Bank performed its duties as Indenture Trustee, in particular, had it adequately enforced the obligations of the Sponsors and Originators to cure, substitute, or repurchase mortgage loans that breached representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trust assets from dissipating.   Had Deutsche Bank enforced the Trusts' rights against Servicers for

reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Noteholders.

## XIX.   <u>DAMAGES</u>

193.    The Trusts have incurred substantial damages attributable to Deutsche Bank's breaches of its contractual, statutory, fiduciary, and common law duties.  In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency.  As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continue to incur significant losses in connection with servicer violations.  Damages incurred by the Trusts and caused by the Indenture Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XX.   <u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>
**(Breach Of Contract)**

194.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

195.    The Governing Agreements are valid contracts that memorialize the issuance of notes of beneficial interests in the Trusts, and establish Deutsche Bank's contractual duties and obligations, in its capacity as Indenture Trustee, to the Trusts and their Noteholders.  Each of the relevant contractual provisions is substantively similar, if not identical, in all of the Governing Agreements, and imposes substantially the same, if not identical, duties and obligations on Deutsche Bank in its capacity as Indenture Trustee.

196.     As current holders of Notes issued by each of the Trusts, Plaintiffs are express, intended third party beneficiaries under the Governing Agreements entitled to enforce the performance of the Trustee.

197.     Under each of the Governing Agreements, Deutsche Bank owed a duty to the Trusts and all Noteholders (i) to give prompt written notice to all parties to the Governing Agreements of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Noteholders in any such mortgage loan, upon Deutsche Bank's knowledge of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

198.     As set forth above, Deutsche Bank materially breached each Governing Agreement by (i) failing to provide prompt written notice to all parties to the Governing Agreements and related responsible parties of breaches of the Sellers' mortgage loan representations and warranties, upon Deutsche Bank's discovery of the breaches; and (ii) failing to enforce the Sellers' obligation to repurchase, substitute, or cure such defective mortgage loans.

199.     The SSAs define a Servicer "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the SSAs, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the indenture trustee requiring the same to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

200.     As set forth herein, Servicer Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the Servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the SSAs.

201.     Deutsche Bank and its responsible officers had knowledge of these and other defaults by the Servicers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Nevertheless, Deutsche Bank failed to deliver written notices to the Servicers of the defaults or terminate the Servicers.  Similarly, Deutsche Bank failed to provide Noteholders with notice of these Servicer Events of Default.  By failing to take these actions, Deutsche Bank materially breached the SSAs.

202.     As set forth herein, Indenture Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the Issuers' defaults in their performance of their obligations under the Indentures.  Deutsche Bank and its responsible officers had knowledge of these and other defaults by the Issuers through, among other things, public reports, lawsuits, exception reports, remittance reports, and the increasing delinquency and loss rates for the Trusts.  Consequently, under the Indentures, Deutsche Bank had and continues to have the obligation to exercise the rights and powers vested in it by the Governing Agreements, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs.  A prudent person would have exercised all of the indenture trustee's rights to recover for these Indenture Events of Default, and would have done so promptly.  Similarly, Deutsche Bank failed to provide Noteholders with notice of these Indenture Events of Default.  By failing to take these actions, Deutsche Bank materially breached the Indentures.

203.    Deutsche Bank's material breaches of the Governing Agreements have directly and proximately caused damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and depleted billions of dollars of Trust assets.  For example, had Deutsche Bank protected the rights of the Trusts and Noteholders by enforcing the Sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan. Deutsche Bank's inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had Deutsche Bank enforced the Servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  Deutsche Bank's inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

204.    Deutsche Bank's material breaches of the Governing Agreements have injured all Noteholders, including Plaintiffs and the Class, in that they have caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION
### (Violation Of The Trust Indenture Act Of 1939, 15 U.S.C. §§ 77ooo(b) And (c))

205.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

206.    Section 315 of the TIA sets out the duties and responsibilities of an indenture trustee, such as Deutsche Bank.  Section 315(b) states that the "trustee shall give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof", unless the indenture trustee believes withholding such notice is in the best

interests of the Noteholders.  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase or substitute defective or nonconforming loans in the Trusts; (ii) the failure on the part of the Servicers to observe and perform covenants and agreements set forth in the SSAs, including failing to provide notice of known breaches of the Sellers' representations and warranties and failing to administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers; and (iii) the failure on the part of the Issuers to perform their obligations under the Indentures.  Given the great importance of those defaults to the Noteholders' interests, Deutsche Bank had no good faith reason for failing to provide notice of those defaults.  Accordingly, by failing to provide this notice, Deutsche Bank violated Section 315(b) of the TIA.

