# Exhibit F

**EXPERT REPORT OF**
**JOHN H. DOLAN**


*BlackRock Allocation Target Shares: Series S Portfolio, et al.,*
*v.*
*Deutsche Bank National Trust Company and*
*Deutsche Bank Trust Company Americas*

**Case No. 14-CV-9367-JMF-SN (S.D.N.Y.)**

**Highly Confidential Pursuant to**
**Stipulation and Order**


**March 26, 2018**

Table of Contents

I.   **Introduction** ....................................................................................................**1**

     A.    Qualifications ...................................................................................1

     B.    Assignment .....................................................................................4

II.  **Summary of Opinions** .......................................................................................**5**

III. *First Opinion*:  **Tracing the Transfers of Particular Beneficial Interests in the Subject RMBS Notes from the Alleged Breaches to the Present Is Not Possible, and Any Attempt to Do So Would Require Highly Detailed Individualized Inquiries** ...................**7**

     A.    My Understanding of the Legal Framework: Plaintiffs Must Establish Chains of Ownership for All Noteholders from Issuance, or at the Latest, from the Date of the Alleged Breaches, to Today ...................................................................7

     B.    Trading of RMBS Is Characterized by Features that Make Identifying Beneficial Holders and Tracing Ownership Over Time Impossible Without Analysis of Individual Transactions ...........................................................................10

           1.    There Is No Unique Identifier for Specific Parts of an RMBS Tranche ... 10

           2.    Because RMBS Are Held in "Book-Entry" Form, Ownership Records Consist of Multiple Layers that Are Difficult to Connect ........................ 11

           3.    RMBS Are Traded Over-the-Counter, Not on an Exchange, in Individualized Negotiations ...................................................................... 15

           4.    RMBS Broker-Dealers Are Geographically Dispersed ............................ 17

     C.    Ownership and Trading Data Produced Are Insufficient to Identify Beneficial Holders or Determine a Chain of Ownership Throughout the Life of an RMBS Note, and Instead Only Demonstrate the Impossibility of Tracing .....................21

           1.    Trade-Run and Bloomberg Data Are Incomplete and Insufficient to Determine a Chain of Ownership ........................................................... 22

           2.    The Incomplete Trade-Run Data Reflect Aggregation and Disaggregation of Positions That Make Tracing Ownership Impossible.......................... 25

           3.    BlackRock Institutional Investors Have Already Asserted That It Is Impossible to Identify Former Holders and That Ownership Is Untraceable .................................................................................................... 33

           4.    International Investors Further Complicate the Individualized Inquiries Necessary to Identify Investors and Trace Ownership ............................ 34

**IV.** *Second Opinion*:  **Dr. Hartzmark's Proposed Database Approach Will Not Solve the Tracing Problem and Equally Requires Individualized Inquiries to Identify Chains of Ownership** .................................................................................................................**39**

**V.** *Third Opinion*:  **Even Assuming the Chain of Ownership Could Be Established, Individualized Inquiries Are Required to Determine Which Owner Possesses Any Litigation Claims Associated with an RMBS Note**.............................................................**45**

**VI.** *Fourth Opinion*:  **Investors Understood the Role of a Trustee to Be Limited**................**53**

# I.     Introduction

## A.     Qualifications

1.      I am the founder of and currently employed by Second Order Strategies, Inc., a firm that provides expert testimony and consulting services in litigation as well as risk analysis.

2.      I received my B.A. *cum laude* in Economics and Mathematics from Union College in 1975 and received my M.B.A. in Finance with a focus on financial markets from the Wharton Graduate Business School at the University of Pennsylvania in 1977.

3.      I have over 30 years of real-world experience in trading, structuring, investing, and valuation of multiple security types within Agency and Private-label residential mortgage-backed securities ("RMBS"), collateralized debt obligations ("CDOs"), agency collateralized mortgage obligations, whole loans, and commercial mortgage-backed securities.

4.      My decades of industry experience include working at executive and senior-level positions at large portfolio managers and investment banks.  I was also certified as a Financial Risk Manager and Energy Risk Professional by the Global Association of Risk Professionals and passed the General Securities Representative (Series 7), the Uniform Securities Agent State Law (Series 63), and the National Commodity Futures (Series 3) exams.  I have served as President of the Fixed Income Analysts Society, a Board Member of the Public Securities Association,[1] and Chairman of the Public Securities Association's Mortgage-Backed Securities ("MBS") Division. I have also appeared on CNBC and testified before a Congressional Committee during the savings and loan crisis of the 1980s and 1990s.

---

[1] The Public Securities Association is now part of the Securities Industry and Financial Markets Association ("SIFMA").  *See* "Our History," *SIFMA*, https://www.sifma.org/about/.

5.     Prior to forming Second Order Strategies, Inc., I served as Chief Investment Officer of Hyperion-Brookfield Asset Management, head of the Active Bond Group at Bankers Trust Global Investment Management, Managing Director at Salomon Brothers, and head of the MBS Trading Desk at Citibank.  In addition, I served as an independent consultant for Pentalpha Group and MF Global.  These positions provided me with direct experience with many facets of MBS, residential MBS ("RMBS"), and residential lending, including:

- Trading MBS (Agency MBS, non-Agency RMBS, and commercial mortgage-backed securities);
- Overseeing the structuring and trading of new-issue collateralized mortgage obligations and MBS;
- Marketing and trading one of the first private-label RMBS deals employing a senior/subordinate credit structure;
- Interacting with key players in the securitization process to include: originators, servicers, rating agencies, trustees, depositories, and custodial banks;
- Valuing the cash flows of credit-sensitive mortgage-related securities from numerous issuers as both a trader and investor;
- Trading Resolution Trust Corporation whole loan pools and RMBS securitized by mortgage loans obtained by the Resolution Trust Corporation through its receivership or conservatorship of failed financial institutions;
- Managing a residential whole loan mortgage conduit, a process that involved buying, selling, and pricing whole loans;
- Evaluating, trading, and modeling securities collateralized by prime,[2] subprime,[3] and

---

[2] "The majority of loans originated are of high-credit quality, where the borrowers have strong employment and credit histories, income sufficient to pay the loans without compromising their creditworthiness, and substantial equity in the underlying property.  These loans are broadly classified as *prime loans*, and have historically experienced low incidences of delinquency and default."  *See* Fabozzi, F.J., A.K. Bhattacharya, and W.S. Berliner (2007), *Mortgage-Backed Securities:  Products, Structuring, and Analytical Techniques*, Hoboken:  John Wiley & Sons, Inc., p. 5.

[3] "Loans of lower initial credit quality which are more likely to experience significantly higher levels of default, are classified as *subprime loans*."  *See* Fabozzi, F.J., A.K. Bhattacharya, and W.S. Berliner (2007), *Mortgage-Backed Securities:  Products, Structuring, and Analytical Techniques*, Hoboken:  John Wiley & Sons, Inc., p. 5.

Alt-A[4] residential mortgage loans, as well as agency collateralized mortgage obligations and CDOs;

– Managing leveraged investments and RMBS for publicly traded mutual funds, as well as a real estate investment trust;

– Overseeing an RMBS investment process that included data screening, visiting issuers and servicers for due diligence, reviews of monthly remittance reports prepared by RMBS trustees that detail the distribution of cash flows generated by the RMBS, and ongoing surveillance of current holdings;

– Serving as a CDO collateral manager; and

– Investing in both cash and synthetic instruments, including credit default swaps and mortgage-related indices.

6.    I have lectured at colleges and universities on the subjects of the residential mortgage loan and securities markets.  Since 2010, I have been the sole independent market maker of Case-Shiller Home Price Index futures traded on the Chicago Mercantile Exchange.  I maintain a blog, *HomePriceFutures.com*, dedicated to home price index futures, and I have organized an industry-wide conference on issues related to home price forecasting.

7.    Since 2007, I have consulted and/or testified on litigation and valuation assignments.  My work has included estimation of valuations, defaults, and loss severities on mortgage loans and RMBS; reviews of approaches to investment, due diligence, monitoring, surveillance, and risk analysis; reviews of the roles of key participants in securitizations; as well as reviews of the use of leverage and valuation methodologies for RMBS, CDOs, and synthetic super senior CDO exposures.

---

[4] Alt-A loans "are considered to be prime loans (the 'A' refers to the A grade assigned by underwriting systems), albeit with some attributes that either increase their perceived credit riskiness or cause them to be difficult to categorize and evaluate." *See* Fabozzi, F.J., A.K. Bhattacharya, and W.S. Berliner (2007), *Mortgage-Backed Securities:  Products, Structuring, and Analytical Techniques*, Hoboken:  John Wiley & Sons, Inc., p. 5.  Alt-A borrowers may also be self-employed borrowers who cannot produce certain forms (*e.g.*, W-2's) needed for prime loans.

8.      My current resume, which contains a list of my publications and speaking engagements, is attached as **Exhibit 1**.  A list of matters in which I have testified as an expert at trial or by deposition over the past four years is attached as **Exhibit 2**.

### B.      Assignment

9.      I have been retained by counsel for Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas ("the Trustees") to opine on certain issues regarding the nature of secondary RMBS trading markets (typically referred to simply as "the RMBS market"), whether it is possible to determine the identities of all current and former owners of the particular RMBS notes or certificates (referred to in this report as "notes") issued by the 58 Trusts at issue in this action (the "Trusts"), and whether it is possible to trace the transfer of particular RMBS notes between former and current beneficial owners.  I have also been asked to review and respond to certain opinions offered in the Expert Report of Michael L. Hartzmark, Ph.D., dated January 26, 2018 ("Hartzmark Report").  The materials that I have considered in forming my opinions are cited within this report or listed in **Exhibit 3**.

10.     I am being compensated for my work in this matter at the rate of $800 per hour.  I have been assisted by the staff of Cornerstone Research ("Cornerstone"), who worked under my direction.  I also receive compensation from Cornerstone based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

11.     To the extent that additional materials are produced in this matter, I reserve the right to supplement or modify my opinions if warranted.

## II.    Summary of Opinions

12.    Below is a brief summary of the principal opinions that I have reached in this matter to date.  I set forth the bases for these opinions and additional details later in this report.

   a. Certain features of RMBS trading make identifying a complete list of end investors who held the notes at any particular point in time and tracing ownership over time impossible without analysis of individual transactions, if it can be reliably done at all.

      1. There is no unique identifier below the tranche level for RMBS holdings. In addition, private-label RMBS do not typically trade on an exchange, and accordingly, there is no central repository of trade history.

      2. RMBS are typically held in "book-entry" form, meaning that notes do not physically transfer between sellers and buyers and are not held in the owner's name.  An individualized inquiry would involve identifying beneficial owners, which, in turn, entails examining multiple layers or records held by multiple distinct entities.  No single broker-dealer or other institution has a database listing all trades across an RMBS deal.  In addition, broker-dealers are geographically dispersed across the country (and world) such that there is no single location from which to obtain information about trades.  Together, these features mean that, as a practical matter, identifying all investors in an RMBS trust at a particular point in time and tracing ownership of particular beneficial interests in the trusts over time is not possible; any attempt to do so would, at minimum, require granular individualized inquiries regarding purchases and sales of RMBS.

   b. Available ownership and trading data are insufficient to determine a chain of ownership throughout the life of an RMBS note or to identify all holders at a particular point in time.

      1. The trade-run and Bloomberg data available in this case are incomplete and cannot account for all RMBS trades at issue.

      2. But even if a complete set of trading records could be obtained, one would still not be able to trace specific holdings of current holders to particular prior holders.  The available trade-run data reflect aggregation and disaggregation of positions that make tracing the chain of ownership impossible.  The presence of international investors and CDOs that appear to have owned notes in the subject RMBS make identifying all owners and tracing ownership even more difficult, as ownership interests have been distributed across the globe, including to holders that may be outside the Court's subpoena power.

3. Thus, I agree with the representations by the BlackRock and PIMCO Plaintiffs to the Court that identifying prior holders and tracing ownership is not possible.

c. It is not possible to even identify all owners and all ownership transfers of the RMBS notes at issue from issuance through today without highly detailed and individualized inquiries.

d. Dr. Hartzmark's proposed database approach will not solve the tracing problems and will require granular individualized inquiries.

1. Dr. Hartzmark also proposes no viable method to account for assignments of litigation claims, the law governing transfers, and holders without litigation rights.

a. The ownership and transactional data provide no information about contractual assignments (or automatic transfer carve-outs) of any litigation claims.

b. There are examples of former investors in the subject RMBS that claim that they retained their litigation claims when selling the RMBS years ago, and examples of former investors that allege that they have been assigned claims.

c. As a result, even if all particularized ownership chains could be reconstructed (they cannot), complex and highly individualized inquiries will be required to determine which current investors own litigation claims against the Trustees.

