**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

BLACKROCK BALANCED CAPITAL
PORTFOLIO (FI), et al.,

        **Plaintiffs,**

    **-against-**

DEUTSCHE BANK NATIONAL TRUST
COMPANY, et al.,

        **Defendants.**
----------------------------------------------------------------X

**14-CV-09367 (JMF)(SN)**

**REPORT AND**
**RECOMMENDATION**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 8/7/2018

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE JESSE M. FURMAN, United States District Judge:**

  Plaintiffs are current investors in 58 residential mortgage-backed securities ("RMBS")

trusts (the "Trusts"). On behalf of a putative class, the plaintiffs have sued the trustees Deutsche

Bank National Trust Company and Deutsche Bank Trust Company Americas (collectively,

"Deutsche Bank" or the "Trustees") for breach of contract and violation of the Trust Indenture

Act of 1939 (the "TIA"). Plaintiffs move to certify the class pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(3), to be appointed as class representatives, and to have their counsel

appointed as class counsel. See ECF No. 419. I recommend that the Court deny BlackRock's

motion for class certification and dismiss BlackRock's TIA and state law claims for 39 Trusts.

See 28 U.S.C. § 636(b)(1)(B).

## BACKGROUND

  The factual and procedural background of this case is summarized briefly below but

familiarity with the Court's prior decisions is presumed.

Plaintiffs (collectively, "BlackRock" or "plaintiffs") are investors holding bond-like instruments called RMBS Certificates. The Certificates are collateralized by thousands of mortgage loans held in the 58 Trusts, with the Certificate-holders entitled to the cash flows generated by those loans. The Trusts acquired these loans after transfer from institutional entities known as "Depositors." The Depositors previously acquired the loans from "Sponsors" or "Sellers," which either purchased them directly or indirectly from originating lenders and aggregated them or originated the loans themselves (collectively, "Warrantors").

Each Trust is governed by various agreements between the Trustee, relevant Depositors, Sponsors or Sellers, and other interested parties, including the Mortgage Loan Purchase and Sale Agreement, the Trust Agreement, the Sale and Servicing Agreement, and the indentures (collectively, the "Governing Agreements"). Depending on the Governing Agreements for a specific Trust, Deutsche Bank is obligated to discharge certain duties on behalf of the Certificate-holders. These could include providing the servicer with written notice upon discovery of a servicer's breach of the Sale and Servicing Agreement, and if the breach is not cured, pursuing the remedies available under the Governing Agreements. See, e.g., Delange Decl., Ex. 6, §§ 3.01 and 6.01. If a breach ripens into an event of default (as defined in the Governing Agreements), Deutsche Bank is obligated to use the same degree of care and skill that a prudent person would in rectifying the events of default, including taking action to cause the servicer or issuer to enforce any rights or preserve title. Id. Ex. 11, §§ 3.05. It also must provide notice to the noteholders of such events. Id. Ex. 42.

Additionally, under the TIA, Deutsche Bank must inform noteholders about defaults within 90 days of their occurrence. 15 U.S.C. § 77ooo(b). In the event of default, the TIA

obligates Deutsche Bank to act as a prudent person would in the conduct of his or her own affairs. 15 U.S.C. § 77ooo(c); Delange Decl. Ex 43, §§ 6.01(a); 11.06.

BlackRock moves to certify a class based on two claims: (1) that the Trustees failed to require Warrantors to repurchase or replace loans upon discovery of breaches of the R&Ws; and (2) that the Trustees had widespread knowledge of breaches and servicing obligations but did not take appropriate action to rectify them. The putative class consists of:

> All persons or entities who purchased or otherwise acquired a beneficial interest in a security issued from the Trusts identified in Exhibit 1 of the accompanying declaration of Timothy A. DeLange between the date of offering and 60 days from the final order certifying the class and who hold that beneficial interest in the security through the date of final judgment in the District Court, and who were damaged as a result of Defendants Deutsche Bank National Trust Company's and Deutsche Bank Trust Company Americas' (together "Deutsche Bank" or "Defendants") alleged breaches of contract and violations of the Trust Indenture Act of 1939 ("TIA") (collectively, the "Class").

See Pls.'s Mem. of Law at 1 (ECF No. 419).

## DISCUSSION

### I.   TIA Standing

#### A.   Legal Standard

"In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498 (1975). To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). "[T]he requirement that a plaintiff have standing to sue is 'no less true with respect to class actions than with respect to other suits.'" Fort Worth Employees' Ret. Fund v.

J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 331 (S.D.N.Y. 2012) (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)).

While the Court need not "require that each member of a class submit evidence of personal standing . . . no class may be certified that contains members lacking Article III standing." Denney v. Deutsche Bank AG, 443 F.3d 253, 263-64 (2d Cir. 2006). In other words, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499. However, "an assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an 'injury-in-fact.'" W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 108 (2d Cir. 2008).

Deutsche Bank argues that plaintiffs' TIA claims in connection with 39 Trusts should be dismissed on standing grounds.[1] To determine whether the BlackRock plaintiffs have Article III standing to assert their TIA claims, the Court proceeds in two steps. It first assesses which claims the BlackRock plaintiffs—who are all current noteholders—retain the litigation rights to bring. That is, are they restricted to claims accrued during their tenure as owners of the Certificates? Or are they also assigned the claims of prior holders? Answering these questions narrows the inquiry for the second issue: whether the BlackRock plaintiffs demonstrate an injury-in-fact sufficient to show Article III standing.

B.    **Assignability of Claims**

"The federal courts have consistently determined that federal law governs the assignability of claims under the federal securities laws." Bluebird Partners, L.P. v. First Fid.

---

[1] The Court notes that Deutsche Bank did not file a formal notice of motion. But BlackRock had ample opportunity to object and be heard on the topic, having filed two reply briefs. It will have another opportunity to make its case should it opt to object to this Report and Recommendation.

