**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **BLACKROCK BALANCED CAPITAL PORTFOLIO (FI), et al.,** | X : : |
| **Plaintiffs,** | : : Case No. 1:14-CV-09367-JMF-SN |
| -against- | : : |
| **DEUTSCHE BANK NATIONAL TRUST COMPANY; and DEUTSCHE BANK TRUST COMPANY AMERICAS,** | : : : : |
| **Defendants.** | : : X |

**MEMORANDUM OF LAW OF DEFENDANTS**
**DEUTSCHE BANK NATIONAL TRUST COMPANY AND**
**DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEES,**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Michael S. Kraut
Bernard J. Garbutt III
John S. Vassos
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
Tel:     (212) 309-6000
Fax:     (212) 309-6001
michael.kraut@morganlewis.com
bernard.garbutt@morganlewis.com
john.vassos@morganlewis.com

Gregory T. Fouts (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
Tel:     (312) 324-1000
Fax:     (312) 324-1001
gregory.fouts@morganlewis.com

Joseph E. Floren (*pro hac vice*)
Tera M. Heintz (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, California 94105
Tel: (415) 442-1000
Fax: (415) 442-1001
joseph.floren@morganlewis.com
tera.heintz@morganlewis.com

*Attorneys for Defendants*
*Deutsche Bank National Trust Company and*
*Deutsche Bank Trust Company Americas, as*
*Trustees*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

ARGUMENT .........................................................................................................................4

I.      MOST PLAINTIFFS LACK STANDING UNDER TIA. ....................................................4

II.     INDIVIDUALIZED ISSUES PREDOMINATE OVER ANY COMMON ONES.............6

        A.      Multiple Individualized Determinations Would Be Necessary to
                Determine Whether Each Class Member Owns the Alleged Claims
                Against the Trustees. .....................................................................................7

        B.      Individual Statute of Limitations Issues Predominate. ..........................................13

        C.      Individualized Issues of Liability and Damages Preclude Certification................17

                1.      Individual issues predominate with respect to the Trustees' obligations
                        under the Governing Agreements. ........................................................... 17

                2.      Individual issues of damages and causation predominate. ...................... 20

        D.      Plaintiffs Fail to Prove Predominance of Any Common Issues. ..........................23

III.    A CLASS ACTION IS NOT SUPERIOR. .........................................................................24

IV.     PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES, AND
        THEIR CLAIMS ARE NOT TYPICAL. ..........................................................................24

CONCLUSION....................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Blackrock Allocation Target Shares Series S Portfolio et al. v. U.S. Bank Nat'l Ass'n*,
   No. 14-cv-9401 (S.D.N.Y. Jan. 31, 2018) ........................................................ passim

*Blackrock Balanced Capital Portfolio (FI) et al. v. HSBC Bank USA, N.A.*
   No. 14-cv-09366, 2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) ........................................ passim

*Blackrock v. DBNTC*,
   OCSC Case No. 30-2016-00843062 (Orange County Super. Ct.) ........................................... 10

*Blazer Foods, Inc. v. Rest. Props. Inc.*,
   259 Mich. App. 241 (Mich. Ct. App. 2003) ............................................................ 17

*Bluebird Partners, L.P. v. First Fid. Bank*,
   896 F. Supp. 152 (S.D.N.Y. 1995) ..................................................................... 4

*Carnegie-Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988) .................................................................................. 6

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016) ........................................................................... 5

*City of Boston v. Aetna Life Ins. Co.*,
   506 N.E.2d 106 (Mass. 1987) ......................................................................... 11

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................... 6, 20, 23

*Comm Trade USA, Inc. v. INTL FCStone, Inc.*,
   2014 WL 787912 (S.D.N.Y. Feb. 27, 2014) ............................................................. 16

*Commerzbank AG v. Deutsche Bank Nat'l Trust Co.*,
   No. 15-cv-10031 (S.D.N.Y.) .......................................................................... 24

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .......................................................................... 7

*Ely Cruikshank Co. v. Bank of Montreal*,
   615 N.E.2d 985 (N.Y. 1993) ........................................................................... 7

*Excelsior Fund, Inc. v. JPMorgan Chase Bank, N.A.*,
   2007 WL 950134 (S.D.N.Y. Mar. 28, 2007) ............................................................. 13

*Glob. Fin. Corp. v. Triarc Corp.*,
   93 N.Y.2d 525 (1999) ................................................................................ 14

*I.K.B. Int'l v. Bank of America,*
  2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014) ........................................................ 14

*In re Cellnet Data Systems, Inc.,*
  313 B.R. 604 (Bankr. D. Del. 2004) ...................................................................... 17

*In re LIBOR-Based Fin. Instruments Antitrust Lit.,*
  No. 11-cv-02613, 2018 WL 1229761 (S.D.N.Y. Feb. 28, 2018) ..................................... 14, 16

*In re Petrobras Secs. Lit.,*
  862 F.3d 250 (2d Cir. 2017) ................................................................................. 7, 9

*In re U.S. Foodservice Inc. Pricing Litig.,*
  729 F.3d 108 (2d Cir. 2013) ................................................................................. 16

*Johnson v. Nextel Comm'cns, Inc.,*
  780 F.3d 128 (2d Cir. 2015) ................................................................................. 14

*Kovaleff v. Piano,*
  142 F.R.D. 406 (S.D.N.Y. 1992) ........................................................................... 25

*Langner v. Brown,*
  No. 95-198, 1996 WL 709757 (S.D.N.Y. Dec. 10, 1996) ........................................... 25

*LNC Investments, Inc. v. First Fid. Bank,*
  1997 WL 528283 (S.D.N.Y. Aug. 27, 1997) ............................................................ 4, 6

*Maryland Cas. Co. v. Continental Cas. Co.,*
  332 F.3d 145 (2d Cir. 2003) ................................................................................. 11

*Mazzei v. Money Store,*
  829 F.3d 260 (2d Cir. 2016) ................................................................................. 12

*McLaughlin v. Am. Tobacco Co.,*
  522 F.3d 215 (2d Cir. 2008) ................................................................................. 22

*Northwest Diversified, Inc. v. Desai,*
  353 Ill. App. 3d 378 (2004) ................................................................................. 11

*Racepoint Partners, LLC v. JPMorgan Chase Bank,*
  06-cv-2500, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ........................................... 12

*Retirement Bd. of Policeman's Annuity & Benefit Fund v. Bank of NY Mellon,*
  775 F.3d 154 (2d Cir. 2014) ......................................................................... 1, 14, 20

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.,*
  14-cv-4394, 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ...................................... passim

iii

*Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*,
  No. 14-cv-9764, 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ........................................... passim

*Schreiner Farms, Inc. v. Am. Tower, Inc.*,
  173 Wash. App, 154 (Wa. Ct. App. 2013) ................................................................. 17

*Semi-Tech Litig., LLC v. Banker's Trust Co.*,
  272 F. Supp. 2d 319 (S.D.N.Y. 2003) ..................................................................... 13

*Sharma v. Skaarup Ship Mgmt. Corp.*,
  916 F.2d 820 (2d Cir. 1990) .............................................................................. 20

*Sicav v. Wang*,
  No. 12-cv-6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ................................................. 20

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ........................................................................ 24, 25