207.    Section 315(c) of the TIA states that an indenture trustee is to "exercise in case of default (as such term is defined in such indenture)" all of the powers available to it under the indenture agreement, using "the same degree of care and skill in their exercise, as a prudent man would exercise" in conducting his own affairs. 15 U.S.C. § 77ooo(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts and Noteholders, any prudent person under those circumstances would have promptly exercised all of the Indenture Trustee's rights to, among other things, (i) enforce the Sellers' obligation to repurchase, substitute, or cure defective mortgage loans; and (ii) require the Servicers' cure all servicing breaches and reimburse the Trusts for losses caused from servicing violations.  By failing to exercise its rights in those circumstances, Deutsche Bank violated Section 315(c) of the TIA.

208.    Deutsche Bank's violations of the TIA have directly and proximately caused actual damages to the Trusts and Noteholders in that they have deprived the Trusts of valuable remedies and allowed billions of dollars of the Trusts' assets to waste away.  For example, had Deutsche Bank protected the rights of the Trusts by enforcing the Sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans.  Deutsche Bank's inaction with respect to the Sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that have increased the severity of the Trusts' losses.  Similarly, had Deutsche Bank enforced the Servicers' servicing obligations, the Trusts would have been able to avoid unnecessary losses.  Deutsche Bank's inaction with respect to the Servicers has exacerbated losses experienced by the Trusts.

209.    Deutsche Bank's violations of the TIA have caused actual damages to all Noteholders, including Plaintiffs and the Class by diminishing the value of the notes held by the Noteholders and preventing the Noteholders from protecting the rights of the Trusts.

### THIRD CAUSE OF ACTION
#### (Breach Of Fiduciary Duty)

210.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

211.    Under New York law, after the occurrence of an Event of Default, Deutsche Bank's duties expanded to include a fiduciary duty owed to the Trusts and all Noteholders, regardless of any limitations or exculpatory provisions contained in the Indenture.  This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Noteholders following an Event of Default.

Following the Events of Default described above, Deutsche Bank breached its fiduciary duties to the Trusts and all Noteholders in several respects.

212.     First, Deutsche Bank, in its capacity as Indenture Trustee, had standing under the Governing Agreements to bring claims against the Sellers of the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Indenture Events of Default, meritorious claims existed against the Sellers for breach of their representations and warranties under the Governing Agreements.  Deutsche Bank, however, failed to promptly enforce the Sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the Sponsors' and Originators' representations and warranties, including by filing suits on behalf of the Trusts against the Sellers.  Moreover, Deutsche Bank failed to provide notice to the Noteholders of the breaches or of its intention not to enforce the Sellers' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

213.     Deutsche Bank's failure to promptly enforce the Sellers' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the Sellers' representations and warranties, as well as its failure to provide notice to the Noteholders of its intention not to promptly enforce the Sellers' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the Sellers' representations and warranties, constituted breaches of Deutsche Bank's post-Event of Default fiduciary duty to all Noteholders.

214.     Second, Deutsche Bank, in its capacity as Indenture Trustee, presently has standing to bring meritorious claims against the Servicers to enforce the Servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, including to service and administer

-72-

the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Deutsche Bank, however, has refused and continues to refuse to enforce the Servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, including by filing suits on behalf of the Trusts against the Servicers for compensatory and injunctive relief for harm caused to the Trusts and Noteholders as a result of servicing violations. Moreover, Deutsche Bank has failed to provide notice to the Noteholders of the servicing violations or of its intention not to enforce the Servicers' obligations to observe and perform covenants and agreements set forth in the SSAs. Deutsche Bank's failure to enforce the Servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, as well as its failure to provide notice to the Noteholders of the servicing violations or of its intention not to enforce the Servicers' obligations to observe and perform covenants and agreements set forth in the SSAs, constitutes breaches of Deutsche Bank's post-Event of Default fiduciary duty to all Noteholders.

215.   Deutsche Bank's breach of its fiduciary duty has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the Sellers and Servicers but for Deutsche Bank's breach of its fiduciary duty.