2. Dr. Hartzmark claims that he can identify current holders using Depository Trust Company ("DTC") documents to identify DTC "Participants" and then by subpoenaing each individual DTC Participant as well as the Participants' clients, the clients' clients, and so on. He then proposes to create a database to analyze and attempt to piece together transactions.

3. This exercise is a multi-layered and highly individualized inquiry requiring, among other things, hundreds or thousands of subpoenas in numerous waves, as well as examinations of all buy and sell transactions (which, when provided in other matters, have been produced—if at all—in varied formats and/or with key data missing). It is not a "straightforward" process as Dr. Hartzmark now claims. Further, he does not even propose a process for identifying former owners.

4. Moreover, data disclosed in response to any such subpoenas will be stale, as the RMBS at issue continue to trade, and the identities of any ultimate beneficial owners of the certificates will continue to change from what may be disclosed in response to any subpoenas.

e. With respect to current holders who do possess litigation rights, one would still need to determine whether their claims are barred by the statute of limitations. This inquiry also raises a host of individualized questions given that investors

were located in different states and countries and traded at different times from 2004 to present.

    f.    Investors understood the role of the trustee in RMBS transactions to be very limited and had no expectation that the trustee would be a guarantor of any loan seller's representations or servicer's timeliness in processing distressed loans.

**III.**    ***First Opinion*: Tracing the Transfers of Particular Beneficial Interests in the Subject RMBS Notes from the Alleged Breaches to the Present Is Not Possible, and Any Attempt to Do So Would Require Highly Detailed Individualized Inquiries**

    13.    My first opinion, which has several sub-parts, is that it is impossible to trace the transfer of particular beneficial interests in the RMBS notes between the original investors who held the Certificates at or around the time of the alleged breaches to the present without performing individualized factual inquiries concerning each transaction. I elaborate on my opinion in this section.

    **A.**    **My Understanding of the Legal Framework: Plaintiffs Must Establish Chains of Ownership for All Noteholders from Issuance, or at the Latest, from the Date of the Alleged Breaches, to Today**

14.    I understand Plaintiffs seek to certify a class defined as follows:

> [A]ll persons or entities who purchased or otherwise acquired a beneficial interest in a security issued from the Trusts . . . between the date of offering and 60 days from the final order certifying the class and who hold that beneficial interest in the security through the date of final judgment, and who were damaged as a result of [Defendants'] alleged breaches of contract . . . .[5]

    15.    I understand from counsel that Plaintiffs' position is that as current holders, Plaintiffs' rights include the claims and demands of all prior holders, which automatically transferred to Plaintiffs upon their purchase of the RMBS under Section 13-107 of the "New

---

[5] Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Representatives and Class Counsel, January 26, 2018, p. 1.

York General Obligation Law" ("§ 13-107").[6]  In other words, as I understand from counsel, Plaintiffs are attempting to bring claims that may have accrued before their purchases of the subject RMBS and to recover damages incurred by prior holders.  Dr. Hartzmark presumes the automatic transfer of claims and damages to current holders.[7]  He makes no effort to identify the investors holding certificates in the subject RMBS at the time of the alleged breaches by the Trustees, or to trace the ownership of notes from the dates of alleged breaches to the present.[8]

16.     I also understand from counsel that the Trustees dispute Plaintiffs' position regarding § 13-107 and the automatic transfer of all claims to subsequent purchasers.  According to the Trustees, § 13-107 can apply and transfer accrued claims (and damages at the time of breach) only if Plaintiffs can establish that New York law governs each individual transfer of the notes in each chain of beneficial ownership in the Certificates since the dates the claims accrued. The Trustees also maintain that in those instances where New York law governs the particular transfer, claims would be assigned to the transferee where the parties to that transfer did not reserve the claims in writing.  I understand that states other than New York, as well as other countries, do not have laws that would automatically assign claims to a note's buyer.

17.     Thus, the Trustees' position is that Plaintiffs must identify the beneficial owners (including former holders) of the subject RMBS at the times when the alleged claims accrued (and any holders were allegedly damaged by the Trustees' alleged conduct) and then trace the

---

[6] I use the term "holders" to refer generally to the holders of beneficial ownership interests in the notes (*i.e.*, the investors) at any given point in time.  As explained further below, however, the investors do not actually hold the notes themselves.  Rather, investors' beneficial ownership interests are reflected through accounts with a chain of one or more intermediaries, and the holder of the notes themselves is almost always a securities depository.

[7] Deposition of Michael L. Hartzmark, March 13, 2018 (Hartzmark Deposition) at 124:23–127:1.

[8] Hartzmark Deposition at 179:20–180:1.

ownership of the specific beneficial interests from the date of alleged breach, to the investors that hold such beneficial interests through the date a class is certified. This inquiry, the Trustees contend, requires (among other things) a determination of the parties' residences, the locations where each transfer was negotiated and occurred, and the laws governing any agreements between the parties to each transfer.

18.     Further, I understand from counsel that even if an automatic assignment rule always applies (which the Trustees dispute), the Trustees' position is that Plaintiffs must still trace ownership to determine (a) whether any prior holder expressly retained its claims (as § 13-107 allows a prior holder to do to avoid automatic assignment of its claims); (b) whether the claims are timely under the applicable statute of limitations in the jurisdictions in which the original investors who held the beneficial interests at the time of breach resided; and (c) to obtain information about each investor that would impact determinations of causation and damages, such as the price at which the notes were bought and sold and other investor-specific facts.

19.     As I understand from counsel, then, identification of all transfers of ownership by investors and a determination of the identities of all investors from issuance, or at the latest, from the date of the alleged breaches, to today, is necessary no matter how the legal disputes turn out. That is, Plaintiffs will have to perform tracing to establish the *chains of ownership*. Plaintiffs, however, have not (i) identified all prior or current holders, or proposed any method for doing so, or (ii) undertaken any exercise to trace chains of ownership, or proposed any method for doing so. In fact, Plaintiffs have represented in court proceedings that such tracing is not possible to complete. As discussed more fully below, this tracing exercise is impossible to complete successfully, and any attempt to do so would require a series of complex and highly detailed individualized inquiries.

**B.** **Trading of RMBS Is Characterized by Features that Make Identifying Beneficial Holders and Tracing Ownership Over Time Impossible Without Analysis of Individual Transactions**

20.      Trading of RMBS is characterized by at least four features that make identifying beneficial holders at particular points in time and tracing ownership over time impossible without analysis of individual transactions.  First, there are no unique identifiers for specific parts of an RMBS tranche (which I also refer to as a "certificate" or "note"; there is no difference between the terms for purposes of my opinion), making the holdings fungible; thus, it is not possible to distinguish the holdings of investors within the same tranche.  Second, RMBS are held in "book-entry" form, making ownership records multi-layered and difficult to connect.  Third, RMBS are traded over-the-counter in individualized negotiations, not on an exchange, and there is no central repository of trade history from issuance to today.  Fourth, RMBS broker-dealers and investors are geographically dispersed both inside and outside of the United States such that there is no single location from which to obtain information about all trades in an RMBS deal.  Together, these features mean that identifying all investors in an RMBS trust and tracing ownership over time is only possible, if at all, with individualized inquiries.

### 1.      There Is No Unique Identifier for Specific Parts of an RMBS Tranche

21.      The RMBS issued by each trust are subdivided into multiple tranches identified by a CUSIP[9] number, which consists of nine characters that uniquely identify the company or issuer and the particular tranche within the deal.  While each RMBS tranche can be sub-divided

---

[9] "CUSIP" is an acronym for "Committee on Uniform Securities Identification Procedures."  *See* U.S. Securities and Exchange Commission, "Fast Answers, CUSIP Number," *available at* https://www.sec.gov/answers/cusip.htm.  In addition to tranches with CUSIPs, there are other parts of an RMBS trust that may not have assigned CUSIPs.

into multiple holdings, there is no unique identifier below the CUSIP level for RMBS holdings. The sizes of the tranches differ based on the trust.  In the case of the 58 Covered Trusts here, the tranches range in size from $460 thousand to $2.69 billion.[10]  RMBS investors' ownership positions may comprise a small fraction of the total size of a given tranche, but all of those fractional positions held by different investors within a tranche have the same CUSIP number.

22.     Because there is no unique identifier for these fractional holdings within a tranche, one cannot distinguish between the holdings of two or more investors within the same tranche or CUSIP.  That is, fractional holdings within tranches are fungible.  This fungibility presents unique challenges to any attempt to trace ownership of certificates across time.

### 2.     Because RMBS Are Held in "Book-Entry" Form, Ownership Records Consist of Multiple Layers that Are Difficult to Connect

23.     Another feature of RMBS that makes identification of all owners of RMBS over time impossible without individualized inquiries is the layered nature of ownership records. Most domestically owned RMBS notes are held not by the investors themselves, but by The Depository Trust Company ("DTC").  DTC is a securities depository that was created in 1973 to reduce costs and administrative burdens in trading securities by eliminating the need for physical delivery of paper securities.  DTC acts like a clearinghouse to process and settle many types of trades.[11]  For RMBS notes, DTC serves as the "depository" for the notes by holding them on behalf of entities, usually banks or brokerage firms (known as its "Participants"), and reflecting transfers of ownership in the RMBS notes among its Participants by updating its records (*i.e.*, by

---

[10] The smallest tranche ($460 thousand) is the 8M5 tranche of the AHM 2005-1 trust, and the largest tranche ($2.69 billion) is the A1 tranche of the GMSL 2005-A trust.

[11] *See* http://www.dtcc.com/about/businesses-and-subsidiaries/dtc.

"book-entry") without any actual physical delivery of a security from a seller to a buyer in exchange for payment.[12]

24.    DTC records information about RMBS holdings in what is known as "book-entry" or "street name."  DTC explains "street name" as follows:

> When an investor holds shares this way [*i.e.,* in street name], the investor's name is listed on its brokerage firm's books as the beneficial owner of the shares.  The brokerage firm's name is listed in DTC's ownership records.  DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.  DTC holds legal title to the securities and the ultimate investor is the beneficial owner.[13]

25.    Thus, as explained by DTC, here in the United States, the beneficial owners of the notes (*i.e.*, the investors entitled to the benefits associated with the notes) generally are not the registered owners of the notes (*i.e.*, the DTC or other depository) and are not even identified on the registered owner's records (which reflects DTC Participants or other entities acting on behalf of the beneficial owners or other intermediaries).  RMBS notes are typically held in DTC's nominee name ("Cede & Co.") on behalf of various custodians, who in turn have relationships with the beneficial owners of the RMBS notes—*i.e.*, the owners who must be identified in any tracing exercise.[14]  As such, an RMBS issuer might see that most (but not necessarily all) notes were "owned" by "Cede and Co."  Yet DTC is primarily a platform to facilitate custody and transmission of monthly payments.  DTC keeps current lists of the bank custodians or brokerage firms (the "book entries")—referred to by DTC as its Participants—entitled to a specific quantity

---

[12] *See* http://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc

[13] *See* http://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc

[14] *See* http://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc

of each security at that point in time, and DTC passes along monthly payments to those custodians who then, in turn, pass payments to (or hold monies on behalf of) beneficial owners.

26.     DTC Participants typically are not the beneficial owners of the notes.[15]  As Dr. Hartzmark admits, in many cases financial institutions hold certificates in their name on behalf of the beneficial owners.[16]  Only the Participants (not DTC) have knowledge about the investors or other entities on whose behalf the Participants interact with DTC.  DTC may refer to the Participants listed in DTC's books as the "owners" of the notes that DTC holds, but only the DTC Participants (or the Participants' customers and so on) have information about the actual beneficial owners of the notes.[17]

27.     Prospectus Supplements for the subject RMBS explain to investors this layered system of book-entry holding.  For example, the Prospectus Supplement for AMLT 2005-2 provides:

> The notes are sometimes referred to in this prospectus supplement as "book-entry notes." The book-entry notes will be issued in one or more notes which equal the aggregate principal balance of the notes and will initially be registered in the name of Cede & Co., which will be the "holder" of the notes, as the nominee of DTC. Persons acquiring beneficial ownership interests in the notes will hold their notes through DTC in the United States or Clearstream Banking, societé anonyme or Euroclear Bank, as operator of the Euroclear System, in Europe, if they are participants of such systems, or indirectly through organizations which are participants in such systems. Clearstream Banking, societé anonyme, and Euroclear Bank will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream Banking, societé anonyme and Euroclear

---

[15] *See* http://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc

[16] Hartzmark Report, ¶ 23.