Bank, N.A. New Jersey, 85 F.3d 970, 973 (2d Cir. 1996) (collecting cases). Under federal law, claims brought under the TIA "are not automatically assigned to a subsequent purchaser upon the sale of the underlying security." Id. at 974. "[O]therwise, [the Court] would remove the remedy from those to whom the statute provides it, *i.e.*, those who were defrauded, by gratuitously giving it to those who were not defrauded and have suffered no injury under the securities law." In re Nucorp Energy Sec. Litig., 772 F.2d 1486, 1490 (9th Cir. 1985). Thus, absent any indication that prior holders assigned their claims, the BlackRock plaintiffs have standing based only on their own injuries suffered during the time they actually held the Certificates.

But what if the pre-acquisition misconduct harms the plaintiffs after they acquired the Certificates? Those claims are also barred because the Court assumes that if the Trustees' action caused harm, "[m]arket forces assured that the price plaintiff[s] paid for [the C]ertificates . . . reflected their diminished value." Bluebird Partners, L.P. v. First Fid. Bank, 896 F. Supp. 152, 157 (S.D.N.Y. 1995). Thus, any misconduct was already factored into the purchase price. Because any subsequent investors—like the plaintiffs here—purchased the Certificates at a price discounted to reflect any previous Trustee misconduct, it would be unfair to allow them to assert a claim that any pre-acquisition conduct caused harm. "The securities laws were enacted to protect those who have been injured . . . not treasure hunters 'shrewd or lucky enough to have put [their] hands on a security that once belonged to a person who was defrauded.'" Id. (quoting Independent Investor Protective League v. Saunders, 64 F.R.D. 564, 572 (E.D. Pa. 1974)). The BlackRock plaintiffs therefore do not have the right to sue for claims based on Trustee conduct before they purchased the Certificates.

Consistent with this reasoning, however, to the extent that Trustee misconduct continued post-acquisition, any harm derived therefrom is compensable. Indeed, at the time the BlackRock

plaintiffs purchased the notes, the market could not have "predicted that later trustee action would increase th[e] risk" of a diminution in value of the Certificates. LNC Investments, Inc. v. First Fid. Bank, No. 92-CIV-7584 (MBM), 1997 WL 528283, at *11 (S.D.N.Y. Aug. 27, 1997). Accordingly, the purchase price of a Certificate was discounted only by the quantum of harm already caused and did not incorporate the potential for future wrongdoing. Here, BlackRock alleges that Deutsche Bank continuously breached its duties, starting from the events of default or breaches of the R&Ws until the present. Thus, to the extent that Deutsche Bank's breach continued post-acquisition and caused the plaintiffs harm, the plaintiffs are entitled to damages. Accord Bluebird, 896 F. Supp. at 156. ("The alleged breaches occurred over time, throughout the course of [the failure to act], and any resulting injury was gradual, increasing as the collateral declined in value."). But they do not have the right to sue for any claims that arose from discrete pre-acquisition misconduct.

### C.      Injury-in-Fact

As explained above, the BlackRock plaintiffs are limited to bringing claims arising out of Deutsche Bank's conduct during their tenure as noteholders. In order to prove they have standing, therefore, they must show that Deutsche Bank's conduct during this timeframe actually caused them harm sufficient to result in an injury-in-fact. Deutsche Bank contends that the plaintiffs cannot make this showing because even if its actions violated the TIA—which it disputes—the Act limits a bondholder's recovery against a trustee to "actual damages." 15 U.S.C. § 77www(b). Actual damages, according to Deutsche Bank, means out-of-pocket damages. But because some of the BlackRock plaintiffs' Certificates have allegedly appreciated in value since purchase, Deutsche Bank maintains that they could not have suffered out-of-pocket damages. Without the ability to recover for any damages, there is no harm that this Court

can remedy, and therefore no standing. The plaintiffs respond that this reading of the TIA is too narrow because benefit-of-the-bargain damages are also available, and that moreover they have suffered out-of-pocket damages with respect to certain trusts.

The Court interprets the term "actual damages" in a manner consistent with other federal securities laws. BlackRock Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, 109 F. Supp. 3d 587, 612 (S.D.N.Y. 2015) (BR/HSBC); LNC Invs. Inc., 1997 WL 528283, at *34. In the context of securities fraud actions, courts have had ample occasion to construe the term. See, e.g., Osofsky v. Zipf, 645 F.2d 107, 111 (2d Cir. 1981) (defining the actual damages as used in Section 28(a) of the Securities Exchange Act); Panos, 880 F. Supp. 169, 175 (S.D.N.Y. 1995) (same). "Noting that Congress left the term 'actual damages' undefined, courts interpreting [the term] have been reluctant to read the statute as applying a straight jacket to their traditional remedial role." Panos, 880 F. Supp. at 175. In other words, actual damages "compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the [] Act, whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard." Osofsky, 645 F.2d at 111. But courts have recognized that the "speculative nature of reconstructing a world in which the plaintiffs' expectations come true" can make benefit-of-the-bargain damages difficult to prove. Panos, 880 F. Supp. at 176. Courts have therefore typically "restricted [plaintiffs] to an out-of-pocket recovery," though courts have allowed "benefit-of-the-bargain damages [that] can be measured with reasonable certainty." Id. at 177.

The plaintiffs contend that, in this case, benefit-of-the-bargain damages are available because their TIA claims more closely resemble a contractual cause of action, rather than one sounding in tort. As support, they cite two cases in which the Court of Appeals awarded

expectation damages in the context of a securities fraud claim deriving from a contract: Osofsky v. Zipf and McMahan & Co. v. Wherehouse Entertainment, Inc. In Osofsky, the plaintiff sued because the defendant's misrepresentations about the size of a tender offer caused him to sell his shares at a lower price than he otherwise would have received. Osofsky, 645 F.2d at 109. He argued that he should receive expectation damages, which represented the difference between the bargained-for price, $62.50, and the value of the package he actually received, $59.88. Id. at 110. The Court of Appeals agreed because calculating the damages award was a matter of simple arithmetic and therefore reasonably certain. Id. at 114. In McMahan & Co. v. Wherehouse Entertainment, Inc., the plaintiff-debenture holders were contractually entitled to a specific damages figure if the company's independent directors failed to approve a sale of certain debentures. 65 F.3d 1044, 1050 (2d Cir. 1995). They failed to do so, leading the plaintiffs to sue for the contractually-stipulated damages award. Unlike in Osofsky, "[b]ecause the value of plaintiffs' right to tender was contingent on the occurrence of certain events, the value of this right [wa]s somewhat speculative." Id. Nonetheless, the court held that benefit-of-the-bargain damages were available because, once the but-for world was proven, calculating damages was again straightforward. Id.