*Steinberg v. Nationwide Mut. Ins. Co.*,
  224 F.R.D. 67 (E.D.N.Y. 2004) ........................................................................... 16

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...................................................................................... 7

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................................... 16

*Waxman v. Cliffs Nat. Res. Inc.*,
  222 F. Supp. 3d 281 (S.D.N.Y. 2016) ...................................................................... 6

*Westminster Investing Co. v. Lamps Unlimited, Inc.*,
  237 Va. 543 (1989) ....................................................................................... 17

**Statutes**

10 Del. C. § 8106 ........................................................................................ 16

15 U.S.C. §77ooo ......................................................................................... 3

Cal. Code Civ. Proc. § 337 ............................................................................... 15

Fl. Stat. § 95.11(2)(b) ..................................................................................... 16

N.Y. C.P.L.R. § 202 ...................................................................................... 14

N.Y. G.O.L. § 13-107 ..................................................................................... 12

N.Y. G.O.L. § 13-107(1) .................................................................................. 12

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................................ 6

Fed. R. Civ. P. 23(b)(3) ........................................................................................................... 7

## INTRODUCTION

Since the beginning of this year, three judges in this District have denied motions to certify classes of investors suing residential mortgage-backed securities ("RMBS") trustees—cases just like this one.  *See Blackrock Balanced Capital Portfolio (FI) et al. v. HSBC Bank USA, N.A.*, No. 14-cv-09366, 2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) ("*Blackrock/HSBC*"); *Blackrock Allocation Target Shares Series S Portfolio et al. v. U.S. Bank Nat'l Ass'n*, No. 14-cv-9401, Doc. 253 (S.D.N.Y. Jan. 31, 2018) ("*Blackrock/U.S. Bank*"); *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14-cv-9764, 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ("*RPI/Wells Fargo*").  In all these cases—and others like them, *see, e.g.*, *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, 14-cv-4394, 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ("*RPI/DBNTC*")—the courts found that a host of individual issues overwhelmed any common issues, making class treatment inappropriate.  None of this is surprising, given the myriad class-member specific factual and legal issues flowing from the requirement that Plaintiffs prove their claims "loan-by-loan and trust-by-trust."  *Retirement Bd. of Policeman's Annuity & Benefit Fund v. Bank of NY Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) ("*PABF*").

Plaintiffs nevertheless seek to certify an unprecedented class for their claims against defendants Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (the "Trustees").  Plaintiffs press the same arguments for certification that have been thoroughly considered and uniformly rejected, including in *Blackrock/HSBC* and *Blackrock/U.S. Bank*, where the same collection of plaintiffs sought certification of an identically defined class based on the same claims, the same expert, and the same damages theory.  Plaintiffs present this case as a run of the mill candidate for class certification, driven by common issues relating to the Trustees' obligations under the governing trust documents.  It is anything but.

At the outset, for 39 of the 58 trusts at issue, Plaintiffs lack standing to bring claims under

the Trust Indenture Act—the sole basis for federal jurisdiction in this case—because their investments in those Trusts had experienced no cognizable injury when the complaint was filed. The TIA claims of Plaintiffs investing in those Trusts should be dismissed, and the Court should decline to exercise supplemental jurisdiction over the state law claims of those Plaintiffs.

Jurisdiction aside, no class can be certified. This case is shot through with individual issues, from class members' right to proceed in the first place (does any given class member have standing to bring its claim, which requires the Court to analyze if, when, and how every class member acquired the right to sue); to their ability to prove their legal claims (which requires the Court to analyze the Trustees' alleged misconduct loan-by-loan and trust-by-trust to determine whether the Trustees breached their duties affecting any particular investor); to the Trustees' statute of limitations defense (which requires inquiry into when each of the hundreds or thousands of alleged breaches accrued and which law provides the limitations period for each individual class member); to causation and damages (which raise a further host of individualized issues of proof as to each investor). Additionally, a class action is not a superior method of resolving the claims in this case, given class members' sophistication and interest in controlling litigation. And because many Plaintiffs suffered no losses on their investments— ███████████████ ████████████████████████████████████████—they are not adequate class representatives and their claims are atypical. This case raises all the individual issues that have led the courts to deny class certification in other RMBS trustee cases, and more. This Court should do the same.

## BACKGROUND

Plaintiffs are current investors in 58 RMBS trusts created between 2004 and 2007 (the "Trusts"). Each Trust is governed by a different set of agreements, including Indentures, Trust Agreements, Mortgage Loan Pool and Sale Agreements, Sale and Servicing Agreements, and

other contracts that set forth the various parties' obligations (the "Governing Agreements").[1]
Plaintiffs are not parties to the Governing Agreements, but as purported owners of securities (the
"Notes") issued by the Trusts, claim they are third-party beneficiaries of those agreements.

Plaintiffs claim the Trustees breached their obligations under the Governing Agreements
in two main ways.  First, Plaintiffs claim the Trustees discovered breaches of representations and
warranties ("R&Ws") made by sponsors, sellers, and originators (often called "Warrantors")
about the loans in the trusts (regarding, for example, borrower credit scores or LTV ratios).
Plaintiffs claim the Trustees were obligated to force the various Warrantors to repurchase or
replace loans that breached R&Ws, and the Trustees' failure to do so meant that nonperforming
loans remained in the Trusts, impairing cash flow to the Trusts and, in turn, damaging owners of
the notes ("Noteholders") issued by each Trust.  Pl. Mem. at 7-8.  Second, Plaintiffs contend the
Trustees had knowledge of widespread breaches of servicing obligations but did not take
appropriate action against servicers to preserve trust assets.  *Id.* at 9-11.  Plaintiffs also seek
certification of their claims under the Trust Indenture Act ("TIA"), based on the Trustees'
alleged failure (i) to notify Noteholders of defaults within 90 days of their occurrence, and (ii) in
case of default, to act as a prudent person would.  *Id.* at 7 (citing 15 U.S.C. §77ooo).

Plaintiffs seek to certify a class of "[a]ll persons or entities who purchased or otherwise
acquired a beneficial interest in a security issued from the Trusts . . . between the date of offering
and 60 days from the final order certifying the class" and were damaged as a result of
Defendants' alleged breaches of contract and violations of the TIA.  Pl. Mem. at 1.

---

[1] The RMBS securitization process is explained in Appendix A to the expert report of
Christopher M. James, Ph.D. ("James"), Fouts Decl. Ex. A.

## ARGUMENT

## I.     MOST PLAINTIFFS LACK STANDING UNDER THE TIA.

At the outset, class certification should be denied because Plaintiffs lack standing under the TIA to assert claims with respect to 39 of the Trusts, because they have suffered no out-of-pocket damages.  Accordingly, TIA claims relating to these Trusts should be dismissed with prejudice, and the Court should decline supplemental jurisdiction over Plaintiffs' state law claims as to those Trusts.  *See Blackrock/U.S. Bank*, at 43-45 (denying class certification and dismissing TIA claims where plaintiffs suffered no damages recoverable under the TIA).[2]

Actual damages under the TIA "are limited to out-of-pocket losses" such as "the difference between purchase and sale price," and they do not include "benefit of the bargain damages" such as "a pro rata share of the additional funds the trust would have received" had the Trustees fulfilled their obligations.  *LNC Investments, Inc. v. First Fid. Bank*, 1997 WL 528283, at *33-37 (S.D.N.Y. Aug. 27, 1997); *Blackrock/U.S. Bank*, at 37-38.  The securities laws exist "to protect those who have been injured, not treasure hunters shrewd or lucky enough to have put [their] hands on a security that once belonged to a person who was defrauded."  *Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152, 157 (S.D.N.Y. 1995).