216.   Deutsche Bank's breaches of its fiduciary duty have injured all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION
### (Breach Of Duty To Avoid Conflicts Of Interest)

217.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

218.    Under New York law, Deutsche Bank, as Indenture Trustee, had certain extra-contractual duties to the Trusts and all Noteholders, including the duty to avoid conflicts of interest. This duty to avoid conflicts of interests applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

219.    Under each of the Governing Agreements, Deutsche Bank holds the loans for the benefit of the Trusts and all Noteholders, including Plaintiffs and the Class.

220.    Under each of the Indentures, Deutsche Bank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Deutsche Bank held for the benefit of the Trusts and all Noteholders.

221.    As alleged in detail above, Deutsche Bank knew of Seller breaches of representations and warranties and that the Servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

222.    As alleged herein, in its capacity as servicer with regard to other mortgage loans and RMBS trusts, Deutsche Bank was involved in the same wrongful conduct and servicing violations in which many of the same Sellers, Servicers or their affiliates were serving as servicers or trustees.  In addition, in their capacity as a seller with regard to other mortgage loans and RMBS trusts, Deutsche Bank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same Sellers, Servicers or their affiliates were

-74-

serving as servicers or trustees.  Moreover, Deutsche Bank was economically beholden to the Sellers.

223.    Because Deutsche Bank faced liability for its wrongful servicing practices and for the sale and securitization of its own loans in breach of its specific representations and warranties, and since it was economically beholden to the Sellers, Deutsche Bank failed to take any action against the Servicers and Sellers, or even notify the Noteholders that the Servicers or Sellers were engaged in this misconduct.

224.    Deutsche Bank's breach of its duty to avoid conflicts of interests has directly and proximately caused damages to the Trusts and Noteholders.  For example, had Deutsche Bank not been conflicted, it would have enforced the Sellers' repurchase obligations and exercised its discretion to prevent the Servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans.  Deutsche Bank's inaction has relieved the Sellers' of their repurchase liability, and allowed the Servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

225.    Deutsche Bank's breaches of its duty to avoid conflicts of interests have injured all Noteholders, including Plaintiffs and the Class, in that they caused Plaintiffs' losses and have diminished the value of the notes held by the Noteholders and have prevented the Noteholders from protecting the rights of the Trusts.

## XXI.  CLASS ACTION ALLEGATIONS

226.    Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of notes issued by the Trusts (the "Class") that have suffered damages as a result of Deutsche Bank's misconduct alleged herein.  Excluded from the Class are Deutsche Bank, the Sellers and the Servicers, and, for each of them, their respective parents,

affiliates, officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

227.    The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.  Record beneficial owners and other members of the Class may be identified from records maintained by Deutsche Bank or third parties and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

228.    Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all acquired notes issued by the Trusts, and held them at or after the time of Deutsche Bank's misconduct; (ii) all of the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) Deutsche Bank's alleged misconduct was substantially the same with respect to all Class members; and (iv) all Class members suffered similar harm as a result.  Thus, all members of the Class are similarly affected by Deutsche Bank's statutory, contractual, and common law breaches and violations that are alleged of herein.

229.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent counsel with experience in class action and asset-backed securities litigation.

230.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether Deutsche Bank breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether Deutsche Bank violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of Deutsche Bank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

231.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## XXII.  <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs demand judgment as follows:

(a)    Determining this action to be a proper class action under Fed. R. Civ. P. 23, certifying Plaintiffs as Class Representatives, and appointing Bernstein Litowitz Berger & Grossmann LLP as Class Counsel;

(b)    Awarding damages in favor of Plaintiffs and the Class against Deutsche Bank for all damages sustained as a result of Deutsche Bank's wrongdoing;

(c)    Requiring Deutsche Bank to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its Indenture Trustee obligations under the Governing Agreements and applicable laws, and to protect the Trusts and the Noteholders from a repeat of the damaging events described herein;

(d)    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(e)    Granting any other and further relief that the Court deems just and proper.

## XXIII. **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: March 22, 2016

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

*/s/ Blair A. Nicholas*
   BLAIR A. NICHOLAS

BLAIR A. NICHOLAS (admitted *Pro Hac Vice*)
TIMOTHY A. DeLANGE (admitted *Pro Hac Vice*)
BENJAMIN GALDSTON (admitted *Pro Hac Vice*)
BRETT M. MIDDLETON (admitted *Pro Hac Vice*)
LUCAS E. GILMORE (admitted *Pro Hac Vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

*Counsel for Plaintiffs and the Class*