[17] *See* "Disclosure Under the Principles for Financial Market Infrastructures," The Depository Trust Company, December 2016, p. 72 ("…DTC will continue to treat the Participant to whose account the securities are credited as the owner of those securities; it is up to the Participant to maintain appropriate records on its own books to identify customer securities separately.  DTC does not record interests in securities at the ultimate beneficial owner level and does not maintain separate 'customer accounts' for its Participants.").

Bank names on the books of their respective depositaries, which in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC.[18]

28.      In short, an investor's beneficial ownership is not evidenced by a physical certificate, nor is it assigned any unique identification number.  Rather, it is just recorded as an undifferentiated part of block dollar amounts held on the records of DTC Participants.  While a trustee may know to send payments to DTC, the trustee typically does not know the identity of the end investors (*i.e.*, those beneficial owners of interests recorded as block dollar amounts in DTC's records).  Further, while DTC knows to send payments to DTC Participants (commonly custodial banks or brokerage firms), "DTC is only aware of the identity of its Participants to whose accounts securities are credited," and "DTC has no knowledge as to whether the Participant is holding such securities for its own account or others."[19]  Indeed, the ownership

---

[18] *See* Prospectus Supplement of AMLT 2005-2 dated May 24, 2005, S-67.  *See also* Prospectus Supplement of AHM 2005-1 dated March 22, 2005, S-72–3 ("The Notes will initially be issued in book-entry form and are referred to herein as the Book-entry Notes. Holders of the Book-entry Notes may elect to hold their Notes through DTC in the United States, or Clearstream Banking, société anonyme, formerly known as Cedelbank SA, or Clearstream, or Euroclear, in Europe if they are participants of their systems, or indirectly through organizations which are participants in their systems. The Book-entry Notes will be issued in one or more securities which equal the aggregate Note Principal Balance of the Notes and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries which in turn will hold the positions in customers' securities accounts in the depositaries' names on the books of DTC.").

[19] *See* Letter, Y. Bolaji to J. Caringal dated August 10, 2015 at p. 2 ("DTC is only aware of the identity of its Participants to whose accounts securities are credited.  Additionally, DTC has no knowledge as to whether the Participant is holding such securities for its own account or others."); *id*. at p. 1 ("Finally, DTCC objects to the Subpoena to the extent that it is directed at identifying accounts of the beneficial owners of the subject securities.  DTCC's record of ownership stops at its own Participants who are banks and brokerage firms and not individuals.") (filed in *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*, Case #: 1:14-cv-09371-KPF-SN, ECF No. 686-29 (S.D.N.Y.)).

layers may well continue as even the immediate clients of the custodial banks or brokers often hold notes in turn for their respective clients, who are the ultimate beneficial holders of the notes.

29.     Further, even a single tranche of a single RMBS trust is typically held by DTC on behalf of multiple Participants.  Similarly, a broker could hold a single RMBS tranche for multiple clients, with the clients also holding interests in that tranche through multiple brokers. This cross-ownership of even a single RMBS tranche increases at every layer of the chain from DTC to the beneficial holders, making the ownership increasingly diffused across multiple crisscrossing chains.

30.     Thus, multiple layers of information must be uncovered through several discrete steps to even attempt to identify the beneficial owners of RMBS notes.  Any data obtained from or produced by DTC would list its Participants as "owners" for the subject RMBS but would not provide any information as to the actual beneficial owners of the notes.  Obtaining a list of Participant "owners" from DTC would be just the first step in any meaningful attempt to trace the history of transfers between the investors, and would alone present tremendous difficulties. Trying to reconstruct the chain of transfers between these investors would be impossible without individualized information regarding the transactions.

### 3.     RMBS Are Traded Over-the-Counter, Not on an Exchange, in Individualized Negotiations

31.     A third feature of RMBS that makes tracing ownership impossible without individualized inquiries is that, unlike equity securities that trade on exchanges, private-label RMBS typically trade based on individual negotiations between a seller and a buyer.  This is referred to as over-the-counter ("OTC") trading.  Typically, these OTC negotiations occur through various dealers that facilitate the trading of RMBS.  However, it is not industry practice

for a dealer to tell a buyer (or seller) the name of the counterparty that sold to (or will purchase from) that dealer.  For example, if Party A sells to Party B, who sells to Party C (and so on to Parties D through M), then no Party is likely to know the identity of all other parties in the chain of ownership.[20]

32.     Also, because RMBS trade OTC, there is no central repository of trade history to allow one to follow all changes in ownership over time from issuance or from any subsequent date to the present.  ████████████████████████████████████████████ ██████████████████████████████████████████[21]  Instead, as detailed below, trading occurs through a variety of large and small regional, national, and international brokers and dealers, or directly between investors.  There is no single, comprehensive list setting forth the identities of all investors who had a beneficial ownership interest in the securities at any given point in time.

33.     An illustrative comparison is to contrast trading RMBS on the secondary market to purchasing a house.  Unlike RMBS, whose fractional interests within tranches are fungible and can be divided and recombined, every house is unique.  A house also has a unique street address that distinguishes it from all other houses.  For RMBS, the closest unique identifier is the CUSIP; but even then, the CUSIP is more like a zip code than a unique address.  Further, a house will have a chain of title that one can consult to determine prior ownership and, of course, to establish a clear title.  If I buy a house today, I can readily do a title check to determine who

---

[20] In addition, to have a complete record of all holdings, one would need the trading records from each Party (including Party M, to ensure that it did not subsequently sell its holding).  Indeed, while a seller's trading records may identify who bought a note at a moment in time, they cannot, by themselves, prove that the buyer owned the note the next day.  They are only a snapshot in time.

[21] Hartzmark Deposition at 201:1–202:19.

owned the house before me, who owned the house before the previous owner, and so on all the way back to the earliest available records, which may go back to when the house was constructed.  However, if I buy an RMBS note today, I have no idea whether the note had one prior owner who purchased at issuance or whether there were numerous owners prior to my purchase.  I also have no idea who the prior beneficial owners were and whether they were domiciled in the United States or abroad.

34.     Thus, in contrast to a house, it is impossible to identify all past owners of RMBS without a record of all trades and all ownership, which can be obtained, if at all, only through highly individualized inquiries.

### 4.     RMBS Broker-Dealers Are Geographically Dispersed

35.     Tracing ownership of RMBS is likewise impossible without individualized inquiries of transactions because broker-dealers that facilitate the trading of RMBS are not limited to a few large, well-known organizations in one central location, such as New York. Rather, trading occurs through a variety of regional, national, and international brokers and dealers, some large and some small.  These broker-dealers and their clients are located not only in cities across the United States, but also in many different countries around the world.

36.     No single broker-dealer or other institution has a database listing all trades across an RMBS deal.  As a result, trading records from only large brokerage firms in most cases do not comprise the full universe of trading that occurred in the subject RMBS.  Those records (referred

to as "trade-run data" or "trade runs") will not account for any trades made by or through regional or local brokers to which the large brokerage is not a party.[22]

37.     Adding to these complexities, nothing prevents investors from buying and selling RMBS directly from and to another investor[23] (thus making a hypothetical list of all broker trades across the country, let alone the globe, incomplete).  Further, a record indicating that an investor held a security at point A and later the same amount at point B does not prove that the investor held the security continuously because trade-run data reflect only single moments in time.  This is all the more complicated because RMBS investors are often financial institutions, funds, or professional investors that work with numerous different brokers at the same time, so it is possible that no one broker will have a complete record of each investor's transactions or of its entire holdings.

38.     Thus, after the issuance of notes, original holders might have sold all or part of their RMBS holdings to dealers who might have then sold to multiple clients.  A regional dealer might obtain a large holding and sell it piecemeal to numerous individual investors.  Beneficial ownership by the broker itself further complicates reconstruction of the chain of ownership.  Further, over time, ownership of RMBS deals can become fragmented, with a single investor selling to multiple other investors unknown to either the original dealer or the original investor.

39.     In this case, discovery responses obtained by the Trustees allow one to identify some location information for some entities making trades (which for some trades may or may not be the end investor).  The discovery responses show investors or their brokers in states

---

[22] In my experience as an investor and trader, I was aware that large investors often had approved counterparty lists of dozens of dealers.  The firm at which I worked (Hyperion) had in excess of 40 approved counterparties.  As such, a substantial number of subpoenas would need to be issued even to attempt to trace back to the first two layers of prior ownership.

[23] The billions (in original face value) of CDO liquidations are often handled this way.

throughout the country, as listed below.  In addition, trade run data obtained by the Trustees in the State action indicate that entities making trades in the certificates at issue in that action are located in dozens of states.  If such data were available to me in this action, I would expect a substantial number of additional states would be added to the list below.

- Arkansas
- California
- Connecticut
- Delaware
- Florida
- Georgia
- Illinois
- Iowa
- Massachusetts
- Minnesota
- Missouri
- New York
- Ohio
- Tennessee
- Wisconsin[24]

40.     Further, Plaintiffs admit that they are incorporated outside of New York.[25] Indeed, Figure 1, below, presents a list of unique places of incorporation for each Plaintiff.

---

[24] Plaintiffs' Supplemental Responses and Objections to Interrogatory Numbers 1, 2, 4, and 10-25 of Deutsche Bank National Trust Company's First, Second, Third, Fourth, and Fifth Sets of Interrogatories, Exhibit C.

[25] *See* Amended Class Action Complaint, Exhibit 2.

**Figure 1**
**Plaintiffs' Places of Incorporation**
**Sorted by Plaintiff**

| Count | Plaintiff | Place of Incorporation |
|:---:|---|---|
| 1 | Aegon | Arizona |
| 2 | Aegon | Iowa |
| 3 | BlackRock | Cayman Islands |
| 4 | BlackRock | Delaware |
| 5 | DZ Bank AG | Germany |
| 6 | Kore Advisors LP | Delaware |
| 7 | PIMCO | Bermuda |
| 8 | PIMCO | Cayman Islands |
| 9 | PIMCO | Delaware |
| 10 | PIMCO | Ireland |
| 11 | PIMCO | Massachusetts |
| 12 | Prudential | Connecticut |
| 13 | Prudential | Maryland |
| 14 | Prudential | New Jersey |
| 15 | Prudential | Delaware |
| 16 | Prudential | Pennsylvania |
| 17 | Sealink Funding Limited | Ireland |

Source:  Amended Complaint dated March 22, 2016, Exhibit 2.

41.    Given these features of RMBS trading—(a) the lack of unique identifiers, (b) the "book entry" nature of the notes, (c) over-the-counter trading in individual negotiations, and (d) geographically dispersed dealers and investors—tracing ownership is not possible without, at minimum, analysis of individual transactions.  Although some parties might be able to reconstruct a full ownership chain of a note from issuance until today, that is the exception rather than the norm, and even then, such a chain can be ascertained only through highly detailed and individualized inquiries.  The data necessary to trace ownership cannot be extracted from evidence common to all noteholders.

**C.    Ownership and Trading Data Produced Are Insufficient to Identify Beneficial Holders or Determine a Chain of Ownership Throughout the Life of an RMBS Note, and Instead Only Demonstrate the Impossibility of Tracing**

42.    Dr. Hartzmark has obtained and used ownership information from Bloomberg to count current investors.[26]  Dr. Hartzmark also states that he would use data from DTC as well as "transaction records" to identify additional current holders.[27]  However, Dr. Hartzmark has failed to disclose the actual additional records he would use.  Such data would have to be obtained in order to test Dr. Hartzmark's methodology for identifying current holders and determining which such investors have proper claims.[28]

43.    I understand from counsel that Plaintiffs were ordered to issue third-party discover to identify the first and second prior holders of their securities, but to date have failed to obtain complete information regarding two layers of prior holders.  I also understand that certain third-party brokers that produced trade data in the related California action pursuant to subpoenas from the Trustees have authorized such data to be used in this case.  I understand that the California action, also brought by Plaintiffs against the Trustees, relates to trusts that were previously at issue in this case and is based on the same factual allegations as this case, but those trusts were dismissed from this case for legal reasons that make no difference to how the securities are held and traded by investors.  I rely on these data for illustrative purposes below since I would expect similar characteristics in the trade data relating to the 58 Trusts at issue in

---

[26] Hartzmark Report, ¶ 21.

[27] Hartzmark Report, ¶¶ 25–26.

[28] Even if possible, the data that Dr. Hartzmark proposes to collect would only identify the investors at the time of certification.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hartzmark Deposition at 179:20–180:1.

this litigation, and I have consistently observed the same patterns in other cases where I have reviewed brokers' RMBS trade data.