Deutsche Bank argues that Osofsky and McMahan are restricted to their facts, and that this case more closely hews to two cases brought under the prudent person provision of the TIA: LNC, 1997 WL 528283, and BlackRock Allocation Target Shares: Series S Portfolio, et al. v. U.S. Bank Nat'l Assoc., 14-CIV-09401 (PGG), ECF No. 253, (Jan. 31, 2018) ("BR/US Bank"). In both cases, the court rejected an expectation damages measure because the damages sought exceeded actual damages and were not reasonably certain. In LNC, the plaintiff-noteholders sought damages under the TIA because the trustees failed to move to lift the automatic stay in a

bankruptcy proceeding on the collateral underlying their certificates, purportedly diminishing

their value. LNC, 1997 WL 528283, at *2-3. Judge Mukasey ruled on summary judgment that

the actual damages requirement meant that "plaintiffs' damages under the TIA [we]re limited to

out-of-pocket losses directly attributable to the trustees' alleged negligence." LNC, 1997 WL

528283, at *33.

 The LNC court distinguished Osofsky and McMahan, where the defendants had

"promised the plaintiffs certain consideration," because the LNC plaintiffs could only calculate

their damages by hypothesizing about the but-for world. Id. at *37, *38 ("[A] claim for benefit-

of-the-bargain damages must be based on a bargain actually struck, not a bargain whose terms

must be divined by hypothesis."). Further, the plaintiffs' benefit-of-the-bargain damages theory

was inappropriate because it would have provided the plaintiffs with the full value of the

Certificates, but an "indenture trustee does not . . . guarantee the underlying debt." Id. at *35. In

other words, a plaintiff can recover under the TIA only for damages caused by the Trustees'

misconduct. A benefit-of-the-bargain damages measure that grants the plaintiffs full recovery

therefore had the potential to award more than the actual damages.

 In BR/US Bank, the plaintiffs sought to certify a class very similar to the one proposed

here, composed of noteholders alleging violations of the TIA and breach of contract against

indenture trustees. The court relied heavily on LNC in ruling from the bench, holding that out-of-

pocket damages were the only theory available to plaintiffs under the TIA. 14-CIV-09401, ECF

No. 253, at 43. It further rejected the plaintiffs' benefit-of-the-bargain theory of damages because

expectation damages would again inappropriately make the trustee "the guarantor of the debt

underlying the certificate." Id. at 40 (quoting LNC at *35). And because the great majority of the

plaintiffs' investments increased in value, there were no out-of-pocket damages and therefore no

basis for establishing an injury-in-fact. Id. at 43-44. The court then declined to exercise supplemental jurisdiction and dismissed the case as to those trusts. Id. at 44-45.

The Court finds that, taken together, these cases hold that actual damages can include expectation damages where the plaintiff's damages theory does not award a sum in excess of the harm, and damages are reasonably certain. In LNC and BR/US Bank, the plaintiffs sought the full value of the notes as their damages, rather than limiting the award to the harm actually caused by the Trustees' actions. This inappropriately made the trustees the guarantors of the debt, which was wholly inconsistent with the trustees' actual obligations under the indenture. But here the BlackRock plaintiffs only seek the damages that result from the Trustees' failure to act as a prudent person. They do not seek to hold the Trustees accountable for *all* diminution in the value of the Certificates for *any* reason. Their claims are at least consistent with the Trustees' obligation under the indenture. Cf. LNC, 1997 WL 528283, at *35 ("If the trustees' conduct resulted in a further decrease in the probability of full redemption, plaintiffs' damages are limited to that decrease that resulted from the trustees' breach. . . ."). But the plaintiffs' theory still fails, not because it makes the trustees the guarantor of the debt, but because it inappropriately awards the current noteholders damages based on the harm incurred by *all* noteholders, past and present. This could not be part of the parties' bargain because many of the BlackRock plaintiffs purchased the notes at a discounted price—thereby eliminating any expectation that they would be entitled to the full value of the given Certificate.

Further, calculating the damages award will be far from reasonably certain. Unlike in McMahan or Osofsky, the indenture does not specify a damages measure to compensate noteholders for trustee breaches. This means that the plaintiffs will have to develop a damages methodology that quantifies the harm. This endeavor, which will involve a battle of the experts,

requires segregating the damages attributable to the defendant from other market conditions. See James Rpt. ¶¶ 44-75. And once the plaintiffs isolate the damages caused by the Trustees' alleged breaches, they still must show that the intervening third-party action, like servicer bankruptcies, would not have interfered with the Trustees' ability to enforce the Governing Agreements. Id. ¶¶ 80-81. Further, because the plaintiffs' damages theory includes compensation for latent harm resulting from potential defaults, the model must somehow predict the extent to which these hypothetical future damages will occur. See Hartzmark Rpt. ¶ 80. Finally, as explained earlier, any damages model must only compensate plaintiffs for harm caused during their tenure as noteholders.

Because the plaintiffs' proposed damages theory is inconsistent with the Trustees' obligations under the indentures and because benefit-of-the-bargain damages cannot be calculated with reasonable certainty, the Court finds that only out-of-pocket damages are available to the plaintiffs. Deutsche Bank claims that for many of the notes, the BlackRock plaintiffs cannot show that they suffered out-of-pocket losses at the time suit was filed. The BlackRock plaintiffs submit a snapshot, taken later in time, demonstrating that they did suffer out-of-pocket losses with respect to a subset of 13 notes but conceding they had no out-of-pocket losses with respect to the other 26 notes. But the "standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). At the time the Blackrock plaintiffs filed, they had suffered no losses with respect to certain Trusts. It would be unjust to allow them to use this litigation as an insurance policy to compensate them for harm that they happened to have incurred subsequently. Thus, I recommend that all TIA claims be dismissed with respect to the 39 trusts listed in Exhibit C of the Fouts Declaration.