Here, for 39 of the Trusts at issue, Plaintiffs and the Notes that they purchased had experienced ***no losses*** as of the filing of the complaint.  Fouts Decl. Ex. C, Declaration of Jennifer Press ¶ 47 & Ex. 6 (listing Trusts).  Investors in Plaintiffs' Notes of these Trusts had received every payment of principal and interest due.  *Id.*  Moreover, Plaintiffs do not claim they sold any Notes at a loss, ███████████████████████████

████████████████████████████████████████████

---

[2] Judge Gardephe announced his decision in *Blackrock/U.S. Bank* in open court.  A transcript of the decision is attached, and cited throughout as *Blackrock/U.S. Bank*.  *See* Fouts Decl. Ex. B.

███████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████[3]   Rather than claiming Plaintiffs incurred any out-of-pocket loss, their

expert instead focuses on projections of conjectural losses at unknown future dates, but that is

insufficient for standing purposes.  DeLange Decl. (Doc. 420) Ex. 3, Hartzmark ¶¶ 78-82.  This

is because standing is measured at the time Plaintiffs file their complaint.  *Chevron Corp. v.*

*Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) ("the standing inquiry remains focused on whether the

party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.")

Far from suffering losses, most Plaintiffs have ***profited*** from their investments.  By

mostly purchasing their Notes at steeply discounted prices years after the Trustees' alleged

breaches, and after ratings downgrades and loan delinquencies, collateral losses, and write-

downs, these "treasure-hunters" have reaped rich rewards, with their Notes appreciating in value

since they were purchased.  *See* Fouts Decl. Ex. C, Press ¶ 80.  As of January 31, 2018, ██

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *Id.*

Analyzing similar facts in *BlackRock/U.S. Bank*, Judge Gardephe concluded that

plaintiffs who profited on their investments lacked standing under the TIA because they suffered

no out-of-pocket loss.  *BlackRock/U.S. Bank*, at 36-38, 43-45 (plaintiffs lacked standing because

they "have suffered no realized loss of principal in 21 of the trusts in which they hold notes").[4]

---

[3] ████████████████████████████████████████████  Plaintiffs' counsel has also stated,
"[w]e are not seeking damages based on any measurement of a difference in value of the
certificates."  Fouts Decl. Ex. E, 3/9/17 Hearing Tr. at 3.
[4] Plaintiffs' expert solely modeled a "benefit-of-the-bargain," or "expectancy damages," theory,
which measures damages based on the difference in the current value of the Notes and their
value had the Trustees "fulfilled [their] duties."  DeLange Decl. Ex. 3, Hartzmark  ¶¶ 19, 36.
This model is inapplicable to a TIA claim because Plaintiffs may not recover on a "benefit of the
bargain" theory under the TIA.  *BlackRock/U.S. Bank*, at 55.

Judge Gardephe's holding applies with equal force here.  *See, e.g., Waxman v. Cliffs Nat. Res. Inc.*, 222 F. Supp. 3d 281, 289 (S.D.N.Y. 2016) (plaintiffs lacked Article III injury-in-fact to bring TIA claims where the bonds largely increased in value); *LNC Investments*, 1997 WL 528283, at *10, 13 (no standing under TIA where plaintiffs profited from their investment, or where plaintiffs suffered no injury after they purchased their notes).[5]

The Court should also decline to exercise supplemental jurisdiction over the breach of contract claims of Plaintiffs investing in these 39 Trusts.  This Court's subject matter jurisdiction was premised solely on the TIA.  *See* Compl. ¶ 33.  Where all federal claims are dismissed before trial, "the state claims should be dismissed as well."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see Blackrock/U.S. Bank*, at 45-46 (declining to exercise supplemental jurisdiction over Plaintiffs' surviving state-law claims for breach of contract after dismissing Plaintiffs' TIA claims).  This Court should do the same.

## II.    INDIVIDUALIZED ISSUES PREDOMINATE OVER ANY COMMON ONES

As to all Trusts, the Court should deny certification because individual issues overwhelm any common factual or legal issues.  To certify a class, Plaintiffs must "affirmatively demonstrate their compliance" with Rule 23's requirements of numerosity, commonality, typicality, and adequacy of representation.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); Fed. R. Civ. P. 23(a).  Plaintiffs also must prove that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and

---

[5] Plaintiffs' class definition guarantees still more "treasure hunters," who also lack standing. This is because the putative class expressly includes purchasers "through 60 days **after the Court rules on class certification**"—*i.e.*, prospective investors who have never purchased Notes, let alone suffered a loss, could buy their way into this lawsuit *after* a class is certified.  Pl. Mem. at 1.  This extraordinary class definition raises significant additional due process concerns. Because these class members would necessarily be purchasing their Notes *after* alleged breaches and at an accordingly discounted value, they could have no injury as a result of the Trustees' alleged breaches.  *See BlackRock/U.S. Bank*, at 39.

that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

Predominance "is a core feature of the Rule 23(b)(3) class action mechanism, and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *In re Petrobras Secs. Lit.*, 862 F.3d 250, 270 (2d Cir. 2017).  The question is whether common issues "are more prevalent or important than non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

### A. Multiple Individualized Determinations Would Be Necessary to Determine Whether Each Class Member Owns the Alleged Claims Against the Trustees.

Individual issues of standing and claim ownership predominate.  "[T]he Court of Appeals has made clear that 'no class may be certified that contains members lacking Article III standing.'" *RPI/DBNTC*, 2017 WL 1331288, at *10 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).  The proposed class here consists of all persons who own Notes 60 days after a class is certified (regardless of when they purchased).  Pl. Mem. at 1.  However, "[t]he fact that Plaintiffs currently hold the certificates does not establish their standing as to losses incurred by previous certificateholders."  *Blackrock/HSBC*, 2018 WL 679495, at *3. Breach of contract claims accrue to holders "at the time of the breach." *Ely Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986-87 (N.Y. 1993).  A later investor that neither owned its Note at the time of the breach nor was assigned or transferred the right to sue has no claim and lacks Article III standing.  *See RPI/DBNTC*, 2017 WL 1331288, at *6-8, 10.[6]  Here, there are 34 Trusts in which all Plaintiffs that invested in those Trusts acquired all their interests in those Trusts after January 2009, and therefore after the Trustees' alleged breaches.  Fouts Decl. Ex. F,

---

[6] Judge Nathan's *RPI/Deutsche Bank* analysis was grounded in ascertainability, but its logic and rationale apply with equal force to a predominance analysis.

Dolan Ex. 5; *id.* Ex. G, ███████████████████████████████████  Plaintiffs investing in these Trusts have provided no evidence of how they allegedly acquired the right to sue the Trustees.  Plaintiffs thus lack standing to pursue their claims as to these Trusts.