44.     My analysis of the trade-run and Bloomberg data demonstrates that the data are insufficient to determine complete chains of ownership for the holdings in the trusts at issue. Below, I explain why it is not possible to identify all holders at any particular point in time or to construct chains of ownership for specific notes or interests over time using the trade-run or Bloomberg data available in this matter or that Dr. Hartzmark may propose to subpoena.  The data are not only incomplete, but also reflect aggregation and disaggregation of holdings that make tracing chains of ownership impossible even with complete data.

### 1.     Trade-Run and Bloomberg Data Are Incomplete and Insufficient to Determine a Chain of Ownership

45.     The trade-run data available here and Bloomberg data on which Dr. Hartzmark relies do not account for all trades made with respect to the notes.

46.     The trade-run data track information on some buys and sells, CUSIP, volume, principal, interest, trading date, settlement date, and often at least some information on the party involved in a trade.  However, the trade-run data would not account for all trades made with respect to all notes at issue in this matter. ███████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████.[29]

_____

[29] ████████████████████████████████████████
██████████████████████████████████████
████████

47. 

[30] Further, trade-run data do not identify all potential changes of ownership.

[31]





48.     The Bloomberg ownership data that Dr. Hartzmark uses to count investors are also not complete and do not reflect all current or former owners of the subject RMBS or all holdings with respect to any note in this matter.  My understanding is that Bloomberg gets its data from publicly available documents filed by entities like insurance companies and mutual funds, which disclose holdings at an individual trust and tranche level.  Other entities, such as banks, do not publicly report their holdings at this level of detail.  While data vendors such as Bloomberg facilitate searches for noteholders across these publicly filed documents, the largest portion of most deals is comprised of the AAA-rated senior notes, which typically have been held by banks, not by insurance companies.  Therefore, Bloomberg is not a complete data source, and as such, even access to data vendors such as Bloomberg is insufficient for determining total ownership of an RMBS deal.

49.     In fact, Dr. Hartzmark concedes this point.  He states that his Bloomberg data do not account for 65 percent of all current holdings in active tranches.[32]  My analysis confirms these significant gaps in the Bloomberg data.  **Exhibit 4**, for example, summarizes quarter-end holdings data reported by Bloomberg for the A1 tranche of the NCHET 2004-2 A1 securitization (at issue in this case), from the trust's closing to the present.  Data for 2017 Q4 account for less

---

[32] Hartzmark Report, ¶ 22

than 12 percent of the tranche balance, and historical data account for an average of less than three percent of the tranche balance across all quarters dating back to 2004 Q2.

50.     The Bloomberg data are inadequate to trace chains of ownership for other reasons as well.  Bloomberg reports only quarter-end information, and thus does not capture any transfers within a quarter.  The Bloomberg data also lack details on the sellers (*i.e.*, the entities from which the holders identified by Bloomberg obtained their positions), information which is necessary to trace ownership.

51.     Thus, available trade-run and Bloomberg data are incomplete and not sufficient to track chains of ownership of specific notes.  I explain below that, by their very nature, these data will always be insufficient to trace such chains of ownership.

> ### 2.      The Incomplete Trade-Run Data Reflect Aggregation and Disaggregation of Positions That Make Tracing Ownership Impossible

52.     Even if a complete set of data could be collected, trade-run data cannot be used to trace chains of ownership because RMBS holdings are often aggregated and disaggregated in sales and purchases.  Owners often sell pieces (some, but not all) of their holdings.  In my experience as an RMBS trader, there are also purchases by dealers who aggregate holdings of a particular tranche over time, hold them in inventory, and later sell them to multiple clients without any reference to where the dealer bought them, or which lot (or fractional holding of a tranche) was being sold.  For example, in 10-plus years of trading, I cannot recall a situation where I, as the dealer, shared the lot sizes in which I bought, or where an investor asked about how I came to my aggregated position.

53.     Additionally, institutional investors may buy large blocks of a tranche at one time, and then allocate fractional interests of a block to managed and separate accounts, internal funds,

and other sub-entities.  I did just that in my 10-plus years of experience as an asset manager.
Indeed, Dr. Hartzmark acknowledges this point by stating that "it is typical for professional
investment managers to have multiple clients who are the beneficial owners…."[33]

54.     In this way, RMBS ownership of a tranche may become increasingly fragmented
and later re-aggregated.  For example, suppose four separate Investors 1 to 4 each sell $1 million
holdings to Dealer A (possibly over various time periods and/or from different jurisdictions), and
then Dealer A later sells $2 million each to two Investors B and C.  Based on the way RMBS
trade, Investors B and C ultimately would not know whether they are inheriting the securities of
Investor 1, 2, 3, and/or 4.  **Figure 3** illustrates this phenomenon.

**Figure 3**
**Hypothetical of RMBS Ownership Becoming Fragmented**



Dealer A buys $1 million
each from Investors 1-4.

Dealer A sells $2 million
each to Investors B and C,
but the distribution from
Investors 1-4 is unknown.

---

[33] *See* Hartzmark Report, ¶ 23.

55.    **Figure 4** below is a hypothetical that shows trades for a given certificate from the perspective of a dealer trading with different investors.  This example illustrates the inability to use the trade-run data to trace ownership, in part, because of the aggregation and disaggregation of investors' positions.

**Figure 4**
**Hypothetical Aggregation and Disaggregation of a Dealer's Position**
**for a Given Certificate**
(***Figures in Millions***)



56.    In the figure, a dealer purchases notes of a given certificate on four occasions (the green blocks in the figure); in total, the dealer purchases $50 million of the certificates.  As the dealer builds its position, any distinction between the certificate blocks is lost (as is the ability to identify the sellers of specific blocks of interest).  In subsequent months, the dealer sells off its position through three separate sales.  Investors purchasing from the dealer in any of the three sales (the red blocks in the figure) cannot trace the ownership of the certificates they have purchased to any of the certificates that the dealer acquired, or determine the dates (or prices) of the certificates the dealer acquired and then subsequently sold to them.

57.     This is not merely a hypothetical or isolated issue.  The incomplete trade-run data obtained in the related California matter provide specific examples of investors purchasing certificates in multiple transactions (*i.e.*, aggregating certificates) and selling certificates in multiple transactions (*i.e.*, disaggregating certificates).[34]

58.



---

[34] I am not aware of any documents or testimony that defines how to interpret the produced trade-runs definitively, as each trade-run presents different fields and different ways of presenting arguably similar data.  In what follows, I describe what I believe is the most reasonable interpretation of the data and identify some specific issues.









63.     Thus, even if there were a complete record of all trades (which is highly unlikely), tracing chains of ownership is, practically speaking, impossible because there is aggregation and disaggregation of fungible RMBS holdings.

64.     Nor would it be consistent with my experience as a trader to apply a "first-in-first-out," "last-in-first-out," or "pro-rata" assumption to aggregated and disaggregated trades.  In my experience, no such assumption or rule was or is applied or expected by traders or investors with regard to aggregated or disaggregated positions.  Any such assumption would be arbitrary and without basis in the realities of RMBS trading, and would benefit certain holders over others, creating conflicts of interest among investors.  It would also require highly individualized and detailed inquiries to identify and then apply any such assumption across all aggregated and disaggregated trades in the chains of ownership for the subject RMBS.

###### 3. BlackRock Institutional Investors Have Already Asserted That It Is Impossible to Identify Former Holders and That Ownership Is Untraceable

65.     In this matter, Plaintiffs have admitted these features of RMBS trading, stating in

a letter to the Court:

> Plaintiffs submit that the time is now for the Court to determine the need for any additional prior holder discovery. Both Plaintiffs and third-parties have spent considerable time and resources on these efforts, which have only confirmed their ***dubious value***.
>
> . . . .
>
> [B]ecause RMBS securities are traded anonymously on the open market and are not tracked by any unique identification number, many brokers ***could not identify*** the specific securities associated with Plaintiffs' transactions. Rather, they produced voluminous Excel spreadsheets identifying any and all transactions relating to the CUSIPs at issue. Even following meet and confer efforts with the brokers, ***Plaintiffs were not always able to identify the actual prior owners of their securities from the production***.[35]

66.     In the related California matter involving Plaintiffs and the Trustees, Plaintiffs

have likewise argued that "[t]he records of any prior certificateholders — who are numerous,

complete strangers, and largely unidentifiable — are ***not 'reasonably available'*** to Plaintiffs.

Plaintiffs purchased the at-issue securities from anonymous sellers through brokers on an

actively traded secondary market.  Requiring Plaintiffs to track down and produce information

from the potentially thousands of prior certificateholders is neither required ***nor possible***."[36]

---

[35] Letter, B. Galdston to Hon. S. Netburn, Re: *BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank Nat'l Tr. Co., et al.*, 14 Civ. 9367 (JMF) (SN) (S.D.N.Y.) dated January 5, 2018 (emphasis added).

[36] Plaintiffs' Opposition to Defendants Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas' Motion to Compel Further Responses to Discovery Requests, December 18, 2017, p. 9 (emphasis added).

67.     Likewise, in related litigation brought against HSBC Bank by certain of the same BlackRock and PIMCO funds that are Plaintiffs here, BlackRock and PIMCO acknowledged that they "are **unaware of any way** that Plaintiffs can *reliably* discover the full chain of custody for prior owners of Plaintiffs' certificates."[37]  The BlackRock/PIMCO Plaintiffs argued that the "book entry transfer process dispenses with the need for certificated securities and facilitates the free transfer of RMBS.  However, it also renders any particular investor's beneficial interest in the Security **untraceable in transactions subsequent to issuance**."[38]  They also noted that "[f]inancial [i]ntermediaries each record transactions in different ways, **either precluding tracing or rendering the process to identify prior owners on just a single trading day into an elaborate and multi-layered inquiry**."[39]

68.     I agree with the Plaintiffs' admissions in these various cases that tracing is not possible and that any attempt to trace would require a complex and multi-faceted set of individualized inquiries.

### 4.     International Investors Further Complicate the Individualized Inquiries Necessary to Identify Investors and Trace Ownership

69.     International companies with worldwide operations and headquarters outside the United States were and are investors in the notes of the subject RMBS.  Because evidence exists that notes have been traded outside the United States, as was common in RMBS like the trusts at issue here, developing an ownership trail will be even more difficult, because certificateholders

---

[37] Letter, B. Galdston to the Honorable Sarah Netburn, *BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, N.A.*, 1:14-cv-09366 dated May 26, 2016 ("Galdston Letter") (emphasis added).

[38] Galdston Letter, p. 2 (emphasis added).

[39] Galdston Letter, p. 2 (emphasis added).

are domiciled in locations around the globe.  Establishing an ownership chain for these investors would be particularly complicated; the Bloomberg data that Dr. Hartzmark uses in his analysis and the trade-run data that Dr. Hartzmark may propose to collect are insufficient.

70.    As shown above in **Figure 1**, many of the Plaintiffs are entities headquartered and dispersed throughout the world in countries, for example, that include Ireland, Germany, and the Cayman Islands.  Trade records produced in the related California case show that some international investors had trades settle in the United States, some had trades settle overseas, and in some cases no address is provided on the trade blotter.  While some international investors maintain U.S. branches, in my experience, others trade from overseas.  A determination of where each of these international investors settled trades requires analysis of trade tickets, or inquiry of the investor.

71.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████[40] RMBS bought outside the United States may be held in book name by a foreign equivalent of the DTC.[41]  Examples of other listed international investors are shown in **Figure 7**:

---

[40] ████████████████████████████████████████

[41] *See, e.g.*, Prospectus Supplement of AHM 2006-1 dated March 28, 2006, S-47 ("The Offered Notes will initially be issued in book-entry form and are referred to herein as the Book-entry Notes. Holders of the Book-entry Notes may elect to hold their Notes through DTC in the United States, or Clearstream Banking, société anonyme, formerly known as Cedelbank SA, or Clearstream, or Euroclear, in Europe if they are participants of their systems, or indirectly through organizations which are participants in their systems."); *see also* Prospectus Supplement of MHL 2004-1 dated September 28, 2004, S-24.



72.    Further, many investors in AAA-rated bonds may use repurchase agreements ("repos" or "repo transactions") to finance their holdings of RMBS.  A repo "involves an agreement between a seller and a buyer…whereby the seller 'sells' the securities to the buyer, with a simultaneous agreement to repurchase the securities at an agreed upon price at a future point in time."[42]  It is my understanding that repo agreements in the United Kingdom and Europe may be treated as a true sale and repurchase transaction, depending on the jurisdiction.[43]  Identification of both parties to a repo transaction that qualifies as a true sale and repurchase

---

[42] *See* Definition in Glossary, Securities Industry and Financial Markets Association ("SIFMA").