### D.      Supplemental Jurisdiction

Further, I recommend that the Court decline to exercise supplemental jurisdiction over the state law claims related to the 39 Trusts. "[A] district court 'may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction.'" Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). Guiding the court's discretion are "the traditional 'values of judicial economy, convenience, fairness, and comity.'" Id. (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of [these] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 & n.5 (1988). There are some judicial economy concerns at stake here. Fact discovery is over and the Court has expended considerable energy adjudicating disputes to date. That said, expert discovery, which plaintiffs plan to use to prove the large bulk of their case, has yet to commence. The Court is further comforted that, as in the BR/US Bank litigation, the plaintiffs may pursue contract claims in state court such that their efforts here will not be put to waste. See BR/US Bank, 14-CIV-09401, ECF No. 257 at 1-2 (stipulating to file a new complaint in New York Supreme Court to be consolidated with the ongoing action). Finally, the Court is further assured that the New York state court is well-equipped to decide the remaining claims, especially those that present novel issues of state law. In toto, the Court recommends maintaining the standard practice of declining to exercise supplemental jurisdiction over state-law claims this far in advance of trial.

### E.      Grable Federal Question Jurisdiction

Finally, there is no federal question jurisdiction under Grable. Under Grable, a court should exercise federal question jurisdiction over state law claims where there is "not only a

contested federal issue, but a substantial one." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005). Because the indentures incorporate the duties imposed under the TIA, the plaintiffs argue that their state-law contract claims will necessarily involve the interpretation of federal law. See DeLange Decl. Ex. 10 at 8. They argue that this federal issue is substantial, "affecting thousands of RMBS investors." Pls.' Surreply Mem. of Law at 4. But the relevant issue is not whether "the federal issue [is] significant to the particular parties in the immediate suit" but instead whether it is significant "to the federal system as a whole." Gunn v. Minton, 568 U.S. 251, 260 (2013).

The plaintiffs cite NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010 (2d Cir. 2014), as support for the proposition that interpreting the TIA is significant to the federal system as a whole. In NASDAQ, each of the plaintiff's state law claims involved interpretation of the defendant's duty under the Securities Exchange Act. Id. at 1023. The court held that this federal issue was significant because it involved the "development of a uniform body of federal securities regulation." Id. at 1024. It is true that the TIA was "designed to vindicate a federal policy of protecting investors." Bluebird, 85 F.3d at 974 (quoting Nucorp, 772 F.2d at 1489). But unlike the plaintiffs in NASDAQ, the BlackRock plaintiffs assert several grounds for breach of contract, only one of which implicates the TIA. See ECF No. 136, Am. Compl. ¶¶ 197-202. Further, the relevant question under the TIA is whether the Trustee acted as a prudent person. This is highly fact-specific question (or, better put, thousands of highly fact-specific questions) must be resolved on a breach-by-breach, loan-by-loan basis and is unlikely to have precedential value in other RMBS actions. Cf. NASDAQ, 770 F.3d at 1028 ("[R]esolution of the disputed federal law issue here would likely have far-reaching prospective consequences for the operation

of national securities exchanges . . . ."). Thus, I recommend against finding federal question jurisdiction under Grable.

## II.      Class Certification

In order to certify a class, plaintiffs must show that the class (1) is numerous, (2) shares common issues, (3) has a typical named plaintiff, and (4) has an adequate named plaintiff and counsel. Fed. R. Civ. P. 23(a). Because plaintiffs seek to certify a class under Rule 23(b)(3), they must also show that individual issues do not predominate over those common to the class and that the class action mechanism is the superior method for resolving the case. Fed. R. Civ. P. 23(b)(3). The Court must also ensure that the class is ascertainable. In re Petrobras Secs., 862 F.3d 250, 264 (2d Cir. 2017). The plaintiffs must make these showings by a preponderance of the evidence. Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

### A.      Ascertainability Requirement

Independent of the express requirements for class certification set forth in the federal rules, there is "'an implied requirement of ascertainability.'" Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015) (quoting In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 30 (2d Cir. 2006)). In this Circuit, the standard for ascertainability is whether a class is defined "using objective criteria that establish a membership with definite boundaries." Petrobras, 862 F.3d at 264. The "narrow[] question" of ascertainability asks whether defining the class is "objectively *possible*," not whether it is practical or administratively feasible. Id. at 270 (emphasis in original). "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." Id. at 269.

The Court of Appeals specifically rejected an administrative feasibility requirement, concluding that such a requirement would risk encroaching on preponderance analysis or the manageability component of the superiority analysis. Whereas "ascertainability is an absolute standard" (that is, can membership be established within definite boundaries or not?), superiority and preponderance are comparative in nature (that is, is the class action vehicle superior to other methods for adjudicating a controversy? And do common questions predominate over individual ones?). Id. at 268.

The Court accordingly restricts its analysis to whether BlackRock's proposed class definition contains objective criteria. Class members are those who "purchased or otherwise acquired a beneficial interest in a security issued from the Trusts . . . between the date of offering and 60 days from the final order certifying the class and who hold that beneficial interest in the security through the date of final judgment . . . ." This definition incorporates a temporal limitation, avoiding any concern that a class membership without explicit start and end dates would constantly shift, thereby rendering it unascertainable. Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co., No. 14-CIV-4394 (AJN), 2017 WL 1331288, at *5 (S.D.N.Y. Apr. 4, 2017) ("RP/DB I"); see also BlackRock Investments SA/NV v. Bank of New York Mellon, No. 1:14-CIV-6502 (GHW), 2017 WL 3835339, at *5 (S.D.N.Y. Aug. 30, 2017) (same concern). The proposed class is ascertainable.

**B.     Rule 23(a)**

To certify a class, a plaintiff must first demonstrate that the proposed class satisfies the four prerequisites of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4)

the representative parties will fairly and adequately protect the interests of the class. These requirements of "numerosity, commonality, typicality, and adequate representation . . . limit the class claims to those fairly encompassed by the named plaintiff's claims." Dukes, 564 U.S. at 349 (internal quotation marks omitted). A class may be certified only if the court is satisfied that the putative class meets the prerequisites of Rule 23(a). See Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (internal citation and quotation marks omitted).