As to absent class members, determining whether a given class member has standing requires individualized determinations that quickly overwhelm any common issues.   To decide whether any class member who is not a continuous holder has standing, the Court must first seek to trace the ownership history of the Note back to the time of breach, and then analyze, as to each Note, whether the prior holder's legal claim transferred with the Note—an analysis that must be repeated for every transfer of ownership.  This is necessary because if a class member does not have "the right to sue," then "it does not have Article III standing because it has no claim upon which it can recover."  *RPI/Wells Fargo*, 2018 WL 739580, at *14.

Conducting this tracing of ownership history for the Notes, if it can be accomplished at all, is inherently individualized.  The Notes have no unique identifier for each ownership interest. Fouts Decl. Ex. F, Dolan ¶¶ 21-22.  Rather, each tranche of Notes has the same identifier, known as a CUSIP number.  *Id.*  Ownership of a single tranche can be divided among many investors. *Id.* ¶ 29.  Additionally, ownership of most RMBS notes is indirect.   Notes are traded over-the-counter through regional, national, and international broker dealers, typically in circumstances where the buyers and sellers remain unknown to one another.  *Id.* ¶¶ 31-32.  There is no RMBS exchange, and no central repository of trade history to track ownership changes.  *Id.*   Without unique identifiers, it is practically impossible to match trades from dozens of different sources to identify current owners of litigation claims with common evidence.  *Id.* ¶ 41.

Moreover, many original owners sold parts of their ownership interests to multiple different purchasers.  *Id.* ¶¶ 52-64.  At the same time, other investors consolidated ownership of

notes from many different investors. *Id.* This process of fracturing and consolidating beneficial ownership drastically complicates the already labor-intensive tracing of beneficial ownership over time. For example, suppose four separate investors—Investors 1 to 4—each sell notes with original principal balance of $1 million to Dealer A, and then Dealer A then sells $2 million each to Investors 5 and 6. Due to the nature of RMBS and how they trade, Investors 5 and 6 could not know if they were purchasing securities previously owned by Investor 1, 2, 3, or 4. *Id.* ¶ 54. This makes tracing of ownership history impossible in such cases. *Id.* ¶ 63. Plaintiffs admit that "there are dozens of transactions of differing amounts involving the same CUSIP as the Plaintiffs' securities, and it cannot be determined which of the third parties is the actual [prior] holder of Plaintiffs' specific security." Pl. Resp. to Trustees' Mot. to Compel (Doc. 405) at 3.

Courts properly deny class certification in RMBS trustee cases because the need to trace ownership for each Note and class member predominates over any common issues. *See RPI/Wells Fargo*, 2018 WL 739580, at *14 ("[t]racing transactions in securities that are not traded on an exchange and are recorded as indirect electronic entries in a depository would require 'evidence that varies from member to member' and is 'not obviously susceptible to class-wide proof'") (quoting *Petrobras*, 862 F.3d at 272); *Blackrock/U.S. Bank*, at 53; *see also RPI/DBNTC*, 2017 WL 1331288, at *6 ("reconstructing the chain of ownership of any given [note] can only be ascertained through highly detailed and individualized inquiry").

Plaintiffs have acknowledged the practical difficulty, if not impossibility, of tracing ownership of their own Notes. *See, e.g.*, Pl. Resp. to Trustees' Mot. to Compel (Doc. # 405) at 3 (stating "because RMBS securities are traded anonymously on the open market and are not tracked by any unique identification number, many brokers could not identify the specific securities associated with Plaintiffs' transactions"); Fouts Decl. Ex. H, Pl. Resp. to Mot. to

Compel, *Blackrock v. DBNTC*, OCSC Case No. 30-2016-00843062 (Orange County Super. Ct.) at 9 (describing "prior certificateholders" as "numerous, complete strangers, and largely unidentifiable," such that it is "not possible" for Plaintiffs to "track down and produce information" about them.).[7]  The same difficulty would affect the inquiry for each class member.

Plaintiffs nonetheless say this is no obstacle because "[c]urrent noteholders can be readily identified" by the "simple" process of having DTC run a report for each security to identify the banks and brokers holding Notes for the benefit of their clients; and obtaining current beneficial owner information by issuing subpoenas to these banks and brokers.  Pl. Mem. at 22.  But this misses the point: even if Plaintiffs were correct that *current* Noteholders can be readily identified (which is not accurate, *see* Fouts Decl. Ex. F, Dolan ¶ 81), this does nothing to address the need for "producing records that allow for systematic determination of ownership periods, assignments, and choice of law."  *RPI/Wells Fargo*, 2018 WL 739580, at *14.

Furthermore, tracing Notes through prior owners is only the first part of the analysis.  The Court then must determine, at every link in the chain of ownership, whether the claims accruing in 2009 transferred along with the Note.  Determining if claims transferred "in the face of active aftermarket trading across multiple domestic and international jurisdictions" requires a two-part analysis that is specific to each class member.  *Id.*; *Blackrock/HSBC*, 2018 WL 679495, at *4; *RPI/Wells Fargo*, 2018 WL 739580, at *14.  The Court must first decide, based on New York's "grouping of contacts" choice of law rules, which jurisdiction's law governs each transfer culminating in a class member owning a Note.  *Blackrock/HSBC*, 2018 WL 679495, at *4.  Under this approach, the Court must assess which jurisdiction has "the most significant

---

[7] The case pending in Orange County, California Superior Court involves many of the 457 Trusts that originally were part of this case, over which Judge Berman previously determined the Court lacked jurisdiction.  *See* Doc. #127.

relationship" to the contract dispute based on the: (1) place of contracting; (2) place of negotiation; (3) place of performance; (4) location of the subject matter; and (5) domicile or place of business of the parties. *Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 151-52 (2d Cir. 2003). For each class member—allegedly there are "at least 604, and likely hundreds more" (Pl. Mem. at 14)—"this analysis would be necessary for *each* transfer in the chain from the original certificateholder to the potential class member." *Blackrock/HSBC*, 2018 WL 679495, at *4. Plaintiffs alone come from eight states and four foreign countries, Am. Compl. (Doc. # 141 Ex. 2), and other current and former investors undoubtedly come from many others.

Second, the Court would have to apply the relevant law to each transfer to determine whether claims were assigned with the transfer or retained by the seller, because "[a] certificateholder has standing to sue only if every prior transaction in the chain included an assignment of the right to sue along with the underlying certificate." *Blackrock/HSBC*, 2018 WL 679495, at *4; *RPI/Wells Fargo*, 2018 WL 739580, at *14. Most jurisdictions recognize an assignment of a litigation right when an underlying property is transferred only if the assignor "manifest[s] an intention to transfer the right." *Blackrock/HSBC*, 2018 WL 679495, at *4 (citation omitted). For example, in Massachusetts, where many Plaintiffs are incorporated, *see* Am. Compl. Ex. 2, whether litigation claims transferred with a sale turns on whether "any words or acts . . . fairly indicate an intention to make the assignee [the] owner of a claim." *City of Boston v. Aetna Life Ins. Co.*, 506 N.E.2d 106, 108 (Mass. 1987). Conducting this legal analysis under the relevant law would itself be fact-intensive, requiring the Court to examine the circumstances surrounding each transfer. *See, e.g., id.*, 506 N.E.2d at 108 (court is required to examine parties' "words or acts" to determine whether litigation claims transferred); *Northwest Diversified, Inc. v. Desai*, 353 Ill. App. 3d 378, 387 (2004) ("Whether an assignment has

11

occurred is dependent upon proof of intent to make an assignment and that intent must be manifested").  In short, the fact-intensive inquiry necessary to determine standing and class membership would undermine any economies achieved by class treatment.  *See Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (holding common issues did not predominate where individual inquiry was necessary "to determine who did and who did not have a valid claim.").