[43] *See* M. Choudhry (2010), *The Repo Handbook*, 2nd ed., Elsevier Ltd., pp. 339–359, 346 ("The characterisation of a transaction either as a true sale and repurchase (that is, a repo) or as a secured financing is important, as the characterisation may, depending on the relevant laws, result in different outcomes in terms of validity, enforceability and priority of the parties' interests and those of third parties.  For example, whether the buyer obtains outright title to the securities, or whether he simply has a security interest in them, will affect the rights of any third party who seeks to acquire those securities from him.").

would be necessary in any exercise to determine a continuous ownership interest of a given

certificate.  Because trading records may not contain such repo transactions, one would have to

conduct individualized inquiries of all European holders of the notes at issue in this case to

determine if they ever engaged in repo transactions with respect to these notes and, if so, what

rules the relevant jurisdictions follow for repos.

73.



- 
- ████████████████[44]

74.     In my experience, the entity owning the collateral in a CDO (*e.g.*, the RMBS notes) is frequently domiciled offshore (in the case of ART CDO 2006-1, for example, the Cayman Islands[45]), and one would need to conduct individualized inquiries to ascertain its location.

75.     Many CDOs were later collapsed, with the assets sold at public auction, often by non-broker-dealers, sometimes at substantially discounted prices of less than one point.  Such public auctions continue to this day.[46]  Dr. Hartzmark does not explain how he will identify or trace ownership for notes in the subject RMBS formerly owned by any now-liquidated CDOs. As the auctions often are not conducted by dealers, these public auctions would not be reflected in any trade-run data from broker-dealers.

76.     Because evidence exists that notes have been traded outside the United States, tracing ownership will be even more difficult because possible owners could be domiciled anywhere across the globe.  Therefore, even if one were able to obtain complete records from domestic brokers or holders, one would still need to obtain such records from foreign brokers, CDOs, and other holders, for which I understand substantially more complicated discovery procedures may be required.  Given how RMBS notes are traded (and in the case of European

---

[44] ███████████████████████████████████████████████████████
████████████████████████████.

[45] *See* Bloomberg DES Screen.

[46] Numerous CDOs have been liquidated since 2009.  *See*, *e.g.*, "Moody's Withdraws Ratings of Notes Issued by 60 SF CDOs," *Moody's Investors Service*, July 17, 2009 (showing that the Duke XII CDO listed above was liquidated no later than mid-2009).  *See also* "Creativity Needed to Unwind 'Zombie' CDOs," *Financial Times*, March 4, 2013.

investors, possibly financed in "repos"), one could only attempt to resolve this ownership trail through extensive individualized inquiries.

**IV.** *Second Opinion***: Dr. Hartzmark's Proposed Database Approach Will Not Solve the Tracing Problem and Equally Requires Individualized Inquiries to Identify Chains of Ownership**

77.     In his report in this case, Dr. Hartzmark describes what he claims to be a "straightforward, reasonable and practical method" to identify Class Members.[47]  While Dr. Hartzmark's report in this case does not offer an opinion regarding tracing, h███████████ ████████████████████████████████████████████████████████████████████████ ██████████.[48]  However, Dr. Hartzmark's asserted process for tracing is not detailed in any public records, nor has he offered any explanation of how tracing in those cases could be applied, or would be relevant, here.  In this case, the process that Dr. Hartzmark describes for identifying even current investors is riddled with problems, as detailed below.  These problems would only be magnified if Dr. Hartzmark tried to trace ownership of prior holders.

78.     In this case, Dr. Hartzmark proposes to identify class members at the tranche level by using DTC "Participant Position Reports" and subpoenaing each individual DTC Participant,

---

[47] Hartzmark Report, ¶ 24–27.

[48] Hartzmark Deposition at 200:13–20; Dr. Hartzmark describes this database approach in his reply (not his opening) reports in other RMBS trustee breach of contract cases.  *See* Expert Rebuttal Report of Michael L. Hartzmark, Ph.D., in *BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, N.A.* dated June 2, 2017 ("HSBC Hartzmark Rebuttal Report"), ¶¶ 8–10; Expert Rebuttal Report of Michael L. Hartzmark, Ph.D., in *BlackRock Core Bond Portfolio, et al. v. U.S. Bank N.A.* dated March 3, 2017 ("U.S. Bank Hartzmark Rebuttal Report"), ¶¶ 119–122; Supplemental Expert Rebuttal Report of Michael L. Hartzmark, Ph.D., in *BlackRock Core Bond Portfolio, et al. v. U.S. Bank N.A.* dated August 18, 2017 ("Supplemental Hartzmark Rebuttal Report"), ¶¶ 93–94.

then subpoenaing the Participants' clients, and the clients' clients, and so forth.[49]  Dr. Hartzmark

claims he can get data because banks, brokers, and participant institutions maintain holder and

transaction records.  Dr. Hartzmark would also rely on Bloomberg for additional information that

may be used in identifying class members.  Then, he would examine all of the buy and sell

transactions and amounts to try to connect sales chains.[50]  There are multiple problems with Dr.

Hartzmark's proposed approach and his belief that he could trace prior ownership:

79.      *First*, Dr. Hartzmark does not address how "tracing" of ownership (that is,

identifying the past owners of a particular individual holding in a tranche to identify a chain of

ownership) can be accomplished in RMBS deals, particularly once there is aggregation and

disaggregation of holdings.  In any event, as discussed above, I believe tracing of ownership to

be impossible even if such a complete set of records is obtained.

80.      *Second*, ███████████████████████████████████████████████

████████████████████████████████████████.[51]  But even attempting to create a

"database" to identify a "substantial" number of prior holders would be incredibly time-

consuming and highly individualized, and such a database could not be constructed based on

trade-run or Bloomberg data alone.  It would require issuing hundreds or thousands of subpoenas

in numerous waves, which would result in exponential trails of inquiry.  This process certainly

would not be "straightforward" as Dr. Hartzmark claims.

81.      *Third*, I understand Dr. Hartzmark has not tested the feasibility of his proposed

approach for identifying even current holders.  Plaintiffs have not issued a subpoena to DTC for

---

[49] Hartzmark Report, ¶¶ 25–26.

[50] Hartzmark Report, ¶¶ 25–26.

[51] Hartzmark Deposition at 200:13–20.

its Participant records or any other information in this case, nor have they undertaken the multi-layered steps Dr. Hartzmark suggests would be necessary to compile his database. Plaintiffs have not obtained individualized information from the Participants in each of the transactions during the life of the notes, including current and archival DTC records; reports from book-entry systems outside the United States (to the extent trades occurred in Europe or elsewhere through Clearstream, Euroclear, or another international book-entry system); reports from each DTC Participant/counterparty in each transaction; reports from each DTC Participant's clients; and any and all additional reports down the chain until one reaches the ultimate beneficial holder. Most importantly, even if one were to take all these steps, it is likely that one still would not be successful in identifying all current or prior holders, let alone in establishing a chain of ownership throughout the life of the notes.

82.     **Fourth**, these problems are exacerbated in a case such as this one where the notes were issued from 2004 through 2007—more than 10 and up to 14 years ago, and the breaches allegedly occurred in 2009. Dr. Hartzmark has done nothing to confirm what data are available from DTC with regard to the subject RMBS. DTC Participant data are not maintained indefinitely.[52] Yet, tracing in this case may require identifying prior holders as far back as 2004.

83.     **Fifth**, trade-run data and DTC Participant records will not be sufficient to identify all prior owners because trade-run data and DTC Participant records are not complete. Not all

---

[52] *See* letter, D. Maj to S. Walling, Re: *Blackrock Core Bond Portfolio, et al. v. U.S. Bank National Association* (No. 14-cv-9401-PGG) dated July 26, 2017 ("[T]he record retention period for [Security Position Reports ('SPRs')] is six (6) years. Additionally, DTCC can only provide daily SPRs going back two (2) years from the current date. After that, DTCC can only provide weekly SPRs.") (filed in *Blackrock Allocation Target Shares: Series S Portfolio v. U.S. Bank, N.A.*, Case #: 1:14-cv-09401-PGG-AJP, ECF No. 225-2 (S.D.N.Y.)). ███████████

investors purchase via transactions that are recorded in trade-run data. For example, there may

be private transactions not identified in the trade-run data. Repo trades, CDO liquidations, and

internal transfers among affiliated entities are likewise not always recorded in trade-run data. In

other instances, the entities identified in trade-run data have been merged or sold, are defunct, or

are overseas investors that hold their position away from DTC.[53] This makes the prospect of

obtaining information on end clients (ultimate beneficial holders) far more difficult and

individualized.

84. **Sixth**, Dr. Hartzmark assumes that Plaintiffs will obtain clean data from hundreds

or thousands of third parties through subpoenas. Trade-run data are not well-specified, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[54] The

notion of "well-specified" data is a theoretical construct that bears no resemblance to the reality

of these cases, and, in my experience, the materials produced by third parties in response to

subpoenas often do not meet Dr. Hartzmark's standard. I understand that although parties may

attempt to obtain these data (if available) through the use of subpoenas, the extent to which

responses are complete or useful varies substantially. Some entities may object and refuse to

comply; others may respond with an incomplete production or may produce documents, such as

assorted trade tickets, that are not trade-runs and fail to identify the beneficial owner; and some

entities are located outside of the United States and therefore potentially beyond the subpoena

---

[53] *See, e.g.*, Prospectus Supplement of NCHET 2004-2 dated June 25, 2004, S-88 ("Persons acquiring beneficial ownership interests in the book-entry notes are referred to as note owners and will hold their notes through DTC in the United States, or, upon request, through Clearstream Banking Luxembourg, or Clearstream, formerly known as Cedelbank SA, or the Euroclear System, or Euroclear, in Europe if they are participants of these systems, or indirectly through organizations which are participants in these systems."); *see also* Prospectus Supplement of AHM 2005-1 dated March 22, 2005, S-72–73.

[54] *See* Hartzmark Deposition at 198:9–10.

power of the Court.  Additionally, DTC records likely would not show transactions where the Participant did not change.  As an example, if two funds that both custody their holdings with the same bank or broker engaged in a trade, DTC records would not reflect any change in holdings. The same bank or broker would appear as the Participant entitled to the same block of notes on DTC's records, so one would not know to look for a trade from DTC's records.

85.     Moreover, the entities identified in trade-run data themselves record transactions on their own systems in different ways, rendering the process of identifying prior owners an elaborate and multi-layered inquiry.  ███████████████████████████████████ ██████████████████████████████████████████[55]  There are also entities that do not report quantities or prices of trades, and some that do not report any client identifying information beyond a trade ID.

86.     ***Seventh***, other data sources, such as payment records or trustee notices, suffer from the same deficiencies as trade-run data, but more importantly, are not records of transactions and therefore provide no information from which one could establish chain of ownership.  For example, Dr. Hartzmark has asserted in related litigation that "should there be issues related to the buy/sell transactions records and/or identifying investors [that] make tracing difficult," he "would utilize the payment records (i.e., monthly distributions of principal and interest payment that must be in the brokerage records) to gain additional information to assist in the tracing process."[56]  However, payment records would not assist in tracing transfers of

---

[55] ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████

[56] U.S. Bank Hartzmark Rebuttal Report, ¶ 122.

interests between prior beneficial owners, and many of the same problems described above for trade records exist with payment records as well. Payment records originating with the trustee do not identify the end investors (*i.e.*, the ultimate beneficial holder of the note). The trustee makes distributions through DTC (or another depository, if applicable), which DTC remits to its Participants. DTC's own payment records reflect payments to the custodial banks or broker-dealers that are DTC Participants, but do not contain the identities of the clients of the DTC Participants (or the clients of such clients) who may be the ultimate beneficial owners of the notes. Even payment records obtained from the ultimate beneficial owners would not be sufficient to trace the full chain of ownership because payment records do not identify which entities were the prior or subsequent holders of the notes. Finally, since payments are made only monthly, they merely provide a snapshot of the holder of some note in some tranche with some face value at some point in time, and may not address any intra-month trading.

87.     I understand that, in other cases, Plaintiffs have argued that "[t]ransaction records reflecting bond ownership will establish class membership. Indeed, this is the precise manner [the RMBS trustee] utilizes to identify and communicate with current holders regarding trust activities."[57] However, any written trustee notices to holders are no better than payment records for the purpose of tracing beneficial ownership. The same process holds for any notices that might be issued to beneficial owners; they are distributed to DTC, which then distributes them to Participants. Such notices are useless for purposes of identifying prior holders, let alone identifying which current holders actually have claims. In addition, as the notices themselves

---

[57] Plaintiffs' Memorandum of Points and Authorities in Support of Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel dated June 21, 2017 in *BlackRock Core Bond Portfolio, et al. v. U.S. Bank, N.A.,* No. 1:14-cv-09401 ("*U.S. Bank Memorandum*") at p. 24.

reflect, the trustee must rely on (and I understand can only request) nominees and custodians to transmit the notice to the beneficial owners.  Accordingly, rather than supporting Plaintiffs' assertion, this point only reinforces the difficulties and need for individualized inquiries associated with the layered ownership identified above.