### 1.    Numerosity

To meet the requirements of Rule 23(a)(1), the class must be "so numerous that joinder of all members would be impracticable." Fed. R. Civ. P. 23(a); see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d Cir. 2007) (construing "impracticable" not to require impossibility but instead "that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate"). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." In re Vivendi Universal, S.A., 242 F.R.D. 76, 83 (S.D.N.Y. 2007), aff'd sub nom. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223 (2d Cir. 2016) (citations omitted); see also Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993) ("evidence of exact class size or identity of class members" is not required to satisfy numerosity); In re Blech Sec. Litig., 187 F.R.D. 97, 103 (S.D.N.Y. 1999) (plaintiffs may "rely on reasonable inferences drawn from the available facts in order to estimate the size of the class"). The numerosity requirement is presumptively met if a putative class has 40 or more members. Shahriar v. Smith

& Wollensky Rest. Grp., Inc., 659 F.3d 234, 252 (2d Cir. 2011) (citing Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)).

According to plaintiffs' expert Dr. Hartzmark, BlackRock's proposed class contains at least 604 unique members, exceeding the presumptive level of 40. See Delange Decl., Ex. 3 ¶ 15 (the "Hartzmark Report"). To arrive at this conclusion, Dr. Hartzmark examined data collected from filings from large financial institutions, which show that 604 of these institutions hold Certificates. Id. ¶ 22. Dr. Hartzmark reasons that this figure represents the lower bound of potential Certificateholders because each of these institutions likely holds the Certificates on behalf of multiple investors. Id. ¶ 23. Further, this figure only accounts for roughly a third of the Certificates; presumably another swath of investors hold the remainder. Id. ¶ 22. The Court recommends a finding that this showing sufficiently demonstrates that the class is numerous.

### 2. Commonality

The commonality requirement requires a plaintiff to show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); see also Marisol A. by Forbes v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997). A plaintiff must articulate a common issue that drives the resolution of the litigation, such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Sykes v. Mel S. Harris and Associates LLC, 780 F.3d 70, 84 (2d Cir. 2015) (citing Dukes, 564 U.S. at 350). The commonality requirement poses a "low hurdle." Dodona I, LLC v. Goldman, Sachs & Co., 296 F.R.D. 261, 267 (S.D.N.Y. 2014); see also Adkins v. Morgan Stanley, 307 F.R.D. 119, 137

(S.D.N.Y. 2015) (courts have generally given the commonality requirement a "permissive application" (internal citation and quotation marks omitted)).

BlackRock alleges that Deutsche Bank breached identical or substantially identical contractual terms and engaged in a common course of behavior, based on common policies and procedures. BlackRock contends that resolving each class member's claims involves assessing how certain contractual terms are defined and which policies Deutsche Bank had in place to address breaches of R&Ws or notice of EODs. These questions are common to the class and, moreover, represent the crux of this litigation. Accordingly, the Court recommends a finding that BlackRock has satisfied commonality's "low hurdle."

### 3.    Typicality

Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members. See Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)(3)). Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Vincent v. Money Store, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)). "The central feature for typicality is that plaintiffs assert 'that defendants committed the same wrongful acts in the same manner, against all members of the class,' and the court looks 'not at the plaintiffs' behavior, but rather at the defendant's actions.'" Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 132 (S.D.N.Y. 2014) (quoting Tsereteli v. Residential Asset Securitization Trust 2006–A8, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)). Put slightly differently, "the disputed issues of law or fact [should] occupy essentially the same degree of centrality to

the named plaintiff's claim as to that of other members of the proposed class." Dodona I, 296 F.R.D. at 267 (quotations and citations omitted).

That said, "[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)). The unique defense rule, however, "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit." Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 77 (S.D.N.Y. 2006) (quoting Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200–01 (S.D.N.Y. 1992)).

Deutsche Bank contends that the BlackRock plaintiffs are atypical because they "profited handsomely" from their investments in the RMBS, opening them up to unique defenses. It is true that "a finding of typicality would not be precluded even if certain plaintiffs are unable to demonstrate that they would recover any damages with respect to certain certificates." Tsereteli, 283 F.R.D. at 208. But because the BlackRock plaintiffs have not suffered out-of-pocket losses on some of the Certificates, they have had to develop a benefit-of-the-bargain damages theory that would still compensate them for their alleged harm. This atypical damages model is likely to engender separate litigation that would distract from the rest of the litigation. Indeed, as discussed above, this damages theory may already result in the dismissal of the federal claims from certain of the Trusts. Should the Court reject a benefit-of-the-bargain damages theory entirely, the claims of those unnamed class members who suffered out-of-pocket losses could be dismissed with prejudice, when they may have prevailed under an out-of-pocket measure. Thus,

the decision to pursue a benefit-of-the-bargain damages model could give rise to unique defenses that would not only be inapplicable to other members of the class, but could actually prejudice them.

The Court therefore recommends a finding that the BlackRock plaintiffs are not typical for purposes of Rule 23(a)(3).

### 4.   Adequacy of Representation

In conducting the adequacy analysis, the Court must consider whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted).

Addressing the second question first, the Court is satisfied that Bernstein Litowitz could fairly and adequately represent the class's interests. To date, Bernstein Litowitz has managed several trust-related complex litigations adeptly and has demonstrated a thorough understanding of the litigation process and substantive subject matter. Other courts have agreed in similar securities litigations. See, e.g., Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co., 277 F.R.D. 97, 110 (S.D.N.Y. 2011) ("It is also beyond serious dispute that class counsel— Bernstein Litowitz Berger & Grossmann LLP—is qualified and capable of prosecuting this action.").

Deutsche Bank contends that BlackRock is not an adequate plaintiff for largely the same reasons it is allegedly atypical. It points out that BlackRock's damages theories would reward investors holding many Certificates but with low out-of-pocket losses (i.e., the BlackRock plaintiffs) but not those holding few shares but high out-of-pocket losses (presumably those holding Certificates from the lower tranches). Because the latter plaintiffs would prefer a

different damages measure, BlackRock's decision to pursue a benefit-of-the-bargain damages makes it inadequate. BlackRock argues that courts routinely reject this type of argument, citing securities fraud cases in which plaintiffs were deemed adequate despite holding "repayment rights [that] may vary slightly based on the seniority of the tranches they purchased." Id. at 108 (quoting In re Dynex Capital, Inc. Sec. Litig., No. 05-CIV-1897 (HB), 2011 WL 781215, at *2 (S.D.N.Y. Mar. 7, 2011). They further point out that BlackRock has vigorously pursued this litigation and has a large financial stake in the relevant securities.