Plaintiffs argue these individualized inquiries are unnecessary because "Plaintiffs have properly limited their class to current noteholders."  Pl. Mem. at 21.  This does not avoid the need to analyze whether each "current noteholder" actually has standing to bring claims that accrued when someone else owned the Note, which requires individual tracing of what rights the Noteholder acquired (and what rights the prior holder acquired from *its* predecessor, and so on).  *See Blackrock/HSBC*, 2018 WL 679495, at *1-2 (denying certification of current holder class).

Pressing an argument numerous courts have soundly rejected, Plaintiffs also say "the Court does not need to apply a choice of law analysis to determine whether current noteholders have standing" because the Notes "are expressly governed by New York law."  Pl. Mem. at 21.  New York is an exception to the general rule.  For conveyances governed by New York law, a default rule provides that, absent an agreement by the parties to the contrary, litigation rights transfer automatically with the sale of a certificate.  *See* N.Y. G.O.L. § 13-107(1); *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 06-cv-2500, 2006 WL 3044416, at *7 (S.D.N.Y. Oct. 26, 2006); *RPI/DBNTC*, 2017 WL 1331288, at *7.  Therefore—so Plaintiffs' argument goes—claims automatically transferred under N.Y. G.O.L. § 13-107 with each transfer of the Notes.  *Id.*

Plaintiffs are wrong on all counts, as every court to consider their argument has ruled.  Although Plaintiffs say the Notes are governed by New York law, they cite only the Indentures.  DeLange Decl. Ex. 34.  But "[t]he governing law in the indentures . . . has no relevance to the

12

question whether the contracts of sale [of the notes] . . . operated to assign certain rights of action.  That question is controlled, as to each sale, by New York choice of law principles." *Semi-Tech Litig., LLC v. Banker's Trust Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y. 2003); *RPI/DBNTC*, 2017 WL 1331288, at *7 (same); *Blackrock/HSBC*, 2018 WL 679495, at *5 (choice of law provisions in the Governing Agreements "govern the rights and duties of the parties to the agreement—as relevant here, the trustees and the certificate holders.  They do not purport to govern the separate contracts between buyers and sellers of the certificates.").

Even if the ***Notes*** had a New York choice of law provision (Plaintiffs, who have the burden of proof, have provided no evidence of this), it would not help Plaintiffs.  The question of what law governs the ***transfer*** of the Notes is separate from the question of what law governs the holder's rights and obligations under the Note.  *Blackrock/HSBC*, 2018 WL 679495, at *5 (choice of law provisions in the notes "which state that the certificates themselves are governed by New York law, do not dictate the governing law for the separate contracts transferring these certificates from one holder to the next.").  To determine what law governs the transfer, the Court must examine the individual transfer contracts, because "there is no reason to conclude that the choice of law governing a particular asset must be the same as the choice of law governing a contract conveying that asset."  *Id.*[8]

**B.  Individual Statute of Limitations Issues Predominate.**

The individual tracing, choice of law, and legal and factual analyses necessary to

---

[8] Plaintiffs rely on *Excelsior Fund, Inc. v. JPMorgan Chase Bank, N.A.*, 2007 WL 950134 (S.D.N.Y. Mar. 28, 2007).  In that case, the court denied a motion to dismiss where the notes at issue included an express New York governing law provision.  *Id.* at *6.  Despite this provision, the court did ***not*** hold that New York law governed transfer of the notes.  Rather, it denied the motion to dismiss so the parties could take discovery and brief the question of what law applied to the transfers.  *Id.*  As other courts have held, *Excelsior* does not stand for the proposition that a New York choice of law provision in a trust agreement directs the application of New York law to transfer of certificates.  *RPI/DBNTC*, 2017 WL 1331288, at *7; *Blackrock/HSBC*, at 10-11.

determine if each class member has standing are also necessary to determine whether any given class member's claims are barred by the statute of limitations—even if Plaintiffs were determined to have been assigned all of their claims.  The Court must consider such affirmative defenses as a factor in the class certification calculus.  *Johnson v. Nextel Comm'cns, Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (predominance analysis requires consideration of the "elements of the claims *and defenses*" to be litigated); *In re LIBOR-Based Fin. Instruments Antitrust Lit.*, No. 11-cv-02613, 2018 WL 1229761, at *98 (S.D.N.Y. Feb. 28, 2018) ("[s]tatutes of limitation are no exception to [the] general rule" that the court must consider whether common issues predominate over individual issues).  Here, as several courts have held, the multi-part individual analysis required to determine whether a class member's claim is timely precludes certification.

To determine the statute of limitations for each claim, the Court must first apply New York's borrowing statute, N.Y. C.P.L.R. § 202.  That statute requires "courts to 'borrow' the Statute of Limitations of a foreign jurisdiction where a non-resident's cause of action accrued, if that limitations period is shorter than New York's."  *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 526 (1999).  Assigned claims are governed by the statute of limitations of the ***assignor's*** residence.  *I.K.B. Int'l v. Bank of America*, 2014 WL 1377801, at *6 (S.D.N.Y. Mar. 31, 2014). Thus, to determine whether a claim is time-barred, the Court would have to "(1) identify when each claim accrued; (2) trace the note ownership to identify who the noteholder was at the time the claim accrued; and (3) identify and apply the limitations period of the applicable jurisdiction."  *Blackrock/U.S. Bank*, at 52.

Each stage of this inquiry presents individualized fact issues.  Plaintiffs must prove their case loan-by-loan and trust-by-trust.  *PABF*, 775 F.3d at 162.  ███████████████

████████████████████████████████████████████

████████████████████████████████[9]  For each one, the Court would have to determine the residence of each affected Noteholder (and thus, the applicable jurisdiction for statute of limitations purposes) at the time of the breach.  This requires tracing ownership, a task that, as explained above, is individualized and highly burdensome at best.  This task is further complicated because some investors with large interests bought from many prior holders, who may reside in different jurisdictions.  Fouts Decl. Ex. F, Dolan ¶¶ 39-40.  So a single owner's claim may be subject to multiple, different statutes of limitation, tolling, and accrual rules.

To put it mildly, determining whether a particular claim is timely "would be no simple task."  *Blackrock/U.S. Bank*, at 52.  Thus, three courts have found that individualized statute of limitations issues predominate over any common issues.  *See id.* at 54 ("identifying prior holders requires the kind of individualized inquiries and note tracing that other courts have found incompatible with class treatment"); *Blackrock/HSBC*, 2018 WL 679495, at *6 ("to ascertain whether any given class member's claim is timely, the Court would have to determine the holder of the certificate at the time the claim accrued, that certificateholder's residency, and the statute of limitations in the applicable jurisdiction"); *RPI/Wells Fargo*, 2018 WL 739580, at *15 ("there will be individualized questions concerning the statute of limitations, and those will require the transactions of each putative class member to be reviewed individually.")