88.    *Eighth*, given that the RMBS at issue continue to trade, the identities of any ultimate beneficial holders of the certificates will continue to change and be different from what may be revealed in the information produced in response to any subpoenas.  Trade-run and Bloomberg data reflect only a snapshot in time and say nothing about ownership after the data are produced.  In other words, given the time I understand to be involved in responding to subpoenas, particularly the multi-layered subpoena process proposed by Dr. Hartzmark, any beneficial ownership information revealed in responses to any subpoenas is likely to be outdated.

## V.    *Third Opinion*:  Even Assuming the Chain of Ownership Could Be Established, Individualized Inquiries Are Required to Determine Which Owner Possesses Any Litigation Claims Associated with an RMBS Note

89.    Plaintiffs request to certify a class of current investors as of the date of judgment. In the case of inactive tranches, Plaintiffs seek to include the most recent holders.  I understand from counsel that Plaintiffs rely on New York's § 13-107 to assert that all claims of prior holders were automatically assigned to the current holders, but the Trustees dispute this position.

90.    Even where § 13-107 applies, my understanding from counsel is that to determine whether a claim is timely, the Court must determine which statute of limitations applies. Counsel has informed me that the applicable statute of limitations for an assigned claim depends on, among other things, the residence of the original investor who held the Certificates at the time the cause of action accrued, and where that prior holder sustained the alleged harm.  Thus,

determining the statute of limitations would also require a tracing exercise to trace the transfer of specific beneficial interests to identify the prior holder of each class member's interest at the time of the alleged breaches.  Doing so would raise all of the problems discussed above.

91.     Further, I also understand from counsel that, even if § 13-107 applies, the law allows former holders to retain (rather than transfer to the buyer) their claims when they sell the notes.  Thus, to know which entities are the owners or holders of the litigation claims Plaintiffs seek to litigate, Plaintiffs would need to trace the notes back to the point of the earliest breach and determine whether any investors retained litigation claims upon sale of their notes.

92.     Dr. Hartzmark does not explain how Plaintiffs could exclude from the class persons or entities who are current noteholders but have not obtained litigation claims against the trustee without individualized inquiries.  Indeed, this would require individualized inquiries at *every* transaction in the chain of ownership from issuance or, at a minimum from the dates of any alleged breaches, to ensure that there was no place, throughout the ownership chain, that a retention of rights occurred.  Dr. Hartzmark has not identified how he would trace the prior owners who retained any litigation claims against the trustee that did not get transferred to the current noteholders.

93.     This is not merely a hypothetical problem.  I recall trading one asset-backed security (the Commercial Financial Services, CFS, defaulted credit card securities) early in the last decade for which traders and investors tried to negotiate different prices for bonds being sold with or without litigation claims.  Trades took place in both forms.

94.     In this case, there are examples of former holders who contend they retained or acquired through assignments litigation claims in a number of legal actions.  Commerzbank is one entity that has asserted its own trustee-related claims against the Trustees based on some of

the same trusts at issue in this case.  In *Commerzbank AG v. Deutsche Bank National Trust Company*, No. 1:15-cv-10031 (S.D.N.Y.), Commerzbank alleges that it "brings both its own claims while it was a certificateholder and the claims that were assigned to it by the [a]ssignors" in connection with RMBS notes issued by, among others, ECR 2005-3 and IMM 2007-A.[58]

95.     Specifically, with respect to ECR 2005-3, Commerzbank alleges that it acquired "through assignments" $6 million in notes from the M5 tranche from the Eurohypo AG New York Branch ("Eurohypo"), a subsidiary of Commerzbank.[59]  Commerzbank then sold the entirety of its M5 tranche holdings to unknown third parties on November 21, 2011.[60]  However, Commerzbank alleges that this sale "did not include assignment of any of Commerzbank's legal claims and therefore Commerzbank has retained all its legal claims against [the Trustees]."[61]

96.     Commerzbank also alleges to have acquired "through assignments" $10 million in notes in the M1 tranche of IMM 2007-A from Palmer Square 3 Limited ("Palmer Square"), a private limited liability company organized under the laws of Ireland.[62]  Commerzbank then alleges to have sold the entirety of its IMM 2007-A M1 holdings to unknown third parties on November 16, 2011.[63]  However, Commerzbank alleges that this sale "did not include assignment of any of Commerzbank's legal claims and therefore Commerzbank has retained all its legal claims against Deutsche Bank."[64]

---

[58] *Commerzbank* Complaint, ¶ 17, Ex. B.

[59] *Commerzbank* Complaint, ¶¶ 3, 17, 19, Ex. B.

[60] *Commerzbank* Complaint, ¶ 3, Ex. B.

[61] C*ommerzbank* Complaint, ¶ 163.

[62] *Commerzbank* Complaint, ¶¶ 3, 17, Ex. B.

[63] *Commerzbank* Complaint, ¶ 3, Ex. B.

[64] *Commerzbank* Complaint, ¶ 163.

97.     Based on these allegations, a graphic illustration of Commerzbank's purchases and sales of the ECR 2005-3 M5 holdings and IMM 2007-A M1 holdings and the assignment or retention of related litigation claims is shown in **Figures 8a** and **8b** below.  **Figure 8a** illustrates each of the alleged holders of ECR 2005-3 M5 and IMM 2007-A M1 notes in *Commerzbank*. Holders in the ECR 2005-3 M5 tranche include (a) Eurohypo, (b) Commerzbank, and (c) the unknown third parties to whom Commerzbank sold its ECR 2005-3 M5 holdings.  Similarly, with respect to the IMM 2007-A M1 tranche, alleged holders include (a) Palmer Square, (b) Commerzbank, and (c) the unknown third parties to whom Commerzbank sold its IMM 2007-A M1 holdings.  Other holders could include (a) the unknown third parties from which Eurohypo and Palmer Square acquired the ECR 2005-3 M5 and IMM 2007-A M1 notes, and (b) any subsequent purchasers of the ECR 2005-3 M5 and IMM 2007-A M1 notes after Commerzbank's initial sale to third parties.

**Figure 8a:  Alleged Holders of Various Notes**
*Commerzbank AG v. Deutsche Bank National Trust Company*
**Case No. 1:15-cv-10031 (S.D.N.Y.)**



Source:  Allegations from *Commerzbank* Complaint ¶¶ 17, 19, 20, 163, & Ex. B.

98.     Yet, according to its complaint in the *Commerzbank* case, only Commerzbank—and not the purchasers of Commerzbank's notes—owns the litigation claims related to these notes arising from its or any prior holder's ownership of those notes.  **Figure 8b** illustrates that, according to its allegations, only Commerzbank would be the holder of the litigation claims for these ECR 2005-3 M5 and IMM 2007-A M1 notes.  If Commerzbank's allegations are true, then subsequent purchasers, including the current holders of Commerzbank's notes, do not hold any claims related to their ownership of certain of the notes that Plaintiffs seek to litigate.

**Figure 8b:  Alleged Holder of Litigation Claims for Various Notes**
*Commerzbank AG v. Deutsche Bank National Trust Company*
**Case No. 1:15-cv-10031 (S.D.N.Y.)**



Source:  Allegations from *Commerzbank* Complaint ¶¶ 17, 19, 20, 163, & Ex. B.

99.      Additionally, to verify Commerzbank's allegations as to its ownership of litigation claims against the Trustees, individualized inquiries would have to be made to trace ownership and confirm that claims did indeed flow through every prior holder to the next in the chain of ownership prior to Commerzbank having purchased the certificates, such that the claims were assigned to Commerzbank by Eurohypo and Palmer Square.  Similar individualized inquires would have to be made to confirm the allegation that Commerzbank did indeed properly retain the claims when transferring the notes to third parties.

100.      *Commerzbank* is just one example of prior holders retaining litigation rights. Another example is Royal Park Investment SA/NV, which has asserted claims against RMBS trustees in many litigation matters.  ██████████████████████████



[65]

101. ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. One of those

litigation matters, entitled *Royal Park Investments v. Merrill Lynch* (N.Y. Supreme Court),

involved claims against various financial institutions relating to 168 RMBS, including five of the

RMBS at issue in this action.[66]  I understand that Royal Park was eventually found by that court

to not have standing to bring such claims, because Royal Park itself had acquired its certificates

from other parties and had not shown the claims were transferred to it.[67]  At minimum, analysis

of who owns any claims today with respect to those notes would appear to require a thorough

and complicated legal and factual analysis.

102.    The Royal Park / Lone Star transaction was a privately negotiated transaction

(*i.e.*, not conducted through a broker) that is known only because it was publicly announced.

---

[65] ████████████████████████████████████████████
████████████████████.

[66] Complaint, *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   Index No. 652607/2012 (NYSCEF Doc. No. 13).

[67] *Royal Park Investments SA/NV v. Morgan Stanley*, 55 Misc. 3d 1210(A), 57 N.Y.S.3d 677
   (N.Y. Sup. 2017).  In this action, Royal Park brought claims against entities affiliated with
   Deutsche Bank (but not the Trustees), Morgan Stanley, Credit Suisse, UBS, and Merrill Lynch.

There are an unknown number of similar transactions that were not conducted through brokers or publicly announced.

103.    The issues related to assignment and ownership illustrated in the above examples likely exist with other notes at issue in this litigation as well.  Further, because investors rarely know the once-removed counterparties to their own transactions,[68] current investors are not likely to know whether there were litigation retentions in transactions occurring prior to their purchase of Certificates.  Only through individualized inquiry could it be determined if there was a relevant retention of litigation claims in the chain of transfer.  Dr. Hartzmark does not attempt to account for the mismatch between holders of notes and holders of litigation claims, or the individualized inquiries that would be required to determine who owns the litigation claims against the Trustees (at the exclusion of others who merely held notes at some time, but did not retain or obtain any litigation claims relating to that ownership).

104.    In his reply report in the related HSBC trustee case, Dr. Hartzmark states that it is his "understanding" that "it is the burden of that prior owner to prove that the Class Member does not have the Litigation Rights and the prior owner has a bona fide claim for its share of the recovery."[69]  However, even if Dr. Hartzmark's "understanding" is correct (which I understand the Trustees dispute), notifying all such prior holders so they can meet their "burden" to establish their retention of any litigation rights and claims would itself require tracing and identifying all prior noteholders.  As discussed above, tracing and identifying all prior noteholders is impossible and any attempt to do so would require analysis of individual transactions.

---

[68] That is, excluding the dealer who may have been between the two investors.

[69] HSBC Hartzmark Rebuttal Report, ¶ 14.

**VI.**   *Fourth Opinion*: **Investors Understood the Role of a Trustee to Be Limited**

105.   Investors primarily looked to trustees as parties that had been engaged to administer certain periodic, repetitive, utility-like functions for RMBS deals.  Investors did not expect trustees to exercise personal judgment or discretion.  Indeed, investors rarely expressed a preference for one trustee over another, and if so, often only as to the formatting of remittance reports.  My opinion is that this view of the trustees was the industry standard.  In addition to its role at the closing of a trust (*e.g.*, agreeing to hold legal title on the loans in the trust in its name), it was generally understood in the industry that a trustee earned nominal fees for, depending on the specifics of the deals, responsibilities that could include the following:

a.   Facilitating the chain of cash flows between mortgage servicers and investors.

b.   Applying cash flow allocations (*i.e.*, the waterfall) unique to every RMBS deal, and paying out cash inflows to the appropriate parties (mostly certificate owners).

c.   Disseminating and/or electronically posting monthly data related to the performance of an RMBS deal, and the calculation of triggers on such deals, (together referred to as "remittance reports") that might affect cash flows.