Boiled down, Deutsche Bank simply argues that BlackRock's damages model is not viable. The Court defers discussion of that point to the section on predominance. Because the plaintiffs have vigorously litigated this case to this point, and because they have a large financial interest in the trusts, the Court recommends a finding that they are adequate.

C.     **Rule 23(b)(3)**

In addition to the four Rule 23(a) requirements, a plaintiff must establish that certification is appropriate for one of the three reasons set forth in Rule 23(b). BlackRock seeks certification pursuant to Rule 23(b)(3), under which a court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In addition to being an atypical plaintiff, I recommend a finding that a class action is not appropriate vehicle because individual issues predominate over those common to the class and because it is inferior to individual litigation to resolve these claims.

### 1. Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This predominance requirement is satisfied if (1) resolution of any material "legal or factual questions . . . can be achieved through generalized proof," and (2) "these [common] issues are more substantial than the issues subject only to individualized proof." Mazzei v. The Money Store, 829 F.3d 260, 272 (2d Cir. 2016) (quoting Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010)). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (alternations omitted) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:59, at 196-97 (5th ed. 2012)).

The predominance inquiry is a "core feature" of the Rule 23(b)(3) analysis. Petrobras, 862 F.3d at 270. "[W]hen individual rather than common issues predominate, the economy and efficiency of class-action treatment are lost and the need for judicial supervision and the risk of confusion is magnified." 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1778, at 1441 (3d ed. 2005) (footnote omitted). For this reason, district courts must "take a 'close look' at whether common questions predominate over individual ones." Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) (quoting Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997)). See also Amchem, 521 U.S. at 624 (Rule 23(b)(3)'s predominance requirement is "far more demanding" than Rule 23(a)(2)'s commonality requirement). Courts must ask "whether the common, aggregation-enabling issues in the case are more prevalent or important

than the non-common, aggregation-defeating, individual issues." Tyson Foods, 136 S. Ct. at
1045 (citations omitted).

### a.      Class Membership

A "class must . . . be defined in such a way that anyone within it would have standing."
Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006). While the Court need not
determine who has standing at the certification stage, it will have to do so at some point in the
litigation. Newberg on Class Actions § 2:3 (collecting cases). BlackRock argues that this inquiry
is simple: anybody who holds a Certificate at the time of judgment is entitled to make a claim.
Figuring out who has a claim is an easy, two-step process, it contends, that obviates the need to
trace the ownership of the securities, thereby sidestepping the need to determine who retained the
litigation rights. This argument, if valid, is crucial because courts in similar actions have
consistently held that the tracing inquiry into which investor in the chain of title retained the right
to sue swamps common issues. See Royal Park Investments SA/NV v. HSBC Bank USA, N.A.,
No. 14 CIV. 8175 (LGS), 2018 WL 679495, at *1 (S.D.N.Y. Feb. 1, 2018) ("RP/HSBC")
(holding that tracing class membership engendered individualized inquiries that predominated
over common issues); Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co., No. 14-
CIV-4394 (AJN), 2018 WL 1750595, at *17 (S.D.N.Y. Apr. 11, 2018) ("RP/DB II") (same);
Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., No. 14-CIV-9764 (KPF)(SN), 2018
WL 739580, at *1 (S.D.N.Y. Jan. 10, 2018) ("RP/WF R&R"), report and recommendation
adopted, 2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018) ("RP/WF") (same).

But BlackRock's argument rests on the crucial, and potentially erroneous, assumption
that it received the litigation rights from earlier noteholders. Most of the BlackRock plaintiffs
(and other unnamed class members) purchased their securities on the aftermarket. BlackRock

asserts that although some of the harm for which it seeks damages accrued to earlier

Certificateholders, the right to sue for that harm came bundled with the Certificates. BlackRock

rests this argument on New York General Obligations Law § 13-107, which provides that each

transfer of securities automatically includes the concomitant right to sue. Racepoint Partners,

LLC v. JPMorgan Chase Bank, No. 06-CIV-2501 (MGC), 2006 WL 3044416, at *4 (S.D.N.Y.

Oct. 26, 2006). BlackRock argues this law applies because the indenture's choice-of-law

provision mandates that New York law govern. But this choice-of-law provision governs only

the terms of the Indenture, not "the separate contracts between buyers and sellers of the

certificates." RP/HSBC, 2018 WL 679495, at *5; see also Semi-Tech Litig., LLC v. Bankers Tr.

Co., 272 F. Supp. 2d 319, 330 (S.D.N.Y. 2003) ("The governing law clause in the indenture,

however, has 'no relevance to the question whether the contracts of sale [of notes] . . . operated

to assign certain rights of action.'") (quoting In re Nucorp Sec. Litig., 772 F.2d 1486, 1492 (9th

Cir. 1985)) (formatting in original).

    Without the benefit of automatic assignment, the Court will need to engage in the number

of individualized inquiries to learn which Certificateholder retained the right to sue discussed at

length in its Report and Recommendation on Royal Park's motion to certify a class against Wells

Fargo. RP/WF R&R, 2018 WL 739580 at *13-*14. The plaintiffs do not appear to contest that

this is the case, but the Court will provide a brief overview of these inquiries.