Moreover, given the timing of the breaches Plaintiffs allege, the limitations periods are critical here.  Because Plaintiffs filed suit in November 2014, arising from breaches that occurred in 2009, claims by owners or assignors with three, four, and in some cases five-year statutes of limitations are likely barred.  *See, e.g.*, Cal. Code Civ. Proc. § 337 (four years); Fl. Stat. §

---

[9] Pl. Resp. to Trustees Inter., at Ex. B.  ████████████████████████████████
████████████████████████

95.11(2)(b) (five years); 10 Del. C. § 8106 (three years).[10]  Under many states' laws, class

members' claims would be untimely.  To avoid "abridging" the statute of limitations defense, the

Court would have to hold mini-hearings, swamping any efficiency gains from class treatment.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

Plaintiffs can only gloss over these individual questions, claiming that differences among

statutes of limitations cannot defeat class certification.  Pl. Mem. at 23.  They are mistaken.

Variations in statute of limitations—especially when they are as pervasive and meaningful as in

this case—can and do counsel against certification.  *In re Libor*, 2018 WL 1229761, at *99

(denying class certification based on part on statute of limitations variations).[11]

Plaintiffs also say a statute of limitations defense will not succeed because they have

alleged "continuing breaches" based on the Trustees' alleged failures to address breaches of

servicing obligations, act prudently in responding to Events of Default, and provide notice of

Events of Default to Noteholders.  Pl. Mem. at 23.  However, this argument does not change the

individualized nature of the statute of limitations analysis.  First, the continuing breach doctrine

does not apply where, as here, class members allege breaches that occurred at discrete moments,

even where the alleged harm from the breaches continues.  *Comm Trade USA, Inc. v. INTL*

*FCStone, Inc.*, 2014 WL 787912, at *9 (S.D.N.Y. Feb. 27, 2014).  Second, even if the continuing

breach theory were valid (it is not), this Court still would have to make an individualized

---

[10] Even the scarce information Plaintiffs have provided about prior Noteholders establishes that they reside in these jurisdictions.  Fouts Decl. Ex. F, Dolan ¶ 39.  Plaintiffs have represented that prior holders come from numerous other states as well.  *Id.*

[11] Plaintiffs cite *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 78 (E.D.N.Y. 2004). *Steinberg* involved a form insurance contract the defendant used in more than 40 states; the case presented none of the difficulties of individualized tracing to determine what jurisdiction's limitations period applies that are present here.  Plaintiffs also misleadingly cite *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 n.10 (2d Cir. 2013).  In that case, the Second Circuit merely observed that the defendant had not challenged the district court's determination that statute of limitations variations were manageable in that case.

assessment of each assignor's statute of limitations because not all jurisdictions apply the continuing breach doctrine, or apply it in the same way.  *See, e.g.*, *Westminster Investing Co. v. Lamps Unlimited, Inc.*, 237 Va. 543, 548-59 (1989) (rejecting continuing breach theory).[12]  For example, if a prior owner of a Note when an alleged breach occurred resides in a jurisdiction that does not recognize the continuous breach doctrine, the statute of limitations as to that claim could have run before any claim was transferred, and any claims the prior owner transferred would thus be barred.  Third, even if the continuing breach theory were valid, class members still would have to prove the theory for any given breach.  Thus, applying the continuing breach theory would only add another layer of complexity to an unavoidably individual analysis.

## C.  Individualized Issues of Liability and Damages Preclude Certification.

Plaintiffs' motion also ignores numerous other issues that must be analyzed individually for each class member.  These issues—which go to the evidence necessary to prove breach, causation, and damages for every class member—also dictate certification should be denied.

### 1.  Individual issues predominate with respect to the Trustees' obligations under the Governing Agreements.

Plaintiffs argue that "the question of whether Defendants violated their duties is common to all Class members."  Pl. Mem. at 2.  Their premise is that "[t]he Governing Agreements impose upon [the Trustees] substantially identical duties with respect to addressing breaches in the underwriting and servicing of the underlying mortgage loans."  *Id.* at 4.  But that premise is

---

[12] *See also Schreiner Farms, Inc. v. Am. Tower, Inc.*, 173 Wash. App, 154, 161 (Wa. Ct. App. 2013) ("No Washington case recognizes a continuing breach as extending the time allowed to bring a suit sounding in contract"); *Blazer Foods, Inc. v. Rest. Props. Inc.*, 259 Mich. App. 241, 251 (Mich. Ct. App. 2003) ("Plaintiffs have identified no cases extending the continuing wrong or continuing services theories to a situation in which a party to a contract fails to perform adequately"); *In re Cellnet Data Systems, Inc.*, 313 B.R. 604, 610 (Bankr. D. Del. 2004) (rejecting "attempts to characterize alleged breaches of contract accruing at fixed points in time as 'continuing' breaches").

false.  In fact, many material differences in the Governing Agreements for the 58 trusts at issue raise individualized issues of proof, making any classwide proof of Plaintiffs' claims untenable.

***Trustees' Obligation Regarding Breaches of R&Ws:***  Contrary to Plaintiffs' argument, the Governing Agreements are ***not*** uniform with respect to the Trustees' and other deal parties' obligations regarding breaches of R&Ws by Warrantors.  Even within a given Trust, obligations and remedies as to R&W breaches may vary.  Illustrative examples of these differences follow.

*First*, the Trustees' obligations regarding R&W breaches vary across the Trusts.  For 26 Trusts, for example, the Trustees have no duty to enforce R&W breaches.  Fouts Decl. Ex. I.  Plaintiffs' legal theory, and whatever facts on which it might be based, must differ accordingly.

*Second*, the time period within which the responsible party must cure, repurchase, or substitute for a loan with a material and adverse R&W breach varies across, and within, the Trusts.  *See* Fouts Decl. Ex. J.  For some Trusts, that time period is 60 days; for others it is 90 days.  *See id.*  And for certain Trusts, the cure period varies depending on the R&W breached.  *See, e.g.*, *id.* (citing variations in cure periods for Trusts).

*Third*, within certain Trusts, repurchase remedies vary because such Trusts each have multiple Warrantors.  Thus, for certain R&Ws, the Governing Agreements require the Trustee to pursue remedies against one Warrantor first before seeking remedies against another Warrantor.  For example, the Transfer and Servicing Agreement for the FBR 2005-5 Trust requires the Trustee to attempt to enforce repurchase obligations against the loan originator before taking any action against the Seller.  Fouts Decl. Ex. K.  Similarly, the Sale and Servicing Agreement for the SAST 2006-3 Trust provides that for certain R&W breaches, the Trustee must first proceed against the applicable Conduit Seller before proceeding against SFM, another Warrantor.  Fouts Decl. Ex. L, SAST 2006-3 SSA §§ 1.1, at p. 10 (defining "Conduit Seller" as Freedom Mortgage

Corporation, People's Choice Home Loan, Lime Financial Services, LTD., and Lender's Direct Capital Corporation), and § 2.3(d), at 46-49.

   ***Trustees' Obligations as to Document Defects:***   The Governing Agreements also vary with respect to the obligations—if any—of the Trustees and other deal parties to address missing documents in the mortgage loan files and other purported document defects.