106.   Trustee fees were sometimes disclosed in RMBS offering documents and/or governing agreements and were generally quite low.  For example, the AMIT 2004-1 deal allocated approximately 0.0003% annually of the stated principal balance of each mortgage loan, or about $292 per month to pay the Trustees.[70]

107.   Investors were aware of the Trustees' limited role as well as the low fees they made.  As such, in my experience, when investors became aware of problems in RMBS deals they had purchased, they would typically contact either the dealer that had sold them the

---

[70] *See* Schedule of Fees for Services as Nominal Trustee for AMIT 2004-1, DBNTC DBTCA BLACKROCK 00001988692-5, at DBNTC DBTCA BLACKROCK 00001988692; Prospectus Supplement of AMIT 2004-1 dated November 24, 2004, S-i.

certificate or the originator/servicer.  For example, originators gave some investors access to their on-site origination process and allowed investors to review sample loan files.  In addition, originators invited investors to visit their servicing departments to perform due diligence and to observe how loans were collected.  From my experience as a CDO investor, I am also aware of other RMBS investors who also touted their visits to originators and servicers as a key component of their RMBS investment process.  Since we, as investment managers, had a vested interest in the performance of our RMBS holdings (either for our track record, and therefore our ability to raise more assets, or via performance fees), we added staff to perform due diligence and surveillance, and we visited issuers and servicers on a regular basis.  From those visits, we formed our own opinions as to the quality of loan underwriting and servicing.  Originators and servicers made it clear that other investors also had similar access.  Finally, investors would typically be able to meet with originators and servicers at conferences to discuss origination and servicing trends.

I declare under penalty of perjury under the laws of the United States that the foregoing is a true and correct report of my opinions in this matter.


Executed on March 26, 2018


John H. Dolan

**Exhibit 1**
# John H. Dolan
777 C St., SE, Apt 510, Washington, DC 2003
917-562-0311
Johnhdolan.work@gmail.com

**CURRENT**

**2007-**     **Independent Consultant (formed Second Order Strategies in 2009) - Greenwich, Ct.**
Providing litigation-support, product education, and risk-management consulting and expert witness services on structured products capitalizing on 30+ years of real-world buy-side, sell-side, and industry self-regulatory experience. Have advised on issues related to valuation, pricing, credit analysis, leverage, repo funding, cash management practices, Securities Lending, RMBS, CMBS and CDO structuring, securities marketing and risk management. Have been "Translator/Tutor" to law firms since early years of financial crises based on hands-on familiarity with risk reports, models, jargon, incentives. Familiar with Bloomberg, Yield Book, Markit, Trepp, Intex, RiskMetrics. Have filed expert reports, been deposed, and testified before a FINRA panel

Longer-term retainer assignments include:
**Pentalpha Group**   2007-9: Consulting services
**MF Global**        2011:  Risk management oversight of MBS trading desk
**Due Diligence**    2014:  Advised buyer on potential investment of publicly traded REIT

**2010-**     **CME S&P/Case Shiller Home Price futures (Sole Market Maker- unaffiliated with CME)**
Leveraging trading experience, Wall St. contacts, and personal capital to rejuvenate an electronic market that benefits the housing-finance industry through greater public price disclosure of forward home price expectations.  Maintain markets on ten regions, with up to $15mm in notional value.

Organized an industry-wide conference with >200 attendees, spoke at seven colleges, and presented a paper at Oct. 2010 NBEA (Northeast Business and Economic Assoc.) conference. Maintain a blog of 250+ posts, including monthly recap of activity in CME S&P Case-Shiller futures at  www.homepricefutures.com Also use other social networking skills (e.g. Twitter, LinkedIn) to increase product awareness of, and provide product education on, trading of home price indices.

**EXPERIENCE**                    *****************
**2015**          **Manhattanville College –Adjunct (FIN 3108 Corporate Finance ) –Purchase, NY**

**2011**          **Baruch College- Lecturer (RES 4200: "Introduction to Commercial Real Estate") – NYC**

**1998-2007**     **Hyperion Capital Management (later Hyperion-Brookfield Asset Management) – Partner-NYC**
**Chief Investment Officer (2001-2007), CIO–Crystal River (REIT) 2005-2006**
Managed a 40-person bond investment team, generating strong outperformance that helped grow AUM from $5 billion to $21 billion.  Client base included: insurance companies, state and private pension plans, a central bank, NYSE-listed mutual funds (HTR, HSM), an MBS REIT (CRZ), and CDOs–using both cash and synthetics.  Mutual Funds recognized as top-performing within sector. In addition to new-issue marketing, orchestrated rights offering for one of two entities able to raise funds in days post 9/11 (despite having to vacate damaged offices).

As REIT CIO, raised funds in both private and public offering via road trips with 70+ presentations. Was responsible for compliance with REIT guidelines, and quarterly investor call.

Frequent written and oral presentations (across the globe) to clients, boards, rating agencies, industry groups and prospects. Responsible for new product development for structured products and funds. Oversaw Quantitative modeling group that reviewed early CDO and attribution analysis.

**1995-1997**     **Bankers Trust Global Investment Management (GIM)- Managing Director - NYC**
**Head of Active Bond Group** – Managed a 9-person team responsible for $7 Billion of primarily ERISA-based, total rate of return, fixed-income assets.  Prepared client reviews, new-business presentations and product-education reports.  Conducted client reviews and new business presentations in US and Japan.  Member of the GIM Investment Committee.

**1987-1995**     **Salomon Brothers, Managing Director - NYC**
Several senior trading positions with responsibility for new products as they were created.  Traded first residential subordinate bonds in 1987, and Agency IO/POs in 1988.  Co-head of industry – leading CMO trading desk from 1989-1992 with responsibility for new issuance, new product development and product education. (New products included: PAC and TAC bonds, VADMs, NERDs, Z bonds, semi-annual pay MBS, Jump Z's and others.)  Coordinated RTC residential securities underwriting for MBS desk, managed process for securitizing sesonsed pass-throughs of thrift whole loans, and traded >75% of assets for early MBS REIT.  Managed a Whole Loan conduit in 1993.

**1977-1987**     **Citibank - Vice President - NYC**
Head of MBS Trading Desk from 1980-1987 overseeing 12 traders.  Traded and promoted all MBS.  Managed the distribution of CitiMae conduit- one of the earliest RMBS.  Heavily involved in industry self-regulation discussions and standardization of trading rules and new products.

**1973-74**     **Allen & Co. – NYC**
Intern during college vacations working in the "cage" (securities receive and delivery department).  Duties included window clerk, coupon counter, and runner

## INDUSTRY POSITIONS
**2003-2004**     **Fixed Income Analysts Society (FIASI) – President.** The FIASI board arranges presentations that allow their Wall St. membership to network and present analysis of timely issues.

**1987-1989**     **Public Securities Association - Board of Directors**.  Served as Chairman of the MBS Division of the PSA for 1988 and as a member of the PSA Board of Directors for 3 years. Helped standardize industry trading practices to include "good delivery", PSA curve (standardizing prepayment analysis) and Agency Pass-Through pool composition.  Contributed to evolution of MBSCC (Clearing firm for MBS).  Testified before Congress  committee during Thrift crises.

## EDUCATION
**1977**     **Wharton Graduate Business School, M.B.A. - Finance (Financial Markets)**

**1975**     **Union College, B.A. - Economics/Math -cum laude**

## INDUSTRY CERTIFICATIONS
**GARP (Global Assoc. of Risk Professionals) – Certified FRM (Financial Risk Manager) 2009, ERP (Energy Risk Professional) 2010**
**Passed Series 7 (twice), 63 (Principal), Series 3 (futures) exams**

**CFA Passed Level 1 (2016)**

## INDUSTRY PRESENTATIONS
**Apr 2009**     **GARP (Stamford Chapter) – "**Lessons Learned: Similarities and Differences between residential (RMBS) and commercial (CMBS) credit"
**Oct 2009**     **ABS East panel–**"Effectively Managing increased litigation and enforcement"
**Dec 2009**     **S&P Roundtable –**"A roundtable discussion reviewing the Alternative Energy landscape with lessons learned from the sub-prime crises"
**Oct 2010**     **NEBA conference –**"Observations on the CME Home Price Futures"
**Mar 2011**     **Bloomberg seminar (moderator) –** "Making Sense of Forward Home Price Forecasts"
**Apr 2014**     **SQA (Society of Quantitative Analyts, NYC)** –"Outside Bitcoin"
**Nov 2014**     **NEBA conference** – "Lessons Learned from 4 years of market making.

## COLLEGE LECTURES

**Mar 2009**      **University of New Hampshire**
- Housing Finance and the Subprime Crises
- Introduction to CDS

**Feb 2010**      **Union College**
- Basics of Housing Finance

**April 2010**    **Baruch College**
- Lessons Learned: Housing and the Subprime Crises

**April 2010**    **Pace University**
- An Update on Securities Litigation

**Nov 2010**      **Wagner College**
- The Road to Economic Recovery

**Feb 2012**      **Johns Hopkins**
- Introduction to Case-Shiller Futures

**Feb 2012**      **Wharton  Graduate School of Business (U Penn)**
Issues w/ Home Price Models

**Apr 2014**      **University of Michigan**
- Understanding Home Price Indices – Looking Backwards and Forwards

**Nov 2014**      **Manhattanville College**
- Bitcoin vs. bitcoin (Currency vs. Block Chain)

**Mar 2015**      **Pace University**
- Valuing Land in Commercial Real Estate

**Apr 2016**      **Babson College**
- Home Price Futures


## PUBLICATIONS

**"Observations on the CME Home Price Futures Market: Were These Futures Able to Predict the Home Price Crash?" (Dolan, Hume -2010)**

**Ongoing blogs: www.homepricefutures.com**
**Twitter: @HomePriceFuture**
**Moderator: Linkedin group – CME Case-Shiller Home Price Futures**


## OTHER

**Former Board Member/ Education Committee Chair –World Affairs Forum (Stamford, Ct)**
**Former Chair SolarCoin Foundation (alternative digital currency)**
**Member Greenwich RTM (Representative Town Meeting) since 2009**
RTM liaison to $400mm Greenwich Retirement Board
**Moderator Greenwich Library Foreign Affairs Book Club, since 2009**
**Moderator Rye Library Current Events Book Club, since 2012**


**Dated: February 2018**

# EXHIBIT 2
# PRIOR TESTIMONY OF JOHN H. DOLAN IN THE PAST FOUR YEARS

---

**Case Name:** National Australia Bank Limited and TSL (USA) Inc. v. Goldman, Sachs & Co., et al
**Case No.:** FINRA Dispute Resolution No. 12-04099
**Date of Testimony:** April, 2015 (Testimony)

**Case Name:** In re Goldman Sachs Group, Inc. Securities Litigation
**Case No.:** Case No. 10-cv-03461 (U.S. District Court for the Southern District of New York)
**Date of Testimony:** October, 2015 (Deposition)

**Case Name:** Basis Yield Alpha Fund (Master) v. Goldman Sachs, & Co. et al.
**Case No.:** Index No: 652996/2011 (Supreme Court of the State of New York, County of New York)
**Date of Testimony:** March, 2016 (Deposition)

**Case Name:** In re Barclays Bank PLC Securities Litigation
**Case No.:** Case No. 09-CV-01989 (U.S. District Court for the Southern District of New York)
**Date of Testimony:** May, 2016 (Deposition)

**Case Name:** Royal Park Investments SA/NV v. Deutsche Bank National Trust Company
**Case No.:** Case No. 1:14-cv-04394 (U.S. District Court for the Southern District of New York)
**Date of Testimony:** October, 2016 (Deposition)

**Case Name:** In the Matter of Lynn Tilton, Patriarch Partners, LLC, et al.
**Case No.:** Administrative Proceeding No. 3-16462 (United States of America Before the Securities and Exchange Commission)
**Date of Testimony:** November, 2016 (Testimony)

**Case Name:** Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.
**Case No.:** Case No. 1:14-cv-09764 (U.S. District Court for the Southern District of New York)
**Date of Testimony:** May, 2017 (Deposition)

| | |
|---|---|
| **Case Name:** | Blackrock Allocation Target Shares: Series S Portfolio, et al. v. Wells Fargo Bank, N.A. |
| **Case No.:** | 1:14-cv-9371 (U.S. District Court for the Southern District of New York) |
| **Date of Testimony:** | January, 2018 (Deposition) |
| | |
| **Case Name:** | China Development Industrial Bank v. Morgan Stanley & Co. Inc., et al. |
| **Case No.:** | Index No: 650957/10 (Supreme Court of the State of New York, County of New York) |
| **Date of Testimony:** | February, 2018 (Deposition) |