    First, the Court will need to trace a Certificate's ownership history. This is a daunting, if

not impossible, task. Each Certificate is only identifiable by a CUSIP number that is fungible

within a tranche, meaning that is largely untraceable. Fouts Decl. Ex. F, Dolan ¶¶ 21-22 ("Dolan

Report"). By way of example, if Investor A and Investor B sell two Certificates with the same

CUSIP to Investor C, who then sells them to Investor D and Investor E, there is no way of

knowing whether Investor D or Investor E ended up with Investor A's Certificate or Investor B's

Certificate. Further complicating the issue is that there is no central trade exchange or repository

of trades; rather they are typically conducted via over-the-counter negotiations between various

dealers. Dolan Report ¶¶ 31-32. In other words, nobody knows who their real counterparty is,

necessitating additional third-party discovery for each transaction. Taken together, these issues

mean that it is very difficult to know who owned a Certificate when. Adjudication of this issue

would require "evidence that varies from member to member" and is "not obviously susceptible

to [ ] class-wide proof." Petrobras, 862 F.3d at 272 (quotations omitted). Indeed, BlackRock

seem to acknowledge the difficulty of tracing. In a discovery letter in this case, plaintiffs wrote

that "because RMBS securities are traded anonymously on the open market and are not tracked

by any unique identification number, many brokers could not identify the specific securities

associated with Plaintiffs' transactions." Ltr. from Benjamin Galdston, ECF No. 405 (Jan. 5,

2018).

But tracing is only the first step in learning who retains the litigation rights. If the Court is

somehow able to learn the entire chain of title, the Court must then engage in an individualized

inquiry to learn who retained the litigation rights for each security. Determining whether a

potential class member holds the litigation rights requires two individualized inquiries. The first

inquiry applies New York's fact-intensive "center of gravity" test to determine which

jurisdiction's law controls. The Court then applies the law of the governing jurisdiction to

determine who holds the litigation rights. As explained earlier, under New York law, litigation

rights transfer automatically with the sale of a Certificate; but the standard rule is that assignors

must manifest an intent to transfer litigation rights. Racepoint Partners, 2006 WL 3044416, at *4

("New York is the only state to have enacted such a provision for the automatic assignment of bondholders' claims."); see also RP/DB I, 2017 WL 1331288, at *7.

In all other jurisdictions, if the Court determined that the seller did not pass on the rights, the Court would have to trace back along the chain of title until it unearthed the party who retained the litigation rights. And that inquiry is itself a fact-intensive, individualized inquiry requiring analysis into whether a party manifested sufficient intent to transfer litigation rights. See, e.g., City of Boston v. Aetna Life Ins. Co., 399 Mass. 569, 572 (1987) (holding that in Massachusetts the relevant inquiry is "what the purported assignor did and what evidence there was of his intent"). "[T]he fact-finder would have to look at every class member's [transaction] documents to determine who did and who did not have a valid claim." Petrobras, 862 F.3d at 274 (quoting Mazzei, 829 F.3d at 272) (formatting in original). Indeed, this Court has previously identified instances in similar RMBS cases against trustees in which the parties purport to hold litigation rights after selling the Certificates. RP/WF R&R, 2018 WL 739580, at *14. Multiplying this exercise across all class members would outweigh any efficiency gained from resolving the common issue of breach.

### b.    Statute of Limitations Defenses

"Although the existence of a meritorious defense does not necessarily defeat certification, affirmative defenses may be considered as a factor in the class certification calculus." Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 226 F.R.D. 446, 454 (S.D.N.Y. 2005). The onus is on the plaintiffs to show that variances in state law do "not present insuperable obstacles." In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 127 (2d Cir. 2013) (quoting Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986)). This includes proving an action is timely,

including across various jurisdictions as necessary. <u>McLaughlin v. Am. Tobacco Co.</u>, 522 F.3d 215, 234 (2d Cir. 2008) (abrogated on other grounds).

BlackRock argues that Deutsche Bank has failed to show that it has a meritorious statute of limitations defense. It asserts that because Deutsche Bank's breach has continued to the present, the statute of limitations has not yet begun to run with respect to any class member. It further contends that the choice-of-law provision in the contract obliges the Court to apply the New York statute of limitations to any claim.

Without ruling in this posture on the viability of BlackRock's continuing breach theory, the Court finds it unlikely to succeed. Under New York law the continuing breach exception is narrow, restricted to continuing wrongs, not "a single wrong that has continuing effects."[2] <u>Maloul v. New Colombia Res., Inc.</u>, No. 15-CIV-8710 (KPF), 2017 WL 2992202, at *5 (S.D.N.Y. July 13, 2017) (quoting <u>Henry v. Bank of Am.</u>, 48 N.Y.S.3d 67, 70 (1st Dep't 2017)). Thus, the Court will simply note that should BlackRock's continuing breach theory fail to toll the accrual date of the statute of limitations, it will have to engage in individualized inquiries into whether each individual class member's claim is time-barred based on the law of their jurisdiction.

BlackRock's response that the indenture's choice-of-law provision requires the Court to use the New York limitations period is, once again, unavailing. It is true that the choice-of-law provision dictates that New York law governs this issue because it specifically mentions rights and remedies. DeLange Decl., Ex. 34 ("This indenture shall be governed by and Construed in accordance with the laws of the state of New York, without Reference to its conflict of laws provisions . . . and the obligations, rights and remedies of the Parties hereunder shall be

---

[2] This issue is squarely substantive law, such that the contractual choice-of-law provision *does* control.

determined in accordance with such laws."); see Tanges v. Heidelberg N. Am., Inc., 93 N.Y.2d 48, 54–55 (1999) (quotations omitted) ("In New York, Statutes of Limitation are generally considered procedural because they are viewed as pertaining to the remedy rather than the right."). But the New York borrowing statute is "an abiding part of New York's procedural law," meaning the Court must decide which jurisdiction's law controls before making any statute of limitations determinations. 2138747 Ontario, Inc. v. Samsung C & T Corp., 31 N.Y.3d 372 (2018) (citing to N.Y. CPLR 202). And according to the borrowing statute, the Court must apply "the Statute of Limitations of a foreign jurisdiction where a nonresident's cause of action accrued, if that limitations period is shorter than New York's." Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 526 (N.Y. 1999). Thus, while BlackRock is correct that New York law governs, this gets them nowhere. Under New York law, the Court will be required to determine an investor's residency, the limitations period of that jurisdiction, and whether the investor's claim is time-barred. And according to the plaintiffs' expert, investors come from at least 15 states. Hartzmark Report ¶ 39.

Further complicating matters is determining whether *assigned* claims are time-barred, which requires looking to "the statute of limitations of the jurisdiction in which the claim accrued to the assignor." IKB Internat'l S.A. v. Bank of Am., No. 12 Civ. 4036 (LAK), 2014 WL 1377801, at *6 (S.D.N.Y. Mar. 31, 2014). This would involve piecing together multiple sales and periods of ownership for just one investor, a difficult task given the lack of unique identifiers and the piecemeal trading and selling of the RMBS at issue.