   *First*, the time periods in which the Trustee and/or Custodian must review the mortgage loan files and provide certifications as to their contents vary among the Trusts.[13]

   *Second*, the time periods in which the responsible parties must remedy missing or defective documents in the mortgage loan files (if required) vary across the Trusts.  *Compare, e.g.*, Fouts Decl. Ex. M, ACCR 2004-1 SSA § 2.06(c) (Sponsor has 60 days after notice from Trustee to take appropriate action); *with* Fouts Decl. Ex. O, AMIT 2004-1 § 2.02(c) (Seller has 90 days from receipt of notice to cure document defect, repurchase or substitute for the loan) *and* Fouts Decl. Ex. P, TMST 2006-8 § 2.02(d) (Seller has 180 days after notice from Trustee to take appropriate action, unless the defect is caused by delay in delivery of documents by the recording office, in which case Seller has 270 days from Closing Date to take appropriate action).

   As these examples make clear, Plaintiffs' argument that the Governing Agreements impose "substantially identical duties" on the Trustees is wrong.  Pl. Mem. at 4.  In fact, whether the Trustees breached any obligations in a particular case requires the Court to examine the Trustees' duties under the Governing Agreements applying to the particular loan and trust.  *See*

---

[13] *Compare, e.g.*, Fouts Decl. Ex. M, ACCR 2004-1 SSA § 2.06(b)(ii), (iii) (Initial Certification due 60 days after Closing Date, and Final Certification due 180 days after Closing Date), *with* Fouts Decl. Ex. K, FBR 2005-5 TSA § 2.5(b), (c) (Initial Certification due at Closing Date and Final Certification due 90 days after Closing Date), *and* Fouts Decl. Ex. N, SAST 2004-1 SSA § 2.2 (Initial Certification due at Closing Date and Final Certification due 360 days after Closing Date).

*PABF*, 775 F.3d at 162.  This cannot be done with common proof.

## 2.   Individual issues of damages and causation predominate.

Individualized issues also predominate with respect to proof of causation and damages. This case is not like a securities fraud case, in which an identifiable loss-causing event harms investors at the same time and the same way.  *Cf. Sicav v. Wang*, No. 12-cv-6682, 2015 WL 268855, at *2 (S.D.N.Y. Jan. 21, 2015).  Here, Plaintiffs assert tens of thousands of different breaches, none of which allegedly occurred at the same time or impacted class members in the same way.  To the contrary, each investor bought and sold its Notes at different prices—before, during, and after the greatest financial crisis in 80 years—so there is no way to determine the fact, let alone the amount, of damages on a classwide basis.

Basic principles foreclose certification in these circumstances.  Under New York law, "the loss caused by a breach [of contract] is determined as of the time of the breach."  *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) ("New York courts . . . have rejected awards based on what the actual economic conditions and performance were in light of hindsight.")  For a damages class to be certified, the Court "must understand, concretely, how [Plaintiffs] propose to reliably establish damages" on a classwide basis.  *Sicav*, 2015 WL 268855, at *6.  The damages model must "measure only those damages attributable" to Plaintiffs' theory of liability."  *Comcast*, 569 U.S. at 35.

Plaintiffs' proposed damages methodology violates these principles.  Plaintiffs propose no method to measure the existence or amount of damages at the time of the breach, and proffer no evidence about how the Trustees' alleged inaction caused class members' losses at the same time or in the same way.  Further, while Plaintiffs' theory of liability is that the Trustees should have undertaken enforcement action against each Warrantor responsible for the loans in each Trust, Plaintiffs suggest no method for establishing, on a classwide basis, whether (or how much)

20

the Trustees would have recovered against those Warrantors.

The flaws in Hartzmark's report are explained at length in the expert report of Christopher James, Ph.D.  Fouts Decl. Ex. A.  A fundamental problem with Plaintiffs' damages theory is that it is not tied to damages Plaintiffs can recover—*i.e.*, damages measured at the time of breach.  Instead, Hartzmark's model seeks to measure damages in a world in which, "but for" the Trustees' "fail[ure] to act consistently with [their] duties" to enforce sellers' obligation to cure, repurchase, or substitute mortgage loans, investors "would own Notes that have supporting collateral pools which would have held and would currently hold no defective loans."  DeLagne Decl. Ex. 3, Hartzmark ¶ 36.  Also in this "but for" world, "excessive servicing costs and fees that the Trustee allowed to continue" would also have flowed to the trusts for the benefit of investors.  *Id.* ¶ 53.  Hartzmark would calculate these "put back" and "servicing" damages for each Trust and then use the Trust's "waterfall" to allocate them to tranches in the Trust.  *Id.* ¶¶ 66-77.  In other words, Hartzmark's model calculates all defective-loan and servicing losses *to the Trust* from inception, and then distributes those amounts to *current* holders.  Fouts Decl. Ex. A, James ¶¶ 26-35.  Rather than attempt to determine whether *investors* were damaged, which ones, and by how much, Hartzmark's model simply awards all current holders of a tranche a pro rata amount based on their holdings, regardless of whether and by how much they were damaged.  DeLange Decl. Ex. 34, Hartzmark ¶ 70; Fouts Decl. Ex. A, James ¶¶ 26-35.

Hartzmark's damages model is also based on a series of baseless assumptions that mask further individualized issues.  For example, Hartzmark assumes that any actions taken by the Trustees against Warrantors would have been successful and would have resulted in additional funds flowing to the Trusts.  In fact, whether such actions would have been successful, and the timing and amount of any recovery, are highly uncertain, even with perfect hindsight.  *See* Fouts

Decl. Ex. Q, Richard Expert Report ¶¶ 32-33; James ¶¶ 82-84.  Plaintiffs have not offered (and

cannot offer) evidence that investors would have attributed any value to any Trustee enforcement

actions at the time of the alleged breaches in 2009, given the fog of uncertainty then enshrouding

virtually every aspect of the housing market and financial industry, as well as the likelihood,

amount, timing and allocation of any recovery from the repurchase process.  Richard ¶¶  32-33,

James ¶¶ 59-75; *see McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 230 (2d Cir. 2008)

(certification denied where plaintiffs proffered no non-speculative common method to measure

"whether, and in what amount, plaintiffs suffered a loss").  Likewise, Hartzmark assumes that

servicing damages can be calculated classwide based on whether the servicer failed to take

timely action (such as foreclosure), but the reasonableness of a servicer's conduct can only be

assessed against the backdrop of a particular loan.  Fouts Decl. Ex. A, James ¶¶ 97-103.

Judge Gardephe excoriated this same damages theory when Plaintiffs proffered it in

*Blackrock/U.S. Bank.*  In contrast to Hartzmark's purported "but for" model,

> an appropriate model of damages would have to account for: (1) whether and
> when [the defendant] discovered the breaches; (2) whether the seller would have
> been in a financial position to repurchase or substitute the loan had [the
> defendant] acted; (3) if not, whether litigation would have been appropriate;
> (4) for any litigation, whether it would have succeeded and whether any damages
> would have been collectible.  Plaintiffs' damages model does not address any of
> these issues.  Accordingly, Plaintiffs' damages model fails to correspond to their
> theory of liability and runs afoul of *Comcast*, and thus provides another basis for
> denying Plaintiffs' motion for class certification.