# Exhibit 3

# Documents Considered by John H. Dolan

| Document Title, Bates Numbers (if applicable) | Document Date |
|---|---|
| **Pleadings** | |
| Amended Class Action Complaint, with Exhibits | March 22, 2016 |
| Plaintiffs' Supplemental Responses and Objections to Interrogatory Numbers 1, 2, 4, and 10-25 of Deutsche Bank National Trust Company's First, Second, Third, Fourth, and Fifth Sets of Interrogatories, with Exhibits | December 1, 2017 |
| Plaintiffs' Opposition to Defendants Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas' Motion to Compel Further Responses to Discovery Requests | December 18, 2017 |
| PIMCO Plaintiffs' Holdings Chart | January 23, 2018 |
| Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification and Appointment of Class Representatives and Class Counsel | January 26, 2018 |
| **Expert Reports** | |
| Expert Rebuttal Report of Michael L. Hartzmark, Ph.D., with Exhibits 1-11 and Appendices A-B, *BlackRock Core Bond Portfolio, et al. v. U.S. Bank National Association* HARTZMARK_WELLS FARGO 00003855-972 | March 3, 2017 |
| Expert Rebuttal Report of Michael L. Hartzmark, Ph.D., with Exhibits 1-5 and Appendices A-C, *BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, National Association* HARTZMARK_WELLS FARGO 00001150-1233 | June 2, 2017 |
| Supplemental Expert Rebuttal Report of Michael L. Hartzmark, Ph.D., with Exhibits 1-5 and Appendices A-B, *BlackRock Core Bond Portfolio, et al. v. U.S. Bank National Association* HARTZMARK_WELLS FARGO 00004082-4147 | August 18, 2017 |
| Expert Report of Michael L. Hartzmark, Ph.D., with Appendices A-G and Exhibits 1-3 | January 26, 2018 |
| **Depositions** | |
| Deposition of Michael Hartzmark | March 13, 2018 |
| **Trade-run Data** | |
| BlackRock v. DB Trade Run February 2018.xlsx | |
| UBS-DBNT 000001.xls | |
| CONFIDENTIAL NSI 001.xlsx | |
| CSSU_BBCP_DB_CA-00000001.xls | |
| CSSU_BBCP_DB_CA-00000002.xlsx | |
| **Other Case Materials** | |
| Deutsche Bank Schedule of Fees for Services as Nominal Trustee DBNTC DBTCA BLACKROCK 00001988692-5 | December 2, 2004 |
| Letter from B. Galdston, to Hon. S. Netburn, Re: *BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank Nat'l Tr. Co., et al.*, 14 Civ. 9367 (JMF) (SN) (S.D.N.Y.) | January 5, 2018 |

| Document Title, Bates Numbers (if applicable) | Document Date |
|---|---|

**Documents from Other Litigation**

| | |
|---|---|
| Complaint, with Appendices A-K, *Royal Park Investments SA/NV, v. Merrill Lynch, et al.,* Index No. 652607/2012, Supreme Court of the State of New York County of New York | December 14, 2012 |
| Portfolio Sale Agreement by and Between Lone Star Fund VIII (U.S.), L.P. As Parent Entity and LSF8 Bond Holdings, Ltd. as Buyer and Royal Park Investments SA/NV as Seller | April 26, 2013 |
| Letter from Y. Bolaji, to J. Caringal, Re:  *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.* (Civil Action No. 1:14-cv-09764-RMB-SN) | August 10, 2015 |
| Amended Class Action Complaint, with Exhibits, *BlackRock Allocation Target Shares:  Series S Portfolio, et al., v. Wells Fargo Bank, National Association,* Case No. 14-cv-9731-RMB-SN, U.S. District Court Southern District of New York | February 23, 2016 |
| Letter from B. Galdston, to Hon. S. Netburn, Re:  *BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, N.A.,* 14-cv-09366-LGS-SN | May 26, 2016 |
| Complaint, with Exhibits A-H, *Commerzbank AG, v. Deutsche Bank National Trust Company.,* Case No. 1:15-cv-10031-JGK, U.S. District Court Southern District of New York | April 29, 2016 |
| Unreported Disposition 55 Misc.3d 1210(A), *Royal Park Investments SA/NV, v. Morgan Stanley et al.,* No. 653695/2013, Supreme Court New York County New York | April 11, 2017 |
| Plaintiffs' Memorandum of Points and Authorities in Support of Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *BlackRock Core Bond Portfolio et al., v. U.S. Bank National Association,* Case No. 1:14-cv-09401-PGG-AJP, Document 219, U.S. District Court Southern District of New York | June 21, 2017 |
| Letter from D. Maj, to S. Walling, Re:  *Blackrock Core Bond Portfolio, et al., v. U.S. Bank National Association* (No. 14-cv-9401-PGG) | July 26, 2017 |

**Literature and Public Press**

| | |
|---|---|
| Fabozzi, Frank J., Anand K. Bhattacharya, and William S. Berliner, *Mortgage-Backed Securities - Products, Structuring, and Analytical Techniques,* John Wiley & Sons, Inc., Hoboken, New Jersey, 2007 | |
| "Rating Action:  Moody's Withdraws Ratings of Notes Issued by 60 SF CDOc," *Moody's Investors Service* | July 17, 2009 |
| Choudhry, Sherif Moorad, *The Repo Handbook,* 2nd ed., Elsevier Ltd., Woburn, MA, 2010 | |
| Johnson, Aaron, "Creativity Needed to Unwind 'Zombie' CDOs," *Financial Times* | March 4, 2013 |

**SEC Filings**

| | |
|---|---|
| Prospectus Supplement Dated June 25, 2004 (to Prospectus Dated April 19, 2004) $1,873,530,000 (Approximate) New Century Home Equity Loan Trust 2004-2 Asset Backed Notes, Series 2004-2 | June 25, 2004 |
| Prospectus Supplement Dated September 28, 2004 (to Prospectus Dated May 14, 2004) $808,389,308 (Approximate) MortgageIT Trust 2004-1 Mortgage-Backed Notes, Series 2004-1 | September 28, 2004 |
| Prospectus Supplement (to Prospectus Dated November 19, 2004) $1,177,206,000 (Approximate) Aames Mortgage Investment Trust 2004-1 Mortgage Backed Notes | November 24, 2004 |
| Prospectus Supplement Dated March 22, 2005 (to Prospectus Dated March 22, 2005) American Home Mortgage Investment Trust 2005-1, Mortgage-Backed Notes, Series, 2005-1 | March 22, 2005 |
| Prospectus Supplement to Prospectus Dated May 14, 2004 $1,007,808,000 Accredited Mortgage Loan Trust 2005-2 Asset-Backed Notes, Series 2005-2 | May 24, 2005 |
| Prospectus Supplement Dated March 28, 2006 (to Prospectus Dated September 19, 2005) $1,964,063,000 (Approximate) American Home Mortgage Investment Trust 2006-1, Mortgage-Backed Notes, Series 2006-1 | March 28, 2006 |

**Document Title, Bates Numbers (if applicable)**        **Document Date**

**Data Sources**

*Bloomberg*

**Additional Materials**

The Depository Trust Company  – Disclosure Under the Principles for Financial Market Infrastructures, available at:  http://www.dtcc.com/~/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf

New York Consolidated Laws, General Obligations Law - GOB §13-107 – Claims or Demands Transferred with Bonds Unless Reserved, available at:  <http://codes.findlaw.com/ny/general-obligations-law/gob-sect-13-107.html>

"Our History," SIFMA, available at:  http://www.sifma.org/about/

Letter R Glossary, SIFMA

Fast Answers - CUSIP Number, SEC, available at:  https://www.sec.gov/answers/cusip.htm

"FAQS:  How Issuers Work with DTC", DTCC, available at:  http://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc

"About DTCC – The Depository Trust Company (DTC)," DTCC, available at:  http://www.dtcc.com/about/businesses-and-subsidiaries/dtc

**Any other materials cited in this report and in the exhibits to this report.**

**Exhibit 4**
**Historical Holdings in Certificate Reported by Bloomberg**
**for NCHET 2004-2 A1 (Original Balance $788.259 Million)**
$ in Thousands

| Holding Period[1] | Certificate Holders | | | | Total Holdings in Cerficiate Reported by Bloomberg | % Not Reported in Bloomberg Data[2] |
| --- | --- | --- | --- | --- | --- | --- |
| | MAG MUTUAL INSURANCE COMPANY | HEALTH NOW NY INC | AMGEN RETIRE AND PLAN | WELLMARK OF SOUTH DAKOTA INC | | |
| Current | $55,000 | $28,000 | $19,000 | $4,000 | $106,000 | 86.55% |
| 2017 Q4 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2017 Q3 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2017 Q3 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2017 Q1 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2016 Q4 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2016 Q3 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2016 Q2 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2016 Q1 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2015 Q4 | $55,000 | $28,000 | | $4,000 | $87,000 | 88.96% |
| 2015 Q3 | $2,120 | $1,079 | | $154 | $3,353 | 99.57% |
| 2015 Q2 | | | | | $0 | 100.00% |
| 2015 Q1 | | | | | $0 | 100.00% |
| 2014 Q4 | | | | | $0 | 100.00% |
| 2014 Q3 | | | | | $0 | 100.00% |
| 2014 Q2 | | | | | $0 | 100.00% |
| 2014 Q1 | | | | | $0 | 100.00% |
| 2013 Q4 | | | | | $0 | 100.00% |
| 2013 Q3 | | | | | $0 | 100.00% |
| 2013 Q2 | | | | | $0 | 100.00% |
| 2013 Q1 | | | | | $0 | 100.00% |
| 2012 Q4 | | | | | $0 | 100.00% |
| 2012 Q3 | | | | | $0 | 100.00% |
| 2012 Q2 | | | | | $0 | 100.00% |
| 2012 Q1 | | | | | $0 | 100.00% |
| 2011 Q4 | | | | | $0 | 100.00% |
| 2011 Q3 | | | | | $0 | 100.00% |
| 2011 Q2 | | | | | $0 | 100.00% |
| 2011 Q1 | | | | | $0 | 100.00% |
| 2010 Q4 | | | | | $0 | 100.00% |
| 2010 Q3 | | | | | $0 | 100.00% |
| 2010 Q2 | | | | | $0 | 100.00% |
| 2010 Q1 | | | | | $0 | 100.00% |
| 2009 Q4 | | | | | $0 | 100.00% |
| 2009 Q3 | | | | | $0 | 100.00% |
| 2009 Q2 | | | | | $0 | 100.00% |
| 2009 Q1 | | | | | $0 | 100.00% |
| 2008 Q4 | | | | | $0 | 100.00% |
| 2008 Q3 | | | | | $0 | 100.00% |
| 2008 Q2 | | | | | $0 | 100.00% |
| 2008 Q1 | | | | | $0 | 100.00% |
| 2007 Q4 | | | | | $0 | 100.00% |
| 2007 Q3 | | | | | $0 | 100.00% |
| 2007 Q2 | | | | | $0 | 100.00% |
| 2007 Q1 | | | | | $0 | 100.00% |
| 2006 Q4 | | | | | $0 | 100.00% |
| 2006 Q3 | | | | | $0 | 100.00% |

**Exhibit 4**
**Historical Holdings in Certificate Reported by Bloomberg**
**for NCHET 2004-2 A1 (Original Balance $788.259 Million)**
$ in Thousands

| | Certificate Holders | | | | | |
|---|---|---|---|---|---|---|
| Holding Period[1] | MAG MUTUAL INSURANCE COMPANY | HEALTH NOW NY INC | AMGEN RETIRE AND PLAN | WELLMARK OF SOUTH DAKOTA INC | Total Holdings in Cerficiate Reported by Bloomberg | % Not Reported in Bloomberg Data[2] |
| 2006 Q2 | | | | | $0 | 100.00% |
| 2006 Q1 | | | | | $0 | 100.00% |
| 2005 Q4 | | | | | $0 | 100.00% |
| 2005 Q3 | | | | | $0 | 100.00% |
| 2005 Q2 | | | | | $0 | 100.00% |
| 2005 Q1 | | | | | $0 | 100.00% |
| 2004 Q4 | | | | | $0 | 100.00% |
| 2004 Q3 | | | | | $0 | 100.00% |
| 2004 Q2 | | | | | $0 | 100.00% |

Source:  *Bloomberg*; Prospectus Supplement of NCHET 2004-2 dated June 25, 2004.

Note:
[1]  The Closing Date for NCHET 2004-2 was June 29, 2004.  Bloomberg data as of 3/19/18.
[2]  % Not Reported in Bloomberg Data = 1 - Total Holdings in Certificate Reported by Bloomberg × 1,000 / Original Balance of NCHET 2004-2 A1 ($788,259,000).

# Exhibit 5



Source:  2018.01.23 DB (federal) - PIMCO Holdings Chart; Plaintiffs' Supplemental Responses and Objections to Interrogatory Numbers 1, 2, 4, and 10-25 of Deutsche Bank National Trust Company's First, Second, Third, Fourth, and Fifth Sets of Interrogatories, Exhibits D, E, G, and H; Hartzmark Report, Appendix C.