Therefore, in the likely event that the Court determines that the continuing breach theory does not toll the statute of limitations, there will be a number of individualized inquiries that would predominate over the issues common to the class. When taken alone these affirmative

defenses would be insufficient to counsel against certifying a class, but they do enter the Court's calculus as another factor weighing against certification.

### c.      Individual Issues from Governing Agreements

Deutsche Bank contends that the Governing Agreements differ in the obligations they place on Trustees and their requirements generally. These issues, it contends, also predominate over common ones. BlackRock contends that despite differences in wording, the Governing Agreements impose largely the same obligations on the Trustee. The Court acknowledges that should Deutsche Bank's view prevail, sorting through the Trustee's obligations on a Trust-by-Trust base will be an onerous task. But it is an onerous task common to all class members. Whether the Court certifies the class or not, it will need to determine what Deutsche Bank's obligations are for each Trust for which the BlackRock plaintiffs hold Certificates. Thus, if anything, deciding these issues once in the context of a class rather than for each individual plaintiffs weighs in favor of class certification.

### d.      Damages

In RP/WF, the Court identified numerous individualized inquiries that threatened to overwhelm common damages issues. BlackRock presents a damages model that it contends eliminates or bypasses these concerns. This model creates a but-for world that calculates how much the Trusts lost from allegedly holding defective loans and paying servicing fees unnecessarily. Hartzmark Report, ¶¶ 29-70. After arriving at these sums, the model would distribute these two groups of damages to each noteholder based on the number of notes that it holds. Hartzmark Report, ¶ 70. For example, if a given tranche has 100 notes, and Deutsche Bank's actions caused $500 in aggregate damages, $5 would accrue to the holder of each individual note. See id. BlackRock argues that this damages model rests on common proof. It

calculates the damages by tranche, and then distributes these damages by member without respect to "a Classmember's periods of ownership, the price the Classmember paid for and/or sold the security, or an evaluation of the impact foregone purchase and excess servicing cost had on the specific investor." Pls. Mot. for Class Cert. at 25-26.

Blackrock is right that its model in the abstract avoids individualized inquiries. But that only goes so far. As explained in the discussion of Article III standing, under federal law, the current noteholders do not automatically receive the litigation rights for their TIA claims from their assignors. And as just noted, whether they received the right to sue under state law for breach of contract claims is a complicated factual analysis. But Dr. Hartzmark's model awards each current noteholder damages designed to compensate for all harm over a note's entire history, not just those that accrued during the noteholder's ownership. Baked into this analysis therefore is the assumption that *all* current noteholders hold the litigation rights for *all* claims. Taking this reasoning to its logical conclusion, an investor could purchase a note today and receive the full damages award upon resolution of this case.

This version of expectation damages is problematic because it runs afoul of the Supreme Court's decision in Comcast. The Comcast court explained that "any model supporting a plaintiff's damages case must be consistent with its liability case." Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013) (quotations omitted). To make out a claim for damages under the TIA, BlackRock must show actual damages. Even if actual damages includes expectation damages, they would not support an award of damages to a noteholder for a period for which he does not hold the litigation rights. Thus, under any workable version of the plaintiffs' liability theory— i.e., one that only seeks damages for harm that accrued during the time in which an individual plaintiff holds the litigation rights—the damages model would have to be so limited. The

disjunction between the plaintiffs' damages model and liability case presents another reason against certifying a class.

Taken together, the difficulty establishing which members of the purported class retain the litigation rights, the potential for individualized affirmative defenses, and a damages model that runs afoul of <u>Comcast</u> predominate over the common liability issues in this litigation.

### 2.     Superiority

The second part of the Rule 23(b)(3) analysis asks whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." <u>Green v. Wolf Corp.</u>, 406 F.2d 291, 301 (2d Cir. 1968). To determine whether class treatment is the superior form of adjudication, a court may consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation already commenced by or against class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) difficulties likely to be encountered in the management of a class action. <u>See</u> Fed. R. Civ. P. 23(b)(3). Class treatment is particularly appropriate where it allows large groups of claimants to bundle common claims that are too small to pursue individually into a single action. <u>See</u> <u>Amchem</u>, 521 U.S. at 617.

While there is undeniable efficiency that stems from consolidating and concentrating the litigation of similar claims, the individualized nature of claims in this case indicates that management of the litigation would be difficult, if not near impossible, and separate actions may be more appropriate. <u>See</u> <u>Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.</u>, 287 F.R.D. 216, 230 (S.D.N.Y. 2012) (class treatment was not superior where "a class action could become unmanageable because of the . . . need for mini-trials to resolve individual issues" (internal quotation marks omitted)). As discussed above, the nature of

31

the Certificates and the fact that they have been transferred via multiple assignments (involving different jurisdictions with different laws governing assignment of claims) will necessitate individualized hearings on the merits of each class member's claim, rendering any class nearly unmanageable. The necessity of hearing all this individualized evidence defeats a finding of superiority of class treatment. See Fed. R. Civ. P. 23(b)(3)(D). Further, past and present noteholders are sophisticated investors who may choose whether to bring claims. Indeed, several of those investors have already brought similar claims against Deutsche Bank.

Accordingly, I suggest a finding that a class action is not a superior method of adjudication in this case.

## CONCLUSION

Because it is an atypical plaintiff, I recommend a finding that this class action would not be appropriate vehicle to adjudicate the claims of unnamed class members. In the alternative, I recommend a finding that individual issues would predominate over common ones, such that BlackRock has not satisfied the predominance or the superiority requirements of Rule 23(b)(3). Finally, I recommend dismissing all TIA claims with prejudice with respect to Certificates on which BlackRock has not suffered out-of-pocket losses, and dismissing without prejudice the concurrent state law claims with respect to those trusts.

DATED:        August 7, 2018
              New York, New York

SARAH NETBURN
United States Magistrate Judge

\*               \*               \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from today, August 7, 2018, the publication date of this sealed Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jesse M. Furman at Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Furman. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).