*Blackrock/U.S. Bank*, at 58-59.  Other courts have likewise held that class members' purchase of

notes at different times, different prices, and under different circumstances creates individual

issues that make it impossible to determine causation and damages classwide.  *RPI/Wells Fargo*,

2018 WL 739580, at *15.  Even if such class members "fall outside of the class for lack of

injury, that determination is highly individualized."  *Id.*

Further, Plaintiffs cannot remedy their failure of proof because determining both the fact and the amount of class members' damages requires consideration of individual issues. For example, investors bought Notes at different times and different prices that were affected by an array of forces in a markedly inefficient market. Fouts Decl. Ex. A, James ¶¶ 59-75. It is impossible to construct a valid damages theory without considering these factors. *Blackrock/U.S. Bank*, at 58-59. By the same token, the Court could not find "damages" by any common method for these Plaintiffs, ███████████████████████████ ████████ because the discounted prices at which they acquired their Notes reflect that any loss—if there was one—was already baked into their purchase price. The Court would have to examine each purchase and the circumstances of each price to determine whether any class member could prove a claim—an unavoidable and highly individualized inquiry that cannot be avoided.

Plaintiffs assure the Court that all of this is no problem because "Plaintiffs have proposed a single common damages methodology for calculating Plaintiffs' and all other Classmembers' resulting injury." Pl. Mem. at 25. But Plaintiffs' one-size methodology neither considers nor answers any of the questions necessary to determine by how much, or even whether, any class member was damaged. Accordingly, the model fails to correspond to Plaintiffs' theory of liability, in violation of *Comcast*. 133 S. Ct. at 1426.

### D.  Plaintiffs Fail to Prove Predominance of Any Common Issues.

Against all of the foregoing intensely individualized inquiries, Plaintiffs provide only a perfunctory claim, with scant evidentiary support, that what the Trustees allegedly failed to do with respect to each of the variously situated loans in the 58 Trusts "will be answered through common proof" and that the Trustees' "internal files, communications and personnel's testimony" will show their breaches. Pl. Mem. at 20. Plaintiffs have failed to carry their burden of proof. The individualized issues overwhelm any common ones.

### III.    A CLASS ACTION IS NOT SUPERIOR.

Because "the individualized nature of claims in this case indicates that management of the litigation would be difficult, if not near impossible," there are no efficiencies to be gained from class treatment and class treatment is not superior.  *RPI/Wells Fargo*, 2018 WL 739580, at *17.  Moreover, unlike in many class actions, class members here "have a strong interest in individually controlling the prosecution of their own actions because they are sophisticated institutional investors with large claims."  *RPI/Wells Fargo*, 2018 WL 739580, at *17.  Such investors can bring individual suits to the extent they have actual losses for which they blame the Trustees.  Plaintiffs say "[t]here does not appear to be an overwhelming interest by Class members to proceed individually."  Pl. Mem. at 27.  But some RMBS investors have brought their own actions against the Trustees (in which, notably, they claim to have retained claims that Plaintiffs allege were automatically transferred).  *See, e.g.*, *Commerzbank AG v. Deutsche Bank Nat'l Trust Co.*, No. 15-cv-10031 (S.D.N.Y.); Dolan ¶¶ 94-104.  For those that have not, it is equally plausible that these sophisticated entities have made a rational decision not to sue.

### IV.    PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES, AND THEIR CLAIMS ARE NOT TYPICAL.

To establish typicality, Plaintiffs must prove that each class member makes similar legal arguments to prove liability.  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 93 (S.D.N.Y. 2010).  The typicality requirement also ensures that the class representative "is not subject to a unique defense which could potentially become the focus of the litigation."  *Id*.  Here, many proposed class representatives have profited handsomely from their investments.  ██████████████████ ███████████████████████████████████████████████  Fouts Decl. Ex. C, Press ¶ 80.  Purchasing Notes largely at steeply discounted prices, years after the Trustees'

24

alleged breaches and after downgrades and loan delinquencies, collateral losses, and writedowns, these Plaintiffs were savvy investors who now seek a windfall on top of their investment returns. These "treasure hunters" are subject to defenses that "attack the heart of the plaintiff's case," *Langner v. Brown*, No. 95-198, 1996 WL 709757, at *3 (S.D.N.Y. Dec. 10, 1996), and are likely to consume the litigation and "adversely impact the interest of the class." *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992). Plaintiffs fail to satisfy typicality.

Plaintiffs who lack damages also cannot adequately represent the class, because their interests will inevitably clash with those of other class members. For example, as discussed above, Plaintiffs propose a model that would calculate damages at a Trust level, allocating any recovery to class members on a pro rata basis in proportion to their holdings—regardless of whether the class member suffered any losses (or even profited). DeLange Decl. Ex. 3, Hartzmark ¶ 70. This method necessarily creates conflicts within the class: class members with a payment deficiency would have to share the same recovery as Plaintiffs who profited from their investments. Fouts Decl. Ex. A, James ¶ 32, 124. And a damages model that properly restricted recoveries to investors who suffered actual damages would preclude recoveries by many Plaintiffs. *Id.* ¶¶ 124-25. Plaintiffs have constructed such a theory here because it benefits them at the expense of others. *Id.* ¶ 30, 124-131. Plaintiffs cannot adequately represent the class when their interests diverge in this way. *See Spagnola*, 264 F.R.D. at 955–96.

25

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion for class certification.

Dated: March 26, 2018                                    Respectfully submitted,
Chicago, Illinois

                                                        Deutsche Bank National Trust
                                                        Company and Deutsche Bank Trust
                                                        Company, Americas

                                                        By:   */s/ Gregory T. Fouts*

Michael S. Kraut                                        Gregory T. Fouts (*pro hac vice*)
Bernard J. Garbutt III                                  MORGAN, LEWIS & BOCKIUS LLP
John S. Vassos                                          77 West Wacker Drive
MORGAN, LEWIS & BOCKIUS LLP                             Chicago, Illinois 60601
101 Park Avenue                                         Tel:    (312) 324-1000
New York, New York 10178                                Fax:    (312) 324-1001
Tel:    (212) 309-6000                                  gregory.fouts@morganlewis.com
Fax:    (212) 309-6001
michael.kraut@morganlewis.com                           Joseph E. Floren (*pro hac vice*)
bernard.garbutt@morganlewis.com                         Tera M. Heintz (*pro hac vice*)
john.vassos@morganlewis.com                             MORGAN, LEWIS & BOCKIUS LLP
                                                        One Market, Spear Street Tower
                                                        San Francisco, California 94105
                                                        Tel: (415) 442-1000
                                                        Fax: (415) 442-1001
                                                        joseph.floren@morganlewis.com
                                                        tera.heintz@morganlewis.com

                                                        *Attorneys for Defendants*
                                                        *Deutsche Bank National Trust Company and*
                                                        *Deutsche Bank Trust Company Americas, as*
                                                        *Trustees*

**<u>Certificate of Service</u>**

I, Gregory T. Fouts, an attorney, certify that I filed the foregoing document via the Court's ECF system, causing a copy to be served on all ECF-registered counsel of record, this 26th day of March 2018.

_____/s/ *Gregory T. Fouts*